**IN THE UNITED STATES BANKRUPTCY COURT FOR
THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| NEAR INTELLIGENCE, INC., *et al.*,[1] | Case No. 23-11962 (TMH) |
| Debtors. | (Joint Administration Requested) |

**DECLARATION OF ABRAHAM T. HAN
IN SUPPORT OF DEBTORS' MOTION FOR
ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING
THE DEBTORS TO OBTAIN POSTPETITION SENIOR SECURED
FINANCING AND THE USE OF CASH COLLATERAL, (II) GRANTING
ADEQUATE PROTECTION, (III) GRANTING LIENS AND SUPERPRIORITY
ADMINISTRATIVE EXPENSE CLAIMS, (IV) MODIFYING THE AUTOMATIC STAY,
(V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED RELIEF**

I, Abraham T. Han, pursuant to 28 U.S.C. § 1746, declare as follows:

1.      I am a Managing Director of GLC Advisors & Co., LLC and GLC Securities, LLC ( together "GLC"), a provider of financial advisory and investment banking services that maintains offices at 600 Lexington Avenue, 9th Floor, New York, NY 10022.  I submit this declaration (the "Declaration") in support of the *Debtors' Motion (I) Authorizing the Debtors to Obtain Postpetition Senior Secured Financing and the Use of Cash Collateral, (II) Granting Adequate Protection, (III) Granting Liens and Superpriority Administrative Expense Claims, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief*, filed contemporaneously herewith (the "Motion")[2].

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of their federal tax identification numbers, to the extent applicable, are Near Intelligence, Inc. (7857), Near Intelligence LLC (7857), Near North America, Inc. (9078), and Near Intelligence Pte. Ltd. The Debtors' headquarters is located at 100 W Walnut St., Suite A-4, Pasadena, CA 91124.

[2]     Capitalized terms used but not defined herein shall have the meanings given to them in the Motion or Interim Order (as defined in the Motion).

2.      I am authorized to submit the Declaration on behalf of the debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors") in support of the relief requested in the Motion.

3.      On December 8, 2023, each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), initiating the above-captioned chapter 11 cases (together, the "Chapter 11 Cases").

4.      Except as otherwise indicated herein, all facts set forth in this Declaration are based upon my personal knowledge, experience and information concerning the Debtors, my review of relevant business records, and information provided to me by the Debtors and their professionals and GLC employees working under my supervision.  I am not being compensated specifically for this testimony.  GLC, as a professional retained by the Debtors, will receive payments in its capacity as investment banker to the Debtors, including in connection with the closing of the transaction contemplated pursuant to the Motion.  If called upon to testify, I would testify competently to the facts set forth herein.

## QUALIFICATIONS

5.      I have approximately 25 years of investment banking experience with a focus on bankruptcy reorganization, mergers and acquisitions, and financing transactions.  I have been employed by GLC since 2009, when I co-founded the firm.  Prior to joining GLC, I was a Principal at GLC Investment Advisors where I focused on distressed investing.  Prior to GLC Investment Advisors, I was an Executive Director in the Restructuring and Leveraged Finance Group at UBS, and prior to that, I was the Steel Division Manager for Hyundai Corp. (USA).  I have completed FINRA Administered Qualification Exams including Series 7, 24, and 63.  I hold a B.A. degree from Rutgers University and an M.B.A. from the Kellogg School of Management at Northwestern University.

6.      My recent restructuring experience includes engagements for City of Detroit, Michigan; Jefferson County, Alabama; The Commonwealth of Puerto Rico; Colt Holding Company; Visteon Corporation; UCI International, LLC; RCS Capital Holdings, LLC; Fallbrook Technologies Inc.; and Invacare Corporation.

7.      GLC is a leading independent investment banking firm, with offices in New York, Los Angeles, San Francisco, and Denver.  GLC is consistently ranked among the top ten restructuring advisors in the United States by Refinitiv (f.k.a. Thomson Reuters).  GLC's professionals include those who have previously served as the heads of restructuring and leveraged finance teams at Credit Suisse First Boston LLC; Donaldson, Lufkin & Jenrette Securities Corporation; Morgan Stanley & Co. International PLC; Smith Barney Inc.; and UBS Investment Bank.  GLC is highly qualified to advise on strategic alternatives and its professionals have extensive experience in deals involving complex financial and operational restructurings.

