IN THE UNITED STATES BANKRUPTCY
COURT FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| NEAR INTELLIGENCE, INC., *et al.*,[1] | Case No. 23-11962 (TMH) |
| Debtors. | (Joint Administration Requested) |

**DECLARATION OF ABRAHAM T. HAN
IN SUPPORT OF THE DEBTORS' MOTION
FOR ENTRY OF ORDERS (I)(A) APPROVING BIDDING
PROCEDURES FOR SUBSTANTIALLY ALL OF THE DEBTORS'
ASSETS, (B) AUTHORIZING THE DEBTORS TO ENTER INTO THE
STALKING HORSE APA, (C) SCHEDULING AN AUCTION AND
APPROVING THE FORM AND MANNER OF NOTICE THEREOF, (D)
APPROVING ASSUMPTION AND ASSIGNMENT PROCEDURES,
AND (E) SCHEDULING A SALE HEARING AND APPROVING THE FORM
AND MANNER OF NOTICE THEREOF AND (F) GRANTING RELATED
RELIEF; AND (II)(A) APPROVING THE SALE OF THE DEBTORS' ASSETS
FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES,
(B) APPROVING THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY
CONTRACTS AND UNEXPIRED LEASES AND (C) GRANTING RELATED RELIEF**

I, Abraham T. Han, declare under penalty of perjury:

1. I am a Managing Director of GLC Advisors & Co., LLC and GLC Securities, LLC (together "GLC"), a provider of financial advisory and investment banking services that maintains offices at 600 Lexington Avenue, 9th Floor, New York, NY 10022. I submit this declaration (the "Han Declaration") in support of the *Debtors' Motion for Entry of Orders (I)(A) Approving Bidding Procedures for Sale of Substantially all of the Debtors' Assets, (B) Authorizing the Debtors to Enter Into the Stalking Horse APA, (C) Scheduling an Auction and Approving the Form*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of their federal tax identification numbers, to the extent applicable, are Near Intelligence, Inc. (7857), Near Intelligence LLC (9004), Near North America, Inc. (9078), and Near Intelligence Pte. Ltd.  The Debtors' headquarters is located at 100 W Walnut St., Suite A-4, Pasadena, CA 91124.

*and Manner of Notice Thereof, (D) Approving Assumption and Assignment Procedures, (E) Scheduling a Sale Hearing and Approving the Form and Manner of Notice Thereof and (F) Granting Related Relief; and (II)(A) Approving the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances, (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases and (C) Granting Related Relief* [Docket No. [●]] (the "Motion").

2.  I am authorized to submit this declaration (this "Declaration") on behalf of the debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors") in support of the relief requested in the Motion.

3.  On December 8, 2023, each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532, initiating the above-captioned chapter 11 cases (together, the "Chapter 11 Cases").

4.  Except as otherwise indicated herein, all facts set forth in this Declaration are based upon my personal knowledge, experience and information concerning the Debtors, my review of relevant business records, and information provided to me by the Debtors and their professionals and GLC employees working under my supervision. I am not being compensated specifically for this testimony. GLC, as a professional retained by the Debtors, will receive payments in its capacity as investment banker to the Debtors, including in connection with the closing of the transaction contemplated pursuant to the Motion. If called upon to testify, I would testify competently to the facts set forth herein.

## QUALIFICATIONS

5.  I have approximately 25 years of investment banking experience with a focus on bankruptcy reorganization, mergers and acquisitions, and financing transactions. I have been employed by GLC since 2009, when I co-founded the firm. Prior to joining GLC, I was a Principal

at GLC Investment Advisors where I focused on distressed investing. Prior to GLC Investment Advisors, I was an Executive Director in the Restructuring and Leveraged Finance Group at UBS, and prior to that, I was the Steel Division Manager for Hyundai Corp. (USA). I have completed FINRA Administered Qualification Exams including Series 7, 24, and 63. I hold a B.A. degree from Rutgers University and an M.B.A. from the Kellogg School of Management at Northwestern University.

6. My recent restructuring experience includes engagements for City of Detroit, Michigan; Jefferson County, Alabama; The Commonwealth of Puerto Rico; Colt Holding Company, Visteon Corporation; UCI International, LLC; RCS Capital Holdings, LLC; Fallbrook Technologies Inc.; and Invacare Corporation.

