IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| NEAR INTELLIGENCE, INC., *et al.*,[1] | Case No. 23-11962 (TMH) |
| Debtors. | (Jointly Administered) |

**SUPPLEMENTAL DECLARATION OF
ABRAHAM T. HAN IN SUPPORT OF ORDER APPROVING
SALE OF THE DEBTORS' ASSETS TO THE SUCCESSFUL BIDDER**

I, Abraham T. Han, declare under penalty of perjury:

1. I am a Managing Director of GLC Advisors & Co., LLC and GLC Securities, LLC (together "GLC"), a provider of financial advisory and investment banking services that maintains offices at 600 Lexington Avenue, 9th Floor, New York, NY 10022. GLC is serving as investment banker to the Debtors and has been engaged in such capacity since September 2023. Further explanation of my education, experience, and expertise can be found in my declaration (the "Declaration") [D.I. 21] in support of the Debtors' motion to sell substantially all of their assets [D.I. 20] (the "Motion").[2]

2. I am duly authorized to submit this supplemental declaration (this "Supplemental Declaration") on behalf of the Debtors and in further support of the Motion. In particular, I submit this Supplemental Declaration in support of (a) the sale of the Transferred Assets to BTC Near HoldCo LLC (together with each of its permitted successors, assigns and designees, collectively,

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of their federal tax identification numbers, to the extent applicable, are Near Intelligence, Inc. (7857), Near Intelligence LLC (7857), Near North America, Inc. (9078), and Near Intelligence Pte. Ltd. The Debtors' headquarters is located at 100 W Walnut St., Suite A-4, Pasadena, CA 91124.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion, the Bidding Procedures Order [D.I. 198], or the Sale Order (as defined herein) as applicable.

the "Purchaser"), in accordance with the terms and conditions contained in that certain Asset Purchase Agreement, dated as of December 8, 2023 (the "Stalking Horse Purchase Agreement"), by and among the Purchaser and the Debtors, as Sellers, Near Intelligence SAS and Near Intelligence Pty. Ltd., solely for the purposes stated expressly therein, and, solely for the purposes stated expressly therein, Blue Torch Finance LLC, as administrative agent and collateral agent under the Prepetition First Lien Facility and the DIP Facility, as applicable, and (b) approval of the proposed *Order (I) Approving the Stalking Horse Purchase Agreement and Authorizing the Sale of the Debtors' Assets Outside the Ordinary Court of Business, (II) Authorizing the Sale of Assets Free and Clear of All Liens, Claims, Interests and Encumbrances, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith, and (IV) Granting Related Relief* (as amended, the "Sale Order") [D.I. 222].

3.  Unless otherwise indicated, all facts set forth in this Supplemental Declaration are based on (a) my personal knowledge or information that I have received from employees of GLC working directly with me or under my supervision, direction, or control, (b) information learned from my review of relevant financial and operational data regarding the Debtors, (c) information received from members of the Debtors' management or other advisors, and (d) my past experience advising both distressed and non-distressed businesses and companies and their stakeholders.

4.  I am over the age of 18 and authorized to submit this Supplemental Declaration on behalf of the Debtors. If I were called upon to testify, I could and would testify competently to the facts set forth herein. I am not being specifically compensated for this testimony other than through payments received by GLC, as a professional retained by the Debtors.

**Marketing Efforts for the Transferred Assets**

5.  As described in the Declaration, the Debtors and their advisors have engaged in a robust marketing and sale process for the Transferred Assets (the "Sale Process"). This process

focused on potential M&A partners and well-funded bidders for which the Debtors' business represented a strategic opportunity, and who possessed the capability of consummating a transaction on an accelerated timeline. Since its retention in September 2023, GLC has led the Sale Process.

6. Prior to the Petition Date, GLC contacted over one hundred (100) parties that were potentially interested in pursuing a transaction for the Transferred Assets (including strategic and financial partners). Nine (9) parties executed a non-disclosure agreement, received a confidential information memorandum and were given access to the virtual data room. GLC worked extensively with multiple interested parties to further diligence the Transferred Assets. Following the prepetition marketing efforts, the Debtors ultimately executed the Stalking Horse Purchase Agreement, whereby the Purchaser committed to acquire the Transferred Assets pursuant to a credit bid comprised of (a) all outstanding obligations under the DIP Facility and (b) not less than $34 million of the outstanding obligations under the Prepetition First Lien Facility subject to the terms and conditions of the Stalking Horse Purchase Agreement, the Bidding Procedures Order and entry of the Sale Order.