8.      GLC and its professionals have worked with financially troubled companies and their stakeholders in a variety of industries in complex financial restructurings, both in chapter 11 cases and out-of-court proceedings.  GLC's business reorganization professionals have served as financial advisors or investment bankers to companies and creditors in numerous restructurings, including: In re Invacare Corporation, et al., No. 23-90068, (Bankr. S.D. Tex.); In re Carestream Health, Inc., et al., No. 22-10778, (Bankr. D. Del.); In re Stimwave Technologies Incorporated, No. 22-10541, (Bankr. D. Del.); In re Riverbed Technology, Inc., et al., No. 21-11503, (Bankr. D. Del.); In re Greensill Capital Inc., No. 21-10561, (Bankr. S.D.N.Y.); In re Alpha Media Holdings LLC, et al., No. 21-30209, (Bankr. E.D. Va.); In re Guitar Center, Inc., et al., No. 20-34656, (Bankr. E.D. Va.); In re Southern Foods Group, LLC, et al., No. 19-36313, (Bankr. S.D. Tex.); In re uBiome, Inc., No. 19-11938, (Bankr. D. Del.); In re FirstEnergy Solutions Corp., et al., No. 18-

50757, (Bankr. N.D. Ohio); <u>In re iHeartMedia, Inc., et al.</u>, No. 18-31274, (Bankr. S.D. Tex.); <u>In re</u>

<u>Brookstone Holdings Corp., et al.</u>, 18-11780, (Bankr. D. Del.); <u>In re Toys "R" Us, Inc., et al.</u>, No.

17-34665, (Bankr. E.D. Va.); <u>In re The Financial Oversight and Management Board for Puerto</u>

<u>Rico</u>, No. 17-3283, (D. Puerto Rico); <u>In re Fallbrook Technologies Inc., et al.</u>, No. 18-10384,

(Bankr. D. Del.); <u>In re Basic Energy Services, Inc., et al.</u>, No. 16-12320, (Bankr. D. Del.); <u>In re</u>

<u>UCI International, LLC, et al.</u>, No. 16-11354, (Bankr. D. Del.); <u>In re RCS Capital Corporation, et</u>

<u>al.</u>, No. 16-10223, (Bankr. D. Del.); <u>In re Essar Steel Algoma Inc., et al.</u>, No. 15-12271, (Bankr.

D. Del.); <u>In re Colt Holding Company LLC, et al.</u>, No. 15-11296, (Bankr. D. Del.); <u>In re</u>

<u>RadioShack Corporation, et al.</u>, No. Case 15-10197, (Bankr. D. Del.); <u>In re Caesars Entertainment</u>

<u>Operating Company, Inc., et al.</u>, No. 15-01145, (Bankr. N.D. Ill.); <u>In re Lightsquared Inc., et al.</u>,

No. 12-12080, (Bankr. S.D.N.Y.); <u>In re Ahern Rentals, Inc.</u>, No. 11-53860, (Bankr. D. Nev.).

9.      I have considerable experience with distressed companies, including advising both

debtors and creditors in chapter 11 cases and in out-of-court restructurings.  During the past

approximately 25 years, I have worked on and analyzed numerous financings for troubled

companies.  In addition, as a restructuring professional, I follow developments in the restructuring

field and, in particular, keep abreast of the terms of current sale transactions in distressed and

bankruptcy situations.

## THE DEBTORS' EFFORTS TO SECURE DIP FINANCING

10.      Since GLC's engagement in mid-September of this year, I, along with other

members of the GLC team, have worked closely with the Debtors and their other professional

advisors (the "<u>Restructuring Advisors</u>") to become knowledgeable about the Debtors' business,

finances, operations and systems.  In the months leading up to the Petition Date, the Debtors faced

numerous challenges.    These included, among other things, allegations of financial

mismanagement and potential fraudulent actions taken by the Debtors' former CEO and CFO, an

inability to satisfy certain requirements under the Debtors' prepetition loan facility, and difficulty raising additional capital. I believe that while the Debtors have continued to generate revenue, their revenue streams—even when combined with their extensive cost cutting measures—have been and will be insufficient to meet the Debtors' long-term liquidity needs and working capital requirements.