7. GLC is a leading independent investment banking firm, with offices in New York, Los Angeles, San Francisco, and Denver. GLC is consistently ranked among the top ten restructuring advisors in the United States by Refinitiv (f.k.a. Thomson Reuters). GLC's professionals include those who have previously served as the heads of restructuring and leveraged finance teams at Credit Suisse First Boston LLC; Donaldson, Lufkin & Jenrette Securities Corporation; Morgan Stanley & Co. International PLC; Smith Barney Inc.; and UBS Investment Bank. GLC is highly qualified to advise on strategic alternatives and its professionals have extensive experience in deals involving complex financial and operational restructurings.

8. GLC and its professionals have worked with financially troubled companies and their stakeholders in a variety of industries in complex financial restructurings, both in chapter 11 cases and out-of-court proceedings. GLC's business reorganization professionals have served as financial advisors or investment bankers to companies and creditors in numerous restructurings, including: In re Invacare Corporation, et al., No. 23-90068, (Bankr. S.D. Tex.); In re Carestream

Health, Inc., et al., No. 22-10778, (Bankr. D. Del.); In re Stimwave Technologies Incorporated, No. 22-10541, (Bankr. D. Del.); In re Riverbed Technology, Inc., et al., No. 21-11503, (Bankr. D. Del.); In re Greensill Capital Inc., No. 21-10561, (Bankr. S.D.N.Y.); In re Alpha Media Holdings LLC, et al., No. 21-30209, (Bankr. E.D. Va.); In re Guitar Center, Inc., et al., No. 20-34656, (Bankr. E.D. Va.); In re Southern Foods Group, LLC, et al., No. 19-36313, (Bankr. S.D. Tex.); In re uBiome, Inc., No. 19-11938, (Bankr. D. Del.); In re FirstEnergy Solutions Corp., et al., No. 18-50757, (Bankr. N.D. Ohio); In re iHeartMedia, Inc., et al., No. 18-31274, (Bankr. S.D. Tex.); In re Brookstone Holdings Corp., et al., 18-11780, (Bankr. D. Del.); In re Toys "R" Us, Inc., et al., No. 17-34665, (Bankr. E.D. Va.); In re The Financial Oversight and Management Board for Puerto Rico, No. 17-3283, (D. Puerto Rico); In re Fallbrook Technologies Inc., et al., No. 18-10384, (Bankr. D. Del.); In re Basic Energy Services, Inc., et al., No. 16-12320, (Bankr. D. Del.); In re UCI International, LLC, et al., No. 16-11354, (Bankr. D. Del.); In re RCS Capital Corporation, et al., No. 16-10223, (Bankr. D. Del.); In re Essar Steel Algoma Inc., et al., No. 15-12271, (Bankr. D. Del.); In re Colt Holding Company LLC, et al., No. 15-11296, (Bankr. D. Del.); In re RadioShack Corporation, et al., No. Case 15-10197, (Bankr. D. Del.); In re Caesars Entertainment Operating Company, Inc., et al., No. 15-01145, (Bankr. N.D. Ill.); In re Lightsquared Inc., et al., No. 12-12080, (Bankr. S.D.N.Y.); In re Ahern Rentals, Inc., No. 11-53860, (Bankr. D. Nev.).

9. I have considerable experience with distressed companies, including advising both debtors and creditors in chapter 11 cases and in out-of-court restructurings. During the past approximately 25 years, I have worked on and analyzed numerous financings for troubled companies. In addition, as a restructuring professional, I follow developments in the restructuring field and, in particular, keep abreast of the terms of current sale transactions in distressed and bankruptcy situations.

## THE MARKETING PROCESS

10. Since GLC's engagement in mid-September of this year, I, along with other members of the GLC team, have worked closely with the Debtors and their other professional advisors (the "Restructuring Advisors") to become knowledgeable about the Debtors' business, finances, operations and systems. In the months leading up to the Petition Date, the Debtors faced numerous obstacles. These included, among other things, allegations of financial mismanagement and potential fraudulent actions taken by the Debtors' former CEO and CFO, an inability to satisfy certain requirements under the Debtors' prepetition loan facility, and difficulty raising additional capital. I believe that while the Debtors have continued to generate revenue, their revenue streams—even when combined with their extensive cost cutting measures—have been and will be insufficient to meet the Debtors' long-term liquidity needs and working capital requirements.

11. Given these obstacles and dwindling operating cash, the Debtors, in tandem with the Restructuring Advisors, have explored various strategic opportunities. This involved undertaking a comprehensive liquidity analysis and considering several potential restructuring alternatives. To that end, in November 2023, the Debtors and GLC commenced a targeted marketing and sale process for substantially all of the Debtors' assets (the "Assets"), focused on potential M&A partners and well-funded bidders for which the Debtors' business represented a strategic opportunity, and who possessed the capability of consummating a transaction on an accelerated timeline.