7. The Stalking Horse Purchase Agreement is one component of the restructuring proposal that the Prepetition First Lien Lenders provided to the Debtors in November 2023—the other component was the provision of the DIP Facility to fund these Chapter 11 Cases. The Stalking Horse Purchase Agreement served as the starting bid in the Court-approved bidding process for the Transferred Assets.

8. In an effort to achieve the highest or otherwise best bid for the Transferred Assets, the Debtors and GLC continued to market the Transferred Assets on a postpetition basis in accordance with the Bidding Procedures Order. Following the Petition Date, GLC contacted one

hundred twenty-four (124) prospective buyers for the Transferred Assets, including parties that the Debtors had engaged with prior to the Petition Date and certain parties identified by the Official Committee of Unsecured Creditors (the "Committee").  I believe that the Debtors and their advisors have solicited the most likely potential purchasers of the Transferred Assets.  Although most parties declined to participate or submit bids in the Court-approved bidding process, the Debtors did execute non-disclosure agreements with eighteen (18) prospective buyers.  The Debtors provided information regarding the Transferred Assets to such parties, including through management presentations and data room access.  Ultimately, however, the Debtors did not receive any Qualified Bid from any party for the Transferred Assets (other than the Stalking Horse Bid) prior to the Bid Deadline on February 8, 2024.

9. Accordingly, the Debtors cancelled the Auction [D.I. 254] and selected the Purchaser as the Successful Bidder in accordance with the Bidding Procedures Order.  The Debtors also determined that the Stalking Horse Bid, memorialized by the Stalking Horse Purchase Agreement, is the Successful Bid.

10. Throughout the Sale Process, GLC provided regular updates to the Restructuring Committee of the Debtors' Board of Directors (the "Restructuring Committee") regarding marketing efforts and the status of discussions with potentially interested parties.  These updates included various presentations, Zoom meetings, emails, and other communications.  The Board provided guidance and direction to GLC and the Debtors' other advisors with respect to conducting the Sale Process as and when appropriate.

11. Following the appointment of the Committee, GLC engaged with the Committee's financial advisor on the Sale Process, including by providing (i) access to the marketing materials and the virtual data room, (ii) contact log details, including lists of parties contacted, and soliciting

feedback from the Committee with respect thereto, and (iii) consistent and periodic telephonic, email and other Sale Process updates, including answering specific questions, addressing the status of certain potential bidders, and addressing other strategy and process points.

### Sale of the Transferred Assets to the Purchaser

12.     Based on the extensive marketing efforts described above and my experience as a restructuring professional, I believe that the terms of the Stalking Horse Purchase Agreement represent the highest or otherwise best offer for the Transferred Assets.  I believe that a market test, such as the one conducted by GLC, is the best means to identify the value of the Transferred Assets.  Here, the market has spoken—the Stalking Horse Purchase Agreement represents the highest or otherwise best offer for the Transferred Assets.  Moreover, I believe that the Stalking Horse Purchase Agreement realizes value that would otherwise not be available outside of the chapter 11 process.  I do not believe that the Debtors would have been able to secure a buyer for the Transferred Assets (including the Purchaser) without a finding that the Sale Transaction would be consummated free and clear of all claims, interests, and encumbrances.

13.     I believe that the Bidding Procedures were reasonable and appropriate and represented the best available method for conducting the Sale Process in a manner that maximizes value for the benefit of the Debtors' estates.  In addition, I believe that the Debtors conducted a fulsome Sale Process and conducted such process in compliance with the Bidding Procedures Order, and that the Debtors and their advisors have afforded potential purchasers an appropriate opportunity to participate in the bidding process for the Transferred Assets and make higher or otherwise better offers than the Stalking Horse Bid (which ultimately did not occur).  Based on my professional experience, the Sale Process was robust, fair, and consistent with other sale processes in similar chapter 11 cases.