11.    The Debtors were unable to secure a comprehensive out of court solution to address these challenges and pivoted to filing these Chapter 11 Cases to effectuate a sale of substantially all of their assets, and to address their unsustainable funded debt obligations in a manner that maximizes value for all stakeholders.[3]  To accomplish these goals, the Debtors commenced negotiations with their Prepetition First Lien Lenders and ultimately entered into both a commitment for the DIP Facility, which will fund these Chapter 11 Cases and a value-maximizing sale process, and a stalking horse asset purchase agreement, which will set the floor bid for the Debtors' assets and facilitate the sale process.

12.    Prior to entering into the DIP Facility, the Debtors and GLC solicited debtor-in-possession ("DIP") financing proposals from potential third party financing sources in order to market check the DIP Facility's terms and ensure that the Debtors were obtaining postpetition financing on the most favorable terms available.  The Debtors recognized that it would be particularly difficult to secure postpetition financing because substantially all of the Debtors' assets are encumbered by existing liens under their prepetition debt, and the Prepetition First Lien Lenders indicated that they would not consent to a "priming" DIP financing facility provided by a third party.  In light of this, GLC understood that any third party DIP financing would require

---

[3]    I understand that prior to the Petition Date, the Debtors received funding through the Prepetition First Lien Facility, Convertible Debentures, Promissory Notes, and the issuance of common equity.

engaging in a protracted and costly priming fight or valuation dispute with their prepetition lenders at the very outset of these Chapter 11 Cases.  And regardless of the prospects of success, the expense and disruption associated with complex litigation at the beginning of the Chapter 11 Cases would seriously jeopardize the Debtors' ability to conduct a competitive and value maximizing sale process, as already strained liquidity would be required to fund such a fight.

13.     Notwithstanding these concerns, the Debtors and GLC conducted a DIP financing marketing process designed to identify parties that might be interested in providing postpetition financing to the Debtors.   Specifically, my team and I contacted 44 third-party financial institutions.  Of those parties, two executed an NDA.  Ultimately, no party other than the DIP Lenders agreed to provide the Debtors with an out-of-court or debtor-in-possession financing facility and after weeks of extensive arm's-length negotiations, the Debtors entered into the DIP Facility with the DIP Agent and DIP Lenders, and secured the consensual use of Cash Collateral from the Prepetition First Lien Lenders.

## THE TERMS OF THE DIP FACILITY

14.     The DIP Facility is a multiple draw term loan facility in an aggregate principal amount of up to $16 million, of which $5 million will be made available in a single draw upon entry of the Interim Order, and of which $11 million will be made available in a single draw upon entry of the Final Order.  The DIP Facility's interest rate, with respect to any Reference Rate Loan (as defined in the DIP Loan Agreement), is 8.75% per annum and, with respect to any SOFR Loan (as defined in the DIP Loan Agreement), is 9.75% per annum.  Moreover, the DIP Facility will be secured by a perfected superpriority first priming lien on all DIP Collateral (subject to the Prepetition Permitted Liens) and all proceeds thereof, a perfected first priority lien on unencumbered property, and a perfected junior priority lien on all DIP Collateral that secures

obligations that are subject to Prepetition Permitted Liens, in each case subject to the Carve Out. As such, the DIP Facility does not purport to prime the Prepetition Permitted Liens.

15.     In consultation with the Restructuring Advisors, the Debtors prepared a budget, a summary of which is to be filed with the Court in connection with the DIP Motion, that reflects the Debtors' reasonable judgment as to the additional liquidity required over the specified period to keep the Debtors' business operational during these Chapter 11 Cases and to permit the Debtors and their Restructuring Advisors sufficient time to complete the Debtors' proposed sale process, pursuant to which the Debtors will seek to sell their business as a going concern.  As part of this evaluation of the Debtors' liquidity position, the Debtors and their Restructuring Advisors reviewed and analyzed the Debtors' 13-week and long-term cash flow forecasts.  These forecasts take into account anticipated cash receipts and disbursements during the projected period and consider a number of factors, including, but not limited to, the effect of the Chapter 11 Cases on the Company's operations, fees, and interest expenses associated with postpetition financing, professional fees, and customer and vendor obligations, as well as the operational performance of the underlying business.

16.     As a result of this process and my knowledge of the marketplace for postpetition financing, I believe the DIP Facility represents the best available financing under the circumstances.  I also understand that the Prepetition First Lien Lenders have consented to the Debtors' use of the Cash Collateral, subject to the terms and limitations set forth in the Interim Order.  In light of the foregoing, I believe that the proposed Adequate Protection Obligations to be provided for the benefit of the Prepetition First Lien Lenders are appropriate.