12. This marketing and sale process (the "Sale Process") included (a) identifying the Assets, (b) developing marketing materials describing the Assets, their history, their use, and the opportunities the Assets present, (c) creating a virtual data room containing information about the Assets, (d) identifying and contacting potential strategic and financial buyers for the Assets, (e)

facilitating due diligence gathering with potential buyers, and (f) negotiating transaction structures with potential buyers interested in acquiring the Assets.

13. In connection with its marketing efforts, GLC has contacted over 100 parties that would potentially be interested in pursuing a transaction for the Assets (including strategic and financial partners). So far, nine parties have executed a non-disclosure agreement, received a confidential information memorandum and were given access to the virtual data room. GLC has been working extensively with two of these interested parties to further diligence the Assets. GLC will continue marketing the Assets on a postpetition basis pursuant to the Bidding Procedures, and expects that additional interested parties will become involved in pursuing a transaction through the chapter 11 process.

## THE STALKING HORSE BID

14. In early November 2023, the Debtors first lien prepetition secured lenders (the "Prepetition First Lien Lenders") provided the Debtors with a restructuring proposal comprised of two components—the provision of the DIP Facility (as defined in the DIP Motion) to fund these Chapter 11 Cases and an agreement to serve as the stalking horse bidder in the Sale Process with a credit-bid for substantially all of the Assets (the "Stalking Horse Bid"), pursuant to the terms of that certain Asset Purchase Agreement, dated as of December 8, 2023, attached to the Motion as **Exhibit D** (the "Stalking Horse APA"). The Debtors intend to continue market-testing the Stalking Horse Bid through the postpetition Sale Process and pursuant to the Bidding Procedures to ensure that they maximize the value of the Assets.

15. I believe that the liquidity provided by the DIP Facility and the support of the Stalking Horse Bid will facilitate a fulsome and value-maximizing postpetition Sale Process for the Assets pursuant to the Bidding Procedures.

## A SOUND BUSINESS PURPOSE
## EXISTS FOR THE BIDDING PROCEDURES

16. As set forth in the Motion, the Debtors are seeking approval of the Bidding Procedures to establish a clear and transparent process for the solicitation, receipt, and evaluation of bids on a court-approved timeline that allows the Debtors to timely consummate a sale.

17. I have reviewed the Bidding Procedures. Generally speaking, the Bidding Procedures establish, among other things:

- the availability of and access to conduct due diligence by Prospective Bidders;

- the deadlines and requirements for submitting competing bids and the method and criteria by which such competing bids are deemed to be "Qualified Bids" sufficient to trigger the Auction, including the terms and conditions that must be satisfied and the deadline that must be met by any bidder to be considered a "Qualified Bidder" and to participate in the Auction;

- the manner in which Qualified Bids will be evaluated by the Debtors;

- the conditions for having the Auction and procedures for conducting the Auction, if any;

- the expense reimbursement provided to the Stalking Horse Bidder pursuant to the terms and conditions of the; and

- various other matters relating to the Sale Process generally, including the designation of the Back-Up Bid, return of any good faith deposits, and certain reservations of rights

18. In addition, the Bidding Procedures propose the following key dates and deadlines:

| Event | Date |
|---|---|
| Sale Objection Deadline | 14 days after entry of Bidding Procedures Order, at 4:00 p.m. (ET) |
| Bid Deadline | No later than 55 days after the Petition Date, at 4:00 p.m. (ET) |
| Auction | No later than 60 days after the Petition Date, at 9:00 a.m. (ET) |
| Post-Auction Objection Deadline | No later than 67 days after the Petition Date, at 4:00 p.m. (ET) |
| Sale Order | No later than 71 days after the Petition Date, 2024 |

19.     Based on my experience, I believe that the Bidding Procedures are designed to maximize the value received for the Assets by facilitating a fair and competitive bidding process where potential bidders are encouraged to participate and submit competing bids within the specified time frame.  As described in the Motion, the proposed Bid Deadline requires bids for the purchase of the Assets to be delivered no later than 55 days after the Petition Date.  The Bid Deadline thus provides parties with approximately 8 weeks from the filing of the Motion to obtain information and formulate and submit a timely and informed competing bid to purchase some or all of the Assets.

20.     Further, the timeframe set forth in the Bidding Procedures was explicitly required by the Debtors' DIP Lender and the Stalking Horse Bidder and a critical negotiating point with respect to both the proposed DIP Facility and the Stalking Horse Bid.  Importantly, the Debtors believe that the sale of the Assets must be executed quickly so that such proceeds may be distributed in a timely fashion.