14. It is my understanding that the Debtors have (a) full corporate power and authority to execute and deliver the Stalking Horse Purchase Agreement, (b) all corporate authority necessary to consummate the transactions contemplated by the Stalking Horse Purchase Agreement, and (c) taken all corporate action and formalities necessary to authorize and approve the Stalking Horse Purchase Agreement and the consummation of the transactions contemplated thereby. I understand that the Sale Transaction contemplated by the Stalking Horse Purchase Agreement has been duly and validly authorized by all necessary corporate action. No consents or approvals other than those expressly provided for in the Stalking Horse Purchase Agreement are required for the Debtors to consummate the Sale Transaction or the Stalking Horse Purchase Agreement. I understand that the Transferred Assets constitute property of the Debtors and good title is vested in the Debtors within the meaning of section 541(a) of the Bankruptcy Code. The Debtors are the sole and rightful owners of the Transferred Assets and no other person has any ownership right, title, or interests therein.

15. Based on my professional experience and knowledge of these Chapter 11 Cases, I believe that the Purchaser acted in compliance with the Bidding Procedures and Bidding Procedures Order and conducted itself in a non-collusive, fair, and good-faith manner, as evidenced by, among other things, the Purchaser agreeing to waive its rights to any expense reimbursement under the Stalking Horse Purchase Agreement, the extensive marketing process by the Debtors, and the Debtors' efforts during arm's-length negotiations between sophisticated parties represented by competent counsel. Neither the DIP Lenders nor the Prepetition Lenders had a role in the Sale Process apart from the negotiations regarding the initial Stalking Horse Purchase Agreement. I understand that the Purchaser is not an "insider" of the Debtors as defined in section 101(31) of the Bankruptcy Code.

16. I am not aware of any facts indicating that the Debtors or the Purchaser are fraudulently entering into the Stalking Horse Purchase Agreement, or indicating that the Stalking Horse Purchase Agreement was entered into for the purpose of hindering, delaying, or defrauding any creditor. I am not aware of any facts demonstrating or suggesting that the purchase price for the Transferred Assets was controlled by any agreement among potential bidders.

17. I believe that the consideration provided by the Purchaser for the Transferred Assets under the Stalking Horse Purchase Agreement (i) is fair and reasonable, (ii) is the highest or otherwise best offer received by the Debtors for the Transferred Assets, (iii) is in the best interests of the Debtors, their estates, their creditors and all other parties in interest, and will provide a greater recovery for the Debtors' creditors than would be provided by any other available alternative, and (iv) constitutes reasonably equivalent value, fair consideration and fair value under the Bankruptcy Code and applicable law. I also believe that the assumption and assignment of the Assumed Contracts to the Purchaser is a reasonable exercise of the Debtors' business judgment and is in the best interests of the Debtors and their estates. The assumption and assignment of the Assumed Contracts also enhances the value of the Debtors' estates and in my opinion, does not constitute unfair discrimination. I believe that the Purchaser has the ability cure any monetary defaults existing under any Assumed Contracts as of and including the Closing Date. I also believe that the Purchaser has the ability to continue future performance under the Assumed Contracts.

18. I understand that neither the Purchaser nor any of its affiliates are a mere continuation of the Debtors or their estates, there is no continuity, nor common identity between the Purchaser, any of its affiliates and any of the Debtors, and there is no continuity of enterprise between the Purchaser, any of its affiliates, and any of the Debtors. I also understand that neither the Purchaser nor any of its affiliates are a successor to any of the Debtors or their estates and none

of the transactions contemplated by the Stalking Horse Purchase Agreement nor the assumption and assignment of the Assumed Contracts amounts to a consolidation, merger, or de facto merger of the Purchaser or any of its affiliates with or into any of the Debtors.

19. Finally, I believe that the Debtors have demonstrated compelling circumstances for consummating the transactions contemplated by the Stalking Horse Purchase Agreement outside the ordinary course of business in order to preserve the viability of the Debtors' businesses as a going concern and maximize the value of the Debtors' estates for the benefit of all of their stakeholders.

[*Remainder of page intentionally left blank.*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: February 15, 2024               /s/ *Abraham T. Han*
                                                                        Abraham T. Han
                                                                         Managing Director
                                                                         GLC Advisors & Co., LLC and
                                                                         GLC Securities, LLC