## THE DIP FACILITY'S FEES AND
## MILESTONES ARE FAIR AND REASONABLE

17.     Under the DIP Facility, the Debtors will, subject to Court approval, pay certain fees to each of the DIP Lenders and DIP Agent, including the Closing Fee and the Agent Fee.  The Closing Fee is equal to 4.00% of (a) the DIP Commitments, available upon the entry of the Interim Order, which shall be deemed fully earned, due and payable upon and subject to the entry of the Interim Order, and (b) the DIP Commitments available upon entry of the Final Order, which shall be deemed fully earned, due, and payable upon and subject to the entry of the Final Order.  The Agent Fee is $100,000, which shall be deemed fully earned, due and payable upon the entry of the Interim DIP Order.

18.     I believe that the DIP Facility's fees, including the Closing Fee and Agent Fee, are customary and reasonable under the circumstances.    Additionally, I believe that the fees are comparable to fees agreed upon in similar DIP financings and should not be viewed separately, but rather as a part of the overall, substantial benefits provided under the DIP Facility.  These fees were the subject of hard fought, arm's length, and good-faith negotiations between the Debtors and the DIP Lenders, are integral components of the overall terms of the DIP Facility, and were required by the DIP Lenders as consideration for the extension of postpetition financing.  Given the fact that no other party has put forward an actionable financing proposal, among other reasons, I believe the DIP Facility fees are reasonable, consistent with market terms, and appropriate under the circumstances.

19.     The DIP Facility is also expressly linked to certain case milestones, which are consistent with the timeline set forth in the sale bidding procedures and provide a foundation for the Debtors' anticipated chapter 11 process—allowing the parties to continue developing and pursuing a comprehensive marketing process for the Debtors' business.  These milestones were

also required by the DIP Lenders as a condition to providing the DIP Facility and were a critical

inducement for the DIP Lenders to provide the Debtors with the liquidity necessary to operate their

business and fund these Chapter 11 Cases.  I believe that the milestones are within the range of

market and provide adequate time to implement the Debtors' sale process through these cases.

**THE DIP FACILITY IS FAIR AND**
**REASONABLE AND SHOULD BE APPROVED**

20.     The DIP Facility, the use of Cash Collateral, and the stalking horse purchase

agreement are complementary and are all a result of good faith, extensive arm's length negotiations

the Debtors had with the DIP Lenders.  Together, they provide a foundation for the Debtors'

marketing process and path forward.

21.     Specifically, the proposed DIP Facility is critical to the Debtors' ability to fund

their operations and the marketing process while providing sufficient liquidity without creating a

value-destructive "priming fight" or valuation dispute at the outset of these Chapter 11 Cases.  I

do not believe that alternative sources of financing are reasonably available given the

circumstances and the Debtors' unsuccessful solicitation of alternative financing proposals.  The

Debtors have searched for actionable alternative proposals and, in this regard, the market has

spoken.  There are no better options.

22.     I also believe that the proposed DIP Facility provides sufficient and necessary

liquidity to administer these Chapter 11 Cases.  As of the Petition Date, the Debtors cash on hand,

all of which constitutes the cash collateral of the Prepetition First Lien Lenders, will be insufficient

to run the Debtors' operations and administer these Chapter 11 Cases.  I do not believe it would

be prudent, or even possible, to administer these Chapter 11 Cases solely on a "cash collateral"

basis.  Moreover, I believe the DIP Facility is an essential component to funding the Debtors'

operations and providing a path to emergence, and is critical to reassure the Debtors' vendors and business partners, as well as protect the Debtors' normal-course operations.

23.      As a result, based on my experience with DIP financing transactions, as well as my involvement in the negotiation of the DIP Facility and pursuit of alternative postpetition financing proposals, I believe the DIP Facility, including the milestones, interest rates, fees, and liens included therein, are appropriate and reasonable, are the only viable source of postpetition financing reasonably attainable under the circumstances, and is in the best interests of the Debtors and is necessary to avoid irreparable harm to the Debtors and their estates.

*[Remainder of Page Intentionally Left Blank]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated:  December 8, 2023
New York, New York

_/s/  Abraham T. Han_

Abraham T. Han
Managing Director
GLC Advisors & Co., LLC and
GLC Securities, LLC

_Proposed Investment Banker to the Debtors_