21.     Given the outreach process being undertaken by GLC with respect to a sale of the Assets, the potential publicity surrounding these chapter 11 cases, the potential for the Stalking Horse Bid to facilitate a fulsome postpetition marketing process, and the Sale Process timeline proposed by the Debtors, it is my view, based on my experience and in light of the circumstances, that the proposed Bidding Procedures and timeline related thereto are reasonable and appropriate under the circumstances. The Bidding Procedures seek to balance the Debtors' interests in consummating a sale transaction on a reasonable timeline while simultaneously preserving the opportunity to attract the highest or otherwise best offer.  At the Auction, as set forth in the proposed Bidding Procedures, the Debtors will have an opportunity to consider all competing offers and select the offers that they deem to be the highest or otherwise best offer for the Assets.

## A SOUND BUSINESS PURPOSE EXISTS
## FOR THE USE OF A STALKING HORSE BIDDER

22.  I believe that the terms of the Stalking Horse Bid and Stalking Horse Agreement are customary, reasonable, and were negotiated in good faith and at arm's length. Negotiations were hard-fought and ongoing until immediately prior to the parties agreeing to enter into Stalking Horse Agreement. I also believe that there was no guarantee that the Stalking Horse Bidder would bid the price of the Stalking Horse Bid at an auction for the Assets in the absence of the Stalking Horse Agreement.

23.  Importantly, the Stalking Horse Agreement provides the Debtors with a committed sale transaction for the Assets that would provide a clear benefit to the Debtors' estates, their creditors, and all other parties in interest. It also establishes in clear terms and conditions that will facilitate further bidding and may increase the consideration received in exchange for the Assets. Any offer that tops the Stalking Horse Bid will inure to the benefit of the Debtors' stakeholders. The consideration contemplated in Stalking Horse APA provides significant value to the Debtors' estates and will be used to repay obligations of the Debtors.

24.  I understand that the Stalking Horse APA was negotiated in good faith and at arms-length. The Stalking Horse APA was executed only after (a) potential alternatives were evaluated, (b) the marketing process was initiated, and (c) the proposed transaction was presented to the Debtors' board of directors, who, in conjunction with advice from experienced professionals, decided to pursue the sale on the terms of the Stalking Horse APA, subject to competitive bidding sanctioned by the Court. I am not aware of any fraud, collusion between the parties or any attempt

by the Stalking Horse Bidder to take unfair advantage of other bidders by participation in the Sale Process.

### THE EXPENSE REIMBURSEMENT FOR THE STALKING HORSE BIDDER IS FAIR AND REASONABLE

25. As described above, in November 2023, the Debtors entered into arm's-length negotiations with the Prepetition First Lien Lenders on the terms of the Stalking Horse Bid and APA. The consideration under the Stalking Horse APA consists of (a) a credit bid equal to (i) all outstanding obligations under the proposed DIP Facility and (ii) not less than $34 million of the outstanding obligations under the Prepetition First Lien Facility (as defined in the DIP Motion), plus (b) the assumption of Assumed Liabilities (as defined in the Stalking Horse APA). The Stalking Horse Bidder has expended, and will continue to expend, time and resources negotiating, drafting, and performing due diligence activities necessitated by the sale, despite the fact that its bid will be subject not only to Court approval, but also to overbidding by third parties. I believe the Expense Reimbursement provisions were critically necessary to induce the Stalking Horse Bid.

26. Further, in my experience, the Expense Reimbursement, which is capped at $1,000,000, is customary, usual, and consistent with expense reimbursements offered to stalking horse parties in similar contexts. I understand that the Expense Reimbursement was vigorously debated in good faith and at arm's length between the Debtors and the Stalking Horse Bidder. Based on my understanding, the Expense Reimbursement represents a valid and sound exercise of the Debtors' business judgment and should be approved.

### CONCLUSION

27. Accordingly, for all the foregoing reasons, I believe that the Bidding Procedures and the timeline set forth therein: (a) will encourage bidding for the Debtors' assets; (b) are generally consistent with other procedures previously approved in chapter 11 cases of similar size

and complexity; and (c) are appropriate under the circumstances. Given the details described above and based on my experience as a restructuring professional and involvement in other sales transactions, I believe that the Bidding Procedures are appropriate and should be approved.

[*Remainder of the Page Intentionally Left Blank*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the facts set forth in the foregoing declaration are true and correct to the best of my knowledge, information, and belief.

Dated: December 8, 2023

/s/Abraham T. Han
Abraham T. Han
Managing Director
GLC Advisors & Co., LLC and
GLC Securities, LLC