# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| NEAR INTELLIGENCE, INC., *et al.*,[1] | Case No. 23-11962 (TMH) |
| Debtors. | (Jointly Administered) |
|  | **Ref. Docket Nos. 20, 198, 222 & 273** |

## NOTICE OF FILING OF FURTHER REVISED PROPOSED SALE ORDER

**PLEASE TAKE NOTICE** that on December 8, 2023, the above-captioned debtors and debtors in possession (the "Debtors") filed the *Motion of the Debtors for Entry of Orders (I)(A) Approving Bidding Procedures for Sale of Substantially All of the Debtors' Assets, (B) Authorizing the Debtors to Enter into the Stalking Horse APA, (C) Scheduling an Auction and Approving the Form and Manner of Notice Thereof, (D) Approving Assumption and Assignment Procedures, (E) Scheduling a Sale Hearing and Approving the Form and Manner of Notice Thereof; and (F) Granting Related Relief; and (II)(A) Approving the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances, (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases and (C) Granting Related Relief* [Docket No. 20] (the "Motion").

**PLEASE TAKE FURTHER NOTICE** that, on January 23, 2024, the Court entered the *Order (I) Approving Bidding Procedures for the Sale of Substantially All of the Debtors' Assets, (II) Scheduling an Auction and Approving the Form and Manner of Notice Thereof, (III) Approving Assumption and Assignment Procedures, (IV) Scheduling a Sale Hearing and Approving the Form and Manner of Notice Thereof and (V) Granting Related Relief* [Docket No. 198] (the "Bidding Procedures Order").[2]   Pursuant to the Bidding Procedures Order, the Sale Hearing is currently scheduled for **February 21, 2024 at 2:00 p.m. (ET)**.

**PLEASE TAKE FURTHER NOTICE** that on January 30, 2024, the Debtors filed a proposed form of order approving the Sale of substantially all of the Debtors' Assets to the Stalking Horse Bidder [Docket No. 222] (the "Proposed Sale Order").

**PLEASE TAKE FURTHER NOTICE** that on February 15, 2024, the Debtors filed a revised Proposed Sale Order [Docket No. 273].

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of their federal tax identification numbers, to the extent applicable, are Near Intelligence, Inc. (7857), Near Intelligence LLC (7857), Near North America, Inc. (9078), and Near Intelligence Pte. Ltd.  The Debtors' headquarters is located at 100 W Walnut St., Suite A-4, Pasadena, CA 91124.

[2]   All capitalized terms used but not otherwise defined herein shall be given the meanings ascribed to them in the Bidding Procedures Order.

**PLEASE TAKE FURTHER NOTICE** that attached hereto as **Exhibit 1** is a further revised Proposed Sale Order (the "Revised Proposed Sale Order").  For convenience of the Court and all interested parties, a blackline comparing the Revised Proposed Sale Order against the Proposed Sale Order filed at Docket No. 222 is attached hereto as **Exhibit 2**.

**PLEASE TAKE FURTHER NOTICE** that the Debtors intend to present the Revised Proposed Sale Order for the Court's consideration at the Sale Hearing.  The Debtors reserve all rights to revise the Revised Proposed Sale Order at or prior to the Sale Hearing.

Dated: February 20, 2024
      Wilmington, Delaware

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

/s/ Shane M. Reil
Edmon L. Morton (No. 3856)
Matthew B. Lunn (No. 4119)
Shane M. Reil (No. 6195)
Carol E. Cox (No. 6936)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
emorton@ycst.com
mlunn@ycst.com
sreil@ycst.com
ccox@ycst.com

-and-

**WILLKIE FARR & GALLAGHER LLP**
Rachel C. Strickland (admitted *pro hac vice*)
Andrew S. Mordkoff (admitted *pro hac vice*)
Joseph R. Brandt (admitted *pro hac vice*)
787 Seventh Avenue
New York, New York 10019
Telephone:  (212) 728-8000
Facsimile:  (212) 728-8111
rstrickland@willkie.com
amordkoff@willkie.com
jbrandt@willkie.com

*Co-Counsel to the Debtors and Debtors in Possession*

31328323.1

**<u>EXHIBIT 1</u>**

**Revised Proposed Sale Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| NEAR INTELLIGENCE, INC., *et al.*,[1] | Case No. 23-11962 (TMH) |
| Debtors. | (Jointly Administered) |
| | **Re: Docket Nos. 20, 198** |

**ORDER (I) APPROVING THE STALKING HORSE PURCHASE
AGREEMENT AND AUTHORIZING THE SALE OF THE DEBTORS' ASSETS
OUTSIDE THE ORDINARY COURSE OF BUSINESS, (II) AUTHORIZING
THE SALE OF ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS
AND ENCUMBRANCES, (III) AUTHORIZING THE ASSUMPTION AND
ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED
LEASES IN CONNECTION THEREWITH, AND (IV) GRANTING RELATED RELIEF**

Upon the motion, dated December 8, 2023 [Docket No. 20] (the "Motion"),[2] of the debtors

and debtors in possession in the above-captioned cases (each, a "Debtor" and collectively, the

"Debtors"), pursuant to Bankruptcy Code sections 105(a), 363 and 365 of title 11 of the United

States Code (the "Bankruptcy Code") and Rules 2002, 6004, 6006, and 9014 of the Federal Rules

of Bankruptcy Procedure (the "Bankruptcy Rules") and Rules 2002-1, 6004-1 and 9006-1 of the

Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the

District of Delaware (the "Local Rules"), seeking entry of an order (the "Order"): (a) authorizing

the sale of the Debtors' Assets free and clear of all liens, claims, interests, and encumbrances, in

accordance with the terms and conditions contained in that certain *Asset Purchase Agreement* (as

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of their federal tax identification numbers, to the extent applicable, are Near Intelligence, Inc. (7857), Near Intelligence LLC (7857), Near North America, Inc. (9078), and Near Intelligence Pte. Ltd.  The Debtors' headquarters is located at 100 W Walnut St., Suite A-4, Pasadena, CA 91124.

[2]   Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Motion or the Stalking Horse Purchase Agreement (as defined herein), as applicable.

may be amended or otherwise modified from time to time and including all related documents, exhibits, schedules, and agreements thereto, collectively, the "Stalking Horse Purchase Agreement"), substantially in the form attached hereto as **Exhibit 1**, by and among BTC Near Holdco LLC (together with each of its permitted successors, assigns and designees, collectively, the "Purchaser"), as Buyer, the Debtors (each a "Seller" and collectively, the "Sellers"), Near Intelligence SAS, and Near Intelligence Pty. Ltd., solely for the purposes stated expressly therein, and Blue Torch Finance LLC, as administrative agent and collateral agent, (b) approving the Sale of the Transferred Assets and other transactions contemplated by the Stalking Horse Purchase Agreement to the Purchaser free and clear of all Claims (as defined below), Liens (as defined in the Stalking Horse Purchase Agreement), Liabilities (as defined in the Stalking Horse Purchase Agreement), rights, other interests of any kind or nature whatsoever ("Interests"), and other encumbrances of any kind or nature whatsoever ("Encumbrances" and, collectively, "Claims, Interests and Encumbrances") (other than Permitted Liens and Assumed Liabilities, as defined in the Stalking Horse Purchase Agreement) in accordance with the terms of the Stalking Horse Purchase Agreement, (c) approving the assumption and assignment of certain executory contracts and unexpired leases, and (d) granting certain related relief; and the Court having entered the *Order (I) Approving Bidding Procedures for the Sale of Substantially All of the Debtors' Assets, (II) Scheduling an Auction and Approving the Form and Manner of Notice Thereof, (III) Approving Assumption and Assignment Procedures, (IV) Scheduling a Sale Hearing and Approving the Form and Manner of Notice Thereof and (V) Granting Related Relief* (the "Bidding Procedures Order") on January 23, 2024 [Docket No. 198] authorizing the Debtors to enter into the Stalking Horse Purchase Agreement pursuant to which the Purchaser agreed to serve as the "stalking horse bidder" with respect to the "Purchased Assets" (as defined thereunder and hereinafter referred to as, the

"Transferred Assets"), free and clear of any Claims, Interests and Encumbrances, with such Sale to be in accordance with the terms and conditions of the Bidding Procedures Order and the Stalking Horse Purchase Agreement; and the Bidding Procedures Order having authorized the Debtors to conduct, and approved the terms and conditions of, an auction, if applicable, as required and as set forth in the Bidding Procedures (as defined below) (the "Auction") to consider higher or otherwise better offers for the Transferred Assets, establishing a date for the Auction, if any, and approving, among other things (i) certain bidding procedures (the "Bidding Procedures") to be used in connection with the Auction, if applicable; (ii) the form and manner of notice of the Auction and Bidding Procedures; (iii) the form of Sale Notice (as defined below); (iv) the form of Assumption Notice (as defined below); and (v) the procedures relating to the assumption and assignment of the Assumed Contracts (as defined in the Stalking Horse Purchase Agreement); and the Sale Hearing having been held on February 16, 2024; and the Court having reviewed and considered the relief sought in the Motion, the Stalking Horse Purchase Agreement, all objections to the Motion, and the arguments of counsel made, and the evidence proffered or adduced at the Sale Hearing; and all parties in interest having been heard or having had the opportunity to be heard regarding the Sale Transaction and the relief requested in this Order; and due and sufficient notice of the Sale Hearing and the relief sought therein having been given under the particular circumstances of these chapter 11 cases and in accordance with the Bidding Procedures Order; and it appearing that no other or further notice need be provided; and it appearing that the relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors and all other parties in interest; and it appearing that the Court has jurisdiction over this matter; and it further appearing that the legal and factual bases set forth in the Motion and the supplemental declaration of Abraham Han

[Docket No. 272] and at the Sale Hearing establish just cause for the relief granted herein; and after due deliberation thereon,

**THE COURT HEREBY MAKES THE FOLLOWING FINDINGS:[3]**

## Jurisdiction and Venue

A.      This Court has jurisdiction to hear and determine the Motion pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue of these cases and proceedings is proper in this District and this Court under 28 U.S.C. §§ 1408 and 1409.

## Statutory Predicates

B.      The statutory predicates for the relief requested in the Motion are Bankruptcy Code sections 105, 363 and 365. Such relief is also warranted pursuant to Bankruptcy Rules 2002, 6004, 6006, 9007, 9008 and 9014 and Local Rules 2002-1 and 6004-1.

## Final Order

C.      This Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a). Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, this Court expressly finds that there is no just reason for delay in the implementation of this Order, waives any stay, and expressly directs entry of judgment as set forth herein.

---

[3]     The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

**Notice of the Stalking Horse Purchase Agreement, Assumption and Assignment of Assumed Contracts, Sale Transaction, Sale Hearing and Bidding Procedures Order**

D.      On December 8, 2023 (the "Petition Date"), the Debtors commenced these chapter 11 cases (the "Chapter 11 Cases") by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code. Since the Petition Date, the Debtors have continued to operate and manage their businesses as debtors-in-possession pursuant to Bankruptcy Code sections 1107(a) and 1108.[4]

E.      The Debtors gave due and proper notice of the Sale on January 23, 2024 [Docket No. 201] (the "Sale Notice"). The Sale Notice constituted good, sufficient, and appropriate notice of the Sale under the particular circumstances and no further notice need be given with respect to the proposed Sale. As provided by the Sale Notice, a reasonable opportunity to object or be heard regarding the requested relief has been afforded to all interested persons and entities. Other parties interested in bidding on the Transferred Assets were provided, pursuant to the Bidding Procedures Order, sufficient information to make an informed judgment on whether to bid.

F.      The Debtors also gave due and proper notice of the potential assumption and assignment of each executory contract or unexpired lease available to be assumed by the Debtors and assigned to the Purchaser to each non-Debtor party under each such executory contract or unexpired lease as reflected on the notice of assumption, sale and assignment of the Assumed Contracts filed on January 26, 2024 [Docket No. 215, 219, 230 & 265] (the "Assumption Notice"). Such notice was good, sufficient, and appropriate under the particular circumstances, and the counterparties to the Assumed Contracts are hereby deemed to consent to the relief granted herein unless otherwise provided in this Order.

---

[4]      A detailed description of the Debtors and their business, including the facts and circumstances giving rise to the Debtors' chapter 11 cases, is set forth in the *Declaration of John Faieta in Support of Chapter 11 Petitions and First Day Pleadings* (the "First Day Declaration"), filed on the Petition Date [Docket No. 14] and incorporated by reference herein.

G.      In addition, the Debtors have caused the Sale Notice to be published in USA Today on January 26, 2024 [Docket No. 233].  Such notice was sufficient and reasonably calculated under the circumstances to reach persons or entities whose identities are not reasonably ascertainable by the Debtors.

H.      As evidenced by the affidavits of service [Docket Nos. 44, 102, 218, 226, 247, 252, 271 & 284] and publication [Docket No. 233] previously filed with this Court, and based on the representations of counsel at the Sale Hearing, due, proper, timely, adequate and sufficient notice of the Motion, the Bidding Procedures Order, the Auction, the Sale Hearing, the assumption and assignment of the Assumed Contracts, the Stalking Horse Purchase Agreement, this Order and the Sale Transaction has been provided in accordance with Bankruptcy Code sections 102(1) and 363, Bankruptcy Rules 2002, 9007, 9008 and 9014, and Local Rules 2002-1 and 6004-1. The Debtors have complied with all obligations to provide notice of the Motion, the Bidding Procedures Order, the Auction, the Sale Hearing, the assumption and assignment of the Assumed Contracts, the Stalking Horse Purchase Agreement, this Order and the Sale Transaction as required by the Bidding Procedures Order. The aforementioned notices are good, sufficient and appropriate under the circumstances, and no other or further notice of the Motion, the Bidding Procedures Order, the Bid Deadline, the Auction, the Sale Hearing, the assumption and assignment of the Assumed Contracts, the Contract Objection Deadline, the Sale Objection Deadline, the Post-Auction Objection Deadline (each as defined in the Bidding Procedures Order), the Stalking Horse Purchase Agreement, this Order or the Sale Transaction is or shall be required.

I.      A reasonable opportunity to object or be heard regarding the relief requested in the Motion and provided in this Order was afforded to all parties in interest.

**Compliance with the Bidding Procedures Order**

J.    As demonstrated by the evidence proffered or adduced at the Sale Hearing and the representations of counsel at the Sale Hearing, the Debtors have complied in all material respects with the Bidding Procedures Order. The Debtors and their professionals have adequately and appropriately marketed the Transferred Assets in compliance with the Bidding Procedures and the Bidding Procedures Order, and in accordance with the Debtors' fiduciary duties. Based upon the record of these proceedings, creditors, other parties in interest and prospective purchasers were afforded a reasonable and fair opportunity to bid for the Transferred Assets.

K.    The Bidding Procedures were substantively and procedurally fair to all parties and all potential bidders and afforded notice and a full, fair and reasonable opportunity for any person to make a higher or otherwise better offer to purchase the Transferred Assets. The Debtors conducted the sale process without collusion and in accordance with the Bidding Procedures. No other entity or group of entities has presented a higher or otherwise better offer to the Debtors to purchase the Transferred Assets for greater economic value to the Debtors' estates than the Purchaser.

L.    The Purchaser is the Successful Bidder (as defined in the Bidding Procedures), and the Stalking Horse Bid is the Successful Bid (as defined in the Bidding Procedures), for the Transferred Assets in accordance with the Bidding Procedures Order. The Purchaser has complied in all respects with the Bidding Procedures Order and all other applicable orders of this Court in negotiating and entering into the Stalking Horse Purchase Agreement, and the Sale Transaction and the Stalking Horse Purchase Agreement likewise comply with the Bidding Procedures Order and all other applicable orders of this Court.

**Sale in Best Interests of the Debtors' Estates**

M.    The Stalking Horse Purchase Agreement, including the form and total consideration to be realized by the Debtors under the Stalking Horse Purchase Agreement, (i) constitutes the highest and best offer received by the Debtors for the Transferred Assets; (ii) is fair and reasonable; (iii) is in the best interests of the Debtors, their estates, their creditors and all other parties in interest; and (iv) constitutes reasonably equivalent value, fair consideration and fair value under the Bankruptcy Code and applicable law, including, without limitation, the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act, the Uniform Voidable Transactions Act, and any other applicable law.

N.    The Debtors' determination that the consideration provided by the Purchaser under the Stalking Horse Purchase Agreement constitutes the highest and best offer for the Transferred Assets constitutes a valid and sound exercise of the Debtors' business judgment.

O.    Good and sufficient reasons for approval of the Stalking Horse Purchase Agreement and the transactions to be consummated in connection therewith have been articulated, and the relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors and other parties in interest. The Debtors have demonstrated both (i) good, sufficient, and sound business purposes and justifications and (ii) compelling circumstances for the Sale other than in the ordinary course of business, pursuant to section 363(b) of the Bankruptcy Code, outside of a plan, in that, among other things, the immediate consummation of the Sale Transaction to the Purchaser is necessary and appropriate to maximize the value of the Debtors' estates.

P.    The Sale Transaction must be approved and consummated promptly in order to preserve the viability of the Debtors' businesses as a going concern and to maximize the value of the Debtors' estates. Time is of the essence in consummating the Sale Transaction. Given all of the circumstances of these Chapter 11 Cases and the adequacy and fair value of the Purchase Price,

the proposed Sale Transaction constitutes a reasonable and sound exercise of the Debtors' business judgment and should be approved.

Q.      The consummation of the Sale Transaction and the assumption and assignment of the Assigned Contracts are legal, valid, and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, sections 105(a), 363(b), 363(f), 363(m), and 365 of the Bankruptcy Code, and all of the applicable requirements of such sections have been complied with in respect of the transaction.

### Corporate Authority

R.      Subject to entry of this Order, the Debtors (i) have full corporate power and authority to execute and deliver the Stalking Horse Purchase Agreement and all other documents contemplated thereby, (ii) have all of the necessary corporate power and authority to consummate the transactions contemplated by the Stalking Horse Purchase Agreement, including, without limitation, the Sale Transaction and the assumption and assignment of the Assumed Contracts, (iii) have taken all corporate action necessary to authorize and approve the Stalking Horse Purchase Agreement and the consummation by the Debtors of the transactions contemplated thereby, including, without limitation, the Sale Transaction and the assumption and assignment of the Assumed Contracts, and (iv) subject to entry of this Order, need no consents or approvals, including any consents or approvals from any non-Debtor entities, other than those expressly set forth in the Stalking Horse Purchase Agreement, the DIP Orders (as defined below) or this Order, to consummate the transactions contemplated thereby, including, without limitation, the Sale Transaction and the assumption and assignment of the Assumed Contracts.

S.      The Stalking Horse Purchase Agreement was not entered into, and none of the Debtors or the Purchaser has entered into the Stalking Horse Purchase Agreement or proposes to consummate the Sale Transaction for the purpose of hindering, delaying or defrauding the Debtors'

creditors, for the purpose of statutory and common law fraudulent conveyance and fraudulent transfer claims whether under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof or the District of Columbia or any other applicable jurisdiction with laws substantially similar to the foregoing.

**Credit Bid**

T.     As set forth more fully in the DIP Orders, the Debtors have acknowledged that the Prepetition First Lien Obligations (as defined in the DIP Orders): (a) constitute legal, valid, binding, enforceable, unavoidable obligations of the Debtors; (b) are secured by valid, binding, enforceable, unavoidable and properly perfected Prepetition Secured Liens on the Prepetition First Lien Collateral (each as defined in the DIP Orders); (c) constitute allowed secured claims under section 502(a) of the Bankruptcy Code; and (d) are authorized to be credit bid pursuant to section 363(k) of the Bankruptcy Code. The Prepetition First Lien Lenders and/or the DIP Lenders (each as defined in the DIP Orders) shall contribute (x) all outstanding obligations under the DIP Facility, and (y) not less than $34 million of the outstanding obligations under the Prepetition First Lien Facility to the Purchaser in connection with the Sale Transaction contemplated under the Stalking Horse Purchase Agreement; provided,  that, as of the expiration of the Challenge Period, there shall be no pending Challenge (each as defined in the Final DIP Order) or other contest to the validity, amount, perfection or priority of the DIP Documents, the Prepetition First Lien Loan Documents or other Claims of Purchaser, Prepetition First Lien Lenders, or DIP Lenders (as applicable) thereunder that would prevent Purchaser's ability to credit bid the Credit Bid Amount, unless any such challenge or contest shall have been resolved to the reasonable satisfaction of Purchaser in its sole discretion.

U.     As set forth more fully in the DIP Orders, the DIP Obligations (as defined in the DIP Orders): (a) constitute legal, valid, binding, enforceable, unavoidable obligations of the

Debtors; (b) are secured by valid, binding, enforceable, unavoidable and properly perfected DIP

Liens on the DIP Collateral (each as defined in the DIP Orders); and (c) are authorized to be credit

bid pursuant to section 363(k) of the Bankruptcy Code. The DIP Obligations shall be contributed

by the DIP Lenders (as defined in the DIP Orders) to the Purchaser in connection with the Sale

Transaction contemplated under the Stalking Horse Purchase Agreement.

V.      Pursuant to applicable law, including section 363(k) of the Bankruptcy Code, and

in accordance with the DIP Orders, the Purchaser is authorized to credit bid the full amount of all

outstanding obligations under the DIP Facility and up to the full amount, but not less than

$34,000,000, of all outstanding obligations under the Prepetition First Lien Facility in connection

with Sale Transaction contemplated under the Stalking Horse Purchase Agreement. Any such

credit bid is valid and proper consideration pursuant to sections 363(b) and 363(k) of the

Bankruptcy Code and the DIP Orders.

## **Good Faith**

W.      The sales process engaged in by the Debtors and the Purchaser, including, without

limitation, the negotiation of the Stalking Horse Purchase Agreement, was non-collusive, in good

faith, from arm's-length bargaining positions, and substantively and procedurally fair to all parties

in interest. None of the Debtors or the Purchaser has engaged in any conduct that would cause or

permit the Stalking Horse Purchase Agreement or the Sale Transaction to be avoided, or costs or

damages to be imposed, under Bankruptcy Code section 363(n).  the Purchaser is not an "insider"

of the Debtors as defined in Bankruptcy Code section 101(31).

X.      The Debtors and the Purchaser have complied, in good faith, in all respects with

the Bidding Procedures Order and the Bidding Procedures. The Debtors and the Purchaser, and

their respective management, board of directors, board of managers (or comparable governing

authority), employees, agents, advisors and representatives, each actively participated in the

bidding process and in the Auction, and each acted in good faith and without collusion or fraud of any kind. Purchaser subjected its bid to competitive bidding in accordance with the Bidding Procedures and was designated the Successful Bidder for the Transferred Assets in accordance with the Bidding Procedures and the Bidding Procedures Order.

Y.        The Purchaser is a good faith purchaser within the meaning of Bankruptcy Code section 363(m), and is therefore entitled to the full protection of that provision in respect of the Sale Transaction, each term of the Stalking Horse Purchase Agreement (and any ancillary documents executed in connection therewith) and each term of this Order, and otherwise has proceeded in good faith in all respects in connection with this proceeding. None of the Debtors or the Purchaser has engaged in any conduct that would prevent the application of Bankruptcy Code section 363(m). The Debtors were free to deal with any other party interested in buying or selling some or all of the Transferred Assets on behalf of the Debtors' estates. The protections afforded by Bankruptcy Code section 363(m) are integral to the Sale Transaction and the Purchaser would not consummate the Sale Transaction without such protections.

Z.        The form and total consideration to be realized by the Debtors under the Stalking Horse Purchase Agreement constitutes fair value, fair, full and adequate consideration, reasonably equivalent value and reasonable market value for the Transferred Assets.

### Free and Clear

AA.        The transfer of the Transferred Assets to the Purchaser will be legal, valid, and effective transfers of the Transferred Assets, and will vest the Purchaser with all right, title, and interest of the Debtors to the Transferred Assets free and clear of all claims, liens (including, without limitation, any statutory lien on real and personal property and any and all "liens" as that term is defined and used in the Bankruptcy Code, including section 101(37) thereof), liabilities, interests, rights and encumbrances, including, without limitation, the following: all mortgages,

restrictions (including, without limitation, any restriction on the use, voting rights, transfer rights, claims for receipt of income or other exercise of any attributes of ownership), hypothecations, charges, indentures, loan agreements, instruments, leases, licenses, sublicenses, options, deeds of trust, security interests, equity interests, conditional sale rights or other title retention agreements, pledges, judgments, demands, rights of first refusal, consent rights, contract rights, rights of setoff (except for setoffs validly exercised before the petition date), rights of recovery, reimbursement rights, contribution claims, indemnity rights, exoneration rights, product liability claims, alter-ego claims, environmental rights and claims (including, without limitation, toxic tort claims), labor rights and claims, employment rights and claims, pension rights and claims, tax claims, regulatory violations by any governmental entity, decrees of any court or foreign or domestic governmental entity, charges of any kind or nature, debts arising in any way in connection with any agreements, acts, or failures to act, reclamation claims, obligation claims, demands, guaranties, option rights or claims, rights, contractual or other commitment rights and claims, and all other matters of any kind and nature, whether known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, whether arising prior to or subsequent to the commencement of the Chapter 11 Cases, and whether imposed by agreement, understanding, law, equity or otherwise, including claims otherwise arising under any theory, law or doctrine of successor or transferee liability or theories of liability related to acting in concert or active participation with the Debtors or related theories (all of the foregoing, including, without limitation, Liens and Liabilities, but excluding Permitted Liens and Assumed Liabilities, collectively being referred to in this Order as "Claims" and, as used in this Order, the term

"Claims" includes, without limitation, any and all "claims" as that term is defined and used in the Bankruptcy Code, including section 101(5) thereof; provided, however, that such transfer shall not be free and clear of any Permitted Liens and Assumed Liabilities.

BB.     The Debtors may transfer the Transferred Assets free and clear of all Claims, Interests and Encumbrances, other than any Permitted Liens and Assumed Liabilities, including, without limitation, rights or claims based on any successor or transferee liability or theories of liability related to actions in concert or active participation with the Debtors, because, in each case, one or more of the standards set forth in Bankruptcy Code section 363(f)(1)-(5) has been satisfied.

CC.     Those (a) holders of Claims or Interests and (b) non-Debtor parties to the Assumed Contracts, who did not object or who withdrew their objections to the Motion, are deemed to have consented pursuant to Bankruptcy Code section 363(f)(2). Those (i) holders of Claims or Interests and (ii) non-Debtor parties to the Assumed Contracts who did object, fall within one or more of the other subsections of Bankruptcy Code section 363(f).

DD.     Each of (i) the DIP Secured Parties (as defined in the DIP Orders) and (ii) the Prepetition First Lien Lenders has consented to the sale of the Transferred Assets to the Purchaser pursuant to the Stalking Horse Purchase Agreement free and clear of any Claims, Interests, or Encumbrances (other than the Permitted Liens and Assumed Liabilities) of the DIP Secured Parties and the Prepetition First Lien Lenders against the Transferred Assets (the "Secured Lenders' Liens"), and any reference herein to Claims, Interests, or Encumbrances shall include the Secured Lenders' Liens.

EE.     The Debtors have, to the extent necessary, satisfied the requirements of section 363(b)(1) of the Bankruptcy Code.

FF.     The Purchaser would not have entered into the Stalking Horse Purchase Agreement and would not consummate the transactions contemplated thereby, including, without limitation, the Sale Transaction and the assumption and assignment of the Assumed Contracts, (i) if the transfer of the Transferred Assets were not free and clear of all Claims, Interests, and Encumbrances (other than any Permitted Liens and Assumed Liabilities), or (ii) if the Purchaser would, or in the future could, be liable for any such Claims, Interests, and Encumbrances (other than any Permitted Liens and Assumed Liabilities). The Purchaser will not consummate the transactions contemplated by the Stalking Horse Purchase Agreement, including, without limitation, the Sale Transaction and the assumption and assignment of the Assumed Contracts, unless this Court expressly orders that none of the Purchaser, its affiliates, its present or contemplated members or shareholders, or the Transferred Assets will have any liability whatsoever (other than any Permitted Liens and Assumed Liabilities) with respect to, or be required to satisfy in any manner, whether at law or equity, or by payment, setoff, or otherwise, directly or indirectly, any Claims, Interests, and Encumbrances.

GG.     Not transferring the Transferred Assets free and clear of all Claims, Interests, and Encumbrances (other than any Permitted Liens and Assumed Liabilities) would adversely impact the Debtors' efforts to maximize the value of their estates, and the transfer of the Transferred Assets other than pursuant to a transfer that is free and clear of all Claims, Interests, and Encumbrances (other than any Permitted Liens and Assumed Liabilities) would be of substantially less benefit to the Debtors' estates.

HH.     Neither the Purchaser nor any of its affiliates are a mere continuation of the Debtors or their estates, there is no continuity or common identity between the Purchaser, any of its affiliates and any of the Debtors, and there is no continuity of enterprise between the Purchaser,

any of its affiliates and any of the Debtors. Neither the Purchaser nor any of its affiliates are holding themselves out to the public as a continuation of any of the Debtors. Neither the Purchaser nor any of its affiliates are a successor to any of the Debtors or their estates and none of the transactions contemplated by the Stalking Horse Purchase Agreement, including, without limitation, the Sale Transaction and the assumption and assignment of the Assumed Contracts amounts to a consolidation, merger, or *de facto* merger of the Purchaser or any of its affiliates with or into any of the Debtors.

II.     Without limiting the generality of the foregoing, and other than as may be set forth in the Stalking Horse Purchase Agreement, none of the Purchaser, its affiliates, its and their respective present or contemplated members or shareholders, or the Transferred Assets will have any liability whatsoever with respect to, or be required to satisfy in any manner, whether at law or equity, or by payment, setoff, or otherwise, directly or indirectly, any Claims relating to any U.S. federal, state or local income tax liabilities, that the Debtors may incur in connection with consummation of the transactions contemplated by the Stalking Horse Purchase Agreement, including, without limitation, the Sale Transaction and the assumption and assignment of the Assumed Contracts, or that the Debtors have otherwise incurred prior to the consummation of the transactions contemplated by the Stalking Horse Purchase Agreement.

### Validity of Transfer

JJ.     The consummation of the transactions contemplated by the Stalking Horse Purchase Agreement, including, without limitation, the Sale Transaction and the assumption and assignment of the Assumed Contracts, is legal, valid and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, Bankruptcy Code sections 105(a), 363(b), 363(f), 363(m), 365(b), and 365(f), and all of the applicable requirements of such

sections have been complied with in respect of the transactions contemplated under the Stalking Horse Purchase Agreement.

KK.    The Transferred Assets constitute property of the Debtors' estates and good title to the Transferred Assets of the Debtors is vested in the Debtors' estates within the meaning of Bankruptcy Code section 541(a). The Debtors are the sole and lawful owners of the Transferred Assets, and no other person has any ownership right, title, or interest therein.

LL.    The Stalking Horse Purchase Agreement has been duly and validly executed and delivered by the Debtors and, subject to the terms of the Stalking Horse Purchase Agreement, shall constitute a valid and binding obligation of the Debtors, enforceable against the Debtors in accordance with its terms. The Stalking Horse Purchase Agreement, the Sale Transaction, and the consummation thereof shall be specifically enforceable against and binding upon (without posting any bond) the Debtors and any chapter 7 or chapter 11 trustee appointed in these Chapter 11 Cases, and shall not be subject to rejection or avoidance by the foregoing parties or any other person.

## Assumed Contracts

MM.    The assumption and assignment of the Assumed Contracts pursuant to the Assumption Notice, the terms of this Order and the Stalking Horse Purchase Agreement is integral to the transactions contemplated by the Stalking Horse Purchase Agreement and is in the best interests of the Debtors, their estates and creditors, and all other parties in interest, and represents a reasonable exercise of the Debtors' sound and prudent business judgment.

NN.    Pursuant to the terms of the Stalking Horse Purchase Agreement and this Order, on or before the Closing Date (as defined in the Stalking Horse Purchase Agreement), the Debtors or the Purchaser, as applicable, shall have, except as otherwise provided in the Stalking Horse Purchase Agreement or this Order or as otherwise expressly agreed to between the Debtors or the Purchaser (as applicable) and such counterparty: (i) cured, or provided adequate assurance of cure

17

of, any monetary default existing as of and including the Closing Date under any of the Assumed Contracts, within the meaning of Bankruptcy Code section 365(b)(1)(A), (ii) provided compensation, or adequate assurance of compensation, to any party for actual pecuniary loss to such party resulting from a monetary default existing as of and including the Closing Date under any of the Assumed Contracts, within the meaning of Bankruptcy Code section 365(b)(1)(B), and (iii) provided adequate assurance of future performance under the Assumed Contracts within the meaning of Bankruptcy Code sections 365(b)(1)(C), 365(b)(3) (to the extent applicable) and 365(f)(2)(B).

## Application of Proceeds

OO.     Pursuant to the interim and final orders authorizing and approving the Debtors' debtor in possession financing and use of Cash Collateral [Docket Nos. 66 and 197] (together, the "DIP Orders"), the Transferred Assets constitute Cash Collateral, Prepetition First Lien Collateral and DIP Collateral and are subject to the Adequate Protection Obligations (including, without limitation, Adequate Protection Liens and the Adequate Protection Claim) set forth in the Final DIP Order (each as defined in the DIP Orders), Prepetition Secured Liens and DIP Liens. Subject to the "Payment in Full" (as defined in the DIP Orders) of the Prepetition First Lien Obligations (as defined in the DIP Orders), pursuant to the DIP Orders and the DIP Documents (as defined in the DIP Orders), the Debtors are required to apply all consideration received from the Sale of the Transferred Assets in accordance with the terms of the DIP Orders and the Stalking Horse Purchase Agreement.

## Not a *Sub Rosa* Plan

PP.     The Sale does not constitute a *sub rosa* chapter 11 plan or an element of such plan for the Debtors, for which approval has been sought without the protections that a disclosure statement would afford. The Sale Transaction does not (i) impermissibly restructure the rights of

the Debtors' creditors or equity interest holders, (ii) impair or circumvent voting rights with respect to any future plan proposed by the Debtors, (iii) impermissibly dictate a plan of reorganization or liquidation for the Debtors, or (iv) classify claims or equity interests, compromise controversies, or extend debt maturities.

## Legal and Factual Bases

QQ.    The legal and factual bases set forth in the Motion and at the Sale Hearing establish just cause for the relief granted herein.

**IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED THAT:**

## General Provisions

1.    The Motion is granted as provided herein, and entry into and performance under, and in respect of, the Stalking Horse Purchase Agreement attached hereto as **Exhibit 1** and the consummation of the transactions contemplated thereby, including, without limitation, the Sale Transaction and the assumption and assignment of the Assumed Contracts is authorized and approved.

2.    Any objections and responses to the Motion or the relief requested therein that have not been withdrawn, waived, settled, or resolved, and all reservation of rights included in such objections and responses, are overruled on the merits and denied with prejudice. All persons and entities given notice of the Motion that failed to timely object thereto are deemed to consent to the relief granted herein, including for purposes of sections 363(f)(2), 365(c)(1), and 365(e)(2) of the Bankruptcy Code.

## Approval of the Stalking Horse Purchase Agreement

3.    The Stalking Horse Purchase Agreement, all ancillary documents, the transactions contemplated thereby, including, without limitation, the Sale Transaction, and the assumption and assignment of the Assumed Contracts (but subject to the Purchaser's rights with respect thereto

pursuant to the Stalking Horse Purchase Agreement) and all the terms and conditions thereof, are approved. The failure specifically to include any particular provision of the Stalking Horse Purchase Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Stalking Horse Purchase Agreement be authorized and approved in its entirety.

4.      The Debtors and their respective officers, employees and agents are authorized and directed to take any and all actions necessary, appropriate or reasonably requested by the Purchaser to perform, consummate, implement and close the Sale Transaction, including, without limitation, (a) the sale to the Purchaser of all Transferred Assets, in accordance with the terms and conditions set forth in the Stalking Horse Purchase Agreement and this Order; and (b) execution, acknowledgment and delivery of such deeds, assignments, conveyances and other assurance, documents and instruments of transfer and any action for purposes of assigning, transferring, granting, conveying and confirming to the Purchaser, or reducing to possession, the Transferred Assets, all without further order of this Court. The Debtors are further authorized to pay, without further order of this Court and in accordance with the Approved Budget (as defined in the DIP Orders), whether before, at or after the Closing Date, any reasonable and documented out-of-pocket expenses or costs that are required to be paid by the Debtors under the Stalking Horse Purchase Agreement, this Order or the Bidding Procedures Order, in order to consummate the Sale Transaction or perform their obligations under the Stalking Horse Purchase Agreement.

5.      All persons and entities, including, without limitation, the Debtors, the Debtors' estates, all debt security holders, equity security holders, governmental tax and regulatory authorities, lenders, customers, vendors, employees, former employees, litigation claimants, trustees, trade creditors, and any other creditors (or agent of any of the foregoing) who may or do

hold Claims (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or noncontingent, senior or subordinated) against the Debtors or the Transferred Assets owned by the Debtors, arising under or out of, in connection with, or in any way relating to, the Debtors, the Transferred Assets owned by the Debtors, the operation or ownership of the Transferred Assets by the Debtors prior to the Closing Date, or the Sale Transaction, are hereby prohibited, forever barred, estopped, and permanently enjoined from asserting or pursuing such Claims against Purchaser, its affiliates, successors, assigns, its property or the Transferred Assets, including, without limitation, taking any of the following actions with respect to any Claims: (a) commencing or continuing in any manner any action, whether at law or in equity, in any judicial, administrative, arbitral, or any other proceeding, against Purchaser, its affiliates, successors, assigns, assets (including the Transferred Assets), and/or properties; (b) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order against Purchaser, its affiliates, successors, assigns, assets (including the Transferred Assets), and/or properties; (c) creating, perfecting, or enforcing any Claim against Purchaser, its affiliates, any of their respective successors, assigns, assets (including the Transferred Assets), and/or properties; (d) asserting a Claim as a setoff (except for setoffs validly exercised before the petition date) or right of subrogation of any kind against any obligation due against Purchaser, its affiliates or any of their respective successors or assigns; or (e) commencing or continuing any action in any manner or place that does not comply, or is inconsistent, with the provisions of this Order, the Stalking Horse Purchase Agreement, or the agreements or actions contemplated or taken in respect thereof, including the Debtors' ability to transfer the Transferred Assets to the Purchaser in accordance with the terms of this Order and the Stalking Horse Purchase Agreement. No such Person shall assert or pursue against Purchaser or its affiliates, successors or assigns any such Claim.

6.       The Sale of the Transferred Assets to the Purchaser under the Stalking Horse Purchase Agreement constitutes a transfer for reasonably equivalent value and fair consideration under the Bankruptcy Code and laws of all applicable jurisdictions, including, without limitation, the laws of each jurisdiction in which the Transferred Assets are located, and the sale of the Transferred Assets to the Purchaser may not be avoided under any statutory or common law fraudulent conveyance and fraudulent transfer theories whether under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof or the District of Columbia or any other applicable jurisdiction with laws substantially similar to the foregoing.

**Transfer of the Transferred Assets Free and Clear**

7.       Pursuant to Bankruptcy Code sections 105(a) and 363(f), the Transferred Assets shall be sold free and clear of all Claims, Interests, and Encumbrances (other than any Permitted Liens and Assumed Liabilities), including, for the avoidance of doubt, the Secured Lenders' Liens, with all such Claims to attach to the proceeds of the Sale Transaction to be received by the Debtors with the same validity, force, priority and effect which they now have as against the Transferred Assets, subject to any claims and defenses the Debtors may possess with respect thereto; provided, however, that setoff rights not validly exercised before the petition date will be extinguished to the extent there is no longer mutuality after the consummation of the Sale Transaction.

8.       At Closing, all of the Debtors' right, title and interest in and to, and possession of, the Transferred Assets shall be immediately vested in the Purchaser pursuant to Bankruptcy Code sections 105(a), 363(b), and 363(f) free and clear of any and all Claims, Interests, and Encumbrances (other than any Permitted Liens and Assumed Liabilities). Such transfer shall constitute a legal, valid, binding and effective transfer of, and shall vest the Purchaser with good and marketable title to, the Transferred Assets. All persons or entities, presently or on or after the Closing Date, in possession of some or all of the Transferred Assets are directed to surrender

possession of the Transferred Assets to the Purchaser or its designees on the Closing Date or at such time thereafter as the Purchaser may request.

9.    This Order is and shall be binding upon and govern the acts of all entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, registrars of patents, trademarks or other intellectual property, administrative agencies, governmental departments, secretaries of state, federal and local officials and all other persons and entities who may be required by operation of law, the duties of their office or contract, to accept, file, register or otherwise record or release any documents or instruments; and each of the foregoing persons and entities is hereby authorized to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the Sale Transaction contemplated by the Stalking Horse Purchase Agreement.

10.    Except as otherwise expressly provided in the Stalking Horse Purchase Agreement or this Order, all persons and entities (and their respective successors and assigns), including, but not limited to, all debt security holders, equity security holders, affiliates, foreign, federal, state and local governmental, tax and regulatory authorities, lenders, customers, vendors, employees, trade creditors, litigation claimants and other creditors holding Claims against the Debtors or the Transferred Assets arising under or out of, in connection with, or in any way relating to, the Debtors, their estates, the Debtors' predecessors or affiliates, the Transferred Assets, the ownership, sale or operation of the Transferred Assets prior to the Closing Date or the transfer of the Transferred Assets to the Purchaser, are hereby forever barred, estopped and permanently enjoined from asserting or prosecuting any cause of action or any process or other act or seeking to collect, offset, or recover on account of any Claims against the Purchaser, its successors or assigns, their property or the Transferred Assets, other than Permitted Liens and Assumed

Liabilities. Following the Closing Date, no holder of any Claim, Interest or Encumbrance (other than Permitted Liens and Assumed Liabilities) shall interfere with the Purchaser's title to or use and enjoyment of the Transferred Assets based on or related to any such Claim, Interest or Encumbrance (other than Permitted Liens and Assumed Liabilities), or based on any action or omission of the Debtors, including any action or omission the Debtors may take in the Chapter 11 Cases.

11.    The Debtors are authorized and directed to execute such documents as may be necessary to release any Claims, Interests, or Encumbrances (other than Permitted Liens and Assumed Liabilities) of any kind against the Transferred Assets as such Claims, Interests, or Encumbrances (other than Permitted Liens and Assumed Liabilities) may have been recorded or may otherwise exist. If any person or entity that has filed financing statements, lis pendens or other documents or agreements evidencing Claims, Interests, or Encumbrances (other than Permitted Liens and Assumed Liabilities) against or in the Transferred Assets shall not have delivered to the Debtors prior to the Closing Date of the Sale Transaction, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of all Claims, Interests, or Encumbrances (other than Permitted Liens and Assumed Liabilities) that the person or entity has with respect to the Transferred Assets, (a) the Debtors are hereby authorized and directed to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to the Transferred Assets; (b) the Purchaser is hereby authorized to file, register or otherwise record a certified copy of this Order, which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all such Claims, Interests, or Encumbrances (other than Permitted Liens and Assumed Liabilities) against the Purchaser and the applicable Transferred Assets; (c) the Debtors' creditors and the holders of

24

any Claims, Interests, or Encumbrances (other than Permitted Liens and Assumed Liabilities) are authorized and directed to execute such documents and take all other actions as may be necessary to terminate, discharge or release their Claims, Interests, or Encumbrances (other than Permitted Liens and Assumed Liabilities) in the Transferred Assets and (d) the Purchaser may seek in this Court or any other court to compel appropriate parties to execute termination statements, instruments of satisfaction and releases of all such Claims, Interests, or Encumbrances (other than Permitted Liens and Assumed Liabilities) with respect to the Transferred Assets. This Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state, or local government agency, department or office, and such agencies, departments and offices are authorized to accept this Order for filing or recording. Notwithstanding the foregoing, the provisions of this Order authorizing the sale and assignment of the Transferred Assets free and clear of Claims, Interests, and Encumbrances (other than any Permitted Liens and Assumed Liabilities) shall be self-executing, and none of the Debtors or the Purchaser shall be required to execute or file releases, termination statements, assignments, consents or other instruments in order to effectuate, consummate and implement the provisions of this Order.

12.     To the maximum extent permitted under applicable law, the Purchaser shall be authorized, as of the Closing Date, to operate under any license, permit, registration and governmental authorization or approval of the Debtors with respect to the Transferred Assets, and all such licenses, permits, registrations and governmental authorizations and approvals are deemed to have been, and hereby are, directed to be transferred to the Purchaser with respect to the Transferred Assets as of the Closing Date. To the extent the Purchaser cannot operate under any such license, permit, registration and governmental authorization or approval in accordance with the previous sentence, such licenses, permits, registrations and governmental authorizations and

approvals shall be in effect while the Purchaser, with assistance from the Debtors (and at the Purchaser's sole cost and expense), works promptly and diligently to apply for and secure all necessary government approvals for new issuance of such licenses, permits, registrations and governmental authorizations and approvals to the Purchaser. Nothing in this Order or the Stalking Horse Purchase Agreement precludes or enjoins the enforcement of any valid police or regulatory liability to a governmental unit for acts taken by the Purchaser after the Closing Date, to which the Purchaser may be subject to as the owner or operator of any property that is a Transferred Asset after the Closing Date; provided, however, that all rights and defenses of the Purchaser under nonbankruptcy law are preserved. Nothing in this Order or the Stalking Horse Purchase Agreement authorizes the transfer or assignment of any governmental (a) license, (b) permit, (c) registration, (d) authorization or (e) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements and approvals under police or regulatory law. Nothing in this Order divests any tribunal of any jurisdiction it may have under police or regulatory law.

13.     No governmental unit (as defined in Bankruptcy Code section 101(27)) or any representative thereof may deny, revoke, suspend or refuse to renew any permit, license or similar grant relating to the operation of the Transferred Assets on account of the filing or pendency of the Chapter 11 Cases or the consummation of the Sale Transaction to the extent that any such action by a governmental unit or any representative thereof would violate Bankruptcy Code section 525.

### No Successor or Transferee Liability

14.     Upon the Closing Date, except as provided in the Stalking Horse Purchase Agreement, the entry of this Order and the Stalking Horse Purchase Agreement shall mean that the Purchaser (and any of its affiliates, successors, or assigns), as a result of any action taken in

connection with the Stalking Horse Purchase Agreement, the consummation of the transactions contemplated by the Stalking Horse Purchase Agreement, including, without limitation, the Sale Transaction and the assumption and assignment of the Assumed Contracts, or the transfer or operation of the Transferred Assets, shall not be, nor be deemed to: (a) be a legal successor or successor employer to the Debtors, or otherwise be deemed a successor to the Debtors, and shall instead be, and be deemed to be, a new employer with respect to all federal or state unemployment laws, including any unemployment compensation or tax laws, or any other similar federal or state laws; (b) have, *de facto*, or otherwise, merged or consolidated with or into the Debtors; or (c) be an alter ego or a mere continuation or substantial continuation of the Debtors or the enterprise(s) of the Debtors, or otherwise be deemed to be acting in concert or active participation with the Debtors, including, in the case of each of (a)-(c), without limitation, (x) within the meaning of any foreign, federal, state or local revenue law, pension law, the Employee Retirement Income Security Act, the Consolidated Omnibus Budget Reconciliation Act, the WARN Act (29 U.S.C. §§ 2101 et seq.) ("WARN"), Comprehensive Environmental Response Compensation and Liability Act ("CERCLA"), the Fair Labor Standard Act, Title VII of the Civil Rights Act of 1964 (as amended), the Age Discrimination and Employment Act of 1967 (as amended), the Federal Rehabilitation Act of 1973 (as amended), the National Labor Relations Act, 29 U.S.C. § 151, et seq. or (y) in respect of (i) any environmental liabilities, debts, claims or obligations arising from conditions first existing on or prior to the Closing Date (including, without limitation, the presence of hazardous, toxic, polluting, or contaminating substances or wastes), which may be asserted on any basis, including, without limitation, under CERCLA, (ii) any liabilities, penalties, costs, debts or obligations of or required to be paid by the Debtors for any taxes of any kind for any period, labor, employment, or other law, rule or regulation (including, without limitation, filing requirements

under any such laws, rules or regulations), (iii) any products liability law or doctrine with respect to the Debtors' liability under such law, rule or regulation or doctrine or (iv) any consumer protection law or doctrine with respect to the Debtors' liability under such law, rule or regulation or doctrine, including, without limitation, any liabilities, penalties, costs, debts or obligations imposed by the Federal Trade Commission and/or Bureau of Consumer Protection, of or required to be paid by the Debtors.

15.     Without limiting the generality of the foregoing, and except as otherwise provided in the Stalking Horse Purchase Agreement and this Order, neither the Purchaser (nor any of its affiliates, successors or assigns) shall have any responsibility for (a) any liability or other obligation of the Debtors related to the Transferred Assets or (b) any Claims against the Debtors or any of their predecessors or affiliates. By virtue of the Purchaser's purchase of the Transferred Assets, neither the Purchaser nor any of its affiliates shall have any liability whatsoever with respect to the Debtors' (or their predecessors' or affiliates') respective businesses or operations or any of the Debtors' (or their predecessors' or affiliates') obligations based, in whole or part, directly or indirectly, on any theory of successor or vicarious liability of any kind or character, or any theory based on acting in concert or active participation with the Debtors, or based upon any theory of antitrust, environmental (including, but not limited to CERCLA), successor or transferee liability, *de facto* merger or substantial continuity, labor and employment (including, but not limited to, WARN), consumer protection law, or products liability law, whether known or unknown as of the Closing Date, now existing or hereafter arising, asserted or unasserted, fixed or contingent, liquidated or unliquidated, including any liabilities or non-monetary obligations on account of any settlement or injunction or any liabilities on account of any taxes arising, accruing or payable under, out of, in connection with, or in any way relating to the operation of the

Transferred Assets prior to the Closing Date or such later time as Purchaser is assigned and assumes any Assumed Contract (collectively, with the potential claims set forth in paragraph 14 above, "Successor or Transferee Liability"). The Purchaser would not have acquired the Transferred Assets but for the foregoing protections against Successor or Transferee Liability.

16.    None of the Purchaser or its affiliates, successors, assigns, equity holders, employees or professionals shall have or incur any liability to, or be subject to any action by any of the Debtors or any of their estates, predecessors, successors or assigns, arising out of the negotiation, investigation, preparation, execution, delivery of the Stalking Horse Purchase Agreement and the entry into and consummation of the Sale of the Transferred Assets, except as expressly provided in the Stalking Horse Purchase Agreement and this Order.

17.    Nothing in this Order or the Stalking Horse Purchase Agreement shall require the Purchaser or any of its affiliates to (a) continue or maintain in effect, or assume any liability in respect of any employee, collective bargaining agreement, pension, fringe benefit or any trust arrangement or other agreements to which the Debtors are a party or have any responsibility therefor including, without limitation, pension benefits payable after retirement or other termination of employment; or (b) assume any responsibility as a fiduciary, plan sponsor or otherwise, for making any contribution to, or in respect of the funding, investment or administration of any employee benefit plan, arrangement or agreement (including but not limited to pension plans) or the termination of any such plan, arrangement or agreement.

18.    No bulk sales law or similar law of any state or other jurisdiction shall apply in any way to the transactions with the Debtors that are approved by this Order, including, without limitation, the Stalking Horse Purchase Agreement and the Sale Transaction.

**Good Faith Sale**

19.     The Stalking Horse Purchase Agreement has been negotiated and executed, and the transactions contemplated thereby, including, without limitation, the Sale Transaction and the assumption and assignment of the Assumed Contracts, are and have been undertaken, by Debtors, the Purchaser and their respective representatives without collusion and in "good faith," as that term is used in Bankruptcy Code section 363(m). Accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale Transaction shall not affect the validity of the Sale Transaction (including the assumption and assignment of the Assigned Contracts) with the Purchaser, or any term of the Stalking Horse Purchase Agreement, and shall not permit the unwinding of the Sale Transaction unless such authorization is duly stayed pending such appeal. The Purchaser is a good faith purchaser of the Transferred Assets within the meaning of Bankruptcy Code section 363(m) and, as such, is entitled to the all of the benefits and full protections of Bankruptcy Code section 363(m).

20.     None of the Debtors or the Purchaser has engaged in any conduct that would cause or permit the Stalking Horse Purchase Agreement or the transactions contemplated thereby, including, without limitation, the Sale Transaction and the assumption and assignment of the Assumed Contracts, to be avoided or costs or damages to be imposed, under Bankruptcy Code section 363(n). The consideration provided by the Purchaser for the Transferred Assets under the Stalking Horse Purchase Agreement is fair and reasonable, and the Sale Transaction may not be avoided under Bankruptcy Code section 363(n).

**Assumption and Assignment of the Assumed Contracts**

21.     Except as otherwise expressly provided in the Stalking Horse Purchase Agreement or this Order, upon the Closing Date, pursuant to Bankruptcy Code sections 105(a), 363, and 365, the Debtors are authorized to (a) assume each of the Assumed Contracts and assign the Assumed

Contracts, set forth in **Exhibit 2** (the "<u>Assumed Contracts Exhibit</u>") attached hereto, which may be subsequently modified at any time prior to the date that is two (2) business days prior to the Closing Date and upon Purchaser's delivery of written notice to the Debtors, to add or remove certain executory contracts or unexpired leases, pursuant to the terms of the Stalking Horse Purchase Agreement, to the Purchaser free and clear of all Claims, Interests, and Encumbrances (other than any Permitted Liens and Assumed Liabilities) and (b) execute and deliver to the Purchaser such documents or other instruments as may be reasonably requested by Purchaser to assign and transfer the Assumed Contracts to the Purchaser.

22.    The Cure Amounts (as defined in the Stalking Horse Purchase Agreement) listed on the Assumed Contracts Exhibit are the sole amounts necessary to be paid upon assumption of the Assumed Contracts under Bankruptcy Code sections 365(b)(1)(A) and (B) and 365(f)(2)(A). All Cure Amounts shall be paid by the Purchaser. Upon the payment of the Cure Amounts, if any, by the Purchaser, the Assumed Contracts shall remain in full force and effect, and no default shall exist under the Assumed Contracts nor shall there exist any event or condition which, with the passage of time or giving of notice, or both, would constitute such a default. The Cure Amounts shall not be subject to further dispute or audit, including, without limitation, any based on performance prior to the Closing Date, irrespective of whether such Assumed Contract contains an audit clause. After the payment of the Cure Amounts by the Purchaser, none of the Debtors or the Purchaser shall have any further liabilities to the counterparties to the Assumed Contracts other than the Purchaser's obligations under the Assumed Contracts that accrue and become due and payable on or after the Closing Date.

23.    In the event of a dispute as of, or after, the Closing Date regarding assumption and assignment or Cure Amount of any executory contract or unexpired lease proposed to be an

Assumed Contract, the assumption and assignment of such executory contract or unexpired lease, and payment of any applicable Cure Amounts, shall be made following the entry of an order of the Court resolving any such dispute (or upon the consensual resolution of such dispute as may be agreed by the Purchaser and such counterparty and, solely with respect to disputes regarding Cure Amounts, the Debtors). Upon an election of the Purchaser to designate an executory contract or unexpired lease as an Excluded Contract (as defined in, and in accordance with, the Stalking Horse Purchase Agreement), the Purchaser shall have no liability whatsoever to the counterparty to such executory contract or unexpired lease or the Debtors.

24.      To the extent any non-Debtor counterparty to an Assumed Contract has failed to timely object to a proposed Cure Amount, such Cure Amount has been and shall be deemed to be finally determined as the Cure Amount listed on the Assumption Notice and Assumed Contracts Exhibit and any such non-Debtor counterparty shall be prohibited from challenging, objecting to, or denying the validity and finality of the Cure Amount at any time. The non-Debtor counterparty to an Assumed Contract is forever bound by the applicable Cure Amount and, upon payment of the Cure Amounts as provided herein and in the Stalking Horse Purchase Agreement, is hereby enjoined from taking any action against Purchaser with respect to any claim for cure under the Assumed Contract.

25.      Any provisions in any Assumed Contract that prohibit or condition the assignment of such Assumed Contract or allow the party to such Assumed Contract to terminate, recapture, impose any penalty, condition on renewal or extension or modify any term or condition upon assignment of such Assumed Contract, constitute unenforceable anti-assignment provisions that are void and of no force and effect.

26.     Any party that may have had the right to consent to the assignment of an Assumed Contract is deemed to have consented to such assignment, including for purposes of Bankruptcy Code sections 365(c)(1)(B) and 365(e)(2)(A)(ii) and otherwise, if such party failed to timely object to the assumption and assignment of such Assumed Contract.

27.     Each Assumed Contract constitutes an executory contract or unexpired lease under the Bankruptcy Code and all requirements and conditions under Bankruptcy Code sections 363 and 365 for the assumption by the Debtors and assignment to the Purchaser of the Assumed Contracts have been, or will be, satisfied. Upon the Purchaser's assumption of the Assumed Contracts in accordance with the terms hereof, in accordance with Bankruptcy Code sections 363 and 365, (a) the Purchaser shall be fully and irrevocably vested with all rights, title and interest of the Debtors under the Assumed Contracts, (b) the Purchaser shall be deemed to be substituted for the Debtors as a party to the applicable Assumed Contracts, and (c) the Debtors shall be relieved, pursuant to Bankruptcy Code section 365(k), from any further liability under the Assumed Contracts.

28.     The Purchaser has demonstrated adequate assurance of future performance under the relevant Assumed Contracts within the meaning of Bankruptcy Code sections 365(b)(1)(C) and 365(f)(2)(B).

29.     There shall be no rent accelerations, assignment fees, increases or any other fees charged to the Debtors or the Purchaser as a result of the assumption, assignment and sale of the Assumed Contracts. Subject to the terms of the Stalking Horse Purchase Agreement, the validity of the transactions contemplated by the Stalking Horse Purchase Agreement, including, without limitation, the Sale Transaction and the assumption and assignment of the Assumed Contracts, shall not be affected by any dispute between any of the Debtors or their affiliates, and another

party to an Assumed Contract regarding the payment of any amount. Upon assignment to the Purchaser, the Assumed Contracts shall be valid and binding, in full force and effect and enforceable by the Purchaser in accordance with their respective terms.

30.    Pursuant to Bankruptcy Code sections 105(a), 363, and 365, all counterparties to the Assumed Contracts are forever barred and permanently enjoined from raising or asserting against the Debtors or the Purchaser any assignment fee, default, breach or claim of pecuniary loss, or condition to assignment, arising under or related to the Assumed Contracts existing as of and including the Closing Date under the Stalking Horse Purchase Agreement or arising by reason of the consummation of transactions contemplated by the Stalking Horse Purchase Agreement, including, without limitation, the Sale Transaction and the assumption and assignment of the Assumed Contracts.

31.    All counterparties to the Assumed Contracts shall cooperate and expeditiously execute and deliver, upon the reasonable requests of the Purchaser, and shall not charge the Debtors or the Purchaser for, any instruments, applications, consents or other documents which may be required or requested by any public or quasi-public authority or other party or entity to effectuate the applicable transfers in connection with the Sale of the Transferred Assets.

32.    Notwithstanding anything to the contrary in this Order or the Stalking Horse Purchase Agreement, no contract between the Debtors, on the one hand, and Oracle Corporation Singapore Pte. Ltd., Oracle Corporation UK Limited and Oracle America, Inc. (jointly, "Oracle"), on the other hand, will be assumed and/or assigned without Oracle's prior written consent or further Order of Court, specifically relating to Oracle, upon notice and opportunity to be heard by the parties.  In addition, no provision of this Order or any Transition Services Agreement shall authorize: (x) the transfer of any Oracle license agreement to any third party; or (y) use of any

Oracle license agreement that is inconsistent with the relevant license grant including, but not limited to, exceeding the number of authorized users, shared use, or license splitting, absent Oracle's express prior written consent or further Order of Court.

## Failure to Specify Provisions

33.     The failure specifically to include any particular provisions of the Stalking Horse Purchase Agreement in this Order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Court that the Stalking Horse Purchase Agreement be authorized and approved in its entirety; provided, however, that this Order shall govern if there is any inconsistency between the Stalking Horse Purchase Agreement (including all ancillary documents executed in connection therewith) and this Order. Likewise, all of the provisions of this Order are nonseverable and mutually dependent. To the extent that this Order is inconsistent with any prior order or pleading with respect to the Motion in these Chapter 11 Cases, the terms of this Order shall control.

## Non-Material Modifications

34.     The Stalking Horse Purchase Agreement and any related agreements, documents, or other instruments may be modified, amended, or supplemented by the parties thereto, in a writing signed by such parties, and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment or supplement does not have a material adverse effect on the Debtors' estates.

## Sensitive Location Data Program

35.     Within the time periods specified below, the Purchaser must establish and implement, and thereafter maintain, a "Sensitive Location Data Program" designed to develop a

comprehensive list of Sensitive Locations[5] and to prevent the use, sale, licensing, transfer, or disclosure of Sensitive Location Data[6].    To satisfy this requirement, the Purchaser must at a minimum:

Within 180 days of the Closing Date (as defined in the Stalking Horse Purchase Agreement):

    A.    Document in writing the components of the Sensitive Location Data Program as well as the plan for implementing and maintaining the Sensitive Location Data Program;

    B.    Identify a senior officer, such as a Chief Privacy Officer or Chief Compliance Officer, to be responsible for the Sensitive Location Data Program.  The senior officer will be approved by and report directly to the Purchaser's board of managers or a committee thereof (the "Board");

    C.    Provide the written program and any evaluations thereof or updates thereto to the Board at least every twelve months;

Within 270 days of the Closing Date:

    D.    Develop procedures, including through the use of services obtained from third parties, to identify Sensitive Locations to be used by the Purchaser in preventing the sale, license, transfer, use, or other sharing or disclosure of Sensitive Location Data.  If a building or place is identified as including both a Sensitive Location and a non-Sensitive Location, the Purchaser may associate Location Data with the non-Sensitive Location only;

    E.    Test procedures and implement the Sensitive Location Data Program;

From and after implementation of the Sensitive Location Data Program:

    F.    Assess, update and document, at least once every six months, the accuracy and completeness of the Purchaser's list of Sensitive Locations using the methods, sources, products, or services developed by the Purchaser or provided to it by third parties.  The

---

[5]  "**Sensitive Locations**" means locations within the United States associated on the basis of NAICS and/or SIC codes, if any, with:  (1) medical facilities (e.g., family planning centers, general medical and surgical hospitals, offices of physicians, offices of mental health physicians and practitioners, residential mental health and substance abuse facilities, outpatient mental health and substance abuse centers, outpatient care centers, psychiatric and substance abuse hospitals, and specialty hospitals); religious organizations; (3) correctional facilities; (4) labor union offices; (5) locations of entities held out to the public as predominantly providing education or childcare services to minors; (6) associations held out to the public as predominantly providing services based on racial or ethnic origin; or (7) locations held out to the public as providing temporary shelter or social services to homeless, survivors of domestic violence, refugees, or immigrants.

[6]  "**Sensitive Location Data**" means any consumer Location Data associated with a Sensitive Location.

Purchaser's assessments must include a verification that the Purchaser's list includes Sensitive Locations known to the Purchaser. The Purchaser must maintain documentation of such assessments for 5 years;

G. Implement policies, procedures, and technical measures reasonably designed to prevent the Purchaser from using, selling, licensing, transferring, or otherwise sharing or disclosing Sensitive Location Data, and monitor and test the effectiveness of these policies, procedures, and technical measures at least once every six months. Such testing must be reasonably designed to verify that the Purchaser is not using, selling, licensing, transferring, or otherwise sharing or disclosing Sensitive Location Data;

H. Delete or render non-sensitive, Sensitive Location Data associated with locations included in the list developed pursuant to Subparts D and E, within 60 days of adding the location to the list of Sensitive Locations. The Purchaser must not use, provide access to, or disclose Sensitive Location Data during the process of deleting or rendering non- sensitive, for any other purpose;

I. Evaluate and adjust the Sensitive Location Data Program in light of any material changes to the Purchaser's operations or business arrangements, or any other circumstance that the Purchaser knows or has reason to know may have a material and adverse impact on the Sensitive Location Data Program's effectiveness. At a minimum, the Purchaser must evaluate the Sensitive Location Data Program every twelve months and implement modifications, as necessary, based on the results of the evaluation; and

J. Maintain policies, procedures, and technical measures reasonably designed to prevent recipients of the Purchaser's Location Data[7] from (i) associating such data with (a) locations held out to the public as predominantly providing services to LGBTQ+ individuals such as service organizations, bars and nightlife, (b) locations of public gatherings of individuals during political or social demonstrations, marches and protests, or (ii) using such Location Data to determine the identity or the location of an individual's home, i.e., the location of any individual's private residences (e.g., single family homes, apartments, condominiums, townhomes) (together, "Prohibited Uses"). Such policies, procedures, and technical measures shall include:

   (i) contractual prohibitions against recipients of the Purchaser's Location Data from using the Purchaser's Location Data in whole or in part to associate a specific individual with the locations identified above;

---

[7] "**Location Data**" means any data that may reveal a mobile device's or consumer's precise location, including but not limited to Global Positioning System (GPS) coordinates, cell tower information, or precise location information inferred from basic service set identifiers (BSSIDs), WiFi Service Set Identifiers (SSID) information, or Bluetooth receiver information, and any unique persistent identifier combined with any such data, such as a mobile advertising identifier (MAID) or identifier for advertisers (IDFA). Data that reveals only a mobile device or consumer's coarse location (e.g., zip code or census block location with a radius of at least 1,850 feet) is not Location Data.

(ii)    marking techniques, such as seeding, or salting, reasonably designed to detect recipients' non-compliance with contractual prohibitions;

(iii)    assessing and documenting recipients' compliance at least once every twelve months; and

(iv)    terminating relationships with recipients for non-compliance.

### Supplier Assessment Program

36.    Within 180 days of the Closing Date, the Purchaser must implement a program reasonably designed to ensure that consumers have provided consent for the collection and use of Location Data obtained by the Purchaser, including by implementing and maintaining a "Supplier Assessment Program." In connection with the Supplier Assessment Program, the Purchaser must, at a minimum:

A.    Document in writing the content, implementation, and maintenance of the Supplier Assessment Program;

B.    Conduct an initial assessment either within 30 days of a third party entering into data sharing agreements with the Purchaser (or, for parties with existing data-sharing agreements, within 90 days of the Closing Date) or within 30 days of the initial date of data collection from such a third party, and thereafter annually, reasonably designed to confirm that consumers specifically consent to the collection, use, and sale of their Location Data;

C.    Create and maintain records of the suppliers' responses obtained by the Purchaser under the Supplier Assessment Program for 5 years; and

D.    Cease from using, selling, licensing, transferring, or otherwise sharing or disclosing Location Data for which consumers have not provided consent.

### Additional Provisions

37.    Each and every federal, state and governmental agency or department, and any other person or entity, is hereby authorized to accept any and all documents and instruments in connection with or necessary to consummate the Sale Transaction and all other transactions contemplated by the Stalking Horse Purchase Agreement.

38.     To the extent provided in Bankruptcy Code section 525(a), no governmental unit may revoke or suspend any right, license, copyright, patent, trademark or other permission relating to the use of the Transferred Assets sold, transferred or conveyed to the Purchaser on account of the filing or pendency of these Chapter 11 Cases or the consummation of the Sale of the Transferred Assets.

39.     Absent the express written consent of the Purchaser, the Debtors shall not settle or otherwise resolve any existing or future litigation with any third party or any governmental entity other than any settlement pursuant to which no restrictions are placed on or affecting the Transferred Assets or the operation of the business from and after the Closing Date or otherwise directly or indirectly materially affect the operations of, or impose successor or any other theory of liability upon, the Purchaser.

40.     Notwithstanding anything to the contrary herein, the Purchaser and the Debtors will preserve and maintain all records responsive to any subpoena from the U.S. Securities and Exchange Commission ("SEC") for a period not to exceed seven years, or, if earlier, at such time as the SEC staff has advised such party in writing that the staff has no objection to abandonment or destruction of such records; provided, that, if the Purchaser or the Debtors notify the SEC in writing of their intent to destroy or abandon such records and the SEC fails to respond within 60 days of the delivery of such notice, the SEC shall be deemed to consent to such abandonment or destruction of such records; provided further, that, the Purchaser shall be responsible only for preserving and maintaining any such responsive records that are Purchased Assets (as defined in the Stalking Horse APA) and in the custody and control of the Purchaser; and, provided further, that nothing herein shall limit the rights of the Debtors or the Purchaser to contest, object to, or otherwise respond to any such subpoena.

41.     Unless expressly preserved pursuant to the Stalking Horse Purchase Agreement or the *Combined Disclosure Statement and Chapter 11 Plan of Liquidation of Near Intelligence, Inc. and its Affiliated Debtors* [Docket No. 22] (the "<u>Plan</u>"), all claims and causes of action under chapter 5 of the Bankruptcy Code and similar claims and causes of action under state or other applicable law held by the Sellers first arising on or prior to the Closing Date, whether actual or potential, against any and all parties (such claims and actions, the "<u>Avoidance Actions</u>") and all of the rights, claims or causes of action of the Sellers of any kind, including those available under the Bankruptcy Code shall be Transferred Assets pursuant to the Stalking Horse Purchase Agreement (together with the Avoidance Actions, the "<u>Transferred Claims</u>"). The Purchaser agrees it shall not initiate, and shall cause its Affiliates or any subsidiary acquired in the Sale Transaction, not to initiate, continue, or otherwise maintain, any civil, administrative, or other proceeding related to Avoidance Actions against any party. For the avoidance of doubt, except to the extent expressly preserved pursuant to the Stalking Horse Purchase Agreement or this Order, the Purchaser, to the fullest extent permissible under applicable law, is deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged any and all Avoidance Actions.

42.     Except as expressly provided in the Stalking Horse Purchase Agreement, nothing in this Order shall be deemed to waive, release, extinguish or estop the Debtors or their estates from asserting, or otherwise impair or diminish, any right (including, without limitation, any right of recoupment), claim, cause of action, defense, offset or counterclaim in respect of any Excluded Asset (as defined in the Stalking Horse Purchase Agreement) or Retained Cause of Action (as defined in the Plan).

43.     Notwithstanding anything to the contrary herein, in the Stalking Horse Purchase Agreement or in the Final DIP Order, the amounts held in the Carve Out Reserves (as defined in

the Final DIP Order) shall constitute Excluded Cash (as defined in the Stalking Horse Purchase Agreement). Nothing in this Order shall impair, modify, or otherwise affect the Carve Out. The DIP Agent and DIP Lenders (each as defined in the DIP Orders) shall be deemed to have satisfied their obligations with respect to the Carve Out (as defined in the Final DIP Order) and the Carve Out Reserves as set forth in the Final DIP Order.

44.    Except as expressly set forth in this Order, nothing herein shall otherwise impair, modify, or affect the Final DIP Order.

45.    All entities that are presently, or on the Closing Date may be, in possession of some or all of the Transferred Assets are hereby directed to surrender possession of the Transferred Assets to the Purchaser on or prior to the Closing Date or such later date that such party and Purchaser mutually agree.

46.    Nothing contained in any plan of liquidation or reorganization, or order of any type or kind entered in these Chapter 11 Cases, any subsequent chapter 7 or chapter 11 case of the Debtors, or any related proceeding subsequent to entry of this Order, will conflict with or derogate from the terms of this Order or the Stalking Horse Purchase Agreement.

47.    This Order and the Stalking Horse Purchase Agreement shall be binding in all respects upon all prepetition and postpetition creditors of the Debtors, all interest holders of the Debtors, all non-Debtor parties to the Assumed Contracts, the Official Committee of Unsecured Creditors appointed on December 22, 2023 (the "Committee"), all successors and assigns of the Debtors and their affiliates and subsidiaries, and any trustees, examiners, "responsible persons" or other fiduciaries appointed in these Chapter 11 Cases or upon a conversion of the Debtors' cases to those under chapter 7 of the Bankruptcy Code, including a chapter 7 trustee, and the Stalking Horse Purchase Agreement and Sale Transaction shall not be subject to rejection or avoidance

under any circumstances by any party. If any order under Bankruptcy Code section 1112 is entered, such order shall provide (in accordance with Bankruptcy Code sections 105 and 349) that this Order and the rights granted to the Purchaser hereunder shall remain effective and, notwithstanding such dismissal, shall remain binding on parties in interest. For the avoidance of doubt, the Debtors' inability to satisfy in full all administrative expense claims of the Debtors' estates shall not be a basis for termination, rejection or avoidance (as applicable) of the Stalking Horse Purchase Agreement or the Sale Transaction.

48.   This Court shall retain jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Order and the Stalking Horse Purchase Agreement, all amendments thereto and any waivers and consents thereunder and each of the agreements executed in connection therewith to which the Debtors are a party or which has been assigned by the Debtors to the Purchaser, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the Sale Transaction, including any and all disputes with any counterparty to any executory contract or unexpired lease of the Debtors (including, without limitation, disputes with respect to assumption and assignment of any Assumed Contracts or any cure disputes) and any party that has, or asserts, possession, control or other rights in respect of any of the Transferred Assets; provided, however, that, in the event the Court abstains from exercising or declines to exercise such jurisdiction with respect to the Stalking Horse Purchase Agreement, the Bidding Procedures Order, or this Order, such abstention, refusal, or lack of jurisdiction shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction of any other court having competent jurisdiction with respect to any such matter. This Court retains jurisdiction to compel delivery of the Transferred Assets, to protect the Debtors and their assets, including the Transferred Assets, against any Claims and Successor or Transferee Liability and to enter orders, as

42

appropriate, pursuant to Bankruptcy Code sections 105(a) or 363 (or other applicable provisions) necessary to transfer the Transferred Assets to the Purchaser.

49.     At any time prior to the Closing Date, the Purchaser or the Debtors may terminate the Stalking Horse Purchase Agreement pursuant to the terms thereof without any penalty or liability to the Purchaser or the Debtors (or their estates), except as set forth in the Stalking Horse Purchase Agreement and this Order.

50.     This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a). Notwithstanding any provision in the Bankruptcy Rules to the contrary, including but not limited to Bankruptcy Rules 6004(h) and 6006(d), the Court expressly finds there is no reason for delay in the implementation of this Order and, accordingly: (a) the terms of this Order shall be immediately effective and enforceable upon its entry; (b) the Debtors are not subject to any stay of this Order or in the implementation, enforcement or realization of the relief granted in this Order; and (c) the Debtors and the Purchaser may, in their discretion and without further delay, take any action and perform any act authorized under this Order.

51.     The Purchaser shall not be required to seek or obtain relief from the automatic stay under Bankruptcy Code section 362, to give any notice permitted by the Stalking Horse Purchase Agreement or to enforce any of its remedies under the Stalking Horse Purchase Agreement or any other sale-related document. The automatic stay imposed by Bankruptcy Code section 362 is modified solely to the extent necessary to implement the preceding sentence; provided however, that this Court shall retain jurisdiction over any and all disputes with respect thereto.

52.     Notwithstanding the provisions of Bankruptcy Rules 6004(h) and 6006(d) or any applicable provisions of the Local Rules, this Order shall not be stayed after the entry hereof, but shall be effective and enforceable immediately upon entry, and the 14-day stay provided in

Bankruptcy Rules 6004(h) and 6006(d) is hereby expressly waived and shall not apply. Time is of the essence in closing the Sale Transaction and the Debtors and the Purchaser intend to close the Sale Transaction as soon as practicable.

53.    All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

**<u>Exhibit 1</u>**

EXECUTION VERSION

**ASSET PURCHASE AGREEMENT**

by and among

BTC NEAR HOLDCO LLC,

as Buyer,

THE SELLERS PARTY HERETO,

NEAR INTELLIGENCE SAS,

NEAR INTELLIGENCE PTY. LTD.,

and

solely for the purposes stated expressly herein,

BLUE TORCH FINANCE LLC,

as Administrative Agent and Collateral Agent


Dated as of December 8, 2023

# TABLE OF CONTENTS

## ARTICLE I
## DEFINITIONS

1.1    Defined Terms ...................................................................................................2
1.2    Other Definitional Provisions .........................................................................16

## ARTICLE II
## TRANSFER OF ASSETS AND LIABILITIES

2.1    Purchased Assets...............................................................................................18
2.2    Excluded Assets.................................................................................................19
2.3    Assumed Liabilities ..........................................................................................21
2.4    Excluded Liabilities ..........................................................................................21
2.5    Assumption and Assignment of Assumed Contracts.......................................23

## ARTICLE III
## CLOSING AND PURCHASE PRICE

3.1    Closing; Transfer of Possession; Certain Deliveries ......................................26
3.2    Purchase Price; Related Matters ......................................................................27
3.3    Allocation of Purchase Price............................................................................27
3.4    Withholding ......................................................................................................28

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF SELLERS

4.1    Organization and Good Standing......................................................................28
4.2    Power and Authority .........................................................................................29
4.3    Foreign Subsidiaries.........................................................................................29
4.4    Litigation...........................................................................................................29
4.5    No Contravention..............................................................................................30
4.6    Consents and Approvals ...................................................................................30
4.7    Title to Purchased Assets; Sufficiency ...........................................................30
4.8    Validity of Available Contracts .......................................................................30
4.9    Intellectual Property..........................................................................................31
4.10   Employee Benefits............................................................................................33
4.11   Labor Matters....................................................................................................34
4.12   Conduct of Business .........................................................................................35
4.13   Compliance with Laws; Permits ......................................................................35
4.14   [Reserved] .........................................................................................................36
4.15   Financial Advisors............................................................................................36
4.16   [Reserved] .........................................................................................................36
4.17   Tax Matters .......................................................................................................36
4.18   Real Property ....................................................................................................37
4.19   Tangible Personal Property...............................................................................38

4.20    Insurance ....................................................................................................38
4.21    Condition and Suitability of Purchased Assets ........................................38
4.22    Anti-Corruption ........................................................................................38
4.23    OFAC .........................................................................................................39
4.24    Related Party Transactions .......................................................................39
4.25    Customers and Suppliers ...........................................................................40
4.26    Disclaimer of Other Representations and Warranties ...............................40

ARTICLE V
REPRESENTATIONS AND WARRANTIES OF BUYER

5.1    Organization and Good Standing................................................................40
5.2    Power and Authority ..................................................................................40
5.3    No Contravention .......................................................................................40
5.4    Consents and Approvals .............................................................................40
5.5    Litigation ....................................................................................................41
5.6    Financial Advisors .....................................................................................41
5.7    Sufficient Funds; Adequate Assurances ....................................................41
5.8    Acknowledgements; "As Is" "Where Is" Transaction ..............................41

ARTICLE VI
COVENANTS OF THE PARTIES

6.1    Conduct of Business Pending the Closing .................................................42
6.2    Negative Covenants ...................................................................................43
6.3    Access .........................................................................................................45
6.4    Confidentiality ...........................................................................................46
6.5    Public Announcements ...............................................................................46
6.6    Employment Matters ..................................................................................47
6.7    Reasonable Efforts; Approvals ..................................................................48
6.8    Corporate Name Change ............................................................................49
6.9    Assignment of Contracts and Rights..........................................................49
6.10    Tax Matters ................................................................................................50
6.11    Available Contracts List ............................................................................51
6.12    HSR Act; Antitrust Laws ...........................................................................51

ARTICLE VII
BANKRUPTCY PROVISIONS

7.1    Expense Reimbursement.............................................................................52
7.2    Bankruptcy Court Orders and Related Matters..........................................53
7.3    Bankruptcy Milestones ..............................................................................54

ARTICLE VIII
CONDITIONS TO OBLIGATIONS OF THE PARTIES

8.1    Conditions Precedent to Obligations of Buyer ..........................................55
8.2    Conditions Precedent to the Obligations of the Sellers .............................56

8.3    Conditions Precedent to Obligations of Buyer and the Sellers..........................................57
8.4    Frustration of Closing Conditions........................................................................................57

ARTICLE IX
TERMINATION

9.1    Termination of Agreement....................................................................................................57
9.2    Consequences of Termination..............................................................................................59

ARTICLE X
MISCELLANEOUS

10.1    Expenses ...............................................................................................................................60
10.2    Assignment ...........................................................................................................................60
10.3    Parties in Interest..................................................................................................................60
10.4    Matters Related to the Administrative Agent .....................................................................60
10.5    Risk of Loss ..........................................................................................................................61
10.6    Notices ..................................................................................................................................61
10.7    Entire Agreement; Amendments and Waivers ...................................................................62
10.8    Counterparts..........................................................................................................................62
10.9    Invalidity ...............................................................................................................................63
10.10   Governing Law .....................................................................................................................63
10.11   Dispute Resolution; Consent to Jurisdiction.....................................................................63
10.12   WAIVER OF RIGHT TO TRIAL BY JURY.....................................................................64
10.13   Specific Performance ...........................................................................................................64
10.14   Third Party Beneficiaries ....................................................................................................64
10.15   Counting................................................................................................................................64
10.16   Survival.................................................................................................................................64
10.17   Non-Recourse .......................................................................................................................64
10.18   Preparation of this Agreement ............................................................................................65
10.19   Releases.................................................................................................................................65
10.20   Schedules ..............................................................................................................................65
10.21   Fiduciary Obligation ............................................................................................................66

**Exhibits**

Exhibit A        Bidding Procedures Order

# ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (the "Agreement"), dated as of December 8, 2023 (the "Agreement Date"), is made and entered into by and among (i) BTC Near HoldCo LLC, a Delaware limited liability company (together with any assignee(s) or designee(s) pursuant to Section 10.2, "Buyer"), (ii) Near Intelligence, Inc., a Delaware corporation ("Holdings"), Near Intelligence LLC, a Delaware limited liability company (f/k/a Paas Merger Sub 2 LLC and successor in interest to Near Intelligence Holdings Inc.) (the "Borrower"), Near North America Inc., a Delaware corporation ("Near North America"), and Near Intelligence Pte. Ltd., a company organized under the Laws of Singapore ("Near Singapore") (each a "Seller," and collectively, the "Sellers"), (iii) Blue Torch Finance LLC, a Delaware limited liability company, solely in its capacity as administrative agent and collateral agent for the lenders under the Prepetition Financing Agreement and the DIP Facility (as defined below) and signing solely with respect to Section 3.2, Section 5.2(b), Section 10.2, Section 10.4, and Sections 10.7-10.19 of this Agreement (the "Administrative Agent"), and (iv) Near Intelligence SAS and Near Intelligence Pty. Ltd., each signing solely with respect to Section 6.1 and Section 6.2. The Administrative Agent, Buyer and Sellers collectively are referred to herein as the "Parties" and each, a "Party."

## RECITALS:

A.      The Sellers, together with their subsidiaries, operate a global, full stack data intelligence platform that curates data on people and places from which its customers can derive actionable intelligence on consumer behavior to help its customers make meaningful decisions (the "Business").

B.      Reference is made to that certain Financing Agreement, dated as of November 4, 2022, by and among the Borrower, the guarantors from time to time party thereto, the lenders from time to time party thereto (the "Prepetition Lenders"), and the Administrative Agent (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Prepetition Financing Agreement"). The obligations under the Prepetition Financing Agreement and the other Prepetition Loan Documents (as defined below) are secured by Liens in and upon substantially all property and assets of the Sellers.

C.      Buyer is an entity organized for the purpose of effecting the rights and interests of the Prepetition Lenders in accordance with the terms and conditions of the Prepetition Loan Documents.

D.      Simultaneously with or immediately following execution of this Agreement, each of the Sellers intends to file voluntary petitions for relief under chapter 11 of Title 11 of the United States Code, 11 U.S.C. Sections 101 et seq. (as amended, the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") (such cases, the "Cases").

E.      Upon the terms and subject to the conditions set forth in this Agreement, and as authorized under sections 363 and 365 of the Bankruptcy Code as relates to the Sellers, the Sellers propose to sell, transfer and assign to Buyer, and Buyer proposes to purchase, acquire and assume from the Sellers, respectively, the Purchased Assets and Assumed Liabilities.

NOW, THEREFORE, in consideration of the mutual representations, warranties, covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and upon the terms and subject to the conditions hereof, the Parties, intending to be legally bound, hereby agree as follows:

**ARTICLE I**
**DEFINITIONS**

1.1    <u>Defined Terms</u>. As used herein, the terms below shall have the following respective meanings:

"<u>Acquired Bank Accounts</u>" shall mean any bank accounts of Sellers that Buyer elects to acquire by written notice to Sellers on or before the date that is ten (10) days prior to Closing; <u>provided</u>, that the Parties shall agree in good faith as to one or more bank accounts that the Debtors shall retain in connection with the wind down and liquidation of the Seller entities and businesses following the Closing (the "<u>Retained Bank Account(s)</u>").

"<u>Acquired Intellectual Property</u>" shall mean, collectively, all Owned Intellectual Property and Licensed Intellectual Property.

"<u>Administrative Agent</u>" shall have the meaning set forth in the Preamble.

"<u>Administrative Expenses</u>" shall mean, collectively, the administrative expenses incurred by Debtors in the Cases, including expenses of the kind specified in Sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 507(b), 546(c), 546(d), or 726 (to the extent permitted by Law) of the Bankruptcy Code, and any other provision of the Bankruptcy Code (including, subject to entry of the DIP Order, Section 506(c) of the Bankruptcy Code).

"<u>Affiliate</u>" shall mean, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"<u>Agreement</u>" shall have the meaning set forth in the Preamble.

"<u>Agreement Date</u>" shall have the meaning set forth in the Preamble.

"<u>Allocation Schedule</u>" shall have the meaning set forth in <u>Section 3.3</u>.

"<u>Alternate Transaction</u>" shall mean a transaction or transactions pursuant to which any of the Sellers or any of its subsidiaries, in one or a series of transactions, sells, transfers, exchanges, leases or otherwise disposes of, directly or indirectly, all or any material portion of the Purchased Assets, including any transaction pursuant to one or more Competing Qualified Bids or through any other asset sale, stock sale, share exchange, debt-for-equity swap, joint venture, credit bid, financing, merger, amalgamation, business combination, reorganization, restructuring or recapitalization, a plan of reorganization, a plan of arrangement or any similar transaction, in each

2

case that would not involve a sale or disposition of any or all of the Purchased Assets (other than sale of the products of the Business in the Ordinary Course of Business) or the Business to Buyer; provided, that any disposition of Purchased Assets that is expressly permitted by Section 6.2 of this Agreement shall not be deemed an Alternate Transaction.

"Anti-Corruption Laws" shall mean the FCPA and all other applicable Laws concerning or relating to bribery or corruption in any jurisdiction in which any Seller or any of its subsidiaries is located or is doing business.

"Anti-Money Laundering Laws" shall mean the U.S. Patriot Act, as amended, and all other applicable Laws in any jurisdiction in which any Seller or any of its subsidiaries is located or is doing business, which Laws relate to money laundering, any predicate crime to money laundering, or any financial record keeping and reporting requirements related thereto.

"Antitrust Laws" shall have the meaning set forth in Section 6.12(b).

"Assumed Benefit Plans" shall have the meaning set forth in Section 2.3(i).

"Assumed Contracts" shall have the meaning set forth in Section 2.5(a).

"Assumed Liabilities" shall have the meaning set forth in Section 2.3.

"Assumption Notice" shall have the meaning set forth in Section 2.5(f).

"Auction" shall mean the auction for the Purchased Assets to be conducted on the Auction Date in the event of the submission of one or more Competing Qualified Bids in accordance with the terms and provisions of the Bidding Procedures Order and as expressly defined in the Bidding Procedures.

"Auction Date" shall mean the date of the Auction scheduled by the Bankruptcy Court and set forth in the Bidding Procedures Order or such later date as shall be announced by the Sellers and agreed upon by the Sellers and Buyer.

"Available Contracts" shall have the meaning set forth in Section 2.5(a).

"Avoidance Actions" shall mean those actual and/or potential claims and causes of action under sections 502(d), 544, 545, 547, 548 and 550 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code.

"Bankruptcy Code" shall have the meaning set forth in the Recitals.

"Bankruptcy Court" shall have the meaning set forth in the Recitals.

"Bankruptcy Milestones" shall have the meaning set forth in Section 7.3.

"Bankruptcy Rules" shall mean the Federal Rules of Bankruptcy Procedure originally promulgated pursuant to 28 U.S.C. § 2075 and the general, local and chambers rules of the Bankruptcy Court, applicable to the Cases.

3

"Benefit Plan" shall mean any "employee benefit plan" (within the meaning of Section 3(3) of ERISA, including multiemployer plans within the meaning of Section 3(37) of ERISA), and all pension, severance, retirement, consulting, compensation, profit sharing, commission, employment, change in control, retention, fringe benefit, bonus, stock or other equity, equitybased, option, incentive compensation, restricted stock, stock appreciation right or similar right, phantom equity, profits interests, deferred compensation, employee loan, vacation, paid time off, welfare, medical, dental, vision, flexible benefit, cafeteria, dependent care, disability or wage continuation benefits during periods of absence from work (including short-term disability, long-term disability and worker's compensation benefits), supplemental unemployment, hospitalization, life insurance, death or survivor benefits, employment insurance, and all other employee benefit plans, programs, policies, practices, agreements and other arrangements, and any funding vehicle therefor now in effect or required to be established in the future as a result of the transactions contemplated by this Agreement, in each case, whether or not subject to ERISA, whether formal or informal, written or oral, insured or self-insured, funded or unfunded, binding or not, that (i) provides benefits or compensation to, or which has any application to, any present or former employee, director, independent contractor or other individual service provider of any Seller or any beneficiary or dependent of such persons, (ii) is adopted, maintained, sponsored, contributed to, or required to be contributed to by any Seller, or (iii) with respect to which any Seller is a party, is bound, participates in, or has or could reasonably be expected to have any Liability with respect thereto, whether actual or contingent, or direct or indirect.

"Bidding Procedures" shall mean the Bidding Procedures filed with the Bankruptcy Court in the form attached as Exhibit 1 to the Bidding Procedures Order and approved by the Bankruptcy Court, with such changes thereto being in form and substance reasonably acceptable to Sellers and Buyer.

"Bid" shall have the meaning ascribed to such term in the Bidding Procedures.

"Bidding Procedures Motion" shall mean the motion filed in the Cases, which motion shall be in form and substance reasonably satisfactory to Sellers and Buyer (together with all exhibits thereto), (i) seeking approval of (A) this Agreement and the Transactions and (B) the Bidding Procedures and scheduling certain dates, deadlines and forms of notice in connection therewith, (ii) authorizing the payment of the Expense Reimbursement to Buyer, and (iii) granting other related relief.

"Bidding Procedures Order" shall mean the order of the Bankruptcy Court approving the Bidding Procedures Motion, the Bidding Procedures and granting the relief requested therein in the form set forth hereto as Exhibit A with changes thereto being in form and substance reasonably acceptable to Buyer.

"Bill of Sale and Assignment and Assumption Agreement" shall have the meaning set forth in Section 3.1(b)(i).

"Budget" shall have the meaning ascribed thereto in the DIP Documents.

"Business" shall have the meaning set forth in the Recitals.

"Business Day" shall mean any day other than a Saturday, Sunday or a legal holiday on which banking institutions in New York City, New York or Governmental Entities in the State of Delaware are authorized or obligated by Law or executive order to close.

"Buyer" shall have the meaning set forth in the Preamble.

"Buyer Group" shall mean means Buyer, any Affiliate of Buyer and each of their respective former, current or future Affiliates, officers, directors, employees, partners, members, managers, agents, advisors, successors or permitted assigns.

"Cases" shall have the meaning set forth in the Recitals.

"Claims" shall have the meaning as defined in the Bankruptcy Code.

"Closing" shall mean the consummation of the Transactions.

"Closing Date" shall have the meaning set forth in Section 3.1(a).

"Code" shall mean the Internal Revenue Code of 1986, as amended, and the regulations promulgated thereunder.

"Competing Qualified Bid" shall have the meaning set forth in the Bidding Procedures Order.

"Confidential Information" shall mean all information in any form or medium that relates to the Business, the Purchased Assets or the Assumed Liabilities, including financial information, projections, pricing structures, technical data, Trade Secrets, know-how, ideas, inventions, designs, research, development plans, identities of, and arrangements with, customers and suppliers, software and databases, but shall not include any information that (i) at the time of disclosure thereof is generally available to the public (other than as a result of disclosure in violation of this Agreement), (ii) is, was or hereafter becomes available to the receiving party from a source not known by the receiving party to be bound by obligations of confidentiality with respect to such information, or (iii) is independently developed by the receiving party following the Closing Date without reliance on or use of any Confidential Information.

"Contract" shall mean any lease, sublease, license, sublicense, agreement, contract, contract right, obligation, trust, purchase order, sale order, instrument and other similar arrangements, whether or not in written form, that is binding upon a Person or its property (including any binding commitment to enter into any of the foregoing).

"Contracting Parties" shall have the meaning set forth in Section 10.17.

"Copyrights" shall have the meaning set forth in the definition of Intellectual Property.

"Credit Bid Amount" shall have the meaning set forth in Section 3.2(a).

"Credit Documents" shall mean, collectively, the Prepetition Loan Documents and the DIP Documents.

"Cure Amounts" shall mean all amounts payable that must be paid or otherwise satisfied to cure all of the Sellers' monetary defaults under the Assumed Contracts at the time of the assumption thereof and assignment to Buyer pursuant to section 365 of the Bankruptcy Code.

"Debt" shall mean, without duplication, (i) indebtedness or other obligations for borrowed money or in respect of loans or advances or issued in substitution for or exchange of indebtedness for borrowed money or loans or advances, whether short-term or long-term, secured or unsecured, (ii) any indebtedness or other obligations evidenced by any note, bond, debenture or other debt security or instrument, (iii) all obligations to pay the deferred purchase price of property or services, contingent or otherwise (including all "earn-out" obligations), (iv) all obligations under interest rate and currency hedging agreements, including swap breakage or associated fees, (v) all obligations arising from bankers' acceptances, letters of credit (to the extent drawn) and cash/book overdrafts or similar facilities, (vi) all obligations for the payment of which a Person is responsible or liable, directly or indirectly, as obligor, guarantor or otherwise, including guarantees of such obligations, (vii) any obligations under leases that have been or are required to be, in accordance with GAAP, recorded as capital leases, (viii) any indebtedness or other obligations secured by a Lien on any Seller's interest in any assets, and (ix) all accrued interest, premiums, penalties (including any prepayment penalties or premiums) and other obligations related to any of the foregoing.

"Debtors" shall mean the Sellers as debtors in possession in the Cases.

"Designation Notice" shall have the meaning set forth in Section 2.5(a).

"Determination Date" shall have the meaning set forth in Section 2.5(a).

"DIP Documents" shall mean that certain Superpriority Secured Debtor-in-Possession Financing Agreement by and among the DIP Lenders, the Sellers and the Administrative Agent and the other Loan Documents (as defined therein).

"DIP Facility" shall mean the debtor-in-possession term loan facility pursuant to which the DIP Lenders agreed to provide up to $16 million in debtor-in-possession financing commitments on the terms set forth in the DIP Documents.

"DIP Lenders" shall mean the lenders providing the DIP Facility.

"Documents" shall mean all of the Sellers' written files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, plans, operating records, safety and environmental reports, data, studies, and documents, Tax Returns, ledgers, journals, title policies, customer lists, regulatory filings, operating data and plans, research material, technical documentation (design specifications, engineering information, test results, maintenance schedules, functional requirements, operating instructions, logic manuals, processes, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), and other similar materials, in each case whether or not in electronic form.

"Equity Interests" of any Person shall mean all (i) shares of capital stock, rights to purchase shares of capital stock, warrants, options, calls or restricted stock (whether or not currently

6

exercisable), (ii) equity appreciation, phantom stock, stock plans, profit participation plans, profit units, profit interests, equity plans or similar rights, (iii) participations or other equivalents of or interests in (however designated, including units thereof) the equity (including common stock, preferred stock and limited liability company, partnership and joint venture interests) of such Person and (iv) securities exchangeable for or convertible or exercisable into any of the foregoing.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended, and the regulations promulgated thereunder.

"ERISA Affiliate" shall mean, with respect to any Person, any trade or business (whether or not incorporated) which is a member of a group of which such Person is a member and which would be deemed to be a "controlled group" within the meaning of Sections 414(b), (c), (m) and (o) of the Code.

"Excluded Assets" shall have the meaning set forth in Section 2.2.

"Excluded Cash" shall mean, an amount in cash, determined as of the Closing Date, that has not otherwise been disbursed by the Sellers and their subsidiaries in accordance with the Budget from (i) any borrowings under the DIP Facility and (ii) the amount of cash and cash equivalents of the Sellers and their subsidiaries as of the date hereof

"Excluded Contracts" shall have the meaning set forth in Section 2.2(a).

"Excluded Liabilities" shall have the meaning set forth in Section 2.4.

"Expense Reimbursement" shall mean, following entry of the Bidding Procedures Order, all reasonable and documented out-of-pocket fees and expenses, including all professional fees and expenses and travel expenses, incurred by Buyer or the Administrative Agent, in each case, without duplication and to the extent not otherwise payable to, and received by, the Administrative Agent pursuant to the DIP Documents or the Prepetition Loan Documents, in connection with the diligence, negotiation, execution, delivery, performance and enforcement of this Agreement and the Transactions contemplated thereby, which aggregate total amount shall not, in any event, exceed $1,000,000.

"Express Representations" shall have the meaning set forth in Section 5.8(c).

"Extended Contract Period" shall have the meaning set forth in Section 2.5(a).

"FCPA" shall mean the Foreign Corrupt Practices Act of 1977, as amended, 15 U.S.C. §§78dd-1, et seq.

"Final DIP Order" shall mean an Order of the Bankruptcy Court acceptable to the Debtors and Administrative Agent, authorizing and approving on a final basis, among other things, the DIP Documents and the DIP Facility (as the same may be amended, supplemented, or modified from time to time after entry thereof in accordance with the terms thereof) as to which no stay has been entered.

"<u>Final Order</u>" shall mean an Order of the Bankruptcy Court or other applicable court (a) that is not the subject of a pending appeal, petition for certiorari, motion for reconsideration or leave to appeal or other proceeding for review, rehearing or reargument, (b) that has not been reversed, vacated, modified or amended, is not stayed and remains in full force and effect, and (c) with respect to which the time to appeal, to petition for certiorari, to move for reconsideration or to seek review, rehearing or reargument shall have expired, as a result of which such order shall have become final in accordance with Rule 8002 of the Federal Rules of Bankruptcy Procedure or other applicable Laws, as applicable.

"<u>Foreign Subsidiaries</u>" shall mean each of the following subsidiaries of the Sellers: (i) Near Intelligence SAS, a simplified joint-stock company organized under the Laws of France; (ii) Near Intelligence Pvt. Ltd., a private company organized under the Laws of India; and (iii) Near Intelligence Pty. Ltd., a private company organized under the Laws of Australia.

"<u>GAAP</u>" shall mean United States generally accepted accounting principles.

"<u>Government Official</u>" shall mean any officer or employee of a Governmental Entity or any department, agency, or instrumentality thereof, or of a public international organization, or any person acting in an official capacity for or on behalf of any such Governmental Entity or department, agency, or instrumentality, or for or on behalf of any such public international organization, or any political party, party official, or candidate thereof, excluding officials related to the government of the United States.

"<u>Governmental Entity</u>" shall mean any (i) federal, state, provincial, local, municipal, foreign or other government, (ii) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official, or entity and any court, arbitrator or other tribunal) or (iii) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory, or taxing authority, including any arbitral tribunal.

"<u>Hired Employees</u>" shall mean, collectively, the employees of the Sellers who accept an offer of employment by Buyer at or prior to the Closing and actually commence employment with Buyer upon the Closing.

"<u>HSR Act</u>" shall mean the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"<u>Income Taxes</u>" means Taxes imposed on, or measured by, income or profits, including franchise taxes imposed in lieu of income tax.

"<u>Intellectual Property</u>" shall mean all intellectual property and industrial property, whether protected, created or arising under the Laws of the United States or any other jurisdiction, including all: (i) patents and patent applications, all continuations, divisionals, and continuations-in-part of any of the foregoing, all patents issuing on any of the foregoing, and all reissues, renewals, substitutions, reexaminations and extensions of any of the foregoing (collectively, "<u>Patents</u>"); (ii) trademarks, service marks, trade names, service names, brand names, trade dress rights, logos, corporate names, trade styles, logos and other source or business identifiers and general intangibles of a like nature, together with the goodwill associated with any of the foregoing, and all

applications, registrations, renewals and extensions of any of the foregoing (collectively, "Marks"); (iii) internet domain names; (iv) copyrights, works of authorship, and all mask work, database and design rights, whether or not registered or published, all applications, registrations, reversions, extensions and renewals of any of the foregoing, and all moral rights, however denominated (collectively, "Copyrights"); (v) trade secrets and other confidential or proprietary information (collectively, "Trade Secrets"); (vi) rights of publicity, persona rights or other rights to use indicia of any Person's personality; and (vii) Technology and other intellectual property or industrial property rights arising from or relating to any Technology.

"Interim DIP Order" shall mean an Order of the Bankruptcy Court (as the same may be amended, supplemented, or modified from time to time after entry thereof in accordance with the terms thereof), in form and substance acceptable to the Debtors and Administrative Agent, authorizing on an interim basis, among other things, the DIP Documents and the DIP Facility.

"IT Systems" shall mean all information technology, computers, computer systems and communications systems owned, operated, leased or licensed by any Seller.

"Knowledge of the Sellers" shall mean, as to a particular matter, the actual knowledge of Gladys Kong and John Faieta.

"Labor Laws" shall mean, collectively, to the extent applicable to any Seller, any federal, national, state, and foreign Laws governing labor and/or employment and employment-related matters, including all such Laws relating to wages, employee classification, other compensation and benefits (including but not limited to any applicable federal, state or local laws concerning COVID-19 related paid sick leave or other benefits), family and medical leave and other leaves of absence, the provision of meal and rest periods/breaks, hours, vacation, severance, restrictive covenants, background checks and screening, immigration, WARN Act and any similar federal, state, provincial or local "mass layoff" or "plant closing" Law, collective bargaining, discrimination, harassment, retaliation, civil rights, safety and health (including but not limited to the federal Occupational Safety and Health Act and any applicable state or local laws concerning COVID-19-related health and safety issues), and workers' compensation.

"Law" shall mean any federal, state, provincial, local or foreign statute, law, ordinance, regulation, rule, code, order, treaty, administrative interpretation, guideline, principle of common law or equity, judgment enacted, promulgated, issued, enforced or entered by any Governmental Entity.

"Leased Real Property" shall mean each parcel of real property leased by a Seller as tenant, lessee or sublessee and used in or necessary for the conduct of the Business as currently conducted, together with all rights, title and interest of each such Seller in and to leasehold improvements relating thereto.

"Leases" shall mean all leases, subleases, licenses, concessions and other agreements pursuant to which a Seller holds any Leased Real Property.

"Lenders" shall mean, collectively, the Prepetition Lenders and the DIP Lenders.

"Liabilities" shall mean, as to any Person, all debts, adverse claims, liabilities, commitments, responsibilities, and obligations of any kind or nature whatsoever, direct, indirect, asserted or unasserted, absolute or contingent, of such Person, whether accrued, vested or otherwise, whether known or unknown, and whether or not actually reflected, or required to be reflected, in such Person's balance sheets or other books and records, including any liability for Taxes.

"Licensed Intellectual Property" shall mean all Intellectual Property (other than Owned Intellectual Property) used, held for use or practiced in connection with the Business.

"Lien" shall mean any claim, pledge, option, charge, hypothecation, easement, security interest, license, right-of-way, encroachment, mortgage, statutory or deemed trust, and deed of trust or other encumbrance.

"Marks" shall have the meaning set forth in the definition of Intellectual Property.

"Material Adverse Effect" shall mean any event, change, occurrence, circumstance, development, condition, fact or effect, which, when considered either individually or in the aggregate together with other events, changes, occurrences, circumstances, developments, conditions, facts or effects, is or would reasonably be expected to be materially adverse to (i) the Business or the properties, assets, condition (financial or otherwise), results or operations of the Business or the Purchased Assets, or (ii) any Seller's ability to consummate the Transactions, other than with respect to clause (i) hereof any event, change, occurrence, circumstance, development, condition or change of fact, arising out of, resulting from or attributable to (A) general business or economic conditions affecting the United States or those countries within which the Business operates or the industries in which the Business operates, (B) a change in GAAP or regulatory accounting principles or interpretations thereof after the date hereof, or a change in applicable Law by any Governmental Entity after the date hereof, (C) any act of war or terrorism (or, in each case, escalation thereof), cyberattack or declaration of a national emergency, (D) any pandemic or epidemic, (E) general economic or political conditions, (F) financial, banking or securities markets (including (w) any disruption of any of the foregoing markets, (x) any change in currency exchange rates, (y) any decline or rise in the price of any security, commodity, Contract or index, and (z) any increased cost, or decreased availability, of capital), (G) any act or omission by any Seller or any of their respective Affiliate required to be taken pursuant to the terms of the Final DIP Order, (H) any change in the market price, credit rating or trading volume of Holdings' stock or other securities or any change affecting the ratings or the ratings outlook for Holdings, (I) any matter disclosed in the Sellers' Disclosure Schedules, (J) the negotiation, public announcement, or pendency of this Agreement or the Transactions, (K) any failure, in and of itself, to achieve any budgets, projections, forecasts, estimates, plans, predictions, performance metrics or operating statistics or the inputs into such items (whether or not shared with Buyer or its Affiliates or Representatives), (L) any action taken by Buyer or its Affiliates with respect to the Transactions or the financing thereof, (M) (x) the commencement or pendency of the Cases, (y) any objections in the Bankruptcy Court to (1) this Agreement or any of the Transactions, (2) any requirements in the Sale Order or the Bidding Procedures Order or any actions or omissions of the Sellers or their Affiliates in compliance therewith, (3) the Sale Order or the reorganization or liquidation of the Sellers or their Affiliates, or (4) the assumption or rejection of any Available Contract, or (z) any requirements in the Sale Order or the Bidding Procedures Order, which each are in form and

10

substance acceptable to Buyer, or any other actions or omissions of the Sellers or their Affiliates in compliance therewith, or (N) any natural disaster, except in each case covered by clauses (A) through (F) to the extent such event, change, occurrence, circumstance, development, condition or change of fact disproportionately and adversely affects any Seller as compared to other companies in a business similarly situated to that of the Business.

"Non-Recourse Persons" shall have the meaning set forth in Section 10.17.

"Notices" shall have the meaning set forth in Section 10.6.

"OFAC" shall mean The Office of Foreign Assets Control of the U.S. Department of the Treasury.

"Open Source Software" shall mean any Software that is subject to, or licensed, provided or distributed under, any license meeting the Open Source Definition (as promulgated by the Open Source Initiative as of the date of this Agreement) or the Free Software Definition (as promulgated by the Free Software Foundation as of the date of this Agreement) or any similar license for "free," "publicly available" or "open source" Software, including the GNU General Public License, the Lesser GNU General Public License, the Apache License, the BSD License, Mozilla Public License (MPL), the MIT License or any other license that includes similar terms.

"Order" shall mean any judgment, order, injunction, writ, ruling, verdict, decree, stipulation, award or other binding obligation, pronouncement or determination of any Governmental Entity or arbitration tribunal.

"Ordinary Course of Business" shall mean the conduct and operation of the Business, taken as a whole, in the ordinary course, consistent with past practice, and in accordance with applicable Law.

"Organizational Documents" shall mean, with respect to any Person (other than a natural Person), (i) the certificate or articles of incorporation, formation or organization and any limited liability company, operating or partnership agreement, or similar organizational document adopted or filed in connection with the creation, formation or organization of such Person and (ii) all bylaws and equity holders agreements or similar arrangements to which such Person (or holders of its Equity Interests) is a party relating to the organization or governance of such Person, in each case, as amended or supplemented.

"Outside Date" shall have the meaning set forth in Section 9.1(b)(ii).

"Owned Intellectual Property" shall mean all Intellectual Property owned or purported to be owned by any Seller.

"Party" or "Parties" shall have the meaning set forth in the Preamble.

"Permits" shall mean all licenses, certificates, consents, permits, registrations, quotas, and other authorizations of any Governmental Entity relating to the Purchased Assets or used by the Sellers in connection with the Business, and all pending applications therefor.

"<u>Permitted Liens</u>" shall mean (i) Liens for utilities and Taxes, assessments or other governmental charges not yet due and payable or the amount or validity of which is being contested in good faith by appropriate proceedings or the nonpayment of which is permitted or required by the Bankruptcy Code, (ii) zoning, entitlement and other land use and environmental regulations by any Governmental Entity having jurisdiction over any Real Property which are not violated by the current use, occupancy or operation of any Real Property, (iii) easements, rights of way, restrictive covenants, encroachments, and similar non-monetary encumbrances or non-monetary impediments against any of the Purchased Assets which do not, individually or in the aggregate, adversely affect the operation of the Purchased Assets and, in the case of the Leased Real Property, which do not, individually or in the aggregate, adversely affect the use or occupancy of such Leased Real Property as it relates to the operation of the Purchased Assets, (iv) materialmans', mechanics', artisans', shippers', warehousemans' or other similar common law or statutory liens incurred in the Ordinary Course of Business for amounts not yet due and payable, (v) licenses granted on a non-exclusive basis in the Ordinary Course of Business, and (vi) such other defects, exceptions, restrictions, imperfections in title, charges, easements, restrictions and encumbrances (other than in connection with the Loan Debt) which would not, individually or in the aggregate, reasonably be expected to materially detract from the property and/or the use of the property for its intended purpose in the Ordinary Course of Business.

"<u>Person</u>" shall mean an individual, partnership, joint venture, corporation, business trust, limited liability company, trust, unincorporated organization, association, joint stock company, estate, Governmental Entity or other entity.

"<u>Personal Information</u>" shall mean, (a) "personal data" or "personally identifiable information" or "PII" provided by applicable Law or by the Sellers; or (b) information that identifies, could be used to identify, or is otherwise associated with an identifiable individual.

"<u>Personal Property Leases</u>" shall have the meaning set forth in <u>Section 4.19</u>.

"<u>Petition Date</u>" shall mean the date on which the Debtors file voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

"<u>Plan</u>" shall mean a plan of reorganization or liquidation for the Debtors pursuant to sections 1125, 1126, 1129 and 1145 of the Bankruptcy Code (as applicable), to be implemented in the Cases.

"<u>Post-Closing Tax Period</u>" shall mean all taxable years or other taxable periods that end after the Closing Date and, with respect to any taxable year or other taxable period beginning on or before and ending after the Closing Date, the portion of such taxable year or period beginning after the Closing Date.

"<u>Pre-Closing Tax Period</u>" shall mean all taxable years or other taxable periods that end on or before the Closing Date and, with respect to any taxable year or other taxable period beginning on or before and ending after the Closing Date, the portion of such taxable year or period ending on and including the Closing Date.

"<u>Prepetition Financing Agreement</u>" shall have the meaning set forth in the Recitals.

"<u>Prepetition Lenders</u>" shall have the meaning set forth in the Recitals.

"<u>Prepetition Loan Documents</u>" shall mean the Prepetition Financing Agreement and the other Loan Documents (as defined therein).

"<u>Previously Omitted Contract</u>" shall have the meaning set forth in <u>Section 2.5(k)(i)</u>.

"<u>Previously Omitted Contract Notice</u>" shall have the meaning set forth in <u>Section 2.5(k)(ii)</u>.

"<u>Privacy Laws</u>" shall mean any and all applicable Laws relating to the receipt, collection, compilation, use, storage, processing, sharing, safeguarding, security (technical, physical or administrative), disposal, destruction, disclosure or transfer (including cross-border) of any Personal Information.

"<u>Proceeding</u>" shall mean any action, claim, complaint, arbitration, governmental investigation, prosecution, order, litigation, proceeding, or suit (whether civil, criminal, administrative, investigative, appellate, or informal) of any kind whatsoever, regardless of the legal theory under which such Liability or obligation may be sought to be imposed, whether sounding in Contract or tort, or whether at law or in equity, or otherwise under any legal or equitable theory, commenced, brought, conducted, or heard by or before, or otherwise involving, any Governmental Entity or arbitrator.

"<u>Professional Fees and Expenses</u>" shall mean the reasonable and documented fees and expenses of professionals of Debtors and any committee appointed in the Cases pursuant to section 1102 of the Bankruptcy Code that are accrued and unpaid as of the Closing Date, whether or not included in a fee statement or fee application at such time and whether or not allowed by the Bankruptcy Court at such time.

"<u>Purchase Price</u>" shall have the meaning set forth in <u>Section 3.2(a)</u>.

"<u>Purchased Assets</u>" shall mean all right, title and interest of each of the Sellers, as of the Closing, in, to and under all of the assets, properties, interests, rights and claims of the Sellers as of the Closing (whether owned, leased, licensed, used or held for use by the Sellers), wherever situated and of whatever kind and nature, real or personal, tangible or intangible, and whether or not reflected on the books and records of the Sellers, including the assets, properties, rights and claims as of the Closing described in <u>Section 2.1</u>, other than the Excluded Assets.

"<u>Related Party</u>" shall have the meaning set forth in <u>Section 4.24(a)</u>.

"<u>Related Party Transactions</u>" shall have the meaning set forth in <u>Section 4.24(a)</u>.

"<u>Representative</u>" shall mean, with respect to any Person, such Person's officers, managers, directors, employees, agents and representatives (including any investment banker, financial advisor, accountant, legal counsel or expert retained by or acting on behalf of such Person or its Affiliates).

"<u>Sale Order</u>" shall mean the Order which shall be in a form and substance reasonably acceptable to Buyer and Sellers in their sole discretion and which shall, among other things: (i)

approve, pursuant to sections 363 and 365 of the Bankruptcy Code (A) the execution, delivery and performance by the Sellers of this Agreement, including each and every term and condition hereof, and the other instruments and agreements contemplated hereby, (B) the sale of the applicable Purchased Assets of the Sellers to Buyer free and clear of all Liens and Liabilities (other than Permitted Liens and Assumed Liabilities), on the terms set forth herein, (C) the assumption of the Assumed Liabilities of the Sellers by Buyer on the terms set forth herein and (D) effective as of the Closing, the release of Sellers from amounts due and owing under (x) the Prepetition Loan Documents and (y) the DIP Documents up to an amount equal to the Credit Bid Amount; (ii) authorize the Sellers to assume and assign to Buyer the Assumed Contracts; (iii) find that Buyer has provided adequate assurance of future performance with respect to the Assumed Contracts to which any Seller is a party; (iv) find that Buyer is a "good faith" buyer within the meaning of section 363(m) of the Bankruptcy Code; (v) provide that neither Buyer nor any of its Affiliates or equityholders will have any derivative, successor, transferee or vicarious liability of any kind or character, whether fixed or contingent, for Liabilities of the Sellers (whether under federal or state Law or otherwise), including on account of any Taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the operation of the Business prior to the Closing (except for such Transfer Taxes that constitute Assumed Liabilities); (vi) waive in all necessary jurisdictions, (A) the so-called "bulk sales," "bulk transfer" and similar Laws, including those related to Taxes and (B) the imposition of any Taxes incurred in connection with the Transactions and the Sale Order; (vii) enjoin all Persons from commencing any proceeding or taking any action against Buyer or any of its Affiliates to recover any claim that such Person has solely against the Sellers or their Affiliates; and (viii) provide that the obligations of the Sellers relating to Taxes, whether arising under Law, by this Agreement, or otherwise, shall be fulfilled by the Sellers (except as specifically set forth in the Agreement).

"Sanctioned Entity" shall mean (i) a country or a government of a country, (ii) an agency of the government of a country, (iii) an organization directly or indirectly controlled by a country or its government, or (iv) a Person resident in or determined to be resident in a country, in each case of clauses (i) through (iv), that is a target of Sanctions, including a target of any country sanctions program administered and enforced by OFAC.

"Sanctioned Person" shall mean, at any time (i) any Person named on the list of Specially Designated Nationals and Blocked Persons maintained by OFAC, OFAC's consolidated Non SDN list or any other Sanctions related list maintained by any Governmental Entity, (ii) a Person that is a target of Sanctions, (iii) any Person operating, organized or resident in a Sanctioned Entity, or (iv) any Person directly or indirectly owned or controlled (individually or in the aggregate) by or acting on behalf of any such Person or Persons described in clauses (i) through (iii) above.

"Sanctions" shall mean any and all economic sanctions, trade sanctions, financial sanctions, sectoral sanctions, secondary sanctions, trade embargoes, anti-terrorism Laws and other sanctions, Laws, regulations or embargoes, including those imposed, administered or enforced from time to time by: (i) the United States of America, including those administered by OFAC, the U.S. Department of State, the U.S. Department of Commerce, or through any existing or future executive order, (ii) the United Nations Security Council, (iii) the European Union or any European Union member state, (iv) Her Majesty's Treasury of the United Kingdom, or (v) any other Governmental Entity with jurisdiction over any Seller or its Affiliates.

"<u>Seller Registered Intellectual Property</u>" shall mean all issued Patents, pending Patent applications, Mark registrations, applications for Mark registration, Copyright registrations, applications for Copyright registration and internet domain names, in each case, included in the Owned Intellectual Property.

"<u>Seller Software</u>" shall mean all Software owned or purported to be owned by, or developed by or for, any Seller.

"<u>Sellers</u>" shall have the meaning set forth in the Preamble.

"<u>Sellers' Disclosure Schedules</u>" shall mean the disclosure schedules delivered by the Sellers to Buyer concurrently with the execution and delivery of this Agreement on the Agreement Date.

"<u>Software</u>" shall mean, collectively, any and all (i) computer programs, including any and all software implementations of algorithms, models and methodologies, whether in source code or object code, (ii) databases and compilations, including any and all data and collections of data, whether machine readable or otherwise, (iii) descriptions, flow-charts and other work product used to design, plan, organize and develop any of the foregoing, screens, user interfaces, report formats, firmware, development tools, templates, menus, buttons and icons, and (iv) all documentation including user manuals and other training documentation related to any of the foregoing.

"<u>Tax</u>" or "<u>Taxes</u>" shall mean (i) all U.S. federal, state, local, foreign and other taxes, assessments, duties or charges of any kind whatsoever, including, income, profits, gains, net worth, sales and use, *ad valorem,* gross receipts, sales, use, business and occupation, license, premium, minimum, alternative or add-on minimum, environmental, estimated, stamp, customs duties, occupation, property (real or personal), franchise, capital stock, license, excise, value added, payroll, employment, social security (or similar), escheat or unclaimed property, unemployment, transfer, severance, registration, lease, service, recording, documentary, permit or authorization, intangibles or other tax (whether payable directly or by withholding), together with any penalty, fine, addition to tax or interest on the foregoing; (ii) any liability in respect of any items described in clause (i) payable by reason of contract, assumption, transferee or successor liability, operation of Law, Treasury Regulations Section 1.1502-6(a) or any analogous or similar provision of any state, local, or non-U.S. Law (or any predecessor or successor thereof) or otherwise; and (iii) any Liability in respect of any items described in clause (i) as a result of being a "transferee" of the taxpayer or entity or a number of a related, non-arm's length, affiliated or combined group.

"<u>Tax Return</u>" shall mean any return, declaration, report, claim for refund, or information return or statement (including elections, declarations, disclaimers, notices, disclosures, schedules, estimates) relating to Taxes, including any schedule or attachment thereto, and including any amendment or supplement thereof.

"<u>Technology</u>" shall mean all technology, formulae, algorithms, procedures, processes, methods, techniques, ideas, know-how, creations, inventions (whether patentable or unpatentable and whether or not reduced to practice), discoveries, improvements, product, servicing, business, financial and supplier information and materials, specifications, designs, models, devices, prototypes, schematics and development tools, Software, websites, recordings, graphs, drawings,

reports, analyses and other writings and other tangible embodiments of any of the foregoing, in any form or media whether or not specifically listed in this definition.

"Third Party Consents" shall have the meaning set forth in Section 6.7(b).

"Trade Secrets" shall have the meaning set forth in the definition of Intellectual Property.

"Transaction Dispute" shall have the meaning set forth in Section 10.10.

"Transactions" shall mean the sale of the Purchased Assets pursuant to this Agreement and the other transactions contemplated by this Agreement.

"Transfer Tax" or "Transfer Taxes" shall mean any stamp, sales, use, transfer, conveyance, recording, registration, filing or other similar non-Income Tax, fee, duty or charge imposed upon the sale, transfer or assignment of property or any interest therein or the recording thereof, and any penalty, addition to Tax or interest with respect thereto.

"Treasury Regulations" shall mean the regulations promulgated under the Code, as such regulations may be amended from time to time.

"U.S. Patriot Act" shall mean Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA Patriot Act of 2001).

"WARN Act" shall mean the Worker Adjustment and Retraining Notification Act of 1988, as amended, and any successor Law, and the rules and regulations thereunder and under any successor Law, and any comparable Law under the Laws of any state.

1.2    Other Definitional Provisions.

(a)    The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Section, Schedule and Exhibit references are to this Agreement unless otherwise specified.

(b)    All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(c)    The meanings given to terms defined herein shall be equally applicable to both singular and plural forms of such terms.

(d)    Whenever the words "include," "includes" or "including" are used in this Agreement they shall be deemed to be followed by the words "without limitation." Where the context permits, the use of the term "or" will be equivalent to the use of the term "and/or."

(e)    Words denoting any gender shall include all genders. Where a word or phrase is defined herein, each of its other grammatical forms shall have a corresponding meaning.

(f)     A reference to any Party shall include such Party's successors and permitted assigns.

(g)     The word "extent" in the phrase "to the extent" means the degree to which a subject or other thing extends, and such phrase does not mean simply "if".

(h)     References herein to any Law shall be deemed to refer to such Law as amended, modified, codified, reenacted, replaced, supplemented or superseded in whole or in part and in effect from time to time, including any successor legislation thereto, and also to all rules and regulations promulgated thereunder, and references to any section or other provision of a Law means that section or provision of such Law in effect from time to time and constituting the substantive amendment, modification, codification, reenactment, replacement or supplement of such section or other provision; provided that for purposes of any representation or warranty set forth herein, with respect to any violation of or non-compliance with, or alleged violation of or non-compliance, with any Law, the reference to such Law means such as in effect at the time of such violation or non-compliance or alleged violation or non-compliance.

(i)     All references to "$" and dollars shall be deemed to refer to the currency of the United States of America.

(j)     The provision of a table of contents, the division into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement. References to the terms "Article," "Section," "clause," "Schedule" and "Exhibit" are references to the Articles, Sections, clauses, Schedules and Exhibits to this Agreement unless otherwise specified.

(k)     References to "days" means calendar days unless Business Days are expressly specified. When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period will be excluded. If the last day of such period is a day other than a Business Day, the period in question will end on the next succeeding Business Day.

(l)     References to "written" or "in writing" include in electronic form (including by e-mail transmission or electronic communication by portable document format (.pdf)).

(m)     The word "will" will be construed to have the same meaning and effect as the word "shall". The words "shall," "will," or "agree(s)" are mandatory, and "may" is permissive.

(n)     Any document or item will be deemed "delivered," "provided" or "made available" by the Sellers, within the meaning of this Agreement if such document or item is (a) included in the data room, (b) actually delivered or provided to Buyer or any of Buyer's Representatives, (c) made available upon request, including at the Sellers' or any of their Subsidiaries' offices or (d) publicly filed with the United States Securities and Exchange Commission.

(o)     Any reference to any agreement or Contract will be a reference to such agreement or Contract, as amended, modified, supplemented or waived.

## ARTICLE II
## TRANSFER OF ASSETS AND LIABILITIES

2.1    <u>Purchased Assets</u>. At the Closing, and upon the terms and subject to the conditions set forth herein and in the Sale Order and, with respect to the Sellers, subject to the approval of the Bankruptcy Court pursuant to sections 363 and 365 of the Bankruptcy Code, the Sellers shall sell, convey, assign, transfer and deliver to Buyer, and Buyer shall purchase, acquire and accept from the Sellers, all of the right, title and interest of each of the Sellers as of the Closing, free and clear of all Liens (other than Permitted Liens and Assumed Liabilities), in, to and under, all of the Purchased Assets. The Purchased Assets shall include Sellers' rights, titles and interests in, to and under each of the following of the Sellers as of the Closing:

(a)    other than the Excluded Cash, (i) all cash, money orders, third-party checks, wire transfers and any other funds of the Sellers, commercial paper, marketable securities, demand deposits, reserves for Taxes, certificates of deposit and other bank deposits, deposits of any Seller with any third-party (including any vendor, manufacturer, customer, utility or landlord or other cash deposits for rent, electricity, telephone or otherwise), treasury bills, and other cash equivalents and liquid investments and (ii) the Acquired Bank Accounts;

(b)    all deposits, credits, and prepaid charges and expenses from whatever source paid;

(c)    all accounts receivable;

(d)    all Avoidance Actions other than those claims set forth on Schedule 2.1(s) that constitute Avoidance Actions (collectively, the "<u>Excluded Avoidance Actions</u>");

(e)    [Reserved];

(f)    all royalties, advances, prepaid assets, and other current assets;

(g)    all machinery, furniture, fixtures, furnishings, equipment, and other tangible personal property owned or used or held for use by the Sellers in the conduct of the Business, including all artwork, desks, chairs, tables, hardware, copiers, telephone lines and numbers, facsimile machines and other telecommunication equipment, cubicles and miscellaneous office furnishings and supplies;

(h)    all rights of any Seller under or pursuant to all warranties, representations and guarantees, including those made by suppliers, manufacturers and contractors or any other third party to and for the benefit of any Seller;

(i)    except as set forth in <u>Section 2.2(g)</u>, all current and prior insurance policies, to the extent transferable, and all rights and benefits of any nature of Sellers with respect thereto, including all insurance recoveries or proceeds thereunder and rights to assert claims with respect to any such insurance recoveries or proceeds;

(j)    all Permits, including those listed on <u>Schedule 2.1(j)</u>, to the extent transferable or assignable under Law;

18

(k)      all Assumed Contracts;

(l)      all Documents (other than Excluded Documents);

(m)      all Acquired Intellectual Property and all of Sellers' rights to institute and pursue Proceedings against third parties for past, present and future infringement, misappropriation or dilution of any of the foregoing, or other conflict therewith, and all of the Sellers' rights to recover damages or lost profits in connection with any of the foregoing;

(n)      all Equity Interests of the Foreign Subsidiaries owned by the Sellers;

(o)      all rights under non-disclosure or confidentiality, non-compete or non-solicitation agreements with current or former employees and non-employee agents of any Seller or with third parties (including any non-disclosure or confidentiality, non-compete, or non-solicitation agreement entered into in connection with the Auction);

(p)      any interest in any internet websites, URLs or internet domain names, and any applications and registrations pertaining thereto;

(q)      any loans owed to any Seller by any current or former employee, officer or director of any Seller;

(r)      the sponsorship of all Assumed Benefit Plans and all right, title and interest in any assets thereof or relating thereto;

(s)      all Claims, other than the Claims set forth on Schedule 2.1(s), that the Sellers may have against any Person, including (i) all other rights, claims, causes of action, rights of recovery, rights of set-off, and rights of recoupment as of the Closing of any Seller, in each case, arising out of or relating to events occurring on or prior to the Closing Date (and any proceeds paid from all current and prior insurance policies), and (ii) all claims that any Seller may have against any Person with respect to any other Purchased Assets or any Assumed Liabilities;

(t)      all other assets or rights of every kind and description of Sellers as of the Closing related to the Business, wherever located, whether real, personal or mixed, tangible or intangible that are not Excluded Assets; and

(u)      all goodwill related to the foregoing.

2.2      Excluded Assets. Notwithstanding anything herein contained to the contrary, from and after the Closing, each Seller shall retain, and Buyer shall not purchase, such Seller's right, title and interest in and to (and the Purchased Assets shall not include any of) the following assets and properties of the Sellers (collectively, the "Excluded Assets"), all of which shall remain the exclusive property of the Sellers:

(a)      any Contract other than (i) any Assumed Contract or (ii) any Contract otherwise included as a Purchased Asset under Section 2.1(h), Section 2.1(k), or Section 2.1(o) (collectively, the "Excluded Contracts");

(b)     any Contract or arrangement (including any loan or similar arrangement) with or binding upon any of the Sellers and any Related Party, except as set forth on <u>Schedule 2.3(i)</u>;

(c)     any intercompany accounts receivable owed between or among the Sellers;

(d)     all rights of the Sellers under this Agreement and the agreements and instruments delivered to the Sellers by Buyer pursuant to this Agreement;

(e)     all Documents (i) to the extent they relate to any of the Excluded Assets or Excluded Liabilities (including information stored on the computer systems, data networks or servers of any Seller); (ii) that are minute books, organizational documents, stock registers and such other books and records of any Seller as pertaining to ownership, organization or existence of such Seller, Tax Returns (and any related work papers), corporate seal, checkbooks, and canceled checks; (iii) prepared by or on behalf of Sellers in connection with this Agreement or the Transactions or related to the Cases or any other Excluded Asset; (iv) that any Seller is required by Law to retain; or (v) that are governed under GDPR or collected from natural persons with addresses in the European Union or European Economic Area; <u>provided</u> that, to the extent not prohibited by applicable Law, Buyer shall have the right to make copies of any portions or all of such Documents (collectively, "<u>Excluded Documents</u>");

(f)     all Equity Interests of the Sellers;

(g)     the Sellers' directors and officers liability insurance policies, if any, and all rights and benefits of any nature of Sellers with respect thereto, including all insurance recoveries thereunder and rights to assert claims with respect to such insurance recoveries;

(h)     all assets owned or used by the Sellers that are specifically identified in <u>Schedule 2.2(h)</u>;

(i)     all assets of the Sellers that would otherwise constitute a Purchased Asset (if owned immediately prior to the Closing) if conveyed or otherwise disposed of during the period from the date hereof until the Closing Date (i) at the direction of the Bankruptcy Court, (ii) as not prohibited by the terms of the DIP Documents, or (iii) in the Ordinary Course of Business;

(j)     all Permits other than those set forth on <u>Schedule 2.1(j)</u> and those Permits that are not transferable;

(k)     the sponsorship of all Benefit Plans that are not Assumed Benefit Plans and all right, title and interest in any asset thereof or relating thereto;

(l)     all rights related to the matters set forth on <u>Schedule 2.1(s)</u>;

(m)     all Excluded Avoidance Actions and all of the rights, claims or causes of action of the Sellers of any kind, including those available under the Bankruptcy Code, against any officer, director, employee, manager or Affiliate of, or lender to, any Seller or any of their respective Affiliates (and the proceeds of any insurance policies related to such rights, claims or causes of action) arising at any time period prior to the Closing; and

(n)     the Excluded Cash.

2.3     <u>Assumed Liabilities</u>. Upon the terms and subject to the conditions set forth in this Agreement and the Sale Order, and subject to the exclusions set forth in <u>Section 2.4</u> (and in the event of any conflict between the exclusions set forth in <u>Section 2.4</u> and the provisions of this <u>Section 2.3</u>, the exclusions set forth in <u>Section 2.4</u> shall prevail), as partial consideration for the Purchased Assets, Buyer shall, on and after the Closing, assume only the following Liabilities of the Sellers (the "<u>Assumed Liabilities</u>"):

(a)     all Liabilities under the Assumed Contracts to the extent that any such Liabilities under such Assumed Contracts: (i) arise out of or relate to events, occurrences, acts or omissions occurring solely after the Closing Date; (ii) do not arise from a breach, violation or default of such Assumed Contract by any Seller prior to the Closing; and (iii) are not required to be performed prior to the Closing;

(b)     all Liabilities relating to Buyer's ownership or operation of the Purchased Assets to the extent arising out of or relating to events, occurrences, acts or omissions occurring solely after the Closing Date and all Liabilities relating to the ownership of the Equity Interests of the Foreign Subsidiaries;

(c)     all Cure Amounts;

(d)     all accrued and unpaid Administrative Expenses incurred by Sellers prior to the Closing Date (other than Professional Fees and Expenses) not to exceed $1,000,000 in the aggregate (the "<u>Post-Petition Payables</u>");

(e)     all Liabilities in respect of wages and other compensation of employees of Sellers for the last pay period immediately preceding the Closing Date;

(f)     all current Liabilities, including all accounts payable and trade payables existing on the Closing Date (including, for the avoidance of doubt, (i) invoiced accounts payable and (ii) accrued but uninvoiced accounts payable) of Sellers not to exceed $3,000,000 in the aggregate;

(g)     all Liabilities relating to Hired Employees accruing on or after the close of business on the Closing Date, solely to the extent arising out of or relating to the Hired Employees' employment by Buyer or its Affiliates;

(h)     all Liabilities relating to Hired Employees' vacation and other time off to the extent set forth in <u>Section 6.6(c)</u>;

(i)     all Liabilities with respect to the Benefit Plans listed on <u>Schedule 2.3(i)</u> (the "<u>Assumed Benefit Plans</u>"); and

(j)     all Liabilities for Transfer Taxes pursuant to <u>Section 6.10(a)</u>.

2.4     <u>Excluded Liabilities</u>. Notwithstanding anything to the contrary set forth herein, Buyer shall not assume, and shall not be deemed to have assumed, and the Sellers shall be solely

and exclusively liable with respect to, all Liabilities of any Seller or any of their respective predecessors other than the Assumed Liabilities (collectively, the "Excluded Liabilities"). For the avoidance of doubt, and without limiting the foregoing, Buyer shall not be obligated to assume, nor assumes, and Buyer hereby disclaims, all of the Excluded Liabilities, including all of the following Liabilities of any Seller (or any of their respective predecessors) (each of which shall constitute an Excluded Liability hereunder):

(a)    any Liability for (i) Taxes of any Seller for any taxable period and (ii) Taxes relating to the operation of the Business or the ownership of the Purchased Assets for any Pre-Closing Tax Period;

(b)    any Claim in connection with or arising from or relating to any Excluded Asset, including any Taxes associated therewith;

(c)    any fees, costs and expenses (including legal fees and accounting fees) incurred by any Seller in connection with the Cases or the Transactions, including all fees, costs and expenses incurred in connection with or by virtue of (i) the negotiation, preparation and review of this Agreement and all agreements ancillary or related hereto, (ii) the preparation and submission of any filing or notice required to be made or given in connection with the Transactions, and the obtaining of any consent required to be obtained in connection with the Transactions, (iii) the negotiation, preparing and review of the DIP Documents and (iv) any Alternate Transaction;

(d)    any Liabilities of Sellers arising under or pursuant to Labor Laws relating to the pre-Closing periods;

(e)    any Liabilities relating to the Hired Employees arising prior to the Closing Date (other than those expressly set forth in Section 2.3 or Section 6.6(c)), and any Liabilities relating to all other current or former employees, directors, consultants and other individual service providers of the Sellers who are not Hired Employees arising at any time, in each case, including any severance, termination or payment in lieu of notice Liability, and any other Liability arising under or out of any Law or Contract in connection with such Person's employment, service or Contract with, or the termination of such Person's employment, service or Contract with, any Seller;

(f)    any Liabilities of the Sellers and their respective ERISA Affiliates with respect to any Benefit Plan or other compensation or benefit plan, program, policy, agreement or arrangement of the Sellers, other than with respect to any Assumed Benefit Plan, including any health, welfare, retirement, pension or profit sharing Liability, deferred compensation Liability, equity or equity-based incentive compensation Liability, any Liability under any employment agreements or offer letters, or any penalties, fines or other expenses resulting from any compliance issue with any Benefit Plan or Law, other than those Liabilities expressly assumed pursuant to Section 2.3(e) and Section 2.3(h);

(g)    other than Liabilities expressly assumed pursuant to Section 2.3(e) or Section 2.3(g) or set forth on Schedule 2.3(i), any success, retention, stay, change of control or similar bonuses and any other payments or benefits owing to current or former employees, independent contractors or consultants of the Sellers in connection with the consummation of the

22

Transactions, including the employer portion of any payroll, social security or similar Taxes in respect thereof;

(h)    any Liability of any Seller arising out of this Agreement or any agreement ancillary or related hereto;

(i)    any Liabilities arising out of or relating to the Business, the Purchased Assets or the ownership, operation or conduct thereof prior to the Closing (other than the Foreign Subsidiaries);

(j)    any Liabilities for accrued expenses and accounts payable of the Sellers, other than those assumed pursuant to Section 2.3(f);

(k)    any Liabilities of the Sellers arising as a result of any Proceeding, whether initiated prior to or following the Closing, to the extent related to the Purchased Assets, including any actions for breach of contract, violations of or non-compliance with Law (including Sanctions, Anti-Corruption Laws and Anti-Money Laundering Laws), or any tort actions related to periods prior to the Closing;

(l)    any Liabilities arising as a result of any Contract or arrangement (including any loan or similar arrangement) with or binding upon any of the Sellers and any Related Party (other than those Liabilities expressly assumed pursuant to Section 2.3(a) and as set forth on Schedule 2.3(i)) and all intercompany payables owed from one Seller to any other Seller;

(m)    any Liabilities of Sellers (i) existing prior to the filing of the Cases that are subject to compromise under the Bankruptcy Code or other applicable Law and (ii) to the extent not otherwise expressly assumed herein, incurred subsequent to the filing of the Cases and prior to the Closing;

(n)    any Liabilities arising out of Professional Fees and Expenses; and

(o)    any Administrative Expenses that do not constitute Post-Petition Payables and except as otherwise assumed pursuant to Section 2.3(f).

2.5    Assumption and Assignment of Assumed Contracts.

(a)    When delivered in accordance with Section 6.11, Schedule 2.5(a) will set forth a list of the executory Contracts to which one or more Sellers is a party, together with estimated Cure Amounts for each Assumed Contract (the "Available Contracts") which may be updated to add Contracts entered into in the Ordinary Course of Business or otherwise not prohibited by this Agreement following the date hereof. By the date that is two (2) Business Days prior to the Closing (such date, the "Determination Date"), Buyer shall designate in writing (each such writing, a "Designation Notice") which Available Contracts from Schedule 2.5(a) that Buyer wishes for Sellers to assume and assign to Buyer at the Closing (the "Assumed Contracts"). Buyer shall have the right to amend a Designation Notice in any respect at any time prior to the Determination Date. All Contracts of the Sellers that are listed on Schedule 2.5(a) and which Buyer does not designate in writing pursuant to a Designation Notice for assumption shall not constitute Assumed Contracts or Purchased Assets and shall automatically be deemed Excluded Assets;

provided, however, that if an Available Contract is subject to a Cure Amount dispute or other dispute as to the assumption or assignment of such Available Contract that has not been resolved to the mutual satisfaction of Buyer and the Sellers prior to the Determination Date, then the Determination Date shall be extended (but only with respect to such Available Contract) to no later than the earlier of (A) the date on which such dispute has been resolved to the mutual satisfaction of Buyer and the Sellers, (B) the date on which such Available Contract is deemed rejected by operation of section 365 of the Bankruptcy Code and (C) the date upon which such dispute is finally determined by the Bankruptcy Court (the "Extended Contract Period"). If a Designation Notice with respect to such Available Contract is not delivered by Buyer in writing by the date which is three (3) Business Days following the expiration of such Extended Contract Period, such Available Contract shall be automatically deemed an Excluded Asset. For the avoidance of doubt, except as set forth in Section 2.3, Buyer shall not assume or otherwise have any Liability with respect to any Excluded Asset. At Buyer's reasonable request, the Sellers shall make reasonably available to Buyer the appropriate employees of the Sellers necessary to discuss the outstanding Available Contracts.

(b)    The Sellers shall use commercially reasonable efforts to take all actions required by the Bankruptcy Court to obtain an Order (which shall be the Sale Order, unless as otherwise determined by Buyer) containing a finding that the proposed assumption and assignment of the Assumed Contracts to Buyer satisfies all applicable requirements of section 365 of the Bankruptcy Code.

(c)    At the Closing, the Sellers shall, pursuant to the Sale Order and the Bill of Sale and Assignment and Assumption Agreement, assume and assign, or cause to be assigned, to Buyer, each of the Assumed Contracts that is capable of being assumed and assigned as of such date.

(d)    Buyer will cooperate with the Sellers in communicating with third parties to Available Contracts as may be reasonably necessary to assist the Sellers in establishing that Buyer has satisfied the requirement of adequate assurance of future performance contained in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the applicable Available Contracts.

(e)    In the event Sellers are unable to assign any such Assumed Contract to Buyer without the consent of another Person, then the Parties shall use their commercially reasonable efforts to obtain, and to cooperate in obtaining, all required consents necessary to assume and assign such Assumed Contracts to Buyer; provided that Sellers shall not be required to expend any money.

(f)    Within three (3) Business Days after entry of the Bidding Procedures Order, or as soon as reasonably practicable thereafter, the Sellers shall file a list of the Available Contracts (the "Assumption Notice") with the Bankruptcy Court and shall serve such Assumption Notice via first class mail on each counterparty to an Available Contract listed thereon. The Assumption Notice shall identify all Available Contracts and set forth a good faith estimate of the amount of the Cure Amounts applicable to each such Contract.

(g)     Not later than one (1) Business Day following the Determination Date, Sellers shall file with the Bankruptcy Court an amended and restated Assumption Notice, which notice shall set forth only the Assumed Contracts (and exclude all other Available Contracts).

(h)     On the Closing Date, with respect to Cure Amounts not disputed as of the Closing Date, the Buyer shall pay all Cure Amounts to the applicable counterparty and Sellers shall have no Liability therefor. With respect to Cure Amounts that are disputed as of the Closing Date, the Parties shall cooperate and diligently pursue resolution of such disputes. Upon the resolution of any disputed Cure Amount following the Closing, the Buyer shall pay such Cure Amount promptly, and in no event later than two (2) Business Days following such resolution.

(i)     Upon payment by Buyer of all Cure Amounts, all defaults under the Assumed Contracts (monetary or otherwise) shall be deemed cured.

(j)     Notwithstanding anything in this Agreement to the contrary, from and after the date hereof through the Closing, the Sellers will not reject or take any action (or fail to take any action that would result in rejection by operation of Law) to reject, repudiate or disclaim any of their Contracts without the prior written consent of Buyer.

(k)     Previously Omitted Contracts.

(i)     If prior to the Determination Date it is discovered by any Party that a Contract should have been listed on Schedule 2.5(a) but was not listed on Schedule 2.5(a) and has not been rejected by the Sellers (any such Contract, a "Previously Omitted Contract"), the discovering Party shall, promptly following the discovery thereof (but in no event later than two (2) Business Days following the discovery thereof), notify the other Parties in writing of such Previously Omitted Contract and then the Sellers shall, promptly following such notification (but in no event later than two (2) Business Days following such notification), notify Buyer of Sellers' good faith estimate of all Cure Amounts (if any) for such Previously Omitted Contract. Buyer may thereafter deliver a Designation Notice to Sellers, no later than the earlier of (x) the Determination Date or the expiration of the Extended Contract Period, as applicable, and (y) five (5) Business Days following notification of such Previously Omitted Contract from the Seller with respect to such Previously Omitted Contract and such contract shall be an Assumed Contract under this Agreement. All Previously Omitted Contracts with respect to which Buyer fails to timely deliver a Designation Notice, shall be an Excluded Asset.

(ii)     If Buyer delivers a Designation Notice in accordance with Section 2.5(k)(i)), the Sellers shall serve a notice (the "Previously Omitted Contract Notice") on the counterparties to such Previously Omitted Contract notifying such counterparties of the Cure Amounts with respect to such Previously Omitted Contract and the Sellers' intention to assume and assign such Previously Omitted Contract in accordance with this Section 2.5. The Previously Omitted Contract Notice shall provide the counterparties to such Previously Omitted Contract with fourteen (14) Business Days to object, in writing to the Sellers and Buyer, to the Cure Amounts or the assumption of its Contract. If the counterparties, the Sellers and Buyer are unable to reach a consensual resolution with respect to the objection, the Sellers shall seek an expedited hearing before the Bankruptcy

Court to determine the Cure Amounts and approve the assumption. If no objection is served on the Sellers and Buyer, the Sellers shall obtain an order of the Bankruptcy Court fixing the Cure Amounts and approving the assumption of the Previously Omitted Contract. Buyer shall be responsible for all Cure Amounts relating to such Previously Omitted Contracts.

## ARTICLE III
## CLOSING AND PURCHASE PRICE

3.1    <u>Closing; Transfer of Possession; Certain Deliveries</u>.

(a)    Unless this Agreement shall have been terminated and the Transactions shall have been abandoned pursuant to <u>Article IX</u>, the Closing shall take place at 10:00 a.m. (prevailing Eastern Time) on the date (the "<u>Closing Date</u>") that is two (2) Business Days after all the conditions set forth in <u>Article VIII</u> shall have been satisfied or waived (excluding, but subject to the satisfaction or waiver of, conditions that, by their nature, are to be satisfied at the Closing), or such other time or date as agreed to in writing by the Parties. The Closing shall take place by telephone or video conference and electronic exchange of documents, unless otherwise mutually agreed to by the Parties. The Closing shall be effective as of 12:01 a.m. (prevailing Eastern Time) on the Closing Date.

(b)    At the Closing, the Sellers shall deliver, or shall cause to be delivered, to Buyer the following:

(i)    a counterpart to the Bill of Sale and Assignment and Assumption Agreement in customary form reasonably agreed to by Buyer and Sellers (such agreement not to be unreasonably withheld or delayed) (the "<u>Bill of Sale and Assignment and Assumption Agreement</u>"), duly executed by each Seller;

(ii)    one (1) or more assignments of the Owned Intellectual Property, in customary form reasonably agreed to by Buyer and Sellers (such agreement not to be unreasonably withheld or delayed) (the "<u>IP Assignment and Assumption Agreement</u>"), duly executed by the applicable Seller(s);

(iii)    a certificate of a duly authorized officer of each Seller dated the Closing Date certifying as to the matters set forth in <u>Section 8.1(a)</u>, <u>Section 8.1(b)</u> and <u>Section 8.1(d)</u>;

(iv)    assignments of the Leases, in each case, in customary form as reasonably requested by Buyer with respect to the Leased Real Property;

(v)    stock certificates representing the Equity Interests of each Foreign Subsidiary held by Sellers, to the extent certificated;

(vi)    a certification of non-foreign status from each of the Sellers other than Near Singapore, duly completed and executed in compliance with Treasury Regulation Section 1.1445-2(b); and

(vii)    such other closing instruments and certificates as may be reasonably requested by Buyer, in each case in form and substance reasonably acceptable to Buyer and Sellers.

(c)    At the Closing, Buyer shall deliver, or shall cause to be delivered to the Sellers, the following:

(i)    a counterpart to the Bill of Sale and Assignment and Assumption Agreement, duly executed by Buyer;

(ii)    a counterpart to the IP Assignment and Assumption Agreement, duly executed by Buyer;

(iii)    the Excluded Cash to the Retained Bank Account(s);

(iv)    a certificate of a duly authorized officer of Buyer dated the Closing Date, certifying as to the matters set forth in Section 8.2(a) and Section 8.2(b); and

(v)    such other closing instruments and certificates as may be reasonably requested by the Sellers, in each case, in form and substance reasonably acceptable to the Sellers and Buyer.

3.2    Purchase Price; Related Matters.

(a)    Purchase Price. The aggregate consideration for the Purchased Assets shall consist of the following (collectively, the "Purchase Price"): (i) a credit bid equal to (A) all outstanding obligations under the DIP Facility and (B) not less than $34,000,000 of the outstanding obligations under the Prepetition Loan Documents (the "Credit Bid Amount"); *plus* (ii) the assumption by Buyer of the Assumed Liabilities. The Credit Bid Amount shall be paid by means of a credit against the total amounts due and owing under the Credit Documents as of the Closing Date. In no event shall the Credit Bid Amount be payable by Buyer in cash.  The Administrative Agent shall take all necessary actions under the DIP Facility and the Prepetition Financing Agreement in order to cause the payment of the Credit Bid Amount in accordance with this Section 3.2(a).

(b)    Bulk Sales Laws. Buyer hereby waives compliance by the Sellers with the requirements and provisions of any "bulk-transfer" Laws that may apply to the sale and transfer of the Purchased Assets to Buyer. Pursuant to section 363(f) of the Bankruptcy Code, the transfer of the Purchased Assets of the Sellers shall be free and clear of all Liens, other than Permitted Liens and Assumed Liabilities, in each case pursuant to the Bankruptcy Code, whether arising prior to or subsequent to the Petition Date, including any liens or claims arising out of the "bulk-transfer" Laws.

3.3    Allocation of Purchase Price. Sellers and Buyer agree to allocate amounts treated as consideration for U.S. federal income tax purposes among the Purchased Assets for all purposes (including tax and financial accounting) in accordance with Section 1060 of the Code and the Treasury Regulations promulgated thereunder and the allocation methodology set forth in Schedule 3.3 attached hereto (the "Allocation Schedule"). Within ninety (90) days following the

Closing Date, Buyer will provide to Sellers a draft of the Allocation Schedule prepared in accordance with such allocation methodology. If, within thirty (30) calendar days of Sellers' receipt of Buyer's proposed allocation, Sellers do not deliver Buyer written notice (a "Seller Allocation Objection Notice") of any objections that they have to such allocation, Buyer's proposed allocation shall be final and binding to all parties. If Sellers timely deliver to Buyer a Seller Allocation Objection Notice, then Buyer and Sellers shall work together in good faith to resolve the disputed items. If Buyer and Sellers are unable to resolve all of the disputed items within thirty (30) calendar days of Buyer's receipt of the Seller Allocation Objection Notice (or such later date as Buyer and Sellers may agree), then Buyer and Sellers shall refer the disputed items for resolution to an accounting firm of national reputation mutually acceptable to Buyer and Sellers, with no existing relationship with either Buyer or Sellers and such accounting firm shall determine the final allocation in accordance with such allocation methodology. Buyer and Sellers shall file all applicable Tax Returns (including Form 8594, any amended Tax Returns, and any claims for refund) consistent with the Allocation Schedule and shall take no position contrary thereto or inconsistent therewith (including in any audits or examinations by any taxing authority or any other proceedings) absent a contrary "determination" (within the meaning of Section 1313(a) of the Code).

3.4     Withholding. Buyer or any other paying agent (as applicable) shall be entitled to deduct and withhold from the amounts payable under this Agreement such amounts as may be required to be deducted and withheld under the Code and any other applicable Tax Laws. Before withholding or deducting any amounts hereunder, the applicable withholding agent shall use commercially reasonable efforts to notify Sellers of its intent to withhold at least five (5) days before deducting or withholding any such amounts (other than (i) any withholding on payments in the nature of compensation for services and (ii) any withholding due to the failure of any Seller to deliver the documentation required by Section 3.1(b)(vi)) and cooperate with the Sellers to reduce or eliminate such withholding or deduction. To the extent any such amount is to be so deducted and withheld by Buyer, such amounts shall be timely paid over to, or deposited with, the relevant Governmental Entity in accordance with the provisions of applicable Law. Any such withheld amount shall be treated as though it had been paid to the Person in respect of which such withholding was required.

**ARTICLE IV**
**REPRESENTATIONS AND WARRANTIES OF SELLERS**

Except as set forth in the Sellers' Disclosure Schedules, each of the Sellers hereby jointly and severally makes the following representations and warranties to Buyer with respect to itself and each other Seller as of the Agreement Date:

4.1     Organization and Good Standing. Each Seller (a) is an entity duly formed, validly existing and in good standing under the Laws of its jurisdiction of incorporation or formation, and (b) subject to any limitations that may be imposed on such Seller as a result of filing a petition for relief under the Bankruptcy Code, has full organizational power and authority to own, lease and operate its properties, to perform all of its obligations under the Available Contracts, and carry on the Business as it is now being conducted. The Sellers have delivered to Buyer true, complete and correct copies of each Seller's Organizational Documents as in effect on the date hereof.

28

4.2     <u>Power and Authority</u>. Subject to entry and effectiveness of the Sale Order in respect of the Sellers, except as set forth on <u>Schedule 4.2</u>, each Seller has the requisite organizational power and authority to enter into this Agreement and to perform its obligations hereunder, and the execution and delivery of this Agreement by each Seller and, subject to the approval of this Agreement by the Bankruptcy Court, the consummation by each Seller of the Transactions and the performance of each Seller's obligations hereunder have been duly authorized by all requisite organizational action on the part of each Seller. This Agreement has been duly executed and delivered by each Seller and (assuming the due and valid authorization, execution and delivery thereof by Buyer), following the approval of this Agreement and the Transactions by the Bankruptcy Court pursuant to the Sale Order, will constitute the legal, valid and binding obligation of each Seller, enforceable against each Seller in accordance with its terms, except that such enforceability (a) may be limited by bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and other similar Laws of general application affecting or relating to the enforcement of creditors' rights generally and (b) is subject to general principles of equity, whether considered in a proceeding at law or in equity (collectively, the "<u>Enforceability Exceptions</u>"). Each Seller has the requisite organizational power to operate its business with respect to the Purchased Assets that it owns as now conducted and is duly qualified as a foreign entity to do business, and to the extent legally applicable, is in good standing, with respect to the Business, in each jurisdiction in which the character of its owned, operated or leased properties or the nature of its activities makes such qualification necessary, except where the failure to be so qualified or in good standing has not had a Material Adverse Effect.

4.3     <u>Foreign Subsidiaries</u>. All of the outstanding Equity Interests of the Foreign Subsidiaries are set forth on <u>Schedule 4.3</u>. Except as set forth on <u>Schedule 4.3</u>, all such Equity Interests are duly authorized and validly issued, are fully paid and nonassessable, were offered, sold and delivered in compliance with all applicable securities Laws, and are owned by the Sellers in the amounts set forth on <u>Schedule 4.3</u>. There are no Contracts to which any Seller or its Affiliates is a party or bound with respect to the voting of the Equity Interests of any Foreign Subsidiary other than the Organizational Documents of such Foreign Subsidiary. There are no outstanding or authorized options, warrants, rights, agreements, subscriptions, convertible securities or commitments to which any Foreign Subsidiary is a party or which are binding upon any Foreign Subsidiary providing for the issuance or redemption of any Equity Interests of any Foreign Subsidiary. Except as set forth on <u>Schedule 4.3</u>, no Foreign Subsidiary has any limitation, whether by Contract, Order or applicable Law, on its ability to make any distributions or dividends to its equity holders or repay any Indebtedness. Except for the Equity Interests set forth on <u>Schedule 4.3</u>, no Seller owns, directly or indirectly, any Equity Interests in any Person and does not have any direct or indirect obligation to (i) purchase or otherwise acquire any notes, obligations, instruments, units, securities or other Equity Interests of any other Person or (ii) make a capital contribution or loan to, or other investment in, any other Person or assume any liability or obligation of any other Person.

4.4     <u>Litigation</u>. Except as set forth on <u>Schedule 4.4</u>, as of the date hereof there are no outstanding Orders or Proceedings pending, or, to the Knowledge of the Sellers, threatened against any Seller relating to the ownership or use of the Purchased Assets or conduct of the Business by the Sellers or otherwise affecting the Purchased Assets or the Business.

4.5     No Contravention. Subject to the entry and effectiveness of the Sale Order by the Bankruptcy Court, and except as set forth on Schedule 4.5, neither the execution and delivery of this Agreement and compliance by the Sellers with any provisions hereof, nor the consummation of the Transactions, will (a) violate or conflict with any provision of any Seller's Organizational Documents, (b) with or without the giving of notice or the lapse of time or both violate, or result in a breach of, or constitute a default under, or conflict with, or accelerate the performance required by, any of the terms of any Available Contract or Lease that are included in Purchased Assets, except as would not be material to the Business, taken as a whole, (c) violate or conflict with any Order, or any Law or Permit that is required to be discharged prior to Closing applicable to the Sellers, or (d) result in the creation of any Lien upon any of the Purchased Assets (other than a Permitted Lien and Assumed Liabilities); except, in the case of clauses (b), (c) and (d) above, for compliance with the applicable requirements of the HSR Act or other Antitrust Laws if required.

4.6     Consents and Approvals. Except (a) to the extent excused or made unenforceable as a result of the filing of the Cases, (b) to the extent not required if the Sale Order is entered, or (c) as set forth on Schedule 4.6, the execution, delivery and performance by each Seller of this Agreement and the Transactions, and the legality, validity, binding effect or enforceability of this Agreement and any agreements contemplated hereby, do not require any consents, waivers, authorizations or approvals of, or filings with, any (i) Governmental Entities or (ii) other third Persons, except with respect to clause (ii) as would not reasonably be expected to have a Material Adverse Effect, or, with respect to clause (i), for any filings required to be made under the HSR Act or any applicable Antitrust Laws.

4.7     Title to Purchased Assets; Sufficiency.

        (a)     Except as set forth on Schedule 4.7(a), Sellers have, and subject to the entry and effectiveness of the Sale Order in respect of the Purchased Assets, at the Closing, Buyer will have, good and valid title to each of the Purchased Assets (except for those Purchased Assets that are leased or licensed to any Seller, as to which any Seller has, and at the Closing, Buyer will have, valid licensed or leasehold interests), free and clear of all Liens, other than (i) Permitted Liens, (ii) Liens encumbering Buyer's assets, if any, securing any loan made directly to Buyer or expressly assumed by Buyer as of the Closing Date, (iii) as subject to Section 2.5, or (iv) the Enforceability Exceptions.

        (b)     Other than the Excluded Assets, the Purchased Assets constitute all of the assets used in or held by the Sellers for use in the Business and, as of the date hereof, are sufficient for Buyer to conduct the Business as of the Closing Date as it has been conducted by the Sellers prior to the Closing Date, in each case, except as would not be material to the Business taken as a whole.

4.8     Validity of Available Contracts. As of the Agreement Date, subject to requisite Bankruptcy Court approvals and assumption by the applicable Seller of the applicable Contract in accordance with applicable Law (including satisfaction any applicable Cure Amounts) and except (i) as set forth on Schedule 4.8, (ii) as a result of the commencement of the Cases, and (iii) with respect to any Contract that has previously expired in accordance with its terms, been terminated, restated, or replaced: (a) each Available Contract is a legal, valid and binding obligation of the Seller that is a party thereto, and is enforceable against such Seller in accordance with its terms

and, to the Knowledge of the Sellers, is a legal, valid and binding obligation of each other party to such Contract and is enforceable against such other party thereto in accordance with its terms, subject to bankruptcy Laws and general equitable principles; (b) no Seller that is a party to any Available Contract, or any other party to an Available Contract is in default or breach of an Available Contract; (c) to the Knowledge of the Sellers, during the twelve (12) months preceding the Agreement Date, no other party to any Available Contract has materially breached such Contract; (d) to the Knowledge of the Sellers, there does not exist any event, condition or omission that would constitute a material default or breach (or event which, with the giving of notice or lapse of time or both would become such a default or breach) under any Available Contract; (e) no Seller that is a party to any Available Contract has received any written notice of termination or cancellation with respect to any Available Contract; and (f) with respect to the Assumed Contracts, upon entry of the Sale Order and payment of the Cure Amounts by Buyer, each Seller will not be in breach or default of its obligations thereunder.

4.9     Intellectual Property.

(a)     Schedule 4.9(a) sets forth a correct and complete list of all items of Seller Registered Intellectual Property, specifying the record owner, jurisdiction and issuance, registration or application number and date, as applicable, of each such item. Except as would not be material and adverse to the Business in the aggregate, and to the Knowledge of the Sellers, all renewal, maintenance and other necessary filings and fees due and payable to any relevant Governmental Entity or domain name registrar to maintain all Seller Registered Intellectual Property in full force and effect have been timely submitted or paid in full. To the Knowledge of the Sellers, all Seller Registered Intellectual Property is subsisting and all issuances and registrations included in the Seller Registered Intellectual Property are valid and enforceable in accordance with applicable Law.

(b)     Except as set forth on Schedule 4.9(b), (i) a Seller is the sole and exclusive owner of all right, title and interest in and to all Owned Intellectual Property, free and clear of all Liens (other than Permitted Liens) and (ii) all Licensed Intellectual Property is licensed to the applicable Seller, free and clear of all Liens (other than Permitted Liens). To the Knowledge of the Sellers, the Acquired Intellectual Property constitutes all of the Intellectual Property used in, and necessary and sufficient for, the conduct and operation of the Business as currently conducted.

(c)     To the Knowledge of the Sellers, in the past two (2) years, none of the Sellers has received any written notice, and there are no claims or Proceedings pending or threatened against any Seller, (i) alleging that the conduct of the Business as currently conducted infringes, misappropriates, dilutes or otherwise violates any Intellectual Property of a third party, (ii) challenging the ownership, validity or enforceability of any Owned Intellectual Property or (iii) challenging the use by any Seller of any Acquired Intellectual Property. Except as set forth on Schedule 4.9(c), to the Knowledge of the Sellers, in the past two (2) years, the conduct of the business as currently conducted does not infringe, constitute or result from a misappropriation of, dilute or otherwise violate any Intellectual Property of any Person.  Notwithstanding anything to the contrary herein, this Section 4.9(c) constitutes the sole and exclusive representation and warranty with respect to the infringement, misappropriation, dilution or other violation of Intellectual Property of a third party.

(d)      To the Knowledge of the Sellers, in the past two (2) years, no Owned Intellectual Property has been or is being infringed, misappropriated, diluted or otherwise violated by any Person; and to the Knowledge of the Sellers, no claim or Proceeding alleging any of the foregoing is pending or threatened against any Person by any Seller.

(e)      To the Knowledge of the Sellers and except as would not be material and adverse to the Business in the aggregate, each Seller has taken commercially reasonable security measures to maintain and protect the confidentiality and value of all (i) Trade Secrets included in the Owned Intellectual Property and (ii) Trade Secrets owned by any Person to whom any Seller has a confidentiality obligation and which are in the possession of a Seller. Except as set forth on Schedule 4.9(e), to the Knowledge of the Sellers, no material Trade Secret included in the Owned Intellectual Property has been authorized to be disclosed or, to the Knowledge of the Sellers, has been actually disclosed to any Person other than pursuant to a valid written confidentiality Contract sufficiently restricting the disclosure and use thereof, in each case, except as would not be material and adverse to the Business in the aggregate.

(f)      To the Knowledge of Sellers and except as would not be material and adverse to the Business in the aggregate or as set forth on Schedule 4.9(f), the IT Systems are adequate and sufficient (including with respect to working condition and capacity) in all material respects for the operation of the Business. To the Knowledge of the Sellers, there have been no material (i) security breaches or a successful unauthorized use, access or intrusions of any IT Systems which required a notice be provided to a Governmental Entity or individual, or (ii) outages of any IT Systems that have caused or resulted in a material disruption to the Business.

(g)      Except as set forth on Schedule 4.9(g), to the Knowledge of Sellers and except as would not be material and adverse to the Business in the aggregate, none of the source code or related materials for any such Seller Software with respect to the manufacturing machines utilized in the Business has been licensed or provided to, or used or accessed by, any Person other than Sellers' employees, consultants or contractors. Except as set forth on Schedule 4.9(g), to the Knowledge of Sellers and except as would not be material and adverse to the Business in the aggregate, no Open Source Software is or has been included, incorporated or embedded in, linked to, combined or distributed with or used in the delivery or provision of any Seller Software, in each case, in a manner that (i) requires or conditions the use or distribution of any Seller on the disclosure, licensing or distribution of any Source Code for any portion of such Software or the granting of any right to decompile, reverse engineer or create derivative works of any such Seller Software, or (ii) otherwise imposes any material limitation, restriction, waiver of rights or condition on the right or ability of the Company to use or distribute any Seller Software, except, in each case, with respect to the Open Source Software itself.

(h)      The Sellers and, to the Knowledge of the Sellers, any Person acting for or on the Sellers' behalf, have at all times materially complied with (i) applicable Privacy Laws; (ii) the Sellers' policies and notices regarding Personal Information; and (iii) the Sellers' contractual obligations with respect to Personal Information. To the Knowledge of the Sellers, each Seller has implemented and maintains reasonable safeguards to protect Personal Information against material loss, theft, misuse or unauthorized access, use, modification, alteration, destruction or disclosure. Except as set forth on Schedule 4.9(h), to the Knowledge of the Sellers, there have been no material breaches, security incidents, misuse of or unauthorized access to or disclosure of any Personal

Information in the possession or control of the Sellers or collected, used or processed by or on behalf of the Sellers. To the Knowledge of the Sellers, no Seller has received any written notice of any claims (including written notice from third parties acting on its behalf), investigations, or inquires related to, or been charged with, the violation of any Privacy Laws.

4.10    Employee Benefits.

(a)    Schedule 4.10(a) lists all Benefit Plans.

(b)    True, correct and complete copies of the following documents, with respect to each of the Benefit Plans, have been made available to Buyer: (i) any plan documents and all material amendments thereto, (ii) the most recent Form 5500, if applicable, and (iii) the most recent summary plan descriptions (including letters or other documents updating such descriptions).

(c)    Each of the Benefit Plans sponsored by any Seller that is intended to qualify under Section 401 of the Code has received a favorable determination letter from the Internal Revenue Service that such plan is so qualified, and, except as disclosed in Schedule 4.10(c), to the Knowledge of the Sellers, nothing has occurred since the date of such determination with respect to the operation of any such plan which could reasonably be expected to result in the revocation of such favorable determination.

(d)    Since January 1, 2023, each of the Benefit Plans has been maintained, in all material respects, in accordance with its terms and all provisions of applicable Law. None of the Sellers has incurred, and no event has occurred and no condition or circumstance exists that could result, directly or indirectly, in, any unsatisfied Liability (including, any indirect, contingent or secondary Liability) of any Seller under Title IV of ERISA or Section 412 or 430 of the Code or Section 302 or 303 of ERISA or other similar Law.

(e)    Other than as required under Section 4980B of the Code or other similar applicable Law or for which the covered person pays the full cost of coverage for such person and his or her beneficiaries and dependents, neither the Sellers nor any ERISA Affiliate has or could reasonably be expected to have any material Liability for providing post-termination or retiree medical, life insurance or other welfare benefits.

(f)    Neither the execution and delivery of this Agreement nor the consummation of the Transactions, either alone or in connection with any other event, will (i) give rise to any payments or benefits that would be nondeductible to the Sellers under Section 280G of the Code or that could result in an excise Tax on any recipient under Section 4999 of the Code, (ii) result in any payment or benefit becoming due to any current or former employee, independent contractor or consultant of the Sellers, (iii) increase the amount or value of any compensation or benefits payable under any Benefit Plan, result in any acceleration of the time of payment or vesting of any compensation or benefits or provide any additional compensatory rights or benefits (including funding of compensation or benefits through a trust or otherwise) to any current or former employee, independent contractor or consultant of the Sellers, or (iv) limit or restrict the ability of Buyer, its Affiliates, or the Sellers to merge, amend or terminate any Benefit Plan.

4.11    <u>Labor Matters</u>.

(a)    <u>Schedule 4.11(a)</u> sets forth a complete list of all employees and individual independent contractors of the Sellers and Foreign Subsidiaries (except if prohibited by Law, in which case the list will be on an anonymous basis), and based on the Sellers' records as of the Agreement Date, correctly reflects, with respect to each individual (except if prohibited by Law), as applicable: (i) date of hire; (ii) job title and department; (iii) rate of pay or salary; (iv) employee versus independent contractor status; (v) exempt versus non-exempt status for purposes of the Fair Labor Standards Act (as applicable); (vi) accrued PTO (as applicable); and (vii) to the extent known, leave of absence status.

(b)    None of the Sellers is a party to any labor or collective bargaining agreement and there are no labor or collective bargaining agreements which pertain to employees of Sellers, and no such agreements are being negotiated as of the Agreement Date. No employees of Sellers are represented by a labor or trade union, works council, employee association or other employee representative, no labor organization or group of employees of any Seller has made a pending demand for recognition, and there are no representation proceedings or petitions seeking a representation proceeding presently pending or, to the Knowledge of the Sellers, threatened in writing to be brought or filed, with the U.S. National Labor Relations Board. There is no organizing activity pending or, to the Knowledge of the Sellers, threatened in writing by any labor organization or group of employees of the Sellers.

(c)    There is (i) no unfair labor practice complaint pending against any Seller or, to the Knowledge of the Sellers, threatened in writing against them, before the U.S. National Labor Relations Board, and no grievance or arbitration proceeding arising out of or under any collective bargaining agreement is so pending against any Seller or, to the Knowledge of the Sellers, threatened in writing against them, and (ii) no strike, labor dispute, slowdown or stoppage pending against any Seller or, to the Knowledge of the Sellers, threatened in writing against them.

(d)    Each of the Sellers and Foreign Subsidiaries is in material compliance with all Labor Laws. Other than as set forth on <u>Schedule 4.11(d)</u>, no equal employment opportunity charges or other claims of employment discrimination are pending or, to the Knowledge of the Sellers, threatened in writing against them, nor have there been any such charges or claims since December 31, 2022. No wage and hour department investigation has been made or, to the Knowledge of the Sellers, threatened in writing against any Seller or Foreign Subsidiary since December 31, 2022, whether internally or by any Governmental Entity in connection with the employment, engagement, compensation, or service of any current or former employee, consultant or contractor. Other than as set forth in <u>Schedule 4.11(d)</u>, there are no complaints, charges or claims against any Seller or Foreign Subsidiary pending or, to Knowledge of the Sellers, threatened in writing, in connection with or otherwise relating to the employment or termination of employment or failure to employ or discrimination, harassment, retaliation, equal pay, or any other employment-related matter arising under the Labor Laws by any Seller or Foreign Subsidiary of any individual, nor have there been any such complaints, charges or claims against any Seller or Foreign Subsidiary since December 31, 2022.

(e)    Prior to the date hereof, except as set forth on <u>Schedule 4.11(e)</u>, the Sellers have not taken any action or any actions relating to the Business at any single site of employment

34

in the ninety (90)-day period prior to the Closing Date that would, individually or in the aggregate, constitute a "mass layoff" or "plant closing" within the meaning of the WARN Act, or any similar applicable Law.

(f)     To the Knowledge of Sellers, there are no outstanding, pending, threatened in writing or anticipated assessments, actions, causes of action, Claims, complaints, demands, orders, prosecutions, suits, or other Proceedings against any Seller, any Foreign Subsidiary, or any of their respective directors, officers or agents pursuant to or under any applicable Laws, with respect of pension obligations, unemployment insurance, social security, income tax, employer health tax, employment standards, labor relations, occupational health and safety, human rights, workers' compensation or pay equity, and no Seller or Foreign Subsidiary has any liability for any arrears of wages, taxes, penalties, or other sums for failure to comply with any of the foregoing obligations. To the Knowledge of Sellers, no Seller has an obligation to re-instate any employees in connection with this Agreement or the completion of the Transactions.

(g)     All vacation pay, bonuses, commissions and other emoluments relating to Sellers and their employees are accurately reflected in all material respects and have been accrued in the books and records of the applicable Seller in accordance with GAAP.

(h)     Since December 31, 2022, to the Knowledge of the Sellers, all individuals who have provided or are providing services of any kind to the Sellers are correctly classified as an employee or an independent contractor and if classified as an employee are correctly classified as exempt or nonexempt from overtime under applicable Laws. Since December 31, 2022, to the Knowledge of the Sellers, Sellers have not implemented, and have no plans to implement, any reductions in hours, furloughs or salary reductions that would (i) cause any employee classified as "exempt" under applicable federal and state overtime pay Laws to lose such "exempt" status, or (ii) cause any employee's compensation to fall below the applicable federal, state or local minimum wage.

(i)     Since December 31, 2022, neither the Sellers, nor, to the Knowledge of Sellers, any of their respective officers or directors in their individual capacities, have settled any material claims, actions, complaints, or other grievances relating to sexual harassment involving or relating to one or more current or former employees, independent contractors, or any other individual service providers. There are no such claims, actions, complaints or other grievances relating to sexual harassment currently pending or, to the Knowledge of Sellers, threatened in writing.

4.12    Conduct of Business. Except as set forth on Schedule 4.12, and except for the Cases, the DIP Documents, all negotiation and preparation therefor, and the negotiation, execution, delivery and performance of this Agreement, as of the Agreement Date, (a) the Business is conducted in the Ordinary Course of Business, (b) the Sellers own and operate the Purchased Assets in the Ordinary Course of Business, and (c) there is no Material Adverse Effect.

4.13    Compliance with Laws; Permits.

(a)     Except as disclosed on Schedule 4.13, the Sellers and the Foreign Subsidiaries are conducting the Business and Purchased Assets in compliance, in all material

respects, with all applicable Laws, notices, approvals and Orders. Except as disclosed on <u>Schedule 4.13</u>, to the Knowledge of the Sellers, (i) each Seller and Foreign Subsidiary is not in material breach of any Law, notice, approval or order applicable to it or the Business, and (ii) there are no facts or circumstances which could form the basis for any such material breach. Each Seller and Foreign Subsidiary is not under investigation with respect to the violation of any Laws and to the Knowledge of the Sellers, there are no facts or circumstances which could form the basis for any such violation. None of the Sellers or Foreign Subsidiaries has received any written notice or other communication that alleges that the Business is not in compliance in any material respect with any Law, Order or Permit applicable to the Business or the Purchased Assets or (B) any written notice or communication regarding any deficiencies in any material respect in the compliance practices, procedures, methodologies or methods of the Business or its employees or internal compliance controls, including any complaint, allegation, assertion or claim that the Business or its employees has engaged in illegal practices.

(b)     The Sellers and Foreign Subsidiaries (and all of their employees who are legally required to be licensed by a Government Entity in order to perform his or her duties with respect to his or her employment with such Seller or Foreign Subsidiary) have all material Permits which are required for the lawful operation of the Business as presently conducted and the ownership and operation of the Purchased Assets, and each such Permit is valid, binding and in full force and effect, in each case except as would not reasonably be expected to have a Material Adverse Effect. Except as set forth on <u>Schedule 4.13(b)</u>, to the Knowledge of Sellers, none of the Sellers is or has been in material default or violation (and no event has occurred which, with notice or the lapse of time or both, would constitute a default or violation) of any term, condition or provision of any Permit to which it is a party. <u>Schedule 4.13(b)</u> sets forth a list of all material Permits of the Sellers.

4.14    [Reserved].

4.15    <u>Financial Advisors</u>. Except as set forth on <u>Schedule 4.15</u>, no Person has acted, directly or indirectly, as a broker, finder or financial advisor for any in connection with the Transactions and no Person is entitled to any fee or commission or like payment in respect thereof.

4.16    [Reserved].

4.17    <u>Tax Matters</u>.

(a)     Except as set forth in <u>Schedule 4.17(a)</u>, the Sellers and the Foreign Subsidiaries have timely filed (taking into account any valid extensions of time to file) all material Tax Returns which are required to be filed by them, all such Tax Returns are true, correct and complete in all material respects, and all material Taxes due and payable by the Sellers and the Foreign Subsidiaries prior to the date hereof have been timely and fully paid.

(b)     Except as set forth on <u>Schedule 4.17(b)</u>, there are no Liens for Taxes upon the Purchased Assets or any assets of the Foreign Subsidiaries other than for Permitted Liens.

(c)     Except as set forth on <u>Schedule 4.17(c)</u>, to the Knowledge of Sellers, the Sellers and the Foreign Subsidiaries have complied in all material respects with all applicable Laws relating to the withholding, collection and payment of material Taxes and have duly and timely

withheld, collected and paid over to the appropriate Governmental Entity all amounts required to be so withheld, collected and paid under all applicable Laws.

(d)    No Seller or Foreign Subsidiary has received any notice from any taxing authority or Governmental Entity asserting that such Seller or Foreign Subsidiary may be subject to Tax in any jurisdiction in which such Seller or Foreign Subsidiary does not file Tax Returns.

(e)    No action, suit, proceeding or audit is pending against or with respect to the Sellers or any Foreign Subsidiary regarding Taxes.

(f)    No Seller or Foreign Subsidiary has waived any statute of limitations in respect of Taxes or agreed to any extension of time with respect to a Tax assessment or deficiency, other than any waiver or exclusion which has expired. There are no outstanding requests by a Seller or any Foreign Subsidiary for any extension of time within which to file any Tax Return or within which to pay any Taxes shown to be due on any Tax Return.

(g)    Except for the Equity Interests in the Foreign Subsidiaries, none of the Purchased Assets is an interest (other than indebtedness within the meaning of Section 163 of the Code) in an entity taxable as a corporation, partnership, trust or real estate mortgage investment conduit for U.S. federal income tax purposes.

4.18    Real Property.

(a)    Schedule 4.18(a) sets forth a complete list of the Leased Real Property and the Leases. Except for the Leased Real Property set forth on Schedule 4.18(a), the Sellers do not own or lease or otherwise occupy any other real property or.

(b)    Except as set forth on Schedule 4.18(b), a Seller has good and valid leasehold title to the Leased Real Property, in each case free and clear of all Liens of any nature whatsoever except for Permitted Liens.

(c)    Except as set forth on Schedule 4.18(c), the Sellers have not subleased, licensed or otherwise granted to any Person the right to possess, use or occupy the Leased Real Property or any portion thereof.

(d)    The Leases are in full force and effect. No Seller has delivered or received written notice from the other party to any Lease of the termination or surrender thereof. The Sellers have delivered to Buyer true and complete copies of the Leases, including all amendments, notices or memoranda of lease thereto, and all estoppel certificates, or subordination, non-disturbance and attornment agreements, if any, relating to the Leased Real Property. There are no material agreements, understandings or undertakings pertaining to the Leases and the Sellers' leasehold interests in the Leased Real Property which have not been disclosed or made available to Buyer prior to the date hereof.

(e)    Except as set forth in Schedule 4.18(e), as of the date hereof, no Seller has received any written notice from any Governmental Entity asserting any material violation of applicable Laws with respect to the Leased Real Property, and there is no pending or, to the

Knowledge of the Sellers, threatened eminent domain taking, expropriation, condemnation or re-zoning affecting any portion of the Leased Real Property.

4.19    <u>Tangible Personal Property</u>. <u>Schedule 4.19</u> sets forth all leases of personal property ("<u>Personal Property Leases</u>") relating to personal property used or held for use by the Sellers or to which any Seller is a party or by which the properties or assets of any of the Sellers is bound. No Seller has received any written notice of any default or event that with notice or lapse of time or both would constitute a default by any Seller under any of the Personal Property Leases.

4.20    <u>Insurance</u>. The Sellers have insurance policies in full force and effect for such amounts as are sufficient for all requirements of Law and all agreements to which any Seller is a party or by which it is bound. Set forth in <u>Schedule 4.20</u> is a list of all insurance policies and all fidelity bonds held by or applicable to any Seller setting forth, in respect of each such policy, the policy name, policy number, carrier, term, type of coverage and annual premium. Except as set forth on <u>Schedule 4.20</u>, to the Knowledge of Sellers, no event relating to any Seller has occurred which can reasonably be expected to result in a retroactive upward adjustment in premiums under any such insurance policies or which is likely to result in a prospective upward adjustment in such premiums. Excluding insurance policies that have expired and been replaced in the Ordinary Course of Business, no insurance policy has been cancelled within the last two (2) years and, to the Knowledge of the Sellers, no threat has been made to cancel any insurance policy of any Seller during such period. Except as noted in each insurance policy or on <u>Schedule 4.20</u>, all such insurance will remain in full force and effect, all premiums due to date thereunder have been paid in full, neither Sellers nor any of Sellers' Affiliates is in material default with respect to any obligations thereunder.

4.21    <u>Condition and Suitability of Purchased Assets</u>. As of the Agreement Date, there has been no condemnation, seizure, damage, destruction or other casualty loss (whether or not covered by insurance) affecting any of the Purchased Assets or the Business in any material respect which has not subsequently been completely repaired, replaced or restored. As of the Agreement Date, there are no pending or, to the Knowledge of the Sellers, threatened or contemplated condemnation proceedings affecting the Business, any of the Purchased Assets (or any portion thereof), or of any sale or other disposition of the Business or any of the Purchased Assets (or any portion thereof) in lieu of condemnation except as would not reasonably be expected to have a Material Adverse Effect.

4.22    <u>Anti-Corruption</u>.

(a)      Except as set forth on <u>Schedule 4.22</u>, none of the Sellers, or any of their respective officers, directors, employees, agents, representatives, consultants, members, equityholders, in each case, acting for or on behalf of the Sellers, since December 31, 2022 has, to the Knowledge of the Sellers, directly or indirectly, in connection with the Business:

(i)      made, offered or promised to make or offer any payment, loan or transfer of anything of value, including any reward, advantage or benefit of any kind, to or for the benefit of any Government Official, candidate for public office, political party or political campaign, for the purpose of (A) influencing any act or decision of such Government Official, candidate, party or campaign, (B) inducing such Government Official, candidate,

party or campaign to do or omit to do any act in violation of a lawful duty, (C) obtaining or retaining business for or with any Person, (D) expediting or securing the performance of official acts of a routine nature, or (E) otherwise securing any improper advantage;

(ii)    paid, offered or promised to make or offer any bribe, payoff, influence payment, kickback, unlawful rebate, or other similar unlawful payment of any nature;

(iii)    made, offered or promised to make or offer any unlawful contributions, gifts, entertainment or other unlawful expenditures;

(iv)    established or maintained any unlawful fund of corporate monies or other properties;

(v)    created or caused the creation of any false or inaccurate books and records of the Sellers related to any of the foregoing; or

(vi)    otherwise violated any provision of any Anti-Corruption Laws.

4.23    OFAC. None of the Sellers are, or to the Knowledge of the Sellers have been since December 31, 2022, in violation of any Sanctions. As of the Agreement Date, none of the Sellers nor, to the Knowledge of the Sellers, any director, officer, employee, agent, member, Affiliate or equityholder of any Seller (a) is a Sanctioned Person or a Sanctioned Entity, (b) has any assets located in Sanctioned Entities, or (c) derives revenues from investments in, or transactions with Sanctioned Persons or Sanctioned Entities. Each of the Sellers and, to the Knowledge of the Sellers, each director, officer, employee, agent and Affiliate of any Seller, is, and since December 31, 2022 has been, in compliance with all applicable Anti-Corruption Laws, and Anti-Money Laundering Laws. No proceeds as a result of the Transactions will be used to fund any operations in, finance any investments or activities in, or make any payments to, a Sanctioned Person or a Sanctioned Entity, or otherwise used in any manner that would result in a violation of any Sanction, Anti-Corruption Law, or Anti-Money Laundering Law by any Persons.

4.24    Related Party Transactions.

(a)    To the Knowledge of the Sellers, no Seller, executive officer, director, member, manager, equityholder or Affiliate of a Seller nor any individual who is a lineal descendant, sibling, parent or spouse of any such Person (each, a "Related Party") is a party to any Contract or arrangement (including any loan or similar arrangement) with or binding upon any of the Sellers or the Purchased Assets or has any interest in any asset (each, a "Related Party Transaction") other than as set forth on Schedule 4.24(a). Except as set forth on Schedule 4.24(a), no Seller has made any payments to or on behalf of any Related Party (including by exercise of set-off rights, cancellation of intercompany indebtedness, or otherwise).

(b)    Except as disclosed on Schedule 4.24(b), to the Knowledge of Sellers, no Related Party will, immediately following the Closing, hold any asset (tangible or intangible), property, right, claim, cause of action (including any counterclaim) or defense used in or related to the Business.

4.25    Customers and Suppliers. Schedule 4.25 lists the ten (10) largest customers (by sales revenue) and ten (10) largest suppliers (by payments) of the Sellers and their subsidiaries during each of (i) the twelve (12)-month period ended December 31, 2022 and (ii) the nine (9)-month period ended September 30, 2023, based upon the Sellers' information systems. Except as set forth on Schedule 4.25, since November 1, 2023 and as of the Agreement Date, no customer or supplier listed on Schedule 4.25 has provided written notice that it intends to cease doing business with or materially and adversely decrease the amount of business done with the Sellers.

4.26    Disclaimer of Other Representations and Warranties. Except as expressly set forth in this Article IV (as modified by the Sellers' Disclosure Schedules hereto), no Seller nor any other Person makes any representation and warranty, express or implied, in respect of such Seller, the Purchased Assets, the Business or the Assumed Liabilities, and any such other representations or warranties, express or implied, are hereby expressly disclaimed.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to the Sellers as follows:

5.1    Organization and Good Standing. Buyer is a limited liability company duly organized, validly existing and in good standing under the Laws of its jurisdiction of formation, and has full power and authority to own, lease and operate its properties and carry on its business as it is now being conducted.

5.2    Power and Authority.

(a)    Buyer has the requisite power and authority to enter into this Agreement and to perform its obligations hereunder, and the execution and delivery of this Agreement and the consummation of the Transactions and the performance of Buyer's obligations hereunder have been duly authorized by all requisite company action on the part of Buyer. This Agreement has been duly executed and delivered by Buyer and constitutes (assuming the due and valid authorization, execution and delivery thereof by the other parties thereto and the entry of approval of this Agreement and the Transactions by the Bankruptcy Court pursuant to the Sale Order) the legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms.

(b)    The Administrative Agent has the requisite power and authority to take all necessary actions under the DIP Facility and the Prepetition Financing Agreement in order to cause the payment of the Credit Bid Amount in accordance with Section 3.2(a).

5.3    No Contravention. Neither the execution and delivery of this Agreement nor the consummation of the Transactions will (a) violate or conflict with any provision of Buyer's Organizational Documents, or (b) violate or conflict with any Order, Governmental Entity or arbitrator, or any Law applicable to Buyer; other than, in the case of clause (b), compliance with the applicable requirements of the HSR Act or other Antitrust Laws if required.

5.4    Consents and Approvals. Except for (a) entry of the Sale Order, and (b) any consents or approvals as are reflected on Schedule 5.4, the execution, delivery and performance

40

by Buyer of this Agreement and the Transactions, and the legality, validity, binding effect or enforceability of this Agreement and any agreements contemplated hereby, do not require any consents, waivers, authorizations or approvals of, or filings with, any third Persons or Governmental Entities, other than any filings required to be made under the HSR Act or applicable Antitrust Laws.

5.5     Litigation. There are no Proceedings pending or, to the knowledge of Buyer, threatened, that would reasonably be expected to adversely affect the ability of Buyer to consummate the Transactions in any material respect.

5.6     Financial Advisors. No Person has acted, directly or indirectly, as a broker, finder or financial advisor for Buyer in connection with the Transactions and no Person is entitled to any fee or commission or like payment in respect thereof.

5.7     Sufficient Funds; Adequate Assurances. Buyer has or will have as of the Closing, immediately available funds sufficient for the satisfaction of all of Buyer's obligations under this Agreement, including all fees, expenses of, and other amounts required to be paid by, Buyer in connection with the transactions contemplated hereby. As of the Closing, Buyer shall be capable of satisfying the conditions contained in sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code with respect to the Assumed Contracts and the related Assumed Liabilities.

5.8     Acknowledgements; "As Is" "Where Is" Transaction.

(a)     IN MAKING ITS DETERMINATION TO PROCEED WITH THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT, BUYER AND THE BUYER GROUP HAVE RELIED SOLELY ON THE RESULTS OF THEIR OWN INDEPENDENT INVESTIGATION.

(b)     BUYER, ON ITS OWN BEHALF AND ON BEHALF OF THE BUYER GROUP, ACKNOWLEDGES AND AGREES THAT IT AND THE BUYER GROUP HAVE RECEIVED FROM SELLERS CERTAIN PROJECTIONS, FORWARD-LOOKING STATEMENTS, FORECASTS, AND PROSPECTIVE OR THIRD-PARTY INFORMATION RELATING TO SELLERS, THE BUSINESS, THE PURCHASED ASSETS AND THE ASSUMED LIABILITIES (WHETHER IN WRITTEN, ELECTRONIC, OR ORAL FORM, AND INCLUDING IN THE DATA ROOM, MANAGEMENT MEETINGS, ETC.) (COLLECTIVELY, "PROJECTIONS"). BUYER, ON BEHALF OF ITSELF AND THE BUYER GROUP, ACKNOWLEDGES THAT (I) SUCH PROEJCTIONS ARE BEING PROVIDED SOLELY FOR THE CONVENIENCE OF BUYER AND THE BUYER GROUP TO FACILITATE THEIR OWN INDEPENDENT INVESTIGATION; (II) THERE ARE UNCERTAINTIES INHERENT IN ATTEMPTING TO MAKE SUCH PROJECTIONS AND FORECASTS AND IN SUCH INFORMATION; (III) BUYER AND THE BUYER GROUP ARE FAMILIAR WITH SUCH UNCERTAINTIES AND ARE TAKING FULL RESPONSIBILITY FOR MAKING THEIR OWN EVALUATION OF THE ADEQUACY AND ACCURACY OF ALL SUCH PROJECTIONS, FORECASTS, AND INFORMATION SO FURNISHED (INCLUDING THE REASONABLENESS OF THE ASSUMPTIONS UNDERLYING SUCH PROJECTIONS); AND (IV) NONE OF THE SELLERS NOR ANY OTHER PERSON MAKES ANY REPRESENTATIONS OR WARRANTIES WITH RESPECT TO SUCH PROJECTIONS AND

FORECASTS. BUYER, ON ITS OWN BEHALF AND ON BEHALF OF THE BUYER GROUP HEREBY DISCLAIMS RELIANCE ON ANY SUCH PROJECTIONS.

(c)    BUYER, ON ITS OWN BEHALF AND ON BEHALF OF THE BUYER GROUP, FURTHER ACKNOWLEDGES AND AGREES THAT THE REPRESENTATIONS AND WARRANTIES MADE BY SELLERS TO BUYER IN ARTICLE IV (AS QUALIFIED BY THE SELLERS' DISCLOSURE SCHEDULES) OR IN THE DOCUMENTS DELIVERED BY SELLERS TO BUYER IN ACCORDANCE WITH SECTION 3.1(b) AT THE CLOSING (COLLECTIVELY, THE "EXPRESS REPRESENTATIONS") ARE THE SOLE AND EXCLUSIVE REPRESENTATIONS, WARRANTIES AND STATEMENTS OF ANY KIND MADE TO BUYER IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT AND THAT ALL OTHER REPRESENTATIONS OR WARRANTIES OF ANY KIND OR NATURE EXPRESSED OR IMPLIED, WHETHER IN WRITTEN, ELECTRONIC OR ORAL FORM, INCLUDING (A) TO THE COMPLETENESS OR ACCURACY OF, OR ANY OMISSION TO STATE OR TO DISCLOSE ANY INFORMATION (OTHER THAN SOLELY TO THE EXTENT OF AN EXPRSS REPRESENTATION), INCLUDING IN THE DATA ROOM, PROJECTIONS, MEETINGS, CALLS OR CORRESPONDENCE WITH MANAGEMENT OR THE SELLERS OR ANY OF THEIR RESPECTIVE AFFILIATES OR REPRESENTATIVES, AND (B) ANY OTHER STATEMENT RELATING TO THE HISTORICAL, CURRENT OR FUTURE BUSINESS, FINANCIAL CONDITION, RESULTS OF OPERATIONS, ASSETS, LIABILITIES, PROPERTIES, CONTRACTS, EMPLOYEE MATTERS, REGULATORY COMPLIANCE, BUSINESS RISKS AND PROSPECTUS OF THE SELLERS OR ANY OF THEIR RESPECTIVE AFFILIATES OR SUBSIDIARIES, OR THE QUALITY, QUANTITY OR CONDITION OF THE SELLERS' ASSETS, ARE, IN EACH CASE, EXPRESSLY DISCLAIMED BY EACH OF THE SELLERS, ON ITS OWN BEHALF AND ON BEHALF OF EACH OF THE OTHER SELLERS, INCLUDING WITH RESPECT TO (I) ANY WARRANTY, EXPRESS OR IMPLIED, OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE AS TO ANY PORTION OF THE PURCHASED ASSETS, AND (II) WITH RESPECT TO THE BUSINESS, FINANCIAL CONDITION, RESULTS OF OPERATIONS, ASSETS, LIABILITIES, AND PROSPECTS OF SELLERS OR THE BUSINESS OF THE SELLERS,), THE MERCHANTABILITY OR FITNESS OF THE PERSONAL PROPERTY OR ANY OTHER PORTION OF THE PURCHASED ASSETS FOR ANY PARTICULAR PURPOSE, OR ANY OTHER MATTER RELATING TO THE PURCHASED ASSETS OR ANY PORTION THEREOF.

(d)    UPON THE CLOSING DATE, SUBJECT TO THE EXPRESS REPRESENTATIONS AND THE PROVISIONS OF SECTION 10.5, BUYER WILL ACCEPT THE PURCHASED ASSETS AT THE CLOSING "AS IS," "WHERE IS," AND "WITH ALL FAULTS."

## ARTICLE VI
## COVENANTS OF THE PARTIES

6.1    <u>Conduct of Business Pending the Closing</u>. Except (a) as required by applicable Law or by order of the Bankruptcy Court, (b) as otherwise expressly required by this Agreement, (c) as limited by the terms of the DIP Documents, (d) as set forth on Schedule 6.1, or (e) with the prior

written consent of Buyer (not to be unreasonably withheld, conditioned, or delayed), during the period from the Agreement Date and continuing until the earlier of the termination of this Agreement in accordance with its terms or the Closing, the Sellers shall use commercially reasonable efforts to, and shall use commercially reasonable efforts to cause the Foreign Subsidiaries to, carry on the Business in the Ordinary Course of Business (subject to the requirements of the Bankruptcy Code and Bankruptcy Court) and use commercially reasonable efforts to preserve in all material respects (i) the operations, organization and goodwill of the Business intact (including by maintaining and renewing its Permits) and (ii) relationships with Governmental Entities, customers, suppliers, partners, lessors, licensors, licensees, vendors, contractors, distributors, agents, officers and employees and others having business dealings with the Business. The Sellers shall notify Buyer in writing of any event, occurrence, fact, condition or change in the Business, assets, operations or prospects of the Sellers that results in, or could reasonably be expected to result in, a Material Adverse Effect, promptly upon the Knowledge of Sellers of such occurrence of any such event, occurrence, fact, condition or change.

6.2    Negative Covenants. Except as otherwise expressly provided by this Agreement, as set forth on Schedule 6.1, or consented to in writing by Buyer (such consent not to be unreasonably withheld, conditioned, or delayed), or as may be required by order of the Bankruptcy Court or as limited by the terms of the DIP Documents, during the period from the Agreement Date until the earlier of the termination of this Agreement in accordance with its terms or the Closing, the Sellers shall not and shall cause the Foreign Subsidiaries to not take any of the following actions:

(a)    incur or commit to incur any capital expenditures other than as expressly contemplated under the Budget;

(b)    acquire or agree to acquire (by merging or consolidating with, or by purchasing any portion of the stock of, or other ownership interests in, or substantial portion of assets of, or by any other manner), any business or division or any corporation, partnership, association, limited liability company or other entity;

(c)    grant any Lien on or otherwise encumber or dispose of (or consent to the disposition of) any of the Purchased Assets (including any Available Contract), including the Equity Interests of any of the Sellers, other than a Permitted Lien or inventory sold in the Ordinary Course of Business, Liens securing the DIP Facility and any other Liens not prohibited by the DIP Documents;

(d)    sell, assign, transfer, license, sublicense, covenant not to sue with respect to, abandon, cancel, terminate, permit to lapse or expire, or otherwise dispose of any material Acquired Intellectual Property, other than (i) non-exclusive licenses granted in the Ordinary Course of Business and (ii) expiration of Intellectual Property at the end of its non-renewable statutory life;

(e)    adjust, split, combine, redeem, repurchase or reclassify any capital stock or equity interests or issue or propose or authorize the issuance of any other securities (including Debt securities, options, profits interests, warrants or any similar security exercisable for, or convertible into, such other security);

(f)    incur or assume any Debt (other than the DIP Facility and any other Debt not prohibited by the DIP Documents and trade payables in the Ordinary Course of Business);

(g)    guarantee any Debt of any Person or enter into any "keep well" or other agreement to maintain any financial condition of another Person or enter into any arrangement having the economic effect of any of the foregoing (other than the DIP Facility and any guarantee not prohibited by the DIP Documents);

(h)    enter into, amend, restate, supplement, modify, waive or terminate any Available Contract, other than any amendment, restatement, supplement, modification or waiver that is done in the Ordinary Course of Business and is not material and adverse to the Business;

(i)    adopt any amendments to the certificate of incorporation, bylaws or other Organizational Documents of any Seller;

(j)    initiate, compromise, settle or agree to settle any Claim, complaint, or Proceeding, other than compromises or settlements in the Ordinary Course of Business that (i) involve only the payment of money damages not in excess of $100,000 individually or $500,000 in the aggregate, (ii) do not impose ongoing limits on the conduct of the Business, and (iii) result in a full release of all Sellers with regard to the Claims or complaint giving rise to such Proceeding;

(k)    make, change or revoke any material Tax election (including entity classification elections), change any financial or Tax accounting method, except insofar as may have been required by applicable Law or a change in GAAP, consent to an extension or waiver of the limitation period applicable to any Tax claim or assessment, or surrender any right to claim a refund of a material amount of Taxes;

(l)    enter into, amend, negotiate or terminate any collective bargaining agreement or similar agreement with any labor union or labor organization representing any employees;

(m)    (i) unless in accordance with an Order of the Bankruptcy Court or the Budget, increase the compensation payable to or to become payable to, or the benefits provided to, pay any bonus to, or grant any equity or equity-based award to, any current or former employee, director, independent contractor or other individual service provider of the Sellers; (ii) grant, increase, pay, provide or modify any severance, retention, change in control or termination payment or benefit to, or loan or advance or accelerate any amount to, any current or former employee, director, independent contractor or other individual service provider of the Sellers; (iii) accelerate the vesting or payment, or fund or in any other way secure the payment, of any compensation or benefit for any current or former employee, director, independent contractor or other individual service provider of the Sellers; (iv) approve, establish, adopt, enter into, amend or terminate any Assumed Benefit Plan, except as required by Law; (v) grant or forgive any loans to any current or former employee, director, independent contractor or other individual service provider of the Sellers; or (vi) hire or promote, or terminate or demote (other than for cause) any current or former employee, independent contractor or other individual service provider of the Sellers with annual target cash compensation greater than $100,000 or in accordance with the Budget;

(n)  (i) enter into any Contract or arrangement (including any loan or similar arrangement) with a Related Party or that would be a Related Party Transaction if it existed on the Agreement Date or (ii) make payments to or on behalf of any Related Party (including by exercise of set-off rights or otherwise), other than in accordance with the terms of an existing, disclosed Related Party Transaction;

(o)  receive, collect, compile, use, store, process, share, safeguard, secure (technically, physically and administratively), dispose of, destroy, disclose, or transfer (including cross-border) Personal Information (or fail to do any of the foregoing, as applicable) in violation of any (i) applicable Privacy Laws, (ii) privacy policies or notices of the Sellers, or (iii) the Sellers' contractual obligations with respect to Personal Information;

(p)  cash collected by the Sellers and their subsidiaries from customers of the Business during the period between the date hereof and the Closing Date shall only be used to fund ordinary course expenses of the Business (not expenses related to the administration of the Cases); or

(q)  authorize, commit or agree to take any of the foregoing actions.

6.3  Access.

(a)  Subject to applicable Law, until the Closing Date, the Sellers (i) shall give Buyer and its Representatives reasonable access during normal business hours to the offices, assets, contracts, properties, officers, employees, accountants, auditors, financial advisors, counsel (other than counsel to the Sellers in connection with the Cases) and other representatives, books and records, of the Sellers and their Affiliates, (ii) shall furnish to Buyer and its Representatives such financial, operating and property related data and other information as such Persons reasonably request, (iii) shall instruct the employees, accountants, counsel and financial advisors of the Sellers and their Affiliates to cooperate reasonably with Buyer in its investigation of the Business; and (iv) shall, upon reasonable request of Buyer, use commercially reasonable efforts to provide Buyer with access to their customers, suppliers, vendors, distributors, manufacturers and other Persons with whom the Business has had material dealings; provided, however, that Buyer will not, and will not permit any of its Representatives to, contact any officer, manager, director, employee, customer, supplier, lessee, lessor, lender, licensee, licensor, distributor, noteholder or other material business relation of the Sellers or any Foreign Subsidiary prior to the Closing with respect to the Sellers, Foreign Subsidiaries, their business or the Transactions without the prior written consent of the Sellers for each such contact, which consent shall not be unreasonably withheld, conditioned or delayed. No investigation by Buyer prior to or after the date of this Agreement shall diminish or obviate any of the representations, warranties, covenants or agreements of the Sellers contained in this Agreement. For the avoidance of doubt, nothing in this Section 6.3(a) shall require Sellers to take any such action if (i) such action may result in a waiver or breach of any attorney/client privilege or (ii) such action could reasonably be expected to result in violation of applicable Law or Order.

(b)  From and after the Closing Date until the conclusion of the Cases, Buyer shall give the Sellers and the Sellers' Representatives reasonable access during normal business hours to the books and records pertaining to the Purchased Assets and Assumed Liabilities, for the

purposes of (i) the preparation or amendment of Tax Returns, (ii) the determination of any matter relating to the rights or obligations of the Sellers under this Agreement, or (iii) as is necessary to administer, or satisfy their obligations in connection with, the Cases. Buyer shall, and shall cause each of its controlled Affiliates to, cooperate with the Sellers as may reasonably be requested by the Sellers for such purposes. For the avoidance of doubt, nothing in this <u>Section 6.3(b)</u> shall require Buyer to take any such action if (i) such action may result in a waiver or breach of any attorney/client privilege, (ii) such action could reasonably be expected to result in violation of applicable Law or Order, or (iii) providing such access or information would be reasonably expected to be disruptive to its normal business operations.  Unless otherwise consented to in writing by the Sellers, Buyer will not, for a period of three (3) years following the Closing Date, destroy, alter or otherwise dispose of any of the books and records without first offering to surrender to the Sellers such books and records or any portion thereof that Buyer may intend to destroy, alter or dispose of. From and after the Closing, Buyer will, and will cause its employees to, provide Sellers with reasonable assistance, support and cooperation with Sellers' wind-down and related activities (e.g., helping to locate documents or information related to preparation of Tax Returns or prosecution or processing of insurance/benefit claims).

(c)     The information provided pursuant to this <u>Section 6.3</u> will be used solely for the purpose of consummating the transactions contemplated hereby, and will be governed by all the terms and conditions of Section 12.19 of the Prepetition Financing Agreement. None of Sellers or Buyer makes any representation or warranty as to the accuracy of any information, if any, provided pursuant to this <u>Section 6.3</u>, and no Party may rely on the accuracy of any such information, in each case, other than the Express Representations or the representations and warranties made by Buyer to Sellers in <u>Article V</u> of this Agreement, as applicable.

6.4     <u>Confidentiality</u>. From and after the Closing Date:

(a)     the Sellers will treat and hold as confidential all of the Confidential Information, and will not, directly or indirectly, without the prior written consent of Buyer, disclose or use any Confidential Information, except as required by Law. The Sellers' obligation not to disclose Confidential Information shall not apply to Confidential Information that it shall be required to disclose by Law; <u>provided</u>, <u>however</u>, that, prior to making such disclosure, the Sellers shall notify Buyer promptly to the extent not prohibited by Law so that Buyer may seek confidential treatment or protection of such Confidential Information at Buyer's sole cost and expense; and

(b)     in the event that the Sellers are required in any Proceeding to disclose any Confidential Information, the Sellers will notify Buyer promptly of the requirement to the extent not prohibited by Law so that Buyer may seek an appropriate protective order at Buyer's sole cost and expense or waive compliance with the provisions of this <u>Section 6.4</u>.

6.5     <u>Public Announcements</u>. From the Agreement Date, Buyer and the Sellers will consult with each other before issuing, and provide each other the reasonable opportunity to review and comment upon, any press release, any court filing or pleading filed with the Bankruptcy Court relating primarily to this Agreement or the Transactions, or other public statements with respect to the Transactions, and neither Buyer nor the Sellers shall issue any such press release or make any such public statement without the prior written approval of the other Party, in each case except as

may be required by Law, or by obligations pursuant to any listing agreement with any national securities exchange. Sellers shall use their respective commercially reasonable efforts to cause their respective Affiliates, employees, officers and directors to comply with this Section 6.5.

6.6    Employment Matters.

(a)    Prior to Closing, Buyer may in its sole discretion (following consultation with the executive management of the Sellers) provide offers of employment to individuals employed by the Sellers as of the Closing Date, which offer shall provide at least the same base salary or hourly wage rate and target incentive cash bonus opportunities and such other terms and conditions determined by Buyer in its sole discretion.

(b)    Buyer shall provide credit to Hired Employees under Buyer's paid time off plans for all accrued but unused paid time off days as of the Closing, except to the extent that Hired Employees receive payment for such vacation days in connection with the Closing.

(c)    Following the Closing, Buyer shall give each Hired Employee full credit for prior service with the Sellers for purposes of (i) eligibility and vesting under any health or welfare Benefit Plans of Buyer (for the avoidance of doubt, excluding defined benefit pension accruals, deferred compensation, or equity or equity-based incentive plans, or any plan under which such crediting would be prohibited), and (ii) determination of benefit levels under any employee benefit plans of Buyer relating to paid time off, in each case, for which the Hired Employee is otherwise eligible and in which the Hired Employee is offered participation, except where such credit would result in a duplication of benefits. Buyer shall use commercially reasonable efforts to waive, or cause to be waived, any limitations on benefits relating to pre-existing conditions to the same extent such limitations are waived under any comparable plan of the Sellers and use commercially reasonable efforts to recognize for purposes of annual deductible and out-of-pocket limits under its medical and dental plans, deductible and out-of-pocket expenses paid by Hired Employees in the calendar year in which the Closing Date occurs.

(d)    Without limiting the generality of Section 2.4, each Seller shall retain responsibility for, and satisfy all Liabilities with respect to, all payments and benefits of the employees (and their spouses, dependents and beneficiaries, and all former employees, agents and representatives) under Benefit Plans of the Sellers that are not Assumed Benefit Plans accrued up to the Closing Date or which relate to events prior to the Closing Date in accordance with the terms thereof and applicable Laws. The Seller and Buyer shall work in good faith to transfer sponsorship of any Assumed Benefit Plan (including any third party insurance contracts or services agreements thereto) from Seller to Buyer or its Affiliates.

(e)    Without limiting the generality of Article II, each Seller shall be responsible for the following claims or benefit payments of all employees (and their spouses, dependents and beneficiaries, and all former employees, agents and representatives) accrued up to the Closing Date or which related to events prior to the Closing Date regardless of whether such claims are filed before or after the Closing Date under each Benefit Plan that is not an Assumed Benefit Plan:

(i)    with respect to death or dismemberment claims, those in respect of which the event occurred prior to the Closing Date;

(ii)    with respect to health claims, those in respect of which the services were provided or the supplies were purchased prior to the Closing Date; and

(iii)    with respect to short term and/or long term disability claims and workers' compensation claims, for those claims resulting from events that occurred prior to the Closing Date, including, to the extent covered under the Benefit Plans, for recurring illnesses which first originated with events occurring prior to the Closing Date, whether or not such claims continue after the Closing Date.

(f)    This <u>Section 6.6</u> shall operate exclusively for the benefit of the Sellers and Buyer and not for the benefit of any other Person, including any current or former employees of the Sellers or the Hired Employees, which Persons shall have no rights to enforce this <u>Section 6.6</u>. Nothing in this <u>Section 6.6</u> shall: (i) entitle any Hired Employee to employment with Buyer; (ii) change such Hired Employee's status as an employee-at-will or restrict the ability of Buyer to terminate the service of any Hired Employee at any time or for any reason; (iii) create any third party rights in any current or former service provider of the Sellers (including any beneficiary or dependent thereof); or (iv) be treated as an amendment of any Benefit Plan or other employee benefit plan or arrangement or restrict the ability of Buyer, the Sellers or any of their respective Affiliates to amend, modify, discontinue or terminate any Benefit Plan or other employee benefit plan or arrangement.

(g)    For any Hired Employees who are principally based outside the United States, the provisions of this <u>Section 6.6</u> shall apply to such employees *mutatis mutandis* to the maximum extent permitted by applicable Law.

6.7    <u>Reasonable Efforts; Approvals</u>.

(a)    Buyer and the Sellers will use reasonable best efforts to take, or cause to be taken, all actions and use reasonable best efforts to do, or cause to be done, and to assist and cooperate with the other Parties in doing, all things which are necessary, proper or advisable to consummate and make effective the Transactions including: (i) the transfer, modification or reissuance of all Permits, (ii) the obtaining or taking of all other necessary actions, non-actions or waivers from Governmental Entities and the making of all other necessary registrations and filings with Governmental Entities (including any Regulatory Authorizations), and (iii) the execution and delivery of any additional certificates, agreements, instruments, reports, schedules, statements, consents, documents and information necessary to consummate the Transactions. The covenants in this <u>Section 6.7(a)</u> shall survive the Closing.

(b)    In furtherance of the foregoing, Buyer and each Seller shall use its commercially reasonable efforts to obtain any consents and approvals from any third party other than a Governmental Entity that may be required in connection with the Transactions (the "<u>Third Party Consents</u>"). Without limiting the generality of the foregoing sentence, the Sellers shall not be required to compensate any applicable third party, commence or participate in any Proceeding or offer or grant any accommodation (financial or otherwise, including any accommodation or arrangement to indemnify, remain primarily, secondarily or contingently liable for any Assumed Liability) to any applicable third party in connection with the Sellers' obligations under this <u>Section 6.7(b)</u>; <u>provided</u>, that the Sellers shall obtain the written consent of Buyer prior to any Seller paying

any such compensation, commencing or participating in any Proceeding, or offering or granting any such accommodation. The covenants in this <u>Section 6.7(b)</u> shall survive the Closing.

(c)    The obligations of the Sellers pursuant to this <u>Section 6.7</u> shall be subject to any Orders entered, or approvals or authorizations granted or required, by or under the Bankruptcy Court or the Bankruptcy Code (including in connection with the Cases), the DIP Facility, and each of Sellers' obligations as a debtor-in-possession to comply with any Order of the Bankruptcy Court (including the Bidding Procedures Order and the Sale Order) and Sellers' duty to seek and obtain the highest or otherwise best price for the Acquired Assets as required by the Bankruptcy Code.

(d)    Promptly following the Closing, at Buyer's sole cost and expense, Sellers shall take such further actions and execute such further documents as may be necessary or reasonably requested by Buyer or Sellers to effectuate, evidence and perfect the assignment and transfer of the Owned Intellectual Property to Buyer, including making such filings with any Governmental Entities as may be required to transfer the Owned Intellectual Property to Buyer or to further the prosecution, issuance or maintenance of the Owned Intellectual Property.

(e)    This <u>Section 6.7</u> shall not apply to filings or consents under Antitrust Laws, which shall be governed by the obligations set forth in <u>Section 6.12</u>.

6.8    <u>Corporate Name Change</u>. Within thirty (30) days following the Closing, each Seller shall deliver to Buyer (a) a duly executed and acknowledged certificate of amendment to such Seller's certificate of incorporation or other Organizational Document which is required to change such Seller's corporate or other entity name to a new name that is, in Buyer's reasonable judgment, sufficiently dissimilar to such Seller's present name and, in all cases, does not include the name "Near" so as to avoid confusion and to make each Seller's present name available to Buyer, and (b) appropriate documents, duly executed and acknowledged, which are required to change such Seller's name to such new name in any jurisdiction in which such Seller is qualified to do business, in forms reasonably satisfactory to Buyer. Buyer and any Affiliate of Buyer are hereby authorized (but not obligated) to file such certificates or other documents (at Buyer's expense) with the applicable Governmental Entities in order to effectuate such change of name at or after the Closing as Buyer may elect.

6.9    <u>Assignment of Contracts and Rights</u>.

(a)    To the maximum extent permitted by the Bankruptcy Code, the Purchased Assets of the Sellers shall be assumed and assigned to Buyer pursuant to section 365 of the Bankruptcy Code as of the Closing Date or such other date as specified in the Sale Order or this Agreement, as applicable. Notwithstanding any other provision of this Agreement to the contrary, this Agreement shall not constitute an agreement to assign any asset or any right thereunder if, after giving effect to the Sale Order, an attempted assignment without the consent of a third party (including any Governmental Entity) would constitute a breach or in any way adversely affect the rights of Buyer following the Closing. If, as of the Closing Date, such consent is not obtained or such assignment is not attainable pursuant to sections 363 or 365 of the Bankruptcy Code other than as a result of the failure by the Buyer to pay or otherwise satisfy all Cure Amounts, then the Sellers and Buyer will, for a period of sixty (60) days following the Closing, cooperate in a

mutually agreeable arrangement, to the extent feasible (without infringing upon the legal rights of any third party or violating any Law), under which Buyer would obtain the benefits and assume the obligations (to the extent otherwise constituting Assumed Liabilities hereunder) thereunder in accordance with this Agreement, including subcontracting, sublicensing or subleasing to Buyer, or under which the Sellers would enforce for the benefit of, and at the direction of, Buyer, with Buyer assuming all of the Sellers' obligations (to the extent constituting Assumed Liabilities hereunder), and any and all rights of the Sellers thereunder.

(b)      Notwithstanding anything herein to the contrary, in the event that Sellers are unable to transfer to Buyer any of their Equity Interests in Near Intelligence Pvt. Ltd. ("Near India") at the Closing as a result of failure to obtain corporate approval for, or registration of, such transfer under the organizational documents of Near India or under applicable Law, from and after the Closing, for a period of time until the earlier to occur of (x) 6 months following the Closing Date and (y) the transfer of such Equity Interests to Buyer (the "End Date"), Buyer and Sellers shall use commercially reasonable efforts to enter into a mutually agreeable arrangement, to the extent feasible under applicable Law, under which Buyer would obtain the benefits and assume all the obligations related to ownership of the Equity Interests of Near India as though it were such record holder of such Equity Interests, and Sellers will continue to hold such Equity Interests for the benefit of the Buyer. Sellers shall use their reasonable best efforts to undertake any instruction received in writing from Buyer with respect to exercising any rights and powers of Sellers in respect of their ownership of the Equity Interests of Near India, to the extent permitted by applicable Law. From and after the Closing until the End Date, Sellers shall use their reasonable best efforts to obtain all approvals required to consummate the transfer of the Equity Interests in Near India to Buyer. As between Sellers and Buyer, from and after the Closing, Buyer shall be responsible for the operations of Near India as though it were the record owner of the Equity Interests of Near India and shall assume and agree to pay for any and all Liabilities of Near India. Buyer shall pay for all expenses reasonably incurred by the Sellers in connection with the arrangements set forth in this Section 6.9(b) and from and after the Closing, Buyer shall indemnify the Sellers and their Affiliates from any Liabilities incurred by the Sellers arising out of any action or omission of Sellers or their Affiliates taken at the direction of Buyer under such arrangement. For the avoidance of doubt, the failure to transfer the Equity Interest of Near India at the Closing as contemplated by this Section 6.9(b) shall not cause a failure to satisfy any condition to Closing set forth in Article VIII of this Agreement nor give rise to an event of termination under Article IX of this Agreement.

6.10    Tax Matters.

(a)      All Transfer Taxes arising out of the transfer of the Purchased Assets and any Transfer Taxes required to effect any recording or filing with respect thereto shall be borne by Buyer. The Transfer Taxes shall be calculated assuming that no exemption from Transfer Taxes is available, unless otherwise indicated in the Sale Order or, at Closing, the Sellers or Buyer, as appropriate, provide an appropriate resale exemption certificate or other evidence acceptable to Buyer or the Sellers, as appropriate, of exemption from such Transfer Taxes. The Sellers and Buyer shall cooperate to timely prepare and file any Tax Returns relating to such Transfer Taxes, including any claim for exemption or exclusion from the application or imposition of any Transfer Taxes. Each Party shall file all necessary documentation and returns that it is required by Law to file with respect to such Transfer Taxes when due, and shall promptly, following the filing thereof,

furnish a copy of such return or other filing and a copy of a receipt showing payment of any such Transfer Tax to the other Party. Each Party shall furnish or cause to be furnished to the other, upon request, as promptly as practicable, such information and assistance relating to the Purchased Assets and the Business as is reasonably necessary for filing of all Tax Returns, including any claim for exemption or exclusion from the application or imposition of any Taxes or making of any election related to Taxes, the preparation for any audit by any taxing authority and the prosecution or defense of any claim, suit or proceeding relating to any Tax Return.

(b)     Other than Transfer Taxes, all Liability for Taxes with respect to the Business or the Purchased Assets attributable to the Pre-Closing Tax Period shall be borne by the Sellers, and all Liability for Taxes with respect to the Purchased Assets attributable to the Post-Closing Tax Period shall be borne by Buyer. For purposes of this Agreement, with respect to Taxes attributable to any taxable year or other taxable period beginning on or before and ending after the Closing Date, the portion of any such Taxes allocated to a Pre-Closing Tax Period shall be: (i) in the case of Taxes based upon, or related to income, receipts, profits, or wages or imposed in connection with the sale, transfer or assignment of property, or required to be withheld, deemed equal to the amount which would be payable if such taxable year or other taxable period ended on the Closing Date, and (ii) in the case of other Taxes deemed to be the amount of such Taxes for the entire period multiplied by a fraction the numerator of which is the number of days in the period ending on the Closing Date and the denominator of which is the number of days in the entire period.

(c)     The Parties agree that the transfer of the Purchased Assets (except for the purchase of the Equity Interests of the Foreign Subsidiaries) to the Buyer is intended to be treated as a taxable acquisition of assets and the Parties shall prepare and file all relevant U.S. federal income tax Returns consistent with such intended treatment and <u>Section 3.3</u>, respectively, absent a contrary "determination" (within the meaning of Section 1313(a) of the Code). No elections shall be made under Section 338 of the Code (or any election to similar effect) with respect to the transactions contemplated by this Agreement.

(d)     The obligations set forth in this <u>Section 6.10</u> with respect to Taxes shall survive until the date that is thirty (30) days following the expiration of the applicable statute of limitations.

6.11    <u>Available Contracts List</u>. Sellers shall use commercially reasonable efforts to provide Buyer with a true and correct list of all Available Contracts (and copies thereof) promptly following the date hereof and in no event later thirty (30) days from the Agreement Date.

6.12    <u>HSR Act; Antitrust Laws</u>.

(a)     Sellers and Buyer shall, if required in connection with the transactions contemplated hereby, (i) promptly make the filings required by any Governmental Entity, including under the HSR Act or any other Antitrust Laws and, in any event, within ten (10) Business Days after the Agreement Date in the case of all filings required under the HSR Act and all other filings required by other Antitrust Laws, (ii) comply at the earliest practicable date with any request for additional information, documents or other materials received from any Governmental Entity, whether such request is formal or informal, (iii) cooperate with the other Parties in connection with

resolving any investigation or other inquiry concerning the transactions contemplated by this Agreement commenced by any Governmental Entity, and (iv) cooperate with the other Parties in connection with any other Party's filing. Each Party shall be responsible for the payment of its respective fees and expenses, including legal fees and expenses, in complying with any request for additional information or documentary material from any Governmental Entity; *provided* that all filing fees required to be paid in connection with any filings hereunder shall be borne equally by Sellers and Buyer. Except where prohibited by applicable Law or any Governmental Entity, and subject to Section 6.4, each Party shall promptly inform the other Parties of any oral communication with, and provide copies of written communications with, any Governmental Entity regarding any such filing. No Party shall agree to participate in any formal meeting with any Governmental Entity in respect of any such filings, investigation, or other inquiry without giving the other Parties prior notice of the meeting and, to the extent permitted by such Governmental Entity, the opportunity to attend and/or participate. Subject to applicable Laws and any Governmental Entity, the Parties will coordinate, consult and cooperate with one another in connection with any analyses, appearances, presentations, memoranda, briefs, arguments, opinions and proposals made or submitted by or on behalf of any Party relating to proceedings under the HSR Act or any other Antitrust Law, if any. Except where prohibited by applicable Law or any Governmental Entity, and subject to Section 6.4, the Parties will provide each other with copies of all correspondence, filings or communications, including any documents, information and data contained therewith, between them or any of their representatives, on the one hand, and any Governmental Entity or members of its staff, on the other hand, with respect to this Agreement and the transactions contemplated hereby.

(b)     Buyer and each Seller shall use their respective reasonable best efforts to obtain any required approval from any Governmental Entity and to resolve such objections, if any, as may be asserted by any Governmental Entity with respect to the transactions contemplated by this Agreement under the HSR Act, the Sherman Act, as amended, the Clayton Act, as amended, the Federal Trade Commission Act, as amended, and any other United States federal or state or foreign Laws that are designed to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade (collectively, the "Antitrust Laws"). Buyer and each Seller shall use their respective reasonable best efforts to take such action as may be required to cause the expiration of the notice periods under the HSR Act or other Antitrust Laws with respect to such transactions as promptly as practicable after the execution of this Agreement.

## ARTICLE VII
## BANKRUPTCY PROVISIONS

7.1     Expense Reimbursement. In consideration for Buyer having expended considerable time and expense in connection with this Agreement and the negotiation thereof and the identification and quantification of assets of the Sellers, if this Agreement is terminated for any reason other than Section 9.1(c)(i) or Section 9.1(c)(iii)(A), the Sellers shall pay Buyer if approved by the Bankruptcy Court, in accordance with the terms of this Agreement (including Section 9.2) and the Bidding Procedures Order an aggregate amount equal to the Expense Reimbursement; provided, however, if this Agreement is terminated pursuant to Section 9.1(b)(vi), Section 9.1(b)(vii) or Section 9.1(c)(ii), any such Expense Reimbursement shall only be due and payable upon consummation of an Alternate Transaction from the proceeds of such Alternate Transaction. Each of the Parties acknowledges and agrees that the agreements contained in this Section 7.1 are

an integral part of the Transactions and this Agreement and that the Expense Reimbursement is not a penalty, but rather is liquidated damages in a reasonable amount that will reasonably compensate Buyer in the circumstances in which such Expense Reimbursement is payable for the efforts and resources expended and opportunities foregone by Buyer while negotiating and pursuing the Transactions and this Agreement and in reasonable reliance on this Agreement and on the reasonable expectation of the consummation of the Transactions, which amount would otherwise be impossible to calculate with precision. In accordance with Section 7.3, Sellers shall file with and seek the entry by the Bankruptcy Court of the Bidding Procedures Order approving the payment of the Expense Reimbursement. The claim of Buyer in respect of the Expense Reimbursement shall constitute an allowed administrative expense claim against each of the Sellers under sections 503(b) and 507(a)(2) of the Bankruptcy Code in the Cases (without the need to file a proof of claim). The Expense Reimbursement shall be payable on a joint and several basis by the Sellers.

7.2     Bankruptcy Court Orders and Related Matters.

(a)     The Sellers and Buyer acknowledge that this Agreement and the Transactions are subject to entry of, as applicable, the Bidding Procedures Order and the Sale Order. In the event of any discrepancy between this Agreement and the Bidding Procedures Order and the Sale Order, the Bidding Procedures Order and the Sale Order shall govern. In the event the entry of the Sale Order or the Bidding Procedures Order is appealed, Sellers shall use commercially reasonable efforts to defend such appeal, and Buyer shall cooperate in such efforts.  Buyer and Sellers acknowledge that Sellers must take reasonable steps to demonstrate that they have sought to obtain the highest or otherwise best offer for the Purchased Assets, including giving notice thereof to the creditors of Sellers and other interested parties, providing information about Sellers' business to prospective bidders, entertaining higher or otherwise better offers from such prospective bidders, and, in the event that additional qualified prospective bidders desire to bid for the Purchased Assets, conducting the Auction. Buyer agrees and acknowledges that Sellers and their Affiliates will be permitted, and will be permitted to cause their Representatives, to initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, respond to any unsolicited inquiries, proposals or offers submitted by, and enter into any discussions or negotiations regarding any of the foregoing with, any Person (in addition to Buyer and its Affiliates, agents and Representatives).

(b)     The bidding procedures to be employed with respect to this Agreement and the Auction will be those reflected in the Bidding Procedures Order.

(c)     Buyer shall take all actions as may be reasonably necessary to cause the Bidding Procedures Order and Sale Order to be issued, entered and become Final Orders, including furnishing affidavits, declarations or other documents or information for filing with the Bankruptcy Court. Buyer agrees that it will promptly take such actions as are reasonably requested by Sellers to assist in obtaining entry of the Bidding Procedures Order and Sale Order and a finding of adequate assurance of future performance by Buyer.  Buyer will provide adequate evidence and assurance under the Bankruptcy Code of the future performance by Buyer of each Assumed Contract in accordance with the Bidding Procedures Order. Buyer will, and will cause its Affiliates to, reasonably promptly take all actions reasonably required or requested by Sellers to assist in obtaining a Bankruptcy Court finding that there has been an adequate demonstration of adequate

assurance of future performance under the Assumed Contracts, such as furnishing affidavits, non-confidential financial information and other documents or information for filing with the Bankruptcy Court and making Buyer's Representatives available to testify before the Bankruptcy Court.

(d)    The Sellers shall, consistent with their respective obligations as fiduciaries under the Bankruptcy Code, cooperate with Buyer concerning the Bidding Procedures Order, the Sale Order, and any other orders of the Bankruptcy Court relating to the Transactions. The Sellers shall give notice under the Bankruptcy Code of the request for the relief specified in the Bidding Procedures Motion to all creditors and parties in interest entitled to notice thereof pursuant to the Bidding Procedures Order, the Bankruptcy Code and the Bankruptcy Rules, including all Persons that have asserted Liens on any Seller's assets, and all non-debtor parties to the Available Contracts of the Sellers and other appropriate notice, including such additional notice as the Bankruptcy Court shall direct or as Buyer may reasonably request, and provide appropriate opportunity for hearing, to all parties entitled thereto, of all motions, orders, hearings, or other Proceedings in the Bankruptcy Court relating to this Agreement, the Transactions and the Bidding Procedures Motion.

(e)    The Sellers shall provide draft copies of all orders, motions, pleading, applications and other material documents they intend to file with the Bankruptcy Court in connection with the sale of the Purchased Assets or the Transactions not less than three (3) Business Days prior to the date when the Sellers plan to file such document (provided, that if the delivery of such drafts at least three (3) Business Days is not reasonably practicable, such drafts shall be delivered to Buyer as soon as reasonable practicable prior to filing). The form and substance of any such document hereunder shall be mutually acceptable to Sellers and Buyer (provided that no party shall unreasonably withhold, condition or delay its consent).

(f)    Subject to the Sellers exercising their rights pursuant to this Section 7.2, the Sellers shall not, and shall cause their subsidiaries not to, take any action that is intended to result in, or fail to take any action that is intended to result in, or fail to take any action the intent of which failure to act would reasonably be expected to result in, the reversal, voiding, modification or staying of the Bidding Procedures Order or, if applicable, if Buyer is the prevailing bidder at the Auction, the Sale Order. The Sellers shall, and shall cause their subsidiaries to, comply with the Bidding Procedures Order and the Sale Order.

(g)    For the avoidance of doubt, nothing in this Agreement will restrict Sellers or their Affiliates from selling, disposing of or otherwise transferring any Excluded Assets (other than Available Contracts, which the Sellers may not terminate, amend or otherwise dispose of, or reject in the Cases, without Buyer's consent) or from settling, delegating or otherwise transferring any Excluded Liabilities, in each case, with the approval of the Bankruptcy Court, or from entering into discussions or agreements with respect to the foregoing.

7.3    Bankruptcy Milestones. The Sellers shall achieve the following milestones by the dates set forth below (or such later date as may be agreed by Buyer) (collectively, the "Bankruptcy Milestones"):

(a)    On the Petition Date, the Debtors shall file a motion with the Bankruptcy Court seeking approval of the DIP Facility.

(b)     On or before the date that is two (2) days after the Petition Date, the Debtors shall have filed the Bidding Procedures Motion with the Bankruptcy Court.

(c)     On or before the date that is three (3) days after the Petition Date, the Bankruptcy Court shall have entered the Interim DIP Order.

(d)     On or before the date that is twenty-five (25) days after the Petition Date, the Bankruptcy Court shall have entered the Bidding Procedures Order and the Final DIP Order.

(e)     On or before the date that is fifty-five (55) days after the Petition Date, the Bid Deadline (as defined in the Bidding Procedures Order) shall have occurred.

(f)     On or before the date that is sixty (60) days after the Petition Date, the Debtors shall have commenced the Auction, if necessary.

(g)     On or before the date that is seventy-one (71) days after the Petition Date, the Bankruptcy Court shall have entered the Sale Order.

(h)     On or before the date that is ninety (90) days after the Petition Date, the Closing shall have occurred.

### ARTICLE VIII
### CONDITIONS TO OBLIGATIONS OF THE PARTIES

8.1     <u>Conditions Precedent to Obligations of Buyer</u>. The obligation of Buyer to consummate the Transactions is subject to the satisfaction (or waiver by Buyer in Buyer's sole discretion) on or prior to the Closing Date of each of the following conditions:

(a)     <u>Accuracy of Representations and Warranties</u>. The representations and warranties of the Sellers contained in <u>Section 4.1</u> (Organization and Good Standing), <u>Section 4.2</u> (Power and Authority), <u>Section 4.3</u> (Foreign Subsidiaries) and <u>Section 4.15</u> (Financial Advisors) shall be true and correct on the date hereof and on and as of the Closing Date, with the same force and effect as though such representations and warranties had been made on and as of the Closing Date (except to the extent that any such representation or warranty is expressly made as of a specified date). All other representations and warranties of the Sellers contained in <u>Article IV</u> shall be true and correct on the date hereof and as of the Closing Date (except to the extent that any such representation or warranty is expressly made as of a specified date), except where the failure of any such representations or warranties to be true and correct (without giving effect to any limitations to "material" or "Material Adverse Effect"), either individually or in the aggregate, has resulted in or would reasonably be expected to result in a Material Adverse Effect.

(b)     <u>Performance of Obligations</u>. Each of the Sellers shall have performed in all material respects all obligations and agreements contained in this Agreement required to be performed by it on or prior to the Closing Date.

(c)     [<u>Reserved</u>.]

(d)    <u>DIP Financing</u>. The DIP Documents shall have each been approved by the Bankruptcy Court pursuant to the Final DIP Order, which shall be in form and substance acceptable to Buyer.

(e)    <u>No Material Adverse Effect</u>. There shall have been no Material Adverse Effect from the Agreement Date through the Closing Date.

(f)    <u>No Challenges to Credit Bid</u>. As of the expiration of the Challenge Period (as defined in the Interim DIP Order), there shall be no pending challenge or contest to the validity, amount, perfection or priority of the DIP Documents, the Loan Documents or other Claims of Buyer or Administrative Agent (as applicable) thereunder that would prevent Buyer's credit bid the Credit Bid Amount, unless any such challenge or contest shall have been resolved to the reasonable satisfaction of Buyer in its sole discretion.

(g)    <u>Deliverables</u>. The Sellers shall have delivered, or caused to be delivered, to Buyer each deliverable required pursuant to <u>Section 3.1(b)</u>.

(h)    <u>Bidding Procedures Order</u>. The Bankruptcy Court shall have entered the Bidding Procedures Order, which Order shall not be subject to a stay or otherwise been vacated.

(i)    <u>Sale Order</u>. The Bankruptcy Court shall have entered the Sale Order, which Order shall have become a Final Order.

(j)    <u>No Default</u>. The DIP Documents shall be in full force and effect, and there shall be no outstanding Events of Default (as defined in the DIP Documents) that materially impair the Buyer's ability to consummate the Transactions described herein.

8.2    <u>Conditions Precedent to the Obligations of the Sellers</u>. The obligation of the Sellers to consummate the Transactions is subject to the satisfaction (or waiver by the Sellers) at or prior to the Closing Date of each of the following conditions:

(a)    <u>Accuracy of Representations and Warranties</u>. The representations of Buyer contained in <u>Section 5.1</u> (Organization and Good Standing), <u>Section 5.2</u> (Power and Authority), and <u>Section 5.6</u> (Financial Advisors) shall be true and correct on the date hereof and on and as of the Closing Date, with the same force and effect as though such representations and warranties had been made on and as of the Closing Date (except to the extent that any such representation or warranty is expressly made as of a specified date). All other representations and warranties contained in <u>Article V</u> shall be true and correct on the date hereof and as of the Closing Date (except to the extent that any such representation or warranty is expressly made as of a specified date), except where the failure of any such representations or warranties to be true and correct (without giving effect to any limitations to "material" or similar qualifier), either individually or in the aggregate, has resulted in or would reasonably be expected to have an adverse effect on Buyer's ability to perform its obligations under this Agreement in any material respect.

(b)    <u>Performance of Obligations</u>. Buyer and Administrative Agent shall have performed in all material respects all obligations and agreements contained in this Agreement required to be performed by it prior to or on the Closing Date.

(c)     <u>Deliverables</u>. Buyer shall have delivered to the Sellers each deliverable required pursuant to <u>Section 3.1(c)</u>.

(d)     <u>Bidding Procedures Order</u>. The Bankruptcy Court shall have entered the Bidding Procedures Order, which Order shall not be subject to a stay or otherwise been vacated.

(e)     <u>Sale Order</u>. The Bankruptcy Court shall have entered the Sale Order, which Order shall not be subject to a stay or otherwise been vacated.

8.3     <u>Conditions Precedent to Obligations of Buyer and the Sellers</u>. The respective obligations of Buyer and the Sellers to consummate the Transactions are subject to the fulfillment, on or prior to the Closing Date, of the condition (which may be waived by the Parties in whole or in part to the extent permitted by applicable Law) that (a) no provision of any applicable Law or Order enacted, entered, promulgated, enforced or issued by any Governmental Entity shall be in effect that prevents, renders illegal or otherwise prohibits the sale and purchase of the Purchased Assets or any of the other Transactions, and (b) the waiting period applicable to the transactions contemplated by this Agreement under the HSR Act and any other applicable Antitrust Laws, if required, shall have expired or early termination shall have been granted.

8.4     <u>Frustration of Closing Conditions</u>. Upon the occurrence of the Closing, any condition set forth in <u>Article VIII</u> that was not satisfied as of the Closing will be deemed to have been waived for all purposes by the Party having the benefit of such condition as of and after the Closing.  Neither the Sellers nor Buyer may rely on the failure of any condition to their respective obligations to consummate the Transactions set forth in <u>Section 8.1</u>, <u>Section 8.2</u> or <u>Section 8.3</u>, as the case may be, to be satisfied if such failure was caused by such Party's failure to comply with or breach of any provision of this Agreement.

## ARTICLE IX
## TERMINATION

9.1     <u>Termination of Agreement</u>. This Agreement may be terminated and the Transactions abandoned at any time prior to the Closing:

(a)     by written agreement of the Sellers and Buyer.

(b)     by Buyer, if:

(i)     any Bankruptcy Milestone is not timely satisfied in accordance with <u>Section 7.3</u>;

(ii)     there shall have been a breach by the Sellers of any of their representations, warranties, covenants or agreements contained in this Agreement, which breach would result in the failure to satisfy one or more of the conditions set forth in <u>Section 8.1</u>, and such breach shall be incapable of being cured or, if capable of being cured, shall not have been cured by the earlier of (A) ninety-one (91) days following the date hereof (or such later date as the Parties may agree upon in writing, the "<u>Outside Date</u>") or twenty (20) Business Days after written notice thereof shall have been received by the Sellers, provided that the right to terminate this Agreement pursuant to this <u>Section 9.1(b)(ii)</u> will not be

available to Buyer at any time that Buyer is in material breach of any covenant, representation or warranty hereunder;

(iii)    the Cases are (A) converted to cases under chapter 7 of the Bankruptcy Code or (B) dismissed prior to the Closing;

(iv)    a trustee or examiner is appointed under section 1104 of the Bankruptcy Code;

(v)    by either Buyer or the Sellers, if the DIP Documents are terminated, pursuant to the terms therein or as set forth in any DIP Orders;

(vi)    Buyer is not the winning bidder at the Auction for any of the Purchased Assets;

(vii)    any Seller enters into a definitive agreement with respect to an Alternate Transaction or an Order of the Bankruptcy Court or other court of competent jurisdiction is entered approving an Alternate Transaction;

(viii)    any insolvency Proceeding or similar Proceeding is commenced by a Seller or any of their respective Affiliates with respect to any Foreign Subsidiary; or

(ix)    by either Buyer or the Sellers, if the Closing shall not have occurred by the Outside Date.

(c)    by the Sellers, if:

(i)    there shall have been a breach by Buyer or Administrative Agent of any of its representations, warranties, covenants or agreements contained in this Agreement, which breach would result in the failure to satisfy one or more of the conditions set forth in Section 8.2, and such breach shall be incapable of being cured or, if capable of being cured, shall not have been cured within the earlier of (A) Outside Date or (B) twenty (20) Business Days after written notice thereof shall have been received by Buyer;

(ii)    any Seller enters into a definitive agreement with respect to an Alternate Transaction that is a Competing Qualified Bid, or an Order of the Bankruptcy Court or other court of competent jurisdiction is entered approving an Alternate Transaction that is a Competing Qualified Bid; or

(iii)    (A) (i) all of the conditions set forth in Sections 8.1 and 8.3 are satisfied or waived by Buyer as of the Closing Date (other than those conditions that, by their nature, can only be satisfied as of the Closing Date, but which would be satisfied as of the Closing Date); (ii) Sellers have irrevocably notified Buyer in writing that (A) they are ready, willing and able to consummate the transactions contemplated by this Agreement, and (B) all conditions set forth in Section 8.2 have been satisfied (other than those conditions that, by their nature, can only be satisfied as of the Closing Date, but which would be satisfied as of the Closing Date) or that they are willing to irrevocably waive any unsatisfied conditions set forth in Section 8.2; (iii) Sellers have given Buyer written Notice at least two (2)

Business Days prior to such termination stating Sellers' intention to terminate this Agreement pursuant to this <u>Section 9.1(c)(iii)</u>; and (iv) Buyer does not provide, or cause to be provided, Sellers with sufficient funds to complete the transactions contemplated by this Agreement at the time which the Closing should have occurred by the expiration of the two (2) Business Day period contemplated by clause (iii) hereof or (B) if Sellers or their board of directors (or similar governing body) determine in good faith that proceeding with the transaction contemplated by this Agreement would violate Law or be inconsistent with their fiduciary obligations under Law; or

(d)     by either Buyer or the Sellers, if any Governmental Entity shall have enacted or issued a Law or Order or taken other action permanently restraining, prohibiting or enjoining any of the Parties from consummating the Transactions; provided that the right to terminate this Agreement pursuant to this <u>Section 9.1(d)</u> will not be available to any party at any time that such party is in material breach of any covenant, representation or warranty hereunder.

9.2     <u>Consequences of Termination</u>.

(a)     If either Buyer, on the one hand, or Sellers, on the other hand, desire to terminate this Agreement pursuant to <u>Section 9.1</u>, such Party (or Parties, as applicable) shall give written notice of such termination to the other Parties. Upon delivery of such notice of termination, this Agreement will become void and have no further force and effect and all further obligations of the Parties to each other under this Agreement will terminate without further obligation or liability of the Parties.

(b)     Notwithstanding anything to the contrary in this Agreement, if this Agreement is terminated pursuant to <u>Section 9.1(b)(vi)</u>, <u>Section 9.1(b)(vii)</u> or <u>Section 9.1(c)(ii)</u>, then Buyer shall be entitled to payment of the Expense Reimbursement, if approved by the Bankruptcy Court, upon consummation of an Alternate Transaction from the proceeds of such Alternate Transaction.

(c)     Notwithstanding anything to the contrary in this Agreement, if this Agreement is terminated for any reason other than pursuant to <u>Section 9.1(b)(vi)</u>, <u>Section 9.1(b)(vii)</u>, <u>Section 9.1(c)(i)</u>, <u>Section 9.1(c)(ii)</u> or <u>Section 9.1(c)(iii)(A)</u>, then Buyer shall be entitled to payment of the Expense Reimbursement no later than two (2) Business Days following such termination.

(d)     Notwithstanding the foregoing set forth in this <u>Section 9.2</u>, <u>Section 1.1</u> (Defined Terms), <u>Section 6.5</u> (Public Announcements), <u>Section 7.1</u> (Expense Reimbursement), this <u>Section 9.2</u> (Consequences of Termination) and <u>Article X</u> (Miscellaneous) shall survive any termination of this Agreement.

(e)     Nothing in this <u>Section 9.2</u> shall relieve any Party of any liability for an intentional breach of this Agreement prior to the date of termination.

## ARTICLE X
## MISCELLANEOUS

10.1     Expenses. Except as set forth in this Agreement, the Credit Documents or the Sale Order, and whether or not the Transactions are consummated, each Party shall bear all costs and expenses incurred or to be incurred by such Party in connection with this Agreement and the consummation of the Transactions.

10.2     Assignment. Neither this Agreement nor any of the rights or obligations hereunder may be assigned by Sellers without the prior written consent of Buyer, or by Buyer or the Administrative Agent without the prior written consent of Sellers; provided, however, that Buyer may assign any or all of its rights and/or liabilities hereunder (or any document delivered by Buyer pursuant hereto) to one or more Affiliates of Buyer, or to any party which has received a contribution of the outstanding balance under the Prepetition Financing Agreement equal to the Credit Bid Amount, in the aggregate, which assignment shall not relieve Buyer of its obligations hereunder. Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns; provided, further, that Sellers may transfer or assign such rights and obligations under this Agreement to a liquidation trust or similar vehicle under a confirmed chapter 11 plan of liquidation in the Cases.

10.3     Parties in Interest. This Agreement shall be binding upon and inure solely to the benefit of the Sellers and Buyer, and nothing in this Agreement, express or implied, is intended to or shall confer upon any other Person any rights, benefits or remedies of any nature whatsoever under or by reason of this Agreement except as expressly set forth herein. Without limiting the foregoing, no direct or indirect holder of any equity interests or securities of either the Sellers or Buyer (whether such holder is a limited or general partner, member, stockholder or otherwise), nor any Affiliate of either the Sellers or Buyer, nor any Representative, or controlling Person of each of the Parties and their respective Affiliates, shall have any liability or obligation arising under this Agreement or the Transactions.

10.4     Matters Related to the Administrative Agent.

(a)     Each of the Parties acknowledges and agrees that none of the Sellers' title to, control of or possession of any of the Purchased Assets, or any of the Sellers' obligations in respect of any of the Assumed Liabilities, shall be transferred to or assumed by the Administrative Agent. Each Seller and Buyer, on behalf of itself and its respective Affiliates, acknowledges and agrees that neither the Administrative Agent nor any of its Affiliates (other than Buyer) shall have any Liability in the event of any breach by Buyer or any Seller of any of its representations, warranties, covenants, obligations or other agreements under this Agreement, including its obligations to consummate the Transactions in accordance with the terms of any document contemplated by this Agreement, other than as a result of or arising out of the Administrative Agent's intentional fraud or willful misconduct. Each Seller and Buyer, on behalf of itself and its respective Affiliates, further acknowledges and agrees that neither the Administrative Agent nor any of its Affiliates (other than Buyer) shall in any way be deemed to be attributed or otherwise responsible for any of the representations, warranties, covenants, obligations or other agreements of Buyer or the Sellers under any document contemplated by this Agreement, including any obligation of Buyer or the Sellers hereunder to make payments of any kind, provide written

approvals or make deliveries. Each Seller and Buyer, on behalf of itself and its respective Affiliates, further acknowledges and agrees that neither the Administrative Agent nor any of its Affiliates shall have any Liability or other obligation in respect of any action taken or not taken by the Administrative Agent in connection with any document contemplated by this Agreement, other than as a result of or arising out of the Administrative Agent's intentional fraud or willful misconduct. Each Seller and Buyer, on behalf of itself and its respective Affiliates, further acknowledges and agrees that Buyer, and not the Administrative Agent, has negotiated the terms of the purchase set forth herein, including the assets being purchased, the Liabilities being assumed, the Purchase Price and all the terms of this Agreement relating to the purchase by Buyer, and the Administrative Agent shall bear no responsibility and incur no Liability whatsoever to any Person solely by virtue of being a Party.

10.5   <u>Risk of Loss</u>. The Sellers will bear all risk of loss occurring to or upon any portion of the Purchased Assets prior to the Closing Date. In the event that any material portion of any Purchased Assets is damaged or destroyed prior to Closing Date, then, with respect to such Purchased Assets, Buyer may, at Buyer's option, either (i) proceed to close notwithstanding the damage or destruction of such Purchased Assets or (ii) exclude such Purchased Assets, in which event Buyer shall have no obligation to close if as a consequence of the exclusion of such Purchased Assets any condition to Closing in <u>Section 8.1</u> would not be satisfied unless such loss is covered by insurance or cause of action against a third-party. If Buyer closes notwithstanding an unrepaired or unrestored loss to a Purchased Asset, the Sellers will deliver and/or assign to Buyer any insurance proceeds with respect to such damage or destruction, and all claims against third parties relating thereto.

10.6   <u>Notices</u>. All notices, demands, requests, waivers, consents, approvals or other communications (collectively, "<u>Notices</u>") required or permitted to be given hereunder or that are given with respect to this Agreement shall be in writing and shall be personally served, delivered by a nationally recognized overnight delivery service with charges prepaid, or transmitted by hand delivery or electronic mail, addressed as set forth below, or to such other address as such Party shall have specified most recently by written Notice. Notice shall be deemed given on the date of service or transmission if personally served or transmitted by electronic mail with confirmation of receipt (excluding "out of office" or similar automated replies); provided, however, that, if delivered or transmitted on a day other than a Business Day (or if transmitted by electronic mail after 5:00 pm Eastern Time), notice shall be deemed given on the next Business Day. Notice otherwise sent as provided herein shall be deemed given on the next Business Day following timely deposit of such Notice with an overnight delivery service:

|  |  |
|---|---|
| If to the Sellers: | Near Intelligence, Inc.<br>100 W Walnut St., Suite A-4<br>Pasadena, CA 91124<br><u>Attention</u>: Legal Department<br><u>Email</u>:legal@near.com |
| With a copy (which shall not constitute notice) to: | Willkie Farr & Gallagher LLP<br>787 Seventh Avenue<br>New York, NY 10019 |

|                        | Attention: Rachel Strickland; Thomas Mark; Andrew Mordkoff; Erin Kinney<br>Email: rstrickland@willkie.com; tmark@willkie.com; amordkoff@willkie.com; ekinney@willkie.com |
| --- | --- |
| If to Buyer or<br>Administrative Agent: | Blue Torch Finance LLC<br>c/o Blue Torch Capital LP<br>150 East 58th Street, 39th Floor<br>New York, NY 10155<br>Email: BlueTorchAgency@alterdomus.com |
| With a copy (which shall<br>not constitute notice) to: | King & Spalding LLP<br>1185 Avenue of the Americas, 34th Floor<br>New York, NY 10036<br>Attention: Roger G. Schwartz<br>            Timothy M. Fesenmyer<br>Email:     rschwartz@kslaw.com<br>            tfesenmyer@kslaw.com |

Rejection of or refusal to accept any Notice, or the inability to deliver any Notice because of changed address of which no Notice was given, shall be deemed to be receipt of the Notice as of the date of such rejection, refusal or inability to deliver.

10.7    Entire Agreement; Amendments and Waivers. This Agreement and all agreements entered into pursuant hereto and thereto and all certificates and instruments delivered pursuant hereto and thereto constitute the entire agreement between the Parties pertaining to the subject matter hereof and supersede all prior agreements, understandings, negotiations, and discussions, whether oral or written, of the Parties; provided, that nothing herein shall modify or alter the terms, rights or obligations of the Administrative Agent, the Lenders or the Sellers under the Prepetition Loan Documents or the DIP Documents prior to Closing. This Agreement may be amended, supplemented or modified, and any of the terms, covenants, representations, warranties or conditions may be waived, only by a written instrument executed by Buyer and Sellers, or in the case of a waiver, by the Party waiving compliance. No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision hereof (whether or not similar), and no such waiver shall constitute a continuing waiver unless otherwise expressly provided. No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

10.8    Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument. Counterparts to this Agreement may be delivered via electronic delivery, "pdf" or

facsimile. In proving this Agreement, it shall not be necessary to produce or account for more than one such counterpart signed by the Party against whom enforcement is sought.

10.9    <u>Invalidity</u>. If any one or more of the provisions contained in this Agreement or in any other instrument referred to herein, shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, the Parties shall negotiate in good faith to modify this Agreement, to ensure that this Agreement shall reflect as closely as practicable the intent of the Parties on the date hereof. If the final judgment of a court of competent jurisdiction or other Governmental Entity declares that any term or provision hereof is invalid, illegal or unenforceable, the Parties agree that the court making such determination will have the power to reduce the scope, duration, area or applicability of the term or provision, to delete specific words or phrases, or to replace any invalid, illegal or unenforceable term or provision with a term or provision that is valid, legal and enforceable and that comes closest to expressing the intention of the invalid, illegal or unenforceable term or provision.

10.10    <u>Governing Law</u>. This Agreement, and any Proceeding that may be based upon, arise out of or relate or be incidental to the Transactions, this Agreement, the negotiation, execution, performance or consummation of the foregoing or the inducement of any Party to enter into the foregoing, whether for breach of Contract, tortious conduct or otherwise, and whether now existing or hereafter arising (each, a "<u>Transaction Dispute</u>"), will be exclusively governed by and construed and enforced in accordance with the internal Laws of the State of Delaware, without giving effect to any Law or rule that would cause the Laws of any jurisdiction other than the State of Delaware to be applied, except to the extent that such Laws are superseded by the Bankruptcy Code.

10.11    <u>Dispute Resolution; Consent to Jurisdiction</u>.

(a)    Without limiting any Party's right to appeal any order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any Transaction Dispute, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in <u>Section 10.6</u>; <u>provided</u>, <u>however</u>, upon the closing of the Cases (except for any matter(s) with respect to the Sellers and/or the Cases in which the Bankruptcy Court retains jurisdiction with respect to such matter with respect to Sellers and/or the Cases), or if the Bankruptcy Court is unwilling or unable to hear such Transaction Dispute, then, the Parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the U.S. District Court for the District of Delaware sitting in New Castle County or the courts of the State of Delaware sitting in New Castle County and any appellate court from any thereof, for the resolution of any such Transaction Dispute. In that context, and without limiting the generality of the foregoing, each Party irrevocably and unconditionally: (i) submits for itself and its property to the exclusive jurisdiction of such courts with respect to any Transaction Dispute and for recognition and enforcement of any judgment in respect thereof, and agrees that all claims in respect of any Transaction Dispute shall be heard and determined in such courts; (ii) agrees that venue would be proper in such courts, and waives any objection that it may now or hereafter have that any such court is an improper or inconvenient forum for the resolution of any Transaction Dispute; and (iii) agrees that Notice demand in accordance with <u>Section 10.6</u>, will be effective

service of process; provided, however, that nothing herein will be deemed to prevent a Party from making service of process by any means authorized by the Laws of the State of Delaware.

(b)    The foregoing consent to jurisdiction will not constitute submission to jurisdiction or general consent to service of process in the State of Delaware for any purpose except with respect to any Transaction Dispute.

10.12    WAIVER OF RIGHT TO TRIAL BY JURY. EACH PARTY HEREBY WAIVES TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY RIGHT THEY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY PROCEEDING IN CONNECTION WITH A TRANSACTION DISPUTE.

10.13    Specific Performance. Each Party acknowledges and agrees that each other Party would be damaged irreparably in the event that a Party does not perform its obligations under this Agreement in accordance with its specific terms or otherwise breaches this Agreement, so that, in addition to any other remedy that Buyer or the Sellers may have under law or equity, each Party shall be entitled to injunctive relief to prevent any breaches of the provisions of this Agreement by the other Parties and to enforce specifically this Agreement and the terms and provisions hereof.

10.14    Third Party Beneficiaries. Nothing in this Agreement, express or implied, is intended to confer upon any other Person any rights or remedies of any nature under or by reason of this Agreement, except as expressly provided herein, including Section 10.17.

10.15    Counting. If the due date for any action to be taken under this Agreement (including the delivery of Notices) is not a Business Day, then such action shall be considered timely taken if performed on or prior to the next Business Day following such due date.

10.16    Survival. Except as expressly set forth in this Agreement to the contrary, all representations and warranties and covenants of Buyer and the Sellers, respectively, contained in this Agreement or in any document delivered pursuant hereto shall not survive the Closing Date and thereafter shall be of no further force and effect. Notwithstanding the foregoing, all covenants and agreements set forth in this Agreement, which by their terms would require performance after the Closing Date, shall survive until fully performed or until such covenant or agreement expires by its terms.

10.17    Non-Recourse. All claims, Liabilities, Proceedings, or causes of action (whether in contract or in tort, in law or in equity, or granted by statute) that may be based upon, in respect of, arise under, out or by reason of, be connected with, or relate in any manner to a Transaction Dispute, may be made only against (and are expressly limited to) the entities that are expressly identified as parties hereto in the preamble to this Agreement or, if applicable, their permitted assignees (collectively, the "Contracting Parties"). No Person who is not a Contracting Party, including any past, present or future director, officer, employee, incorporator, member, partner, manager, equityholder, Affiliate, agent, attorney, or representative of, and any financial advisor or lender to, any Contracting Party (other than the Persons listed on Schedule 10.17), or any director, officer, employee, incorporator, member, partner, manager, equityholder, Affiliate, agent, attorney, or representative of, and any financial advisor or lender to, any of the foregoing (collectively, the "Non-Recourse Persons"), shall have any Liability (whether in contract or in tort,

in law or in equity, or granted by statute) for any claims, Liabilities, or causes of action, arising under, out of, in connection with, or related in any manner to a Transaction Dispute; and, to the maximum extent permitted by Law, each Contracting Party hereby waives and releases all such claims, Liabilities, and causes of action, against any such Non-Recourse Persons.

10.18   Preparation of this Agreement. Buyer and the Sellers hereby acknowledge that (a) Buyer and the Sellers jointly and equally participated in the drafting of this Agreement and all other agreements contemplated hereby, (b) Buyer and the Sellers have been adequately represented and advised by legal counsel with respect to this Agreement and the Transactions, and (c) no presumption shall be made that any provision of this Agreement shall be construed against either Party by reason of such role in the drafting of this Agreement and any other agreement contemplated hereby.

10.19   Releases. Effective as of the Closing, each of the Sellers on their own behalf and on behalf of their past, present, and future predecessors, successors and assigns hereby unconditionally, irrevocably, and fully forever release, remise, acquit, relinquish, irrevocably waive, and discharge, in their capacity as purchaser of the Purchased Assets, the Buyer, Administrative Agent and the Lenders, and each of their respective affiliates, former, current, or future officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, assigns, and predecessors in interest, each in their capacity as such, of and from any and all Claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending, or threatened, including all legal and equitable theories of recovery, arising under common law, statute, or regulation or by contract, of every nature and description that exist on the date hereof with respect to or relating to this Agreement and the Transaction, in each case, in connection with any event, conduct or circumstance occurring on or prior to the Closing.

10.20   Schedules. The Sellers' Disclosure Schedules have been arranged for purposes of convenience in separately numbered sections corresponding to the sections of this Agreement; provided that each section of the Sellers' Disclosure Schedules will be deemed to incorporate by reference all information disclosed in any other section of the Sellers' Disclosure Schedules, and any disclosure in the such Seller's Disclosure Schedules will be deemed a disclosure against any representation or warranty set forth in this Agreement. Capitalized terms used in the Sellers' Disclosure Schedules and not otherwise defined therein have the meanings given to them in this Agreement. The specification of any dollar amount or the inclusion of any item in the representations and warranties contained in this Agreement, the Sellers' Disclosure Schedules or the attached exhibits is not intended to imply that the amounts, or higher or lower amounts, or the items so included, or other items, are or are not required to be disclosed (including whether such amounts or items are required to be disclosed as material or threatened) or are within or outside of the Ordinary Course of Business, and no Party will use the fact of the setting of the amounts or the fact of the inclusion of any item in this Agreement, the Sellers' Disclosure Schedules or exhibits in any dispute or controversy between the Parties as to whether any obligation, item or matter not set forth or included in this Agreement, the Sellers' Disclosure Schedules or exhibits is or is not required to be disclosed (including whether the amount or items are required to be disclosed as

material or threatened) or are within or outside of the Ordinary Course of Business. In addition, matters reflected in the Sellers' Disclosure Schedules are not necessarily limited to matters required by this Agreement to be reflected in the Sellers' Disclosure Schedules. Such additional matters are set forth for informational purposes only and do not necessarily include other matters of a similar nature. No information set forth in the Sellers' Disclosure Schedules will be deemed to broaden in any way the scope of the Parties' representations and warranties. Any description of any agreement, document, instrument, plan, arrangement or other item set forth on any Sellers' Disclosure Schedule is qualified in its entirety by the terms of such agreement, document, instrument, plan, arrangement, or item which terms will be deemed disclosed for all purposes of this Agreement. The information contained in this Agreement, in the Sellers' Disclosure Schedules and exhibits hereto is disclosed solely for purposes of this Agreement, and no information contained herein or therein will be deemed to be an admission by any Party to any third party of any matter whatsoever, including any violation of Law or breach of Contract.

     10.21 <u>Fiduciary Obligation</u>. Nothing in this Agreement, or any document related to the transactions contemplated hereby, will require any Seller or any of their respective managers, officers or members, in each case, in their capacity as such, to take any action, or to refrain from taking any action, that the board of directors or managers (or other governing body) of such Seller has determined, in good faith after consultation with legal counsel and independent financial advisors, would be a violation of such Person's fiduciary obligations or applicable Law. For the avoidance of doubt, Sellers retain the right to pursue any transaction or restructuring strategy that, in Sellers' business judgment, will maximize the value of their estates.

[<em>Remainder of Page Intentionally Left Blank</em>]

66

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered by the duly authorized officers of the Sellers, Buyer and the Administrative Agent as of the date first above written.

**SELLERS**:

**Near Intelligence, Inc.**

By: *John Faieta*
Name: John Faieta
Title: Chief Financial Officer

**Near Intelligence LLC**

By: *John Faieta*
Name: John Faieta
Title: Chief Financial Officer

**Near North America Inc.**

By: *John Faieta*
Name: John Faieta
Title: Vice President, Chief Financial Officer, Treasurer and Secretary

**Near Intelligence Pte. Ltd.**

By: *John Faieta*
Name: John Faieta
Title: Director

*[Signature Page to Asset Purchase Agreement]*

**Near Intelligence SAS,** solely for purposes of
<u>Section 6.1</u> and <u>Section 6.2</u> (and, in each case, the
related definitions)

By:_____
Name: John Faieta
Title: Director

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered by the duly authorized officers of the Sellers, Buyer and the Administrative Agent as of the date first above written.

**SELLERS:**

**Near Intelligence, Inc.**

By:_____
Name:
Title:


**Near Intelligence LLC**

By:_____
Name:
Title:


**Near North America Inc.**

By:_____
Name:
Title:


**Near Intelligence Pte. Ltd.**

By:_____
Name:
Title:


**Near Intelligence Pty. Ltd.,** solely for purposes of Section 6.1 and Section 6.2 (and, in each case, the related definitions)

By:_____
Name: Gladys Kong
Title: Authorized Person

*[Signature Page to Asset Purchase Agreement]*

**BUYER**:

**BTC Near HoldCo LLC**

By: _Kevin Genda_____
33D5F77A86E142A...
Name: Kevin Genda
Title: Authorized Signatory

[*Signature Page to Asset Purchase Agreement*]

DocuSign Envelope ID: 9A4CA448-94B7-417C-99E2-C4DA5FD762DF

**ADMINISTRATIVE          AGENT          AND COLLATERAL AGENT:**

**Blue Torch Finance LLC**, solely for purposes of <u>Section 3.2</u>, <u>Section 5.2(b)</u>, <u>Section 10.2</u>, <u>Section 10.4</u>, and <u>Sections 10.7</u> to <u>10.19</u> (and, in each case, the related definitions)

By: _____
Name: Kevin Genda
Title: Authorized Signatory

[*Signature Page to Asset Purchase Agreement*]

**Exhibit 2**

**Near Intelligence Inc., et al.**
**($USD)**

*NOTE: Any Government Contracts Listed Herein Will Be Assigned Only to the Extent Such Assignment is Permissible by Law and Their Terms Therein*

*NOTE: For avoidance of doubt, only the contracts (and associated cure amounts) of the Debtors are set out below and not contracts of the Foreign Subsidiaries, which will be assigned and assumed by Buyer indirectly through the acquisition of the Equity Interests of such Foreign Subsidiaries.*

*NOTE: Estimated Cure Amounts Represent Total Prepetition Obligations Owed to the Contract Counterparty Under One or More of the Contracts Listed Herein*

*Current Total:*   **$3,777,584**

| ID | Debtor Name | Contract Counterparty | Contract Title & Description | Date of Contract or Lease | Current Estimated Cure |
|----|-------------|----------------------|----------------------------|---------------------------|------------------------|
| 1623 | Near Intelligence LLC | Amazon Web Services | Agreement | 05/31/23 | 2,706,506 |
| 1778 | Near Intelligence Pte. Ltd. | Magnite, Inc. | Assignment of Agreement - International | 03/14/22 | 407,035 |
| 1819 | Near North America, Inc. | PICKWELL SP ZOO | Mutual Data License Agreement | 12/30/20 | 135,484 |
| 1665 | Near North America Inc | Digital Envoy, Inc. | Agreement | 01/01/23 | 122,706 |
| 1738 | Near Intelligence Pte. Ltd. | INMOBI PTE LTD | Inmobi Near Agreement | 12/05/18 | 109,156 |
| 1862 | Near Intelligence Pte. Ltd. | Unruly Group LLC (now Nexxen Group LLC) | Real Time Bidding Buyer Agreement | 12/20/22 | 100,690 |
| 1754 | Near North America, Inc. | Irys, Inc | Data Supplier Agreement | 08/05/19 | 72,000 |
| 1817 | Near North America Inc | Passby Technologies Limited | Agreement | 11/01/21 | 32,581 |
| 1624 | Near Intelligence Pte. Ltd. | Anthony Fitzgerald (ASLF) | Novation Acknowledgement | 03/01/22 | 26,469 |
| 1885 | Near North America, Inc. | Zoom Video Communications, Inc. | Agreement | 07/26/22 | 12,229 |
| 1785 | Near North America Inc | MBI International | Agreement | 04/05/22 | 8,848 |
| 1811 | Near Intelligence Pte Ltd | Oracle Corporation Singapore Pte Ltdı | Agreement | 09/24/18 | 7,856 |
| 842 | Near North America Inc | Rove Marketing Inc. | Agreement and all relevant Service Orders | 01/01/23 | 22,000 |
| 1607 | Near Intelligence, LLC | Airbiz Offshore Private Limited (SG) | Agreement | 06/01/23 | 3,935 |
| 1812 | Near Intelligence Pte Ltd. | Oracle Corporation UK Limitedı | Agreement | 11/29/21 | 3,774 |
| 1841 | Near North America Inc | Spatial.AI | Agreement | 01/01/21 | 2,213 |
| 1884 | Near North America, Inc. | Zayo | Amendment Form | 06/24/21 | 1,707 |
| 1732 | Near Intelligence Pte. Ltd. | Incubata Australia Pty Ltd | Novation Letter | 01/01/22 | 1,400 |
| 1709 | Near Intelligence Pte. Ltd. | Google Asia Pacific Pte Ltd | Agreement | 12/17/13 | 665 |
| 1774 | Near Intelligence Pte. Ltd. | M2K Advisors Pte Ltd | Agreement | 11/30/21 | 273 |
| 1682 | Near Intelligence Pte Ltd | ECRA Pte Ltd | Agreement | 11/22/21 | 56 |
| 1 | Near North America, Inc. | 36 Presents | Service Order for Data Sets | 05/15/19 | 0 |
| 2 | Near North America, Inc. | Accenture | Agreement | 09/01/21 | 0 |
| 3 | Near North America, Inc. | Activate Holdings Ltd. | Service Order | 07/26/22 | 0 |
| 4 | Near North America, Inc. | Activate Holdings Ltd. | Agreement | 07/01/22 | 0 |
| 5 | Near North America, Inc. | Acutely, Inc. | Service Order | 12/08/16 | 0 |
| 6 | Near North America, Inc. | Acutely, Inc. | Service Order | 04/05/17 | 0 |
| 7 | Near North America, Inc. | Acutely, Inc. | Service Order | 04/18/18 | 0 |
| 8 | Near North America, Inc. | Acutely, Inc. | Service Order | 11/20/18 | 0 |
| 9 | Near North America, Inc. | Acutely, Inc. | Service Order | 12/17/18 | 0 |
| 10 | Near North America, Inc. | Acutely, Inc. | Service Order | 02/26/19 | 0 |
| 11 | Near North America, Inc. | Acutely, Inc. | Service Order | 04/11/19 | 0 |
| 12 | Near North America, Inc. | Acutely, Inc. | Service Order | 04/12/19 | 0 |
| 13 | Near North America, Inc. | AdColony, Inc. | Service Order | 12/06/16 | 0 |
| 14 | Near North America, Inc. | Admatik SDN BHD | Agreement | 01/01/23 | 0 |
| 15 | Near Intelligence Pte. Ltd. | Admatik SDN BHD | Near Platform Data Usage and Services Agreement | 10/30/20 | 0 |
| 16 | Near Intelligence Pte. Ltd. | Admatik SDN BHD | Renewal CUM Amendment Agreement | 12/17/22 | 0 |
| 17 | Near North America, Inc. | Aelius Explotation Technologies, LLC | Amendment #1 to Bundled Data Licensee Agreement | 08/01/20 | 0 |
| 18 | Near North America, Inc. | Affordable Dentures and Implants | Service Order | 09/09/19 | 0 |
| 19 | Near North America, Inc. | Affordable Dentures and Implants | Service Order | 09/12/19 | 0 |
| 20 | Near Intelligence Pte. Ltd. | Agoop Corp | Agreement | 08/28/23 | 0 |
| 21 | Near North America, Inc. | Ailevon Pacific Aviation Consulting | Service Order | 02/22/22 | 0 |
| 22 | Near North America, Inc. | Ailevon Pacific Aviation Consulting | Service Order for Near Data Sets | 03/02/22 | 0 |
| 23 | Near North America, Inc. | Ailevon Pacific Aviation Consulting | Invoice | 04/26/23 | 0 |
| 24 | Near North America, Inc. | AiPod | Service Order for Data Sets | 06/15/17 | 0 |
| 25 | Near North America, Inc. | Airsage, Inc. | Service Order #3 | 03/31/20 | 0 |

| 26 | Near North America, Inc. | Airsage, Inc. | Service Order | 01/29/21 | 0 |
|----|--------------------------|---------------|---------------|----------|---|
| 27 | Near North America, Inc. | Airsage, Inc. | Amendedment to Data License Agreement | 12/29/21 | 0 |
| 28 | Near North America, Inc. | Airsage, Inc. | Service Order | 03/23/21 | 0 |
| 29 | Near North America, Inc. | AJR Media Group | Data License Agreement, 19 Data | 02/08/21 | 0 |
| 30 | Near North America, Inc. | AJR Media Group | Data License Agreemets, 19 to 21 data | | 0 |
| 31 | Near North America, Inc. | AJR Media Group | Service Order #SC120 | 02/07/21 | 0 |
| 32 | Near North America, Inc. | Akya (Konfid S.A. de C.V.) | Service Order - Vista Data Exlporer | 07/10/22 | 0 |
| 33 | Near North America, Inc. | Akya (Konfid S.A. de C.V.) | Service Order | 09/01/23 | 0 |
| 34 | Near North America, Inc. | Albertsons Companies | Service Order for Data Sets | 11/17/17 | 0 |
| 35 | Near North America, Inc. | Alexander Babbage, Inc. | Bundled Reseller Agreement and all related Service Orders | 09/14/22 | 0 |
| 69 | Near North America, Inc. | Alexander Babbage, Inc. | Agreement and all related Service Orders | 01/01/23 | 0 |
| 70 | Near North America, Inc. | Alexander Babbage, Inc. | Bundled Reseller Agreement and all related Service Orders | 12/19/22 | 0 |
| 71 | Near North America, Inc. | Alexander Babbage, Inc. | Addendum to Bundled Reseller Agreement | 09/14/22 | 0 |
| 72 | Near North America, Inc. | Alexander Babbage, Inc. | Bundled Reseller Agreement and all related Service Orders | 09/14/22 | 0 |
| 73 | Near North America, Inc. | AlphaMap | Service Order | 08/01/22 | 0 |
| 79 | Near North America, Inc. | Altometer Business Intelligence | Agreement and all related Service Orders | 04/19/23 | 0 |
| 80 | Near North America, Inc. | Altscore | Service Order | 06/14/22 | 0 |
| 81 | Near North America, Inc. | Altscore | Service Order | 06/15/23 | 0 |
| 82 | Near North America, Inc. | Amaro Law Firm | Service Order | 09/14/20 | 0 |
| 83 | Near North America, Inc. | Amazon | Service Order | 09/15/17 | 0 |
| 84 | Near North America, Inc. | Amberoon | Service Order | 09/15/23 | 0 |
| 85 | Near North America, Inc. | American Dairy Queen Corp. | Service Order | 06/21/17 | 0 |
| 86 | Near North America, Inc. | American Realty Advisors | Service Order | 03/26/19 | 0 |
| 87 | Near North America, Inc. | American Student List Marketing | Service Order | 06/01/17 | 0 |
| 88 | Near North America, Inc. | Analytic Strategies LLC | Service Order | 09/27/19 | 0 |
| 89 | Near North America, Inc. | Apple Inc. | Agreement | 05/20/21 | 0 |
| 90 | Near North America, Inc. | Apple Inc. | Agreement | 06/17/21 | 0 |
| 91 | Near North America, Inc. | Apple Inc. | Purchase Order | 05/21/21 | 0 |
| 92 | Near North America, Inc. | Applied Post | Service Order | 12/31/21 | 0 |
| 93 | Near North America, Inc. | Area Research Associates | Service Order | 11/20/17 | 0 |
| 94 | Near North America, Inc. | Area Research Associates | Service Order | 10/05/15 | 0 |
| 95 | Near North America, Inc. | Argos Analytics | Service Order | 01/20/23 | 0 |
| 96 | Near North America, Inc. | Argos Analytics | Service Order | 10/10/22 | 0 |
| 97 | Near North America, Inc. | Argos Analytics | Service Order | 08/28/22 | 0 |
| 98 | Near North America, Inc. | Argos Analytics | Service Order | 10/11/22 | 0 |
| 99 | Near North America, Inc. | Argos Analytics | Service Order | 06/13/23 | 0 |
| 100 | Near North America, Inc. | Argos Analytics | Service Order | 08/17/23 | 0 |
| 101 | Near North America, Inc. | Argos Analytics / METAVERSO, S.A. | Service Order | 10/11/22 | 0 |
| 102 | Near North America, Inc. | Asset Strategies Group (ASG) | Service Order | 11/14/22 | 0 |
| 103 | Near North America, Inc. | Associated Wholesale Grocers, Inc. | Service Order | 08/24/18 | 0 |
| 104 | Near North America, Inc. | Atkins Group | CEL Report | 11/22/19 | 0 |
| 105 | Near North America, Inc. | Atkins Group | CEL Report | 10/02/20 | 0 |
| 106 | Near North America, Inc. | Atkins Group | CEL Report | 09/02/20 | 0 |
| 107 | Near North America, Inc. | Atlas AI | Service Order | 12/17/21 | 0 |
| 108 | Near Intelligence Pte. Ltd. | AudienceQ | Near Platform Data Usage and Services Agreement | 01/01/22 | 0 |
| 109 | Near Intelligence Pte. Ltd. | AudienceQ Limited | Allspark Usage Agreement | 07/01/19 | 0 |
| 110 | Near North America, Inc. | August Partners | Service Order | 07/19/16 | 0 |
| 111 | Near North America, Inc. | August Partners | Service Order | 12/13/16 | 0 |
| 112 | Near North America, Inc. | August Partners | Service Order | 02/01/18 | 0 |
| 113 | Near North America, Inc. | August Partners | Service Order | 07/20/18 | 0 |
| 114 | Near North America, Inc. | August Partners | Service Order | 10/23/18 | 0 |
| 115 | Near North America, Inc. | August Partners | Service Order | 11/05/17 | 0 |
| 116 | Near North America, Inc. | August Partners | Service Order | 11/26/18 | 0 |
| 117 | Near North America, Inc. | August Partners | Service Order | 11/29/16 | 0 |
| 118 | Near North America, Inc. | August Partners | Service Order | 12/26/18 | 0 |
| 119 | Near North America, Inc. | August Partners | Service Order | 01/25/19 | 0 |
| 120 | Near North America, Inc. | August Partners | Service Order | 09/08/20 | 0 |
| 121 | Near North America, Inc. | August Partners | Service Order | 09/04/18 | 0 |
| 122 | Near North America, Inc. | August Partners | Service Order | 10/01/20 | 0 |
| 123 | Near North America, Inc. | August Partners | Service Order | 04/19/18 | 0 |
| 124 | Near North America, Inc. | August Partners | Service Order | 07/07/17 | 0 |
| 125 | Near North America, Inc. | August Partners | Service Order | 04/18/17 | 0 |
| 126 | Near North America, Inc. | August Partners | Service Order | 03/30/17 | 0 |

| | | | | | |
|---|---|---|---|---|---|
| 127 | Near North America, Inc. | August Partners | Service Order | 04/15/17 | 0 |
| 128 | Near North America, Inc. | August Partners | Service Order | 04/02/18 | 0 |
| 129 | Near North America, Inc. | August Partners | Service Order | 05/27/16 | 0 |
| 130 | Near North America, Inc. | August Partners | Service Order | 06/13/16 | 0 |
| 131 | Near North America, Inc. | August Partners | Service Order | 07/27/18 | 0 |
| 132 | Near North America, Inc. | August Partners | Service Order | 08/17/17 | 0 |
| 133 | Near North America, Inc. | August Partners | Service Order | 08/17/17 | 0 |
| 134 | Near North America, Inc. | August Partners | Service Order | 08/21/18 | 0 |
| 135 | Near North America, Inc. | August Partners | Service Order | 09/12/18 | 0 |
| 136 | Near North America, Inc. | August Partners | Service Order | 09/17/18 | 0 |
| 137 | Near North America, Inc. | August Partners | Service Order | 09/20/18 | 0 |
| 138 | Near North America, Inc. | August Partners | Service Order | 09/17/20 | 0 |
| 139 | Near North America, Inc. | August Partners | Service Order | 07/25/17 | 0 |
| 140 | Near North America, Inc. | August Partners | Service Order | 12/21/16 | 0 |
| 141 | Near North America, Inc. | August Partners | Service Order | 02/03/18 | 0 |
| 142 | Near North America, Inc. | August Partners | Service Order | 02/03/18 | 0 |
| 143 | Near North America, Inc. | August Partners | Service Order | 12/21/16 | 0 |
| 144 | Near North America, Inc. | August Partners | Service Order | 08/26/16 | 0 |
| 145 | Near North America, Inc. | August Partners | Service Order | 02/02/17 | 0 |
| 146 | Near North America, Inc. | August Partners | Service Order | 11/16/17 | 0 |
| 147 | Near North America, Inc. | August Partners | Service Order | 01/17/18 | 0 |
| 148 | Near North America, Inc. | August Partners | Service Order | 01/18/18 | 0 |
| 149 | Near North America, Inc. | August Partners | Service Order | 09/20/17 | 0 |
| 150 | Near North America, Inc. | August Partners | Service Order | 01/25/17 | 0 |
| 151 | Near North America, Inc. | August Partners | Service Order | 01/25/17 | 0 |
| 152 | Near North America, Inc. | August Partners | Service Order | 03/11/16 | 0 |
| 153 | Near North America, Inc. | August Partners | Service Order | 07/07/17 | 0 |
| 154 | Near North America, Inc. | August Partners | Service Order | 03/08/17 | 0 |
| 155 | Near North America, Inc. | August Partners | Service Order | 10/13/17 | 0 |
| 156 | Near North America, Inc. | Australia Bureau of Statistics | Service Order | 06/29/20 | 0 |
| 157 | Near Intelligence Pte. Ltd. | Australian United Retailers Limited | Agreement | 06/30/23 | 0 |
| 158 | Near North America, Inc. | Autonetwork, Inc. | Service Order | 08/01/18 | 0 |
| 159 | Near North America, Inc. | AutoZone Brazil | Service Order | 10/04/22 | 0 |
| 160 | Near Intelligence Pte. Ltd. | Avarisoft Pty Ltd | Agreement | 11/15/22 | 0 |
| 161 | Near North America, Inc. | Avison Young | Serivce Order | 02/18/16 | 0 |
| 162 | Near North America, Inc. | Avison Young | Serivce Order | 08/04/21 | 0 |
| 163 | Near North America, Inc. | Avison Young | Serivce Order | 12/28/22 | 0 |
| 164 | Near North America, Inc. | Bazze | Authorized Reseller Agreement | 06/11/20 | 0 |
| 165 | Near North America, Inc. | Big Lots Stores, Inc. | Service Order | 05/01/21 | 0 |
| 166 | Near North America, Inc. | Big Lots Stores, Inc. | Service Order | 04/04/18 | 0 |
| 167 | Near North America, Inc. | Big Lots Stores, Inc. | Service Order | 02/18/16 | 0 |
| 168 | Near North America, Inc. | Big Lots Stores, Inc. | Service Order | 02/05/16 | 0 |
| 169 | Near North America, Inc. | Big Lots Stores, Inc. | Service Order | 02/28/19 | 0 |
| 170 | Near North America, Inc. | Big Lots Stores, Inc. | Service Order | 05/19/16 | 0 |
| 171 | Near North America, Inc. | Big Lots Stores, Inc. | Service Order | 11/08/16 | 0 |
| 172 | Near North America, Inc. | Big Lots Stores, Inc. | Service Order | 04/20/16 | 0 |
| 173 | Near North America, Inc. | Big Lots Stores, Inc. | Service Order | 10/12/15 | 0 |
| 174 | Near Intelligence Pte. Ltd. | Big Mobile Group Pty. Ltd. | Allspark Usage Agreement | 01/01/20 | 0 |
| 175 | Near North America, Inc. | BJ's Wholesale Club | Service Order | 09/05/19 | 0 |
| 176 | Near North America, Inc. | BJ's Wholesale Club | Service Order | 03/17/20 | 0 |
| 177 | Near Intelligence Pte. Ltd. | Black C Media Limited | Agreement | 10/01/20 | 0 |
| 178 | Near Intelligence Pte. Ltd. | Black C Media Limited | Near Data Usage Agreement | 10/01/20 | 0 |
| 179 | Near North America, Inc. | Blue Genie Art Bazaar | Agreement | 10/01/23 | 0 |
| 180 | Near Intelligence Pte. Ltd. | BMT commercial Aus PTY ltd | Agreement | 10/20/22 | 0 |
| 181 | Near Intelligence Pte. Ltd. | Bonzai Digital Pte Ltd. | Allspark Usage Agreement | 10/01/18 | 0 |
| 182 | Near North America, Inc. | Boston Consulting Group | Agreement | 12/01/22 | 0 |
| 183 | Near North America, Inc. | Boston Red Sox | Service Order | 01/16/18 | 0 |
| 184 | Near Intelligence Pte. Ltd. | Bowling Green State Univ (BGSU) | Agreement | 06/01/22 | 0 |
| 185 | Near Intelligence Pte. Ltd. | BP Australia Pty Ltd | Agreement | 09/30/22 | 0 |
| 186 | Near Intelligence Pte. Ltd. | Break Media Pte Ltd | Agreement | 06/19/23 | 0 |
| 187 | Near North America, Inc. | Brentwood Associates | Agreement | 02/08/23 | 0 |
| 188 | Near North America, Inc. | Brightview Health | Service Order | 06/16/22 | 0 |
| 189 | Near North America, Inc. | Brisbane City Council | Agreement | 01/01/23 | 0 |

| | | | | | |
|---|---|---|---|---|---|
| 190 | Near North America, Inc. | Brookfield Properties (BPR RETI Svc) | Service Order | 01/01/21 | 0 |
| 191 | Near North America, Inc. | Burger King South Africa (RF) Proprietary Limited | Service Order | 02/14/22 | 0 |
| 192 | Near North America, Inc. | CACI LTD. | Data License Agreement | 10/29/21 | 0 |
| 193 | Near North America, Inc. | CACI LTD. | Data License Agreement | 09/21/21 | 0 |
| 194 | Near North America, Inc. | CACI LTD. | Data License Agreement | 11/30/21 | 0 |
| 195 | Near North America, Inc. | CACI LTD. | Data License Agreement | 09/10/21 | 0 |
| 196 | Near North America, Inc. | CACI LTD. | Data License Agreement | 12/15/21 | 0 |
| 197 | Near North America, Inc. | CACI LTD. | Data License Agreement | 09/30/21 | 0 |
| 198 | Near North America, Inc. | CACI LTD. | Data License Agreement | 10/29/21 | 0 |
| 199 | Near North America, Inc. | CACI LTD. | Data License Agreement | 12/03/21 | 0 |
| 200 | Near North America, Inc. | CACI LTD. | Data License Agreement | 10/29/21 | 0 |
| 201 | Near North America, Inc. | CACI LTD. | Data License Agreement | 11/02/21 | 0 |
| 202 | Near North America, Inc. | CACI LTD. | Data License Agreement | 05/22/22 | 0 |
| 203 | Near North America, Inc. | CACI LTD. | Data License Agreement | 09/16/21 | 0 |
| 204 | Near North America, Inc. | CACI LTD. | Data License Agreement | 11/22/21 | 0 |
| 205 | Near North America, Inc. | CACI LTD. | Data License Agreement | 09/21/21 | 0 |
| 206 | Near North America, Inc. | CACI LTD. | Data License Agreement | 09/15/21 | 0 |
| 207 | Near North America, Inc. | CACI LTD. | Data License Agreement | 12/03/21 | 0 |
| 208 | Near North America, Inc. | CACI LTD. | Data License Agreement | 10/18/21 | 0 |
| 209 | Near North America, Inc. | CACI LTD. | Data License Agreement | 09/29/21 | 0 |
| 210 | Near North America, Inc. | CACI LTD. | Data License Agreement | 09/01/21 | 0 |
| 211 | Near North America, Inc. | CACI LTD. | Data License Agreement | 09/10/21 | 0 |
| 212 | Near North America, Inc. | CACI LTD. | Data License Agreement | 09/27/21 | 0 |
| 213 | Near North America, Inc. | CACI LTD. | Data License Agreement | 11/29/21 | 0 |
| 214 | Near North America, Inc. | CACI LTD. | Data License Agreement | 10/29/21 | 0 |
| 215 | Near North America, Inc. | CACI LTD. | Data License Agreement | 11/02/21 | 0 |
| 216 | Near North America, Inc. | CACI LTD. | Data License Agreement | 09/30/21 | 0 |
| 217 | Near North America, Inc. | CACI LTD. | Data License Agreement | 12/09/21 | 0 |
| 218 | Near North America, Inc. | CACI LTD. | Data License Agreement | 09/30/21 | 0 |
| 219 | Near North America, Inc. | CACI LTD. | Data License Agreement | 09/30/21 | 0 |
| 220 | Near North America, Inc. | CACI LTD. | Data License Agreement | 09/21/21 | 0 |
| 221 | Near North America, Inc. | CACI LTD. | Data License Agreement | 12/16/21 | 0 |
| 223 | Near North America, Inc. | Caravan Industry Association of Australia | Agreement | 07/01/21 | 0 |
| 224 | Near North America, Inc. | Caravan Industry Association of Australia | Data License Agreement | 10/29/20 | 0 |
| 225 | Near North America, Inc. | Caravan Industry Association of Australia | Agreement | 01/17/22 | 0 |
| 226 | Near North America, Inc. | Caravaning Informations GmbH | Service Order | 04/27/21 | 0 |
| 227 | Near North America, Inc. | Cardiff University | Service Order | 07/25/22 | 0 |
| 228 | Near North America, Inc. | CBRE GmbH | Agreement | 11/16/21 | 0 |
| 229 | Near North America, Inc. | CBRE Inc. | Service Order | 10/31/22 | 0 |
| 230 | Near North America, Inc. | CBRE Inc. | Purchase Order | 12/07/22 | 0 |
| 231 | Near North America, Inc. | CBRE Inc. | Service Order | 12/27/23 | 0 |
| 232 | Near North America, Inc. | CBRE Inc. | Service Order | 10/31/22 | 0 |
| 233 | Near North America, Inc. | CBRE Inc. | Purchase Order | 11/01/22 | 0 |
| 234 | Near North America, Inc. | CBRE Inc. | Service Order | 10/31/22 | 0 |
| 235 | Near North America, Inc. | CBRE Inc. | Purchase Order | 05/04/20 | 0 |
| 236 | Near North America, Inc. | CBRE Inc. | Purchase Order | 01/19/21 | 0 |
| 237 | Near North America, Inc. | CBRE Inc. | Purchase Order | 12/09/22 | 0 |
| 238 | Near North America, Inc. | CBRE Inc. | Service Order | 11/04/22 | 0 |
| 239 | Near North America, Inc. | CBRE Inc. | Purchase Order | | 0 |
| 240 | Near North America, Inc. | CBRE Inc. | Service Order | 10/12/22 | 0 |
| 241 | Near North America, Inc. | CBRE Limited | Data License Agreement | 01/01/23 | 0 |
| 242 | Near North America, Inc. | CBRE Limited | Purchase Order | 09/28/21 | 0 |
| 243 | Near North America, Inc. | CBRE Limited | Limited License Agreement | 01/04/20 | 0 |
| 244 | Near North America, Inc. | CBRE Limited | Data License Agreement | 01/04/23 | 0 |
| 245 | Near North America, Inc. | CBRE Limited | Data License Agreement | 09/27/22 | 0 |
| 246 | Near North America, Inc. | CBRE LTD | Data License Agreement | 12/17/21 | 0 |
| 247 | Near North America, Inc. | CBRE PTE Ltd | Data License Agreement | 03/04/22 | 0 |
| 248 | Near North America, Inc. | CBRE PTE Ltd | Data License Agreement | 05/06/22 | 0 |
| 249 | Near North America, Inc. | CBRE PTE Ltd | Limited License Agreement | 11/19/21 | 0 |
| 250 | Near North America, Inc. | CBRE Real Estate, S.A. | Limited License Agreement | 11/01/19 | 0 |
| 254 | Near North America, Inc. | CBRE SRL | Data License Agreement and all relevant Purchase Orders | 12/23/22 | 0 |
| 255 | Near North America, Inc. | Central Counties Tourism | Service Order | 03/31/23 | 0 |
| 256 | Near North America, Inc. | Centre for Economic and Regional Studies | Service Order | 05/25/21 | 0 |

| 257 | Near North America, Inc. | Chameleon Digital Media | Data License Agreement and all relevant Service Orders | 10/15/20 | 0 |
| 259 | Near North America, Inc. | Chameleon Digital Media | Data License Agreement and all relevant Service Orders | 03/21/23 | 0 |
| 260 | Near North America, Inc. | Chameleon Digital Media | Data License Agreement and all relevant Service Orders | 08/02/22 | 0 |
| 261 | Near North America, Inc. | Charter Deck Cramer | Service Order | 08/27/21 | 0 |
| 262 | Near North America, Inc. | Chick-Fil-A Inc. | Data License Agreement | 06/30/23 | 0 |
| 263 | Near North America, Inc. | Chick-Fil-A Inc. | Service Order Data Feeds | 06/30/23 | 0 |
| 265 | Near North America, Inc. | Choose Chicago | Data License Agreement and all relevant Service Orders | 11/15/21 | 0 |
| 266 | Near North America, Inc. | Choose Chicago | Data License Agreement and all relevant Service Orders | 06/30/21 | 0 |
| 267 | Near North America, Inc. | Choose Chicago | 2023 Fiscal Year Renewal Contract | 06/01/23 | 0 |
| 269 | Near North America, Inc. | CID | Purchase Order: Disaggregate Mobility Data | 09/08/22 | 0 |
| 270 | Near North America, Inc. | CircleK-TAS | Data License Agreement | 05/01/23 | 0 |
| 271 | Near North America, Inc. | Citadel Enterprise Americas LLC | Data Evaluation Agreement | 09/20/22 | 0 |
| 273 | Near North America, Inc. | City of Apache Junction | Data License Agreement | 12/01/22 | 0 |
| 274 | Near North America, Inc. | City of Cleveland, Department of Community Develo Service Order | | 12/13/22 | 0 |
| 275 | Near North America, Inc. | City of El Paso | No. 2022-0907 Disaggregate Mobility Data | 09/01/22 | 0 |
| 276 | Near North America, Inc. | City of El Paso | Data License Agreement for Near Data Sets | 09/13/22 | 0 |
| 277 | Near North America, Inc. | City of Grand Junction | Data License Agreement | 02/19/20 | 0 |
| 278 | Near North America, Inc. | City of Grand Junction | Data License Agreement | 12/02/20 | 0 |
| 279 | Near North America, Inc. | City of Grand Junction | Data License Agreement | 05/12/20 | 0 |
| 280 | Near North America, Inc. | City of Kingman Tourism Division | Agreement | 12/01/22 | 0 |
| 281 | Near North America, Inc. | City of New Westminster - Office of the CAO | Service Order for Data Feeds | 07/09/21 | 0 |
| 282 | Near Intelligence Pte. Ltd. | City of Perth | Agreement | 12/15/22 | 0 |
| 283 | Near North America, Inc. | City of Prescott Tourism Office AZ | Service Order for Data Feeds | 10/05/20 | 0 |
| 284 | Near North America, Inc. | City of Prescott Tourism Office AZ | Agreement | 12/01/22 | 0 |
| 285 | Near North America, Inc. | City of Québec | Service Order for Data Feeds | 12/01/22 | 0 |
| 286 | Near North America, Inc. | City of Sierra Vista | Service Order | 10/05/20 | 0 |
| 287 | Near North America, Inc. | Claire's European Services Limited | Data Agreement | 05/01/22 | 0 |
| 288 | Near North America, Inc. | Claire's European Services Limited | Data License Agreement | 10/30/20 | 0 |
| 289 | Near North America, Inc. | Claire's European Services Limited | Data Agreement | 03/09/21 | 0 |
| 290 | Near North America, Inc. | Claire's European Services Limited | Data Agreement | 05/18/20 | 0 |
| 291 | Near North America, Inc. | Claire's European Services Limited | First Amendment Agreement | 11/01/22 | 0 |
| 292 | Near North America, Inc. | Coca-Cola Canada Bottling Limited | Service Order | 02/01/23 | 0 |
| 293 | Near North America, Inc. | Coca-Cola Canada Bottling Limited | Data License Agreement | 01/27/23 | 0 |
| 294 | Near North America, Inc. | Cochise County Tourism Council | Agreement | 12/01/22 | 0 |
| 295 | Near North America, Inc. | cohort.digital LLC | Service Order for Data Feeds | 02/05/21 | 0 |
| 296 | Near North America, Inc. | cohort.ID, Inc. | Agreement | 12/01/22 | 0 |
| 297 | Near North America, Inc. | cohort.ID, Inc. | Data License Agreement | 08/09/23 | 0 |
| 298 | Near North America, Inc. | Coldwell Banker Commercial Affiliates | Data License Agreement | 05/28/21 | 0 |
| 299 | Near North America, Inc. | Coldwell Banker Commercial Affiliates | Service Order | 07/14/23 | 0 |
| 300 | Near North America, Inc. | Coles Supermarkets | Service Order | 03/30/20 | 0 |
| 301 | Near North America, Inc. | Coles Supermarkets | Service Order | 04/13/21 | 0 |
| 302 | Near North America, Inc. | Colliers International | Data License Agreement | 02/01/21 | 0 |
| 303 | Near North America, Inc. | Colliers International | Data License Agreement | 09/14/20 | 0 |
| 304 | Near North America, Inc. | Colliers International | Purchase Order | 08/04/22 | 0 |
| 305 | Near North America, Inc. | Colliers International - Atlanta, LLC | Service Order | 07/13/22 | 0 |
| 306 | Near North America, Inc. | Colorado Tourism Office | Service Order | 12/22/22 | 0 |
| 307 | Near North America, Inc. | Columbia Distributing ESRI | Agreement | 01/01/23 | 0 |
| 308 | Near North America, Inc. | Columbia Distributing, Inc. | Data License Agreement | 12/16/22 | 0 |
| 309 | Near North America, Inc. | COMMB | Service Order | 09/12/22 | 0 |
| 310 | Near North America, Inc. | COMMB CA | Data License Agreement for Near Data Sets | 03/02/23 | 0 |
| 311 | Near North America, Inc. | Community Data Platforms | Near Solution Overview and Quote | 01/01/19 | 0 |
| 312 | Near North America, Inc. | Community Data Platforms | Data License Agreement | 01/28/21 | 0 |
| 313 | Near North America, Inc. | Community Data Platforms | Service Order for Data Feed | 02/07/22 | 0 |
| 314 | Near North America, Inc. | Community Service Platforms | Data License Agreement | 08/13/20 | 0 |
| 315 | Near North America, Inc. | Compass Digital Labs | Data License Agreement and all relevant Service Orders | 11/22/17 | 0 |
| 317 | Near North America, Inc. | Competitive Analytics Professionals, LLC | Service Order | 10/29/19 | 0 |
| 318 | Near Intelligence Pte. Ltd. | Container Exchange (QLD) Limited | Agreement | 06/12/23 | 0 |
| 319 | Near North America, Inc. | Coraggio Group LLC | Data License Agreement | 11/02/21 | 0 |
| 320 | Near North America, Inc. | Coraggio Group LLC | Data License Agreement | 08/05/21 | 0 |
| 321 | Near North America, Inc. | Costa Vida Fresh Mexican Grill | Service Order | 03/01/16 | 0 |
| 322 | Near North America, Inc. | County of Newell, Alberta Canada | Service Order | 09/10/20 | 0 |
| 323 | Near North America, Inc. | Cratos Portable Chargers LLC | Service Order for Data Sets | 01/07/21 | 0 |
| 324 | Near North America, Inc. | CS Property Management | Service Order for Data Sets | 01/27/20 | 0 |

| 325 | Near North America, Inc. | Cuebiq, Inc. | Second Amendment to Data Order Form | 09/25/20 | 0 |
| 326 | Near North America, Inc. | Cullari Media | Data License Agreement and all relevant Service Orders | 12/09/22 | 0 |
| 329 | Near North America, Inc. | Culmen International, LLC | Master License Agreement and all relevant Service Orders | 10/16/18 | 0 |
| 332 | Near North America, Inc. | Cultivar Brands | Service Order | 09/08/22 | 0 |
| 333 | Near North America, Inc. | Cushman & Wakefield ULC | Data License Agreement | 09/11/18 | 0 |
| 334 | Near North America, Inc. | Cushman & Wakefield ULC | Data License Agreement | 05/15/19 | 0 |
| 335 | Near Intelligence Pte. Ltd. | D Chain FZ LLC | Agreement | 01/01/23 | 0 |
| 336 | Near Intelligence Pte. Ltd. | Dai Nippon Printing Co., Ltd | Agreement | 10/01/22 | 0 |
| 337 | Near North America, Inc. | Dakota Worldwide | Service Order, Renewal | 07/22/23 | 0 |
| 338 | Near North America, Inc. | Dakota Worldwide | Service Order | 08/28/23 | 0 |
| 339 | Near North America, Inc. | Dallimore & Co. | Data License Agreement and all relevant Service Orders | 05/01/22 | 0 |
| 340 | Near North America, Inc. | Dallimore & Co. | Data License Agreement  and all relevant Service Orders | 04/29/21 | 0 |
| 341 | Near North America, Inc. | Dallimore & Co. | Data License Agreement  and all relevant Service Orders | 05/01/23 | 0 |
| 342 | Near North America, Inc. | Dallimore & Co. | Data License Agreement  and all relevant Service Orders | 06/01/22 | 0 |
| 343 | Near North America, Inc. | Data Graphix | Data License Agreement  and all relevant Service Orders | 01/18/19 | 0 |
| 344 | Near North America, Inc. | Data Graphix | Data License Agreement  and all relevant Service Orders | 12/20/18 | 0 |
| 345 | Near North America, Inc. | Datagence, Inc. d/b/a V12 | Bundled Reseller Agreement | 08/01/19 | 0 |
| 346 | Near North America, Inc. | Datagence, Inc. d/b/a V12 | Amendment 1 to Bundled Reseller Agreement | 02/03/20 | 0 |
| 347 | Near North America, Inc. | Datagence, Inc. d/b/a V12 | Amendment 2 to Bundled Reseller Agreement | 04/01/20 | 0 |
| 348 | Near North America, Inc. | Datagence, Inc. d/b/a V12 | Amendment 3 to Bundled Reseller Agreement | 08/01/20 | 0 |
| 350 | Near North America, Inc. | Datamentors LLC dba V12 Group | Amendment No. 3 to Bundled Reseller Agreement | 08/01/22 | 0 |
| 351 | Near North America, Inc. | DataMesh | Data License Agreement and all relevant Service Orders | 10/26/20 | 0 |
| 352 | Near North America, Inc. | Datapolis | Data License Agreement and all relevant Service Orders | 04/15/21 | 0 |
| 354 | Near North America, Inc. | Datapolis | Data License Agreement  and all relevant Service Orders | 11/03/20 | 0 |
| 355 | Near North America, Inc. | DataRobot | Service Order | 07/20/22 | 0 |
| 356 | Near North America, Inc. | Dean Runyan | Agreement and all relevant Service Orders | 02/01/23 | 0 |
| 357 | Near North America, Inc. | Dean Runyan Associates | Data License Agreement and all relevant Service Orders | 01/19/21 | 0 |
| 361 | Near Intelligence Pte. Ltd. | Decathlon SE | Agreement | 12/23/22 | 0 |
| 362 | Near Intelligence Pte. Ltd. | Deep End Services Pty Ltd | Agreement | 09/26/23 | 0 |
| 363 | Near North America, Inc. | Delaware North | Agreement | 01/01/23 | 0 |
| 364 | Near North America, Inc. | Delaware North | Data License Agreement and all relevant Service Orders | 09/22/22 | 0 |
| 365 | Near North America, Inc. | Delaware North | Data License Agreement and all relevant Service Orders | 01/03/23 | 0 |
| 366 | Near North America, Inc. | Design Workshop, Inc. | Agreement and all relevant Service Orders | 07/10/23 | 0 |
| 367 | Near North America, Inc. | Destination Analysts, Inc. | Agreement | 01/01/23 | 0 |
| 368 | Near North America, Inc. | Destination Analysts, Inc. | Service Order | 07/01/23 | 0 |
| 369 | Near North America, Inc. | Destination Analysts, Inc. | Data License Agreement and all relevant Service Orders | 07/28/21 | 0 |
| 373 | Near North America, Inc. | Destination Analysts, Inc. | Agreement and all relevant Service Orders | 08/31/23 | 0 |
| 374 | Near North America, Inc. | Destination Analysts, Inc. | Agreement and all relevant Service Orders | 07/01/23 | 0 |
| 376 | Near North America, Inc. | Destination Analysts, Inc. | Data License Agreement and all relevant Service Orders | 11/29/22 | 0 |
| 377 | Near North America, Inc. | Destination Analysts, Inc. | Data License Agreement and all relevant Service Orders | 11/10/22 | 0 |
| 378 | Near North America, Inc. | Destination Analysts, Inc. | Data License Agreement and all relevant Service Orders | 06/21/21 | 0 |
| 379 | Near North America, Inc. | Destination Analysts, Inc. | Data License Agreement and all relevant Service Orders | 11/29/22 | 0 |
| 381 | Near North America, Inc. | Destination Analysts, Inc. | Data License Agreement for Near Data Sets and Service Order for Tri-Valley area, California | 12/20/22 | 0 |
| 382 | Near North America, Inc. | Destination Analysts, Inc. | Data License Agreement for Near Data Sets and Service Order for Texas Datasets | 07/28/22 | 0 |
| 383 | Near North America, Inc. | Destination Analysts, Inc. | Data License Agreement for Near Data Sets and Service Order for Texas Datasets | 03/16/23 | 0 |
| 386 | Near North America, Inc. | Destination Analysts, Inc. | Data License Agreement and all relevant Service Orders | 04/13/23 | 0 |
| 387 | Near North America, Inc. | Destination Analysts, Inc. | Data License Agreement and all relevant Service Orders | 01/30/23 | 0 |
| 389 | Near North America, Inc. | Dietrich-Pepper, LLC | Service Order | 08/20/22 | 0 |
| 390 | Near North America, Inc. | Dietrich-Pepper, LLC | Service Order | 08/19/22 | 0 |
| 391 | Near North America, Inc. | Digital Performance Group | Service Order | 11/20/21 | 0 |
| 393 | Near North America, Inc. | Discover DuPage | Data License Agreement and all relevant Service Orders | 11/15/22 | 0 |
| 394 | Near North America, Inc. | Discover Salt River | Service Order | 10/30/20 | 0 |
| 395 | Near Intelligence Pte. Ltd. | DNP Media Art Co. Ltd. | Agreement | 10/01/23 | 0 |
| 396 | Near North America, Inc. | Dollar General Corporation | Agreement | 02/01/23 | 0 |
| 397 | Near North America, Inc. | Dollar General Corporation | Data License Agreement and all relevant Service Orders | 02/02/21 | 0 |
| 399 | Near North America, Inc. | Dollar General Corporation | Data License Agreement and all relevant Service Orders | 07/09/21 | 0 |
| 400 | Near North America, Inc. | Dollar General Corporation | Data License Agreement and all relevant Service Orders | 02/24/21 | 0 |
| 401 | Near North America, Inc. | DuPage CVB | Agreement | 01/01/23 | 0 |
| 403 | Near North America, Inc. | Earth Economics | Agreement | 06/01/22 | 0 |
| 404 | Near North America, Inc. | Earth Economics | Service Order | 02/22/21 | 0 |
| 405 | Near North America, Inc. | Earthvision LLC | Service Order | 10/08/21 | 0 |
| 406 | Near North America, Inc. | Earthvision LLC | Service Order | 06/10/22 | 0 |
| 407 | Near North America, Inc. | Earthvision LLC | Service Order | 07/06/23 | 0 |

| 408 | Near North America, Inc. | Eddy Alexander | Agreement and all relevant Service Orders | 12/01/22 | 0 |
| 414 | Near North America, Inc. | Element Advisory Pty Ltd | Service Order | 03/10/22 | 0 |
| 415 | Near North America, Inc. | Element Advisory Pty Ltd | Agreement | 04/26/23 | 0 |
| 416 | Near North America, Inc. | Elizabeth Destination Marketing Organization | Service Order | 04/11/22 | 0 |
| 417 | Near North America, Inc. | ELV Consulting Inc. | Service Order | 02/01/22 | 0 |
| 418 | Near North America, Inc. | Endlick | Service Order | 08/06/18 | 0 |
| 419 | Near North America, Inc. | Enlighten | Service Order | 03/28/22 | 0 |
| 420 | Near North America, Inc. | Enlighten | Service Order | 11/10/20 | 0 |
| 421 | Near North America, Inc. | Entertainment and Culture Advisors, LLC | Service Order | 06/06/22 | 0 |
| 422 | Near North America, Inc. | Entrada Insights Corporation | Data License Agreement | 07/01/20 | 0 |
| 423 | Near North America, Inc. | Environics Analytics Group Ltd. | Agreement and all relevant Service Orders | 06/01/22 | 0 |
| 427 | Near North America, Inc. | Environics Analytics Group Ltd. | Amendement #3 to the Amended and Restated Bundled Reseller Agreement | 07/01/20 | 0 |
| 428 | Near North America, Inc. | Epsilon Data Management, LLC | Agreement and all relevant Service Orders | 11/01/22 | 0 |
| 430 | Near North America, Inc. | Epsilon Data Management, LLC | Measurement Master Services Agreement and all relevant Service Orders | 08/11/22 | 0 |
| 432 | Near North America, Inc. | Ernst & Young LLP | Service Order for Location Data | 09/30/23 | 0 |
| 434 | Near North America, Inc. | eSite Analytics | Service Order | 03/21/23 | 0 |
| 435 | Near North America, Inc. | Estudios Tecnicos | Service Order | 05/12/22 | 0 |
| 436 | Near Intelligence Pte. Ltd. | Ethos Urban Pty Ltd. | Agreement | 03/16/23 | 0 |
| 437 | Near North America, Inc. | Euphoros Coffee Roasters | Service Order | 04/29/20 | 0 |
| 438 | Near North America, Inc. | EVO Entertainment Group | Service Order | 04/13/22 | 0 |
| 439 | Near North America, Inc. | Exact Marketing | Service Order | 10/04/22 | 0 |
| 440 | Near North America, Inc. | Exact Marketing | Service Order | 03/08/23 | 0 |
| 441 | Near North America, Inc. | Explore Washington Park | Service Order | 09/23/20 | 0 |
| 442 | Near North America, Inc. | Felipe Kup Barbieri de Matos | Service Order | 02/17/22 | 0 |
| 443 | Near North America, Inc. | Fernbank Museum | Service Order | 11/09/22 | 0 |
| 444 | Near North America, Inc. | Fernridge Consulting Pty Ltd | Agreement | 03/01/22 | 0 |
| 446 | Near Intelligence Pte. Ltd. | Finity Consulting Pty. Ltd. | Master Near Platform Data Usage and Services Agreement and all relevant Statements of Work | 05/01/21 | 0 |
| 448 | Near North America, Inc. | Flare Americas LLC. | Data License Agreement for Near Data Sets | 09/06/22 | 0 |
| 449 | Near North America, Inc. | Flare Americas LLC. | Data License Agreement for Near Data Sets | 02/01/23 | 0 |
| 450 | Near North America, Inc. | Flare Americas LLC. | Data License Agreement for Near Data Sets | 09/06/22 | 0 |
| 451 | Near North America, Inc. | Flare Americas LLC. | Data License Agreement for Near Data Sets | 11/15/22 | 0 |
| 452 | Near North America, Inc. | Flare Consulting | Agreement and all relevant Service Orders | 11/01/22 | 0 |
| 462 | Near North America, Inc. | Focus DMG | Service Order | 05/28/20 | 0 |
| 463 | Near North America, Inc. | Foot Locker Retail, Inc. | Service Order | 04/01/22 | 0 |
| 464 | Near North America, Inc. | Foot Locker Retail, Inc. | Service Order | 02/14/22 | 0 |
| 465 | Near North America, Inc. | Fort Smith CVB | Service Order | 05/12/21 | 0 |
| 466 | Near North America, Inc. | Forward Data S.L | Data License Agreement | 06/09/22 | 0 |
| 467 | Near North America, Inc. | Forward Data S.L | Data License Agreement | 06/14/21 | 0 |
| 468 | Near North America, Inc. | Forward Keys | Service Order | 08/13/22 | 0 |
| 469 | Near North America, Inc. | FragranceX | Service Order | 09/13/22 | 0 |
| 470 | Near Intelligence Pte. Ltd. | Fresh Information Limited | Agreement | 09/08/23 | 0 |
| 471 | Near North America, Inc. | Fresno/Clovis Convention & Visitors Bureau | Agreement | 01/01/23 | 0 |
| 472 | Near North America, Inc. | Fresno/Clovis Convention & Visitors Bureau | Data License Agreement for Near Data Sets | 12/14/22 | 0 |
| 474 | Near North America, Inc. | Fresno/Clovis Convention & Visitors Bureau | Service Order | 09/09/21 | 0 |
| 475 | Near North America, Inc. | Front Analytics, Inc. | Service Order | 04/17/19 | 0 |
| 476 | Near North America, Inc. | Fundacio Eurecat | Service Order | 06/16/22 | 0 |
| 477 | Near North America, Inc. | Fundacio Eurecat | Service Order | 09/07/21 | 0 |
| 478 | Near North America, Inc. | GapMaps Ltd. | Amendment 1 to Agreement | 04/20/21 | 0 |
| 479 | Near North America, Inc. | GapMaps Ltd. | Agreement | 01/01/23 | 0 |
| 480 | Near North America, Inc. | Gensler | Service Order | 08/18/21 | 0 |
| 481 | Near North America, Inc. | GEOmarketing Solutions Group | Agreement | 02/01/23 | 0 |
| 482 | Near Intelligence Pte. Ltd. | Geografía Pty Ltd | Agreement | 11/17/22 | 0 |
| 483 | Near North America, Inc. | GEOmarketing Solutions Group | Data License Agreement and all relevant Service Orders | 08/26/21 | 0 |
| 485 | Near North America, Inc. | GEOmarketing Solutions Group | Data License Agreement | 02/03/23 | 0 |
| 486 | Near North America, Inc. | Georgia Tech School of Economics | Service Order | 01/13/21 | 0 |
| 487 | Near Intelligence Pte. Ltd. | Geoscience Australia | Agreement | 03/15/23 | 0 |
| 488 | Near Intelligence Pte. Ltd. | GHD Pty Ltd | Agreement | 06/09/23 | 0 |
| 489 | Near North America, Inc. | Global Planning Solutions | Agreement | 02/01/23 | 0 |
| 490 | Near North America, Inc. | Glomil Teknoloji Anonim Sirketi | Data License Agreement | 04/26/22 | 0 |
| 491 | Near North America, Inc. | Glomil Teknoloji Anonim Sirketi | Data License Agreement | 04/26/22 | 0 |
| 492 | Near North America, Inc. | GMA Gesellschaft fur Markt- und Absatzforschung n | Service Order | 05/25/22 | 0 |
| 493 | Near North America, Inc. | Goman + York Property Advisors / Accubranch Llc. | Service Order | 04/13/21 | 0 |
| 494 | Near North America, Inc. | Greater Florence Chamber of Commerce, Florence A. | Service Order | 10/05/20 | 0 |

| 495 | Near North America, Inc. | Greater Palm Springs CVB | Agreement | 01/01/23 | 0 |
|---|---|---|---|---|---|
| 496 | Near North America, Inc. | Greater Palm Springs CVB | Near Solution Overview and Quote | 05/01/22 | 0 |
| 497 | Near North America, Inc. | Grosvenor Group Management Services Ltd. | Data License Agreement | | 0 |
| 498 | Near North America, Inc. | Guam Visitors Bureau | Independent and Professional Services Sole Source Contract | 11/07/22 | 0 |
| 499 | Near North America, Inc. | Guam Visitors Bureau | Notice to Proceed | 11/10/22 | 0 |
| 500 | Near North America, Inc. | Guam Visitors Bureau | Agreement | 11/01/22 | 0 |
| 501 | Near North America, Inc. | H2R Market Research | Agreement | 03/28/23 | 0 |
| 502 | Near North America, Inc. | Hamilton City Council | Agreement | 09/01/22 | 0 |
| 503 | Near North America, Inc. | Haute Dog Spa | Service Order | 04/21/22 | 0 |
| 504 | Near North America, Inc. | Hawaii Department of Business, Economic Developn | Contract for Goods and Services | 12/23/22 | 0 |
| 505 | Near North America, Inc. | Herrmann Global | Agreement | 01/01/23 | 0 |
| 506 | Near North America, Inc. | Herrmann Global | Service Order | 11/02/21 | 0 |
| 507 | Near North America, Inc. | Herrmann Global | Service Order | 06/05/23 | 0 |
| 508 | Near North America, Inc. | Hibbett Sporting Goods, Inc. | Service Order | 11/23/20 | 0 |
| 509 | Near North America, Inc. | HKS, Inc. | Agreement | 12/01/22 | 0 |
| 510 | Near Intelligence Pte. Ltd. | Hobart City Council | Agreement | 06/30/23 | 0 |
| 511 | Near Intelligence Pte. Ltd. | Houston First Corporation | Agreement | 01/01/23 | 0 |
| 512 | Near Intelligence Pte. Ltd. | Houston kemp Pty Ltd | Agreement | 10/15/22 | 0 |
| 513 | Near North America, Inc. | HR&A Advisors | Service Order | 04/19/22 | 0 |
| 514 | Near North America, Inc. | HumanId | Service Order | 11/10/22 | 0 |
| 515 | Near North America, Inc. | IBM Corp. | Procurement Agreement for the Exchange of Confidential Information | 09/11/18 | 0 |
| 516 | Near North America, Inc. | ICF Consulting Group Inc. | Service Order | 06/10/19 | 0 |
| 517 | Near North America, Inc. | IdealSpot | Service Order | 11/06/20 | 0 |
| 518 | Near Intelligence Pte. Ltd. | Idemitsu Kosan Co. Ltd. | Agreement | 03/01/23 | 0 |
| 519 | Near Intelligence Pte. Ltd. | Ikano Insight Ltd. | Agreement | 07/28/23 | 0 |
| 520 | Near North America, Inc. | IMM, LLC | Service Order | 12/13/19 | 0 |
| 522 | Near North America, Inc. | Indiana University | Service Order | 07/08/20 | 0 |
| 523 | Near North America, Inc. | Infopact Analytics | Service Order | 12/22/20 | 0 |
| 524 | Near Intelligence Pte. Ltd. | Innity China Company Ltd | Amendment to Allspark and Near Data Usage Agreement #5 | 04/01/21 | 0 |
| 525 | Near Intelligence Pte. Ltd. | Innity China Company Ltd | Amendment to Allspark and Near Data Usage Agreement #7 | 04/01/23 | 0 |
| 526 | Near North America, Inc. | Innovatio, S.A. ("Pulpey") | Purchase Order 0010029 | 05/17/22 | 0 |
| 527 | Near North America, Inc. | Innovatio, S.A. ("Pulpey") | Purchase Order 0010028 | 05/18/22 | 0 |
| 528 | Near North America, Inc. | Innovatio, S.A. ("Pulpey") | Reseller Sales and Data License Agreement | 05/26/21 | 0 |
| 529 | Near North America, Inc. | Inretail Management | Service Order | 04/06/23 | 0 |
| 530 | Near North America, Inc. | Inretail Management | Service Order | 06/30/22 | 0 |
| 531 | Near North America, Inc. | Insite Real Estate | Service Order | 06/15/21 | 0 |
| 532 | Near North America, Inc. | Intelligent Direct, Inc. | Agreement | 05/01/22 | 0 |
| 535 | Near North America, Inc. | International Coffee & Tea, LLC | Service Order for Location Data | 05/07/18 | 0 |
| 536 | Near North America, Inc. | International GmbH | Service Order for Location Data | 04/05/19 | 0 |
| 537 | Near North America, Inc. | Intersection Media | Agreement | 02/01/22 | 0 |
| 538 | Near North America, Inc. | Intervistas Consulting | Agreement and all relevant Service Orders | 02/01/23 | 0 |
| 544 | Near North America, Inc. | Intuitive Health | Service Order | 01/07/19 | 0 |
| 545 | Near North America, Inc. | IRB Holding Corp | Service Order | 04/25/22 | 0 |
| 546 | Near North America, Inc. | Jackson County Visitors Bureau | Service Order | 10/13/22 | 0 |
| 547 | Near North America, Inc. | Jacksonville State University | Service Order | 11/30/23 | 0 |
| 548 | Near North America, Inc. | James Andrew Group, Inc | Limited License Agreement | 03/30/21 | 0 |
| 549 | Near North America, Inc. | James Andrew Group, Inc | Data License Agreement | 09/25/22 | 0 |
| 550 | Near North America, Inc. | James Andrew Group, Inc | Data License Agreement | 02/22/22 | 0 |
| 551 | Near Intelligence Pte. Ltd. | JCDecaux Australia Trading Pty Ltd | Agreement | 04/20/23 | 0 |
| 552 | Near North America, Inc. | JKH Business and Property Consulting (Pty) Ltd | Service Order | 07/08/23 | 0 |
| 553 | Near North America, Inc. | JKH Business and Property Consulting (Pty) Ltd | Service Order | 07/11/22 | 0 |
| 554 | Near North America, Inc. | Johnston County | Agreement | 01/01/22 | 0 |
| 555 | Near North America, Inc. | Kalibrate (Knowledge Support Systems Inc.) | Agreement | 01/01/22 | 0 |
| 556 | Near North America, Inc. | Kaua'I Economic Development Board Inc. | Service Order | 11/18/21 | 0 |
| 557 | Near North America, Inc. | Kayrros | Service Order | 12/09/21 | 0 |
| 558 | Near North America, Inc. | KFC Pty Ltd. | Service Order | 10/01/23 | 0 |
| 559 | Near North America, Inc. | KFC Pty Ltd. | Agreement | 05/01/22 | 0 |
| 560 | Near North America, Inc. | KFC Pty Ltd. | Data License Agreement | 05/07/21 | 0 |
| 561 | Near North America, Inc. | KFC Pty Ltd. | Agreement | 02/11/22 | 0 |
| 562 | Near North America, Inc. | KFC Pty Ltd. | Agreement | 05/02/23 | 0 |
| 563 | Near North America, Inc. | Kisio | Service Order | 08/01/19 | 0 |
| 564 | Near North America, Inc. | Kitson & Partners | Service Order | 06/07/19 | 0 |
| 565 | Near North America, Inc. | Knowledge Support Systems, Inc. | Bundled Reseller Agreement | 04/12/22 | 0 |

| 566 | Near North America, Inc. | Kohler Co. | Service Order | 08/15/16 | 0 |
| 567 | Near North America, Inc. | Akya (Konfid S.A. de C.V.) | Service Order | 09/01/23 | 0 |
| 568 | Near North America, Inc. | KPMG LLP | Purchase Order | 05/26/22 | 0 |
| 569 | Near North America, Inc. | KPMG LLP | Near Solution Overview and Quote for Vista Data Explorer Subscription | 04/07/22 | 0 |
| 570 | Near North America, Inc. | Kwiktrip | Data License Agreement | 03/03/23 | 0 |
| 571 | Near North America, Inc. | Kwiktrip | Near Solution Overview and Quote for Vista Data Explorer Subscription | 03/25/22 | 0 |
| 572 | Near North America, Inc. | Land of Illusion Aqua-CTV | Service Order for Location Data | 06/24/22 | 0 |
| 575 | Near North America, Inc. | Lasalle Investment Management | Data License Agreement | 04/01/22 | 0 |
| 576 | Near North America, Inc. | Lasalle Investment Management | Data License Agreement | 04/03/23 | 0 |
| 577 | Near North America, Inc. | Lasalle Investment Management | Data License Agreement | 03/08/21 | 0 |
| 578 | Near North America, Inc. | Legend LLP | Service Order | 04/06/23 | 0 |
| 579 | Near North America, Inc. | Legend LLP | Service Order | 04/06/23 | 0 |
| 580 | Near North America, Inc. | Legend Partners - Beau Niblock | Agreement | 04/01/22 | 0 |
| 581 | Near North America, Inc. | Leggo Studio Pty Ltd | Agreement and all relevant Service Orders | 03/31/23 | 0 |
| 583 | Near North America, Inc. | Lens | Service Order | 05/05/22 | 0 |
| 585 | Near North America, Inc. | Lidl US Operations, LLC | Service Order | 05/05/22 | 0 |
| 586 | Near North America, Inc. | Lidl US Operations, LLC | Service Order | 05/26/21 | 0 |
| 587 | Near North America, Inc. | Lifestyle Media Solutions, LLC | Service Order | 06/30/21 | 0 |
| 588 | Near North America, Inc. | Little Caesar Enterprises, Inc. | Agreement and all relevant Service Orders and Purchase Orders | 01/01/23 | 0 |
| 593 | Near Intelligence Pte. Ltd. | Localis Technologies Australia Pty Ltd | Agreement and all relevant Service Orders | 01/01/22 | 0 |
| 595 | Near Intelligence Pte. Ltd. | Location IQ Pty Ltd. | Service Order | 01/01/23 | 0 |
| 596 | Near North America, Inc. | Location IQ Pty Ltd. | Service Order | 06/25/19 | 0 |
| 597 | Near North America, Inc. | Locomizer | Service Order | 06/14/22 | 0 |
| 598 | Near North America, Inc. | Longwoods International | Service Order | 10/31/22 | 0 |
| 600 | Near North America, Inc. | Longwoods International | Service Order | 10/26/21 | 0 |
| 603 | Near North America, Inc. | Look Media USA LLC | Service Order | 11/17/16 | 0 |
| 604 | Near North America, Inc. | Love Communications | Service Order | 02/28/22 | 0 |
| 605 | Near North America, Inc. | Lyons Group | Service Order | 02/20/19 | 0 |
| 607 | Near Intelligence Pte. Ltd. | MACROPLAN HOLDINGS PTY LTD | Agreement | 10/15/23 | 0 |
| 608 | Near North America, Inc. | Madden | Madden - 2022 Rate Card | 01/01/22 | 0 |
| 609 | Near North America, Inc. | Madden | Service Order | 08/16/22 | 0 |
| 610 | Near North America, Inc. | Madden | Proposed Solution | 04/26/22 | 0 |
| 611 | Near North America, Inc. | Madden | Service Order | 09/29/22 | 0 |
| 612 | Near North America, Inc. | Madden | Service Order | 08/16/22 | 0 |
| 613 | Near North America, Inc. | Madden | Service Order | 09/29/22 | 0 |
| 614 | Near North America, Inc. | Madden | Service Order | 09/29/22 | 0 |
| 615 | Near North America, Inc. | Madden | Service Order | 10/30/22 | 0 |
| 616 | Near North America, Inc. | Madden | Service Order | 09/29/22 | 0 |
| 617 | Near North America, Inc. | Madden | Service Order | 09/29/22 | 0 |
| 619 | Near North America, Inc. | Madden | Service Order | 11/08/22 | 0 |
| 620 | Near North America, Inc. | Madden | Service Order | 09/29/22 | 0 |
| 621 | Near North America, Inc. | Madden | Service Order | 10/11/22 | 0 |
| 622 | Near North America, Inc. | Madden | Service Order | 08/16/22 | 0 |
| 623 | Near North America, Inc. | Madden Media | Service Order | 01/01/23 | 0 |
| 624 | Near North America, Inc. | Madden Media | Service Order | 10/27/22 | 0 |
| 626 | Near North America, Inc. | Madden Media | Service Order | 05/24/22 | 0 |
| 628 | Near North America, Inc. | Madden Media | Service Order | 06/01/22 | 0 |
| 630 | Near North America, Inc. | Madden Media | Service Order | 06/01/22 | 0 |
| 631 | Near North America, Inc. | Madden Media | Service Order | 09/29/22 | 0 |
| 633 | Near North America, Inc. | Madden Media | Service Order | 05/24/22 | 0 |
| 634 | Near North America, Inc. | Madden Media | Service Order | 08/16/22 | 0 |
| 637 | Near North America, Inc. | Madden Media | Service Order | 12/14/22 | 0 |
| 639 | Near North America, Inc. | Madden Media | Service Order | 08/09/22 | 0 |
| 640 | Near North America, Inc. | Magellan Strategy Group | Service Order | 02/18/22 | 0 |
| 641 | Near North America, Inc. | Manistee County Visitors Bureau | Agreement and all relevant Service Orders | 11/01/22 | 0 |
| 644 | Near North America, Inc. | Manistee County Visitors Bureau | Manistee County Visitors Dashboard Contract and all relevant Service Orders | | 0 |
| 646 | Near North America, Inc. | MAPIT (PTY) Ltd | Service Order | 04/01/22 | 0 |
| 647 | Near North America, Inc. | MAPIT (Pty) Ltd | Purchase Order | 07/11/22 | 0 |
| 648 | Near North America, Inc. | MAPIT (Pty) Ltd | Purchase Order | 09/27/22 | 0 |
| 649 | Near North America, Inc. | Market Economics Ltd. | Service Order | 04/01/22 | 0 |
| 650 | Near North America, Inc. | Market Focus Direct Inc. | Service Order | 10/04/18 | 0 |
| 651 | Near North America, Inc. | Massachusetts Convention Center Authority | Service Order | 06/08/19 | 0 |
| 652 | Near North America, Inc. | Matthew Jaffe | Service Order | 03/11/22 | 0 |

| | | | | | |
|---|---|---|---|---|---|
| 653 | Near North America, Inc. | McDonalds | Service Order | 05/11/23 | 0 |
| 654 | Near North America, Inc. | McElhanney Ltd. | Agreement | 09/01/23 | 0 |
| 655 | Near Intelligence Pte. Ltd. | Mead & Hunt | Service Order | 01/01/23 | 0 |
| 656 | Near North America, Inc. | Mead & Hunt | Service Order #E469 | 12/08/21 | 0 |
| 657 | Near North America, Inc. | Mead & Hunt | Service Order #ES243 | 07/28/20 | 0 |
| 658 | Near Intelligence Pte. Ltd. | Measurement of Outdoor Visibiltiy and Exposure Pty | Agreement | 04/20/23 | 0 |
| 663 | Near North America, Inc. | MediaOne North America | Agreement and all relevant Service Orders | 02/16/23 | 0 |
| 667 | Near Intelligence Pte. Ltd. | Mediatiks Limited | Agreement | 04/01/23 | 0 |
| 668 | Near North America, Inc. | Megalytics | Proposed Solution | 04/12/22 | 0 |
| 669 | Near North America, Inc. | Megalytics | Service Order | 12/17/20 | 0 |
| 670 | Near Intelligence Pte. Ltd. | Melbourne City Council | Agreement | 06/30/23 | 0 |
| 671 | Near North America, Inc. | Meta Platforms Technologies, LLC | Service Order Data Feeds #INB2739182 | 07/01/23 | 0 |
| 674 | Near North America, Inc. | METAVERSO, S.A. | Agreement and all relevant Purchase Orders | 11/01/22 | 0 |
| 678 | Near Intelligence Pte. Ltd. | Michael Bauer International GmbH (and Hitachi Solu | Licence Agreement and all relevant Orders | 04/05/22 | 0 |
| 679 | Near North America, Inc. | Michigan State Billling | Service Order | 02/16/21 | 0 |
| 680 | Near North America, Inc. | Mississippi Development Authority | Service Order | 12/31/19 | 0 |
| 681 | Near North America, Inc. | MIT | Service Order | 04/08/21 | 0 |
| 682 | Near North America, Inc. | Mobil IT Consultants | Service Order | 02/02/22 | 0 |
| 699 | Near Intelligence Pte. Ltd. | Monash University | Agreement | 09/12/22 | 0 |
| 700 | Near North America, Inc. | Moreton Bay Australia | Service Order | 07/19/21 | 0 |
| 701 | Near North America, Inc. | Moreton Bay Regional Council | Agreement | 06/01/22 | 0 |
| 702 | Near North America, Inc. | Morey Consulting | Agreement and all relevant Service Orders | 08/23/23 | 0 |
| 705 | Near North America, Inc. | Morey Consulting | Agreement | 07/28/22 | 0 |
| 710 | Near North America, Inc. | Morey Consulting | Agreement | 08/09/22 | 0 |
| 711 | Near North America, Inc. | Morey Consulting | Agreement | 08/04/22 | 0 |
| 712 | Near North America, Inc. | Morey Consulting | Agreement | 08/29/22 | 0 |
| 713 | Near North America, Inc. | Morey Consulting | Agreement | 08/04/22 | 0 |
| 714 | Near North America, Inc. | Morey Consulting | Agreement | 08/30/22 | 0 |
| 715 | Near North America, Inc. | Morey Consulting | Agreement | 08/04/22 | 0 |
| 716 | Near North America, Inc. | Motivation Holdings, LLC | Service Order | 04/28/24 | 0 |
| 717 | Near North America, Inc. | Mount Carmel Health System | Service Order | 05/08/18 | 0 |
| 718 | Near North America, Inc. | MSA Devco (Pty) Ltd (T/A McDonald's Sou Africa) | Service Order | 06/24/21 | 0 |
| 719 | Near North America, Inc. | Munchen Tourismus | Service Order | 06/24/21 | 0 |
| 720 | Near North America, Inc. | National Institutes of Health | Service Order | 07/30/20 | 0 |
| 721 | Near Intelligence Pte. Ltd. | Nationwide News Pty Ltd | Near Platform Data Usage and Services Agreement | 03/14/22 | 0 |
| 722 | Near Intelligence Pte. Ltd. | Nationwide News Pty Ltd | Allspark and Data Usage Agreement | 03/01/19 | 0 |
| 723 | Near North America, Inc. | NaviRetail Inc. | Agreement | 07/01/22 | 0 |
| 724 | Near North America, Inc. | nContext, LLC | Agreement | 01/01/20 | 0 |
| 726 | Near North America, Inc. | nContext, LLC | One Year Agreement | 04/01/23 | 0 |
| 727 | Near North America, Inc. | nContext, LLC | Purchase Order nCX-2023-006 | 04/01/23 | 0 |
| 728 | Near North America, Inc. | Neptune Member LLC | Service Order | 07/23/19 | 0 |
| 729 | Near North America, Inc. | New Balance Athetics, Inc | Service Order | 10/23/23 | 0 |
| 730 | Near North America, Inc. | Newmark & Company Real Estate | Service Order | 08/04/22 | 0 |
| 731 | Near North America, Inc. | Nexcore Group | Service Order | 05/04/23 | 0 |
| 732 | Near North America, Inc. | Nexcore Group | Service Order | 03/03/20 | 0 |
| 733 | Near North America, Inc. | Nexcore Group | Proposed Solution | 05/20/22 | 0 |
| 734 | Near North America, Inc. | Nexcore Group | Proposed Solution | 05/20/22 | 0 |
| 735 | Near North America, Inc. | Nexpansion Inc. | Agreement and all relevant Service Orders | 06/01/22 | 0 |
| 737 | Near North America, Inc. | NextSeed Services LLC | Service Order | 02/11/20 | 0 |
| 738 | Near North America, Inc. | Nike, Inc. | Service Order | 05/22/23 | 0 |
| 739 | Near North America, Inc. | Nike, Inc. | Service Order | 02/13/19 | 0 |
| 740 | Near North America, Inc. | Ninigret Partners LLC | Service Order | 05/19/23 | 0 |
| 741 | Near North America, Inc. | Ninigret Partners LLC | Service Order | 04/16/23 | 0 |
| 742 | Near North America, Inc. | Ninthdecimal, Inc. | Service Order | 01/31/19 | 0 |
| 743 | Near Intelligence Pte. Ltd. | Nissin Shoukai Inc. | Agreement | 06/15/23 | 0 |
| 744 | Near North America, Inc. | NWAP II Inc | Agreement and all relevant Service Orders | 05/01/22 | 0 |
| 748 | Near North America, Inc. | NYC & Company | Agreement | 01/01/23 | 0 |
| 749 | Near North America, Inc. | O2 Planning + Design | Agreement | 01/01/23 | 0 |
| 750 | Near North America, Inc. | O2 Planning + Design | Vista Data Explorer Subscription | 01/18/23 | 0 |
| 751 | Near North America, Inc. | O2 Planning + Design | Proposed Solution | 01/20/22 | 0 |
| 752 | Near North America, Inc. | Off Madison Ave | Agreement and all relevant Insertion Orders | 12/01/22 | 0 |
| 755 | Near Intelligence Pte. Ltd. | Office of Spot | Agreement | 07/14/23 | 0 |
| 756 | Near Intelligence Pte. Ltd. | On The Run Pty Ltd | Agreement | 06/07/22 | 0 |

| | | | | | |
|---|---|---|---|---|---|
| 757 | Near North America, Inc. | Oracle₁ | Data License Agreement | 09/01/16 | 0 |
| 758 | Near North America, Inc. | Oracle America, Inc.₁ | Oracle Amendment Three | 05/06/18 | 0 |
| 759 | Near North America, Inc. | Oracle America, Inc.₁ | Oracle Amendment Six | 05/02/22 | 0 |
| 760 | Near North America, Inc. | Orange142 | Agreement and all relevant Service Orders | 01/01/23 | 0 |
| 763 | Near North America, Inc. | Orbital Insight Inc. | Re: Orbital Insight - agreement | 04/08/22 | 0 |
| 764 | Near North America, Inc. | Orbital Insight Inc. | Re: Orbital Insight - agreement | 04/12/22 | 0 |
| 765 | Near North America, Inc. | Orbital Insight Inc. | Evaluation License Agreement | 04/07/22 | 0 |
| 766 | Near North America, Inc. | Orlando/Orange County Convention & Visitors Burea | Service Order | 11/30/20 | 0 |
| 767 | Near Intelligence Pte. Ltd. | Osaka Metro Adera Co.,Ltd. | Agreement | 03/31/23 | 0 |
| 768 | Near North America, Inc. | Osterreich Werbung | Purchase Order 4500001262 | 08/02/22 | 0 |
| 770 | Near North America, Inc. | Otak, Inc. | Service Order | 12/07/22 | 0 |
| 771 | Near North America, Inc. | Oxford Economics | Agreement and all relevant Service Orders | 02/01/23 | 0 |
| 779 | Near Intelligence Pte. Ltd. | Pacific consultants | Agreement | 03/30/23 | 0 |
| 780 | Near North America, Inc. | PB Software Inc. ("Precisely") | PB Software Inc. Purchase Order | 01/11/21 | 0 |
| 781 | Near North America, Inc. | Pelmorex Corp. | Agreement | 10/01/22 | 0 |
| 782 | Near North America, Inc. | Pendleton | Service Order | 05/18/22 | 0 |
| 783 | Near North America, Inc. | Penn State University | Service Order | 08/02/22 | 0 |
| 784 | Near Intelligence Pte. Ltd. | Perception Media SDN BHD | Near Data Usage Agreement | 09/01/20 | 0 |
| 785 | Near North America, Inc. | Pew Research Center | Service Order | 11/12/20 | 0 |
| 786 | Near North America, Inc. | PiinPoint Inc. | Agreement | 01/01/22 | 0 |
| 787 | Near North America, Inc. | Pinal County | Agreement | 12/01/22 | 0 |
| 788 | Near Intelligence Pte. Ltd. | Pinchhitters BV | Agreement | 04/01/23 | 0 |
| 789 | Near North America, Inc. | Pinchhitters BV | Services Agreement | 04/01/23 | 0 |
| 790 | Near North America, Inc. | Placewise Media | Agreement and all relevant Service Orders | 01/25/23 | 0 |
| 792 | Near North America, Inc. | Point72, L.P. | Service Order for Pinnacle Data | 06/05/23 | 0 |
| 793 | Near North America, Inc. | Popeyes Louisiana Kitchen Inc. (RBI) | Agreement | 05/01/22 | 0 |
| 794 | Near North America, Inc. | Precisely Software Incorporated ("Precisely") | Service Order Data Feeds | 05/11/22 | 0 |
| 795 | Near North America, Inc. | Precisely Software Incorporated ("Precisely") | Service Order Data Feeds | 12/23/21 | 0 |
| 796 | Near North America, Inc. | Precisely Software Incorporated ("Precisely") | Service Order Data Feeds | 12/12/22 | 0 |
| 797 | Near North America, Inc. | Precisely.com (Syncsort) | Agreement | 01/01/23 | 0 |
| 798 | Near North America, Inc. | PriceWaterhouseCoopers | Service Order (Feed) | 05/29/23 | 0 |
| 800 | Near Intelligence Pte. Ltd. | PropertyGuru Pte. Ltd | Service Agreement and all relevant Statements of Work | 10/17/22 | 0 |
| 801 | Near North America, Inc. | Propulso | Agreement and all relevant Service Orders | 03/01/22 | 0 |
| 807 | Near North America, Inc. | PwC Advisory sp. z o.o. sp.k. ("PwC") | Purchase Order PO 61197 | 01/04/23 | 0 |
| 808 | Near North America, Inc. | PwC Middle East | Agreement | 05/29/23 | 0 |
| 809 | Near North America, Inc. | Q1 Media | Agreement | 10/01/22 | 0 |
| 810 | Near North America, Inc. | Q1 Media | Service Order | 01/01/21 | 0 |
| 811 | Near North America, Inc. | Q1 Media | Q1Media Insertion Order | 10/16/19 | 0 |
| 812 | Near North America, Inc. | Q1 Media | Q1Media Insertion Order | 10/16/19 | 0 |
| 813 | Near North America, Inc. | Q1 Media | Service Order for Data Sets | 11/29/22 | 0 |
| 814 | Near Intelligence Pte. Ltd. | Quantify Strategic Insights | Agreement | 03/23/23 | 0 |
| 815 | Near North America, Inc. | Quantum Health | Service Order | 12/18/20 | 0 |
| 816 | Near North America, Inc. | Quantum Health | Service Order | 04/07/21 | 0 |
| 817 | Near North America, Inc. | QuickTrip Corporation | Service Order | 09/30/22 | 0 |
| 818 | Near North America, Inc. | QuickTrip Corporation | Service Order | 09/23/22 | 0 |
| 819 | Near North America, Inc. | QuickTrip Corporation | Service Order | 08/01/22 | 0 |
| 820 | Near North America, Inc. | Radbridge | Service Order | 07/31/23 | 0 |
| 821 | Near North America, Inc. | Radbridge | Service Order | 03/02/23 | 0 |
| 822 | Near Intelligence Pte. Ltd. | Reach Media New Zealand Limited | Agreement | 03/23/23 | 0 |
| 823 | Near Intelligence Pte. Ltd. | Redland City Council | Agreement | 09/25/22 | 0 |
| 824 | Near North America, Inc. | Restaurant Brands International US Services LLC | Service Order | 03/23/22 | 0 |
| 825 | Near North America, Inc. | Restaurant Brands International US Services LLC | Service Order | 04/19/21 | 0 |
| 826 | Near North America, Inc. | Restaurant Brands International US Services LLC | Service Order | 05/01/22 | 0 |
| 827 | Near North America, Inc. | Rexall Pharmacy Group LLC | Service Order | 07/10/23 | 0 |
| 828 | Near North America, Inc. | Rexall Pharmacy Group Ltd | Service Order | 06/24/21 | 0 |
| 829 | Near North America, Inc. | Rexall Pharmacy Group ULC | Service Order | 06/20/22 | 0 |
| 830 | Near North America, Inc. | RMG Advertising | Service Order | 03/31/23 | 0 |
| 831 | Near North America, Inc. | Rockport Analytics | Agreement and all relevant Service Orders | 02/01/23 | 0 |
| 840 | Near North America, Inc. | Roswell, LLC | First Amendment to Data Order Form | 11/15/19 | 0 |
| 855 | Near North America, Inc. | Roy Morgan | Agreement and all relevant Service Orders | 02/01/23 | 0 |
| 858 | Near North America, Inc. | RRC Associates | Agreement and all relevant Service Orders | 08/01/22 | 0 |
| 865 | Near Intelligence Pte. Ltd. | Rural Press Pty. Ltd. | Agreement | 01/01/23 | 0 |
| 866 | Near North America, Inc. | S.M.EG.I.T TURISTICAS S.A.M.P. | Agreement | 01/01/23 | 0 |

| | | | | | |
|---|---|---|---|---|---|
| 867 | Near Intelligence Pte. Ltd. | SA1 Property Holdings Pty Ltd | Agreement | 08/09/23 | 0 |
| 868 | Near North America, Inc. | SDI Realty Advisors | Service Order | 07/26/23 | 0 |
| 869 | Near North America, Inc. | SDI Realty Advisors | Service Order | 04/10/23 | 0 |
| 870 | Near North America, Inc. | Seychelles Tourism Department | Service Order | 11/01/22 | 0 |
| 871 | Near North America, Inc. | Shell International B.V. | Agreement and all Purchase Orders | 06/11/23 | 0 |
| 872 | Near North America, Inc. | Shell International B.V. | Information Licence Agreement CW534195 | 06/11/21 | 0 |
| 873 | Near North America, Inc. | Shell International B.V. | Certificate of Completion (for CW534195) | 06/19/21 | 0 |
| 875 | Near North America, Inc. | Shell International B.V. | Amending Agrement #1 | 03/30/23 | 0 |
| 876 | Near North America, Inc. | Simpleview | Agreement and all relevant Service Orders | 01/01/22 | 0 |
| 877 | Near North America, Inc. | Simpleview | Irving Website Pixel Measurement | 09/11/20 | 0 |
| 881 | Near Intelligence Pte. Ltd. | Singapore Press Holdings Limited | Amendment No. 2 to Near Data Usage Agreement | 04/24/21 | 0 |
| 882 | Near North America, Inc. | SiteSeer Technologies, LLC | Service Order | 09/04/20 | 0 |
| 883 | Near North America, Inc. | SiteSeer Technologies, LLC | Service Order | 04/28/22 | 0 |
| 884 | Near North America, Inc. | SITEZEUS SERVICES LLC | Fwd: SiteZeus April Royalty Report | 01/04/23 | 0 |
| 885 | Near North America, Inc. | SITEZEUS SERVICES LLC | Re: Lidl renewal | 05/05/22 | 0 |
| 886 | Near North America, Inc. | SITEZEUS SERVICES LLC | Amended and Restated Bundled Reseller Agreement | 07/01/21 | 0 |
| 887 | Near North America, Inc. | SITEZEUS SERVICES LLC | Agreement | 02/01/23 | 0 |
| 888 | Near North America, Inc. | SITEZEUS SERVICES LLC | Amendment Agreement | 12/19/22 | 0 |
| 889 | Near North America, Inc. | Sky Synergy, LLC | Agreement | 01/01/21 | 0 |
| 890 | Near North America, Inc. | SMARInsights | Service Order #ES287 | 11/04/20 | 0 |
| 891 | Near North America, Inc. | SMARInsights | Service Order #ES472 | 12/10/21 | 0 |
| 892 | Near North America, Inc. | SMARInsights | Service Order #ES464 | 11/15/21 | 0 |
| 893 | Near North America, Inc. | SMARInsights | Service Order #ES446 | 09/29/21 | 0 |
| 894 | Near North America, Inc. | SMARInsights | Service Order #ES442 | 09/16/21 | 0 |
| 896 | Near Intelligence Pte. Ltd. | SMRT Commercial Pte Ltd. | Near Platform Data Usage and Services Agreement | 03/01/21 | 0 |
| 897 | Near North America, Inc. | Sojern, Inc. | Service Order | 04/15/23 | 0 |
| 898 | Near North America, Inc. | Southern Methodist University | Service Order | 04/01/23 | 0 |
| 899 | Near North America, Inc. | Spatial Labs, Inc. | Bundled Reseller Agreement | 05/21/22 | 0 |
| 900 | Near North America, Inc. | Spatial Labs, Inc. | Amendment to Reseller Agreement | 03/10/21 | 0 |
| 901 | Near North America, Inc. | Spatial Labs, Inc. | Bundled Reseller Agreemend | 05/21/22 | 0 |
| 902 | Near North America, Inc. | Starcom | Orden de Compra de Internet | 02/16/23 | 0 |
| 903 | Near North America, Inc. | Starcom | Orden de Compra de Internet | 02/12/23 | 0 |
| 904 | Near Intelligence Pte. Ltd. | Stellar Lifestyle Pte Ltd | Agreement | 03/01/21 | 0 |
| 905 | Near North America, Inc. | Strategic Marketing and Research Insights | Service Order #ES446 | 11/01/21 | 0 |
| 907 | Near North America, Inc. | StreetMetrics, Inc. | Agreement and all relevant Service Orders | 01/01/23 | 0 |
| 910 | Near North America, Inc. | StreetMetrics, Inc. | Addendum 1 to 2022 Data License Agreement | 06/01/22 | 0 |
| 911 | Near North America, Inc. | StreetMetrics, Inc. | Addendum 2 to 2022 Data License Agreement | 06/01/22 | 0 |
| 912 | Near North America, Inc. | StreetMetrics, Inc. | 2022 Master Data License Agreement | 06/01/22 | 0 |
| 913 | Near Intelligence Pte. Ltd. | SunLife Assurance Company of Canada | Second Amendment to Allspark Agreement | 04/01/21 | 0 |
| 914 | Near North America, Inc. | SunPubs Investment Group | Service Order | 10/01/23 | 0 |
| 915 | Near North America, Inc. | SVF University Westwood, LLC | Service Order | 04/23/19 | 0 |
| 916 | Near North America, Inc. | Tahoe Regional Planning Agency | Service Order | 10/08/20 | 0 |
| 917 | Near North America, Inc. | Tailored Brands Shared Services, LLC | Service Order | 08/16/16 | 0 |
| 918 | Near North America, Inc. | Tailored Brands Shared Services, LLC | Purchase Order | 08/02/18 | 0 |
| 919 | Near North America, Inc. | Tailored Brands Shared Services, LLC | Quote for Subscription license | 08/02/18 | 0 |
| 920 | Near North America, Inc. | Tailored Brands Shared Services, LLC | Quote for Subscription license | 07/15/18 | 0 |
| 921 | Near North America, Inc. | Tailored Brands Shared Services, LLC | Service Order | 08/14/17 | 0 |
| 922 | Near North America, Inc. | Tailored Brands Shared Services, LLC | Purchase Order P0370090 | 08/16/16 | 0 |
| 923 | Near North America, Inc. | Tailored Brands Shared Services, LLC | Purchase Order P0465484 | 08/16/17 | 0 |
| 924 | Near North America, Inc. | Tailored Brands Shared Services, LLC | Service Order | 08/27/15 | 0 |
| 925 | Near North America, Inc. | Tango ("Licensee") | Amendment 2 to Agreement | 02/21/22 | 0 |
| 926 | Near North America, Inc. | Tango ("Licensee") | Amendment 2 to Agreement (KFC) | | 0 |
| 927 | Near North America, Inc. | Tango ("Licensee") | Amendment 1 to Agreement | 02/01/21 | 0 |
| 928 | Near North America, Inc. | Tango Analytics | Service Order | 01/01/23 | 0 |
| 929 | Near North America, Inc. | Tango Analytics | Purchase Order | 09/25/23 | 0 |
| 930 | Near North America, Inc. | Tango Analytics | Service Order | 05/16/23 | 0 |
| 931 | Near North America, Inc. | Tango Analytics | Service Order | 01/23/23 | 0 |
| 932 | Near North America, Inc. | Tango Analytics | Amendment 1 to Data License Agreement | 02/01/21 | 0 |
| 933 | Near North America, Inc. | Tango Management Consulting & Analytics | Purchase Order | 05/09/17 | 0 |
| 934 | Near North America, Inc. | Tango Management Consulting & Analytics | Purchase Order | 05/09/18 | 0 |
| 935 | Near North America, Inc. | Tango Management Consulting & Analytics | Purchase Order | 09/25/23 | 0 |
| 936 | Near North America, Inc. | Tango Management Consulting & Analytics | Purchase Order | 06/28/23 | 0 |
| 937 | Near North America, Inc. | Tango Management Consulting & Analytics | Purchase Order | 01/13/17 | 0 |

| 938 | Near North America, Inc. | Tango Management Consulting & Analytics | Purchase Order | 03/06/18 | 0 |
| 939 | Near North America, Inc. | Tango Management Consulting & Analytics | Purchase Order | 11/04/20 | 0 |
| 940 | Near North America, Inc. | Tango Management Consulting & Analytics | Purchase Order | 08/07/20 | 0 |
| 941 | Near North America, Inc. | Tango Management Consulting & Analytics | Purchase Order | 11/30/20 | 0 |
| 942 | Near North America, Inc. | Tango Management Consulting & Analytics | Purchase Order | 09/29/21 | 0 |
| 943 | Near North America, Inc. | Tango Management Consulting & Analytics | Purchase Order | 07/18/22 | 0 |
| 944 | Near North America, Inc. | Tango Management Consulting & Analytics | Purchase Order | 06/27/23 | 0 |
| 945 | Near North America, Inc. | Tango Management Consulting & Analytics | Purchase Order | 02/04/21 | 0 |
| 946 | Near North America, Inc. | Tango Management Consulting & Analytics | Purchase Order | 11/15/22 | 0 |
| 947 | Near North America, Inc. | Tango Management Consulting & Analytics | Purchase Order | 05/13/20 | 0 |
| 948 | Near North America, Inc. | Tango Management Consulting & Analytics | Purchase Order | 09/09/19 | 0 |
| 949 | Near North America, Inc. | Tango Management Consulting & Analytics | Purchase Order | 09/19/16 | 0 |
| 950 | Near North America, Inc. | Tango Management Consulting & Analytics | Purchase Order | 06/15/18 | 0 |
| 951 | Near North America, Inc. | Tango Management Consulting & Analytics | Purchase Order | 02/11/19 | 0 |
| 952 | Near North America, Inc. | Tango Management Consulting & Analytics | Purchase Order | 06/08/17 | 0 |
| 953 | Near North America, Inc. | Tango Management Consulting & Analytics | Purchase Order | 11/05/15 | 0 |
| 954 | Near North America, Inc. | Tango Management Consulting & Analytics | Purchase Order | 03/16/21 | 0 |
| 955 | Near North America, Inc. | Tango Management Consulting & Analytics | Purchase Order | 06/15/20 | 0 |
| 956 | Near North America, Inc. | Tango Management Consulting & Analytics | Purchase Order | 02/06/17 | 0 |
| 957 | Near North America, Inc. | Tango Management Consulting & Analytics | Purchase Order | 01/17/19 | 0 |
| 958 | Near North America, Inc. | Tango Management Consulting & Analytics | Purchase Order | 03/12/20 | 0 |
| 959 | Near North America, Inc. | Tango Management Consulting & Analytics | Purchase Order | 08/07/17 | 0 |
| 960 | Near North America, Inc. | Tango Management Consulting & Analytics | Purchase Order | 12/16/21 | 0 |
| 961 | Near North America, Inc. | Tango Management Consulting & Analytics | Purchase Order | 02/15/22 | 0 |
| 962 | Near North America, Inc. | Tango Management Consulting & Analytics | Purchase Order | 11/19/18 | 0 |
| 963 | Near North America, Inc. | Tango Management Consulting & Analytics | Purchase Order | 01/12/16 | 0 |
| 964 | Near North America, Inc. | Tango Management Consulting & Analytics | Purchase Order | 08/26/16 | 0 |
| 965 | Near North America, Inc. | Tango Management Consulting & Analytics | Purchase Order | 11/30/21 | 0 |
| 966 | Near North America, Inc. | Tango Management Consulting & Analytics | Purchase Order | 09/09/21 | 0 |
| 967 | Near North America, Inc. | Tango Management Consulting & Analytics | Purchase Order | 02/06/17 | 0 |
| 968 | Near North America, Inc. | Tango Management Consulting & Analytics | Purchase Order | 06/23/21 | 0 |
| 969 | Near North America, Inc. | Tango Management Consulting & Analytics | Purchase Order | 02/27/19 | 0 |
| 970 | Near North America, Inc. | Tango Management Consulting & Analytics | Purchase Order | 05/24/21 | 0 |
| 971 | Near North America, Inc. | Tango Management Consulting & Analytics | Purchase Order | 03/13/17 | 0 |
| 972 | Near North America, Inc. | Tango Management Consulting & Analytics | Purchase Order | 05/05/21 | 0 |
| 973 | Near North America, Inc. | Tango Management Consulting & Analytics | Purchase Order | 12/19/19 | 0 |
| 974 | Near North America, Inc. | Tango Management Consulting & Analytics | Purchase Order | 11/30/22 | 0 |
| 975 | Near North America, Inc. | Tango Management Consulting & Analytics | Purchase Order | 02/15/19 | 0 |
| 976 | Near North America, Inc. | Tango Management Consulting & Analytics | Purchase Order | 01/18/16 | 0 |
| 977 | Near North America, Inc. | Tango Management Consulting & Analytics | Purchase Order | 10/05/17 | 0 |
| 978 | Near North America, Inc. | Tango Management Consulting & Analytics | Purchase Order | 07/30/21 | 0 |
| 979 | Near North America, Inc. | Tango Management Consulting & Analytics | Purchase Order | 10/13/21 | 0 |
| 980 | Near North America, Inc. | Tango Management Consulting & Analytics | Purchase Order | 06/21/21 | 0 |
| 981 | Near North America, Inc. | Tango Management Consulting & Analytics | Purchase Order | 12/19/16 | 0 |
| 982 | Near North America, Inc. | Tango Management Consulting & Analytics | Purchase Order | 03/12/20 | 0 |
| 983 | Near North America, Inc. | Tango Management Consulting & Analytics | Purchase Order | 07/16/16 | 0 |
| 984 | Near North America, Inc. | Tango Management Consulting & Analytics | Purchase Order | 01/12/21 | 0 |
| 985 | Near North America, Inc. | Tango Management Consulting & Analytics | Purchase Order | 07/28/17 | 0 |
| 986 | Near North America, Inc. | Tango Management Consulting & Analytics | Purchase Order | 09/26/16 | 0 |
| 987 | Near North America, Inc. | Tango Management Consulting & Analytics | Purchase Order | 09/14/22 | 0 |
| 988 | Near North America, Inc. | Tango Management Consulting & Analytics | Purchase Order | 07/10/22 | 0 |
| 989 | Near North America, Inc. | Tango Management Consulting & Analytics | Purchase Order | 07/19/22 | 0 |
| 990 | Near North America, Inc. | Tango Management Consulting & Analytics | Purchase Order | 04/26/21 | 0 |
| 991 | Near North America, Inc. | Tango Management Consulting & Analytics | Purchase Order | 03/04/21 | 0 |
| 992 | Near North America, Inc. | Tango Management Consulting & Analytics | Purchase Order | 04/22/21 | 0 |
| 993 | Near North America, Inc. | Tango Management Consulting & Analytics | Purchase Order | 11/18/22 | 0 |
| 994 | Near North America, Inc. | Tango Management Consulting & Analytics | Purchase Order | 03/16/21 | 0 |
| 995 | Near North America, Inc. | Tango Management Consulting & Analytics | Purchase Order | 04/22/21 | 0 |
| 996 | Near North America, Inc. | Tango Management Consulting & Analytics | Purchase Order | 03/25/16 | 0 |
| 997 | Near North America, Inc. | Tango Management Consulting & Analytics | Purchase Order | 09/24/15 | 0 |
| 998 | Near North America, Inc. | Tango Management Consulting & Analytics | Purchase Order | 06/29/21 | 0 |
| 999 | Near North America, Inc. | Tango Management Consulting & Analytics | Purchase Order | 03/08/17 | 0 |
| 1000 | Near North America, Inc. | Tango Management Consulting & Analytics | Purchase Order | 06/29/21 | 0 |

| | | | | | |
|---|---|---|---|---|---|
| 1001 | Near North America, Inc. | Tango Management Consulting & Analytics | Purchase Order | 08/08/22 | 0 |
| 1002 | Near North America, Inc. | Tango Management Consulting & Analytics | Purchase Order | 07/27/21 | 0 |
| 1003 | Near North America, Inc. | Tango Management Consulting & Analytics | Purchase Order | 10/19/20 | 0 |
| 1004 | Near North America, Inc. | Tango Management Consulting & Analytics | Purchase Order | 06/25/21 | 0 |
| 1005 | Near North America, Inc. | Tango Management Consulting & Analytics | Purchase Order | 06/25/21 | 0 |
| 1006 | Near North America, Inc. | Tango Management Consulting & Analytics | Purchase Order | 11/05/19 | 0 |
| 1007 | Near North America, Inc. | Tango Management Consulting & Analytics | Purchase Order | 10/24/19 | 0 |
| 1008 | Near North America, Inc. | Tango Management Consulting & Analytics | Purchase Order | 11/04/15 | 0 |
| 1009 | Near North America, Inc. | Tango Management Consulting & Analytics | Purchase Order | 01/10/17 | 0 |
| 1010 | Near North America, Inc. | Tango Management Consulting & Analytics | Purchase Order | 07/17/18 | 0 |
| 1011 | Near North America, Inc. | Tango Management Consulting & Analytics | Purchase Order | 10/05/17 | 0 |
| 1012 | Near North America, Inc. | Tango Management Consulting & Analytics | Purchase Order | 06/17/15 | 0 |
| 1013 | Near North America, Inc. | Tango Management Consulting & Analytics | Purchase Order | 02/25/16 | 0 |
| 1014 | Near North America, Inc. | Tango Management Consulting & Analytics | Purchase Order | 01/03/19 | 0 |
| 1015 | Near North America, Inc. | Tango Management Consulting & Analytics | Purchase Order | 06/29/16 | 0 |
| 1016 | Near North America, Inc. | Tango Management Consulting & Analytics | Purchase Order | 04/26/21 | 0 |
| 1017 | Near North America, Inc. | Tango Management Consulting & Analytics | Purchase Order | 10/17/18 | 0 |
| 1018 | Near North America, Inc. | Tango Management Consulting & Analytics | Purchase Order | 02/08/16 | 0 |
| 1019 | Near North America, Inc. | Tango Management Consulting & Analytics | Purchase Order | 06/30/20 | 0 |
| 1020 | Near North America, Inc. | Tango Management Consulting & Analytics | Purchase Order | 02/18/16 | 0 |
| 1021 | Near North America, Inc. | Tango Management Consulting & Analytics | Purchase Order | 09/12/19 | 0 |
| 1022 | Near North America, Inc. | Tango Management Consulting & Analytics | Purchase Order | 07/31/19 | 0 |
| 1023 | Near North America, Inc. | Tango Management Consulting & Analytics | Purchase Order | 04/20/17 | 0 |
| 1024 | Near North America, Inc. | Tango Management Consulting & Analytics | Purchase Order | 11/24/15 | 0 |
| 1025 | Near North America, Inc. | Tango Management Consulting & Analytics | Purchase Order | 12/10/18 | 0 |
| 1026 | Near North America, Inc. | Tango Management Consulting & Analytics | Purchase Order | 10/21/22 | 0 |
| 1027 | Near North America, Inc. | Tango Management Consulting & Analytics | Purchase Order | 09/14/18 | 0 |
| 1028 | Near North America, Inc. | Tango Management Consulting & Analytics | Purchase Order | 09/11/18 | 0 |
| 1029 | Near North America, Inc. | Tango Management Consulting & Analytics | Purchase Order | 10/25/18 | 0 |
| 1030 | Near North America, Inc. | Tango Management Consulting & Analytics | Purchase Order | 10/26/18 | 0 |
| 1031 | Near North America, Inc. | Tango Management Consulting & Analytics | Purchase Order | 09/11/18 | 0 |
| 1032 | Near North America, Inc. | Tango Management Consulting & Analytics | Purchase Order | 07/31/19 | 0 |
| 1033 | Near North America, Inc. | Tango Management Consulting & Analytics | Purchase Order | 06/17/19 | 0 |
| 1034 | Near North America, Inc. | Tango Management Consulting & Analytics | Purchase Order | 04/28/17 | 0 |
| 1035 | Near North America, Inc. | Tango Management Consulting & Analytics | Purchase Order | 11/11/16 | 0 |
| 1036 | Near North America, Inc. | Tango Management Consulting & Analytics | Purchase Order | 11/30/16 | 0 |
| 1037 | Near North America, Inc. | Tango Management Consulting & Analytics | Purchase Order | 06/21/16 | 0 |
| 1038 | Near North America, Inc. | Tango Management Consulting & Analytics | Purchase Order | 03/16/17 | 0 |
| 1039 | Near North America, Inc. | Tango Management Consulting & Analytics | Agreement | 06/18/15 | 0 |
| 1040 | Near North America, Inc. | Tarbell Management Group | Service Order | 03/25/22 | 0 |
| 1041 | Near North America, Inc. | Taste Buds Kitchen International, LLC | Service Order | 08/16/22 | 0 |
| 1042 | Near North America, Inc. | Tate Economic Research | Service Order | 12/09/21 | 0 |
| 1043 | Near North America, Inc. | Tate Economic Research | Service Order | 12/11/20 | 0 |
| 1044 | Near North America, Inc. | Tate Economic Research | Service Order | 02/07/19 | 0 |
| 1045 | Near North America, Inc. | Tate Economic Research | Service Order | 02/07/18 | 0 |
| 1046 | Near North America, Inc. | Tate Economic Research | Service Order | 02/07/20 | 0 |
| 1047 | Near North America, Inc. | Taubman Centers | Service Order #SC108 | 12/09/20 | 0 |
| 1048 | Near North America, Inc. | Taubman Centers | Service Order | 12/08/21 | 0 |
| 1049 | Near North America, Inc. | Taubman Centers | Service Order Data Feeds | 12/16/22 | 0 |
| 1050 | Near North America, Inc. | Taubman Centers | Service Order #SC111 (Addition to SC108) | 12/11/20 | 0 |
| 1051 | Near North America, Inc. | Taubman Centers | Service Order#SC118  (Addition to SC108) | 01/19/20 | 0 |
| 1052 | Near North America, Inc. | Taubman Centers | Agreement | 01/01/23 | 0 |
| 1053 | Near North America, Inc. | Taymax Group, LP | Service Order | 07/29/21 | 0 |
| 1054 | Near North America, Inc. | Tazewell County, VA | Summarized Deliverable and Fees | | 0 |
| 1055 | Near North America, Inc. | Tazewell County, VA | Signed Contract | 06/30/20 | 0 |
| 1056 | Near North America, Inc. | TCI - Research | Service Order #ES199 | 02/28/19 | 0 |
| 1057 | Near North America, Inc. | TCI - Research | Service Order #ES39 | 04/02/19 | 0 |
| 1058 | Near North America, Inc. | TD Bank | Agreement | 07/01/22 | 0 |
| 1060 | Near North America, Inc. | TD Bank | Master Service Agreement and all relevant Statements of Work | 08/31/23 | 0 |
| 1062 | Near North America, Inc. | Tech Verti Data and Analytics | Service Order for Data Sets | 06/07/19 | 0 |
| 1063 | Near North America, Inc. | Tetrad Computer Applications, Inc. | Agreement | 03/01/22 | 0 |
| 1064 | Near North America, Inc. | Tetrad Computer Applications, Inc. | Amendment 2 to Bundled Reseller Agreement | 05/31/21 | 0 |
| 1065 | Near North America, Inc. | Tetrad Computer Applications, Inc. | Service Order | 03/23/19 | 0 |

| | | | | | |
|---|---|---|---|---|---|
| 1066 | Near North America, Inc. | Tetrad Computer Applications, Inc. | Purchase Order | 03/20/18 | 0 |
| 1067 | Near North America, Inc. | Tetrad Computer Applications, Inc. | Purchase Order | 01/22/19 | 0 |
| 1068 | Near North America, Inc. | Tetrad Computer Applications, Inc. | Service Order | 11/15/18 | 0 |
| 1069 | Near North America, Inc. | Tetrad Computer Applications, Inc. | Service Order | 11/15/18 | 0 |
| 1070 | Near North America, Inc. | Tetrad Computer Applications, Inc. | Service Order | 01/23/20 | 0 |
| 1071 | Near North America, Inc. | Tetrad Computer Applications, Inc. | Amendment 2 to Bundled Reseller Agreement | 05/31/21 | 0 |
| 1072 | Near North America, Inc. | Tetrad Computer Applications, Inc. | Service Order | 12/30/20 | 0 |
| 1073 | Near North America, Inc. | Tetrad Computer Applications, Inc. | Service Order | 01/30/19 | 0 |
| 1074 | Near North America, Inc. | Tetrad Computer Applications, Inc. | Purchase Order | 03/31/17 | 0 |
| 1075 | Near North America, Inc. | Tetrad Computer Applications, Inc. | Purchase Order | 09/17/18 | 0 |
| 1076 | Near North America, Inc. | Tetrad Computer Applications, Inc. | Service Order | 01/21/20 | 0 |
| 1077 | Near North America, Inc. | The Biltmore Company | Data License Agreement and all relevant Service Orders | 02/11/19 | 0 |
| 1079 | Near North America, Inc. | The Boston Consulting Group, Inc. | Data Processing Agreement and all relevant Service Orders | 05/06/22 | 0 |
| 1080 | Near North America, Inc. | The Boston Consulting Group, Inc. | Near Platform Data Usage and Services Agreement and all relevant Service Orders | 05/06/22 | 0 |
| 1082 | Near North America, Inc. | The Boston Consulting Group, Inc. | Invoicing Requirments | | 0 |
| 1085 | Near North America, Inc. | The Boston Consulting Group, Inc. | Statement of Work | 07/27/22 | 0 |
| 1088 | Near North America, Inc. | The Chicago Bears Football Club, Inc. | Service Order | 08/18/23 | 0 |
| 1089 | Near North America, Inc. | The Data Appeal Company SpA | Service Order | 10/17/22 | 0 |
| 1090 | Near North America, Inc. | The Last House on Mulholland | Service Order | 03/24/22 | 0 |
| 1091 | Near North America, Inc. | The Retail Coach | Limited License Agreement and all relevant Service Orders | 04/10/17 | 0 |
| 1092 | Near North America, Inc. | The Retail Coach | Limited License Agreement and all relevant Service Orders | 02/02/16 | 0 |
| 1093 | Near North America, Inc. | The Retail Coach | Limited License Agreement and all relevant Service Orders | 12/15/15 | 0 |
| 1094 | Near North America, Inc. | The Retail Coach | Limited License Agreement and all relevant Service Orders | 11/28/16 | 0 |
| 1095 | Near North America, Inc. | The Retail Coach | Limited License Agreement and all relevant Service Orders | 10/26/15 | 0 |
| 1096 | Near North America, Inc. | The Retail Coach | Limited License Agreement and all relevant Service Orders | 07/31/18 | 0 |
| 1097 | Near North America, Inc. | The Retail Coach | Limited License Agreement and all relevant Service Orders | 01/12/17 | 0 |
| 1098 | Near North America, Inc. | The Retail Coach | Limited License Agreement and all relevant Service Orders | 09/12/19 | 0 |
| 1099 | Near North America, Inc. | The Retail Coach | Limited License Agreement and all relevant Service Orders | 03/07/16 | 0 |
| 1100 | Near North America, Inc. | The Retail Strategy | Data License Agreement and all relevant Service Orders | 02/05/19 | 0 |
| 1101 | Near North America, Inc. | The Retail Strategy | Service Order | 04/16/19 | 0 |
| 1102 | Near North America, Inc. | The Shopping Center Group | Limited License Agreement | 03/16/17 | 0 |
| 1103 | Near North America, Inc. | The Shopping Center Group | Data License Agreement | 01/28/19 | 0 |
| 1104 | Near North America, Inc. | The Shopping Center Group | Limited License Agreement | 11/29/17 | 0 |
| 1105 | Near North America, Inc. | The Shopping Center Group | Limited License Agreement | 01/15/18 | 0 |
| 1106 | Near North America, Inc. | The Trust for Public Land | Service Order | 06/30/23 | 0 |
| 1107 | Near North America, Inc. | the Wireless Registry Inc. | 2d Restated and Amended Bundled Data License Agreement | 11/01/18 | 0 |
| 1108 | Near North America, Inc. | the Wireless Registry Inc. | Bundled Data License Agreement | 05/30/18 | 0 |
| 1109 | Near North America, Inc. | the Wireless Registry Inc. | Amendment 2 to Second Restated and Amended Bundled Data License Agreement | 12/01/19 | 0 |
| 1110 | Near North America, Inc. | the Wireless Registry Inc. | Bundled Data License Agreement | 08/04/17 | 0 |
| 1111 | Near North America, Inc. | the Wireless Registry Inc. | Amendment 1 to Second Restated and Amended Bundled Data License Agreement | 05/31/19 | 0 |
| 1112 | Near North America, Inc. | the Wireless Registry Inc. | Amendment 1 to Data License Agreement | 11/22/17 | 0 |
| 1113 | Near North America, Inc. | Think Economics | Agreement | 07/20/23 | 0 |
| 1114 | Near North America, Inc. | Think Economics | Data License Agreement and all relevant Service Orders | 04/20/21 | 0 |
| 1115 | Near North America, Inc. | Think Economics | Data License Agreement and all relevant Service Orders | 09/21/21 | 0 |
| 1116 | Near North America, Inc. | Think Economics | Data License Agreement and all relevant Service Orders | 04/01/22 | 0 |
| 1117 | Near North America, Inc. | ThirtySixNZ | Data License Agreement | 08/04/22 | 0 |
| 1121 | Near North America, Inc. | Topos.AI | Data License Agreement and all relevant Service Orders | 06/25/19 | 0 |
| 1122 | Near North America, Inc. | Topos.AI | Data License Agreement and all relevant Service Orders | 12/13/18 | 0 |
| 1123 | Near Intelligence | Topos.AI | Agreement and all relevant Service Orders | | 0 |
| 1124 | Near North America, Inc. | Tourism Australia | Service Order | 06/26/17 | 0 |
| 1125 | Near North America, Inc. | Tourism Economics | Agreement and all relevant Service Orders | 02/01/23 | 0 |
| 1135 | Near North America, Inc. | Tourism Economics | Data License Agreement and all relevant Service Orders | 01/24/23 | 0 |
| 1136 | Near North America, Inc. | Tourism Economics | Data License Agreement and all relevant Service Orders | 01/26/23 | 0 |
| 1141 | Near North America, Inc. | Tourism Economics | Data License Agreement and all relevant Service Orders | 03/14/23 | 0 |
| 1150 | Near North America, Inc. | Tourism Economics | Data License Agreement and all relevant Service Orders | 11/10/22 | 0 |
| 1151 | Near North America, Inc. | Tourism Economics | Data License Agreement and all relevant Service Orders | 12/14/22 | 0 |
| 1159 | Near North America, Inc. | Tourism Economics | Order for Alabma and Acceptance of Quote | 09/30/22 | 0 |
| 1161 | Near North America, Inc. | Tourism Economics | Data License Agreement and all relevant Service Orders | 04/18/23 | 0 |
| 1163 | Near North America, Inc. | Tourism Economics | Data License Agreement and all relevant Service Orders | 09/08/23 | 0 |
| 1166 | Near North America, Inc. | Tourism Economics | Data License Agreement and all relevant Service Orders | 06/30/21 | 0 |
| 1167 | Near North America, Inc. | Tourism Economics | Data License Agreement and all relevant Service Orders | 09/14/21 | 0 |
| 1169 | Near North America, Inc. | Tourism Economics | Data License Agreement and all relevant Service Orders | 09/13/22 | 0 |
| 1170 | Near North America, Inc. | Tourism Economics | Data License Agreement and all relevant Service Orders | 09/08/21 | 0 |

| | | | | | |
|---|---|---|---|---|---|
| 1171 | Near North America, Inc. | Tourism Economics | Data License Agreement and all relevant Service Orders | 04/03/23 | 0 |
| 1173 | Near North America, Inc. | Tourism Economics | Data License Agreement and all relevant Service Orders | 09/13/23 | 0 |
| 1175 | Near North America, Inc. | Tourism Economics | Data License Agreement and all relevant Service Orders | 10/12/23 | 0 |
| 1176 | Near North America, Inc. | Tourism Economics | Data License Agreement and all relevant Service Orders | 05/11/22 | 0 |
| 1179 | Near North America, Inc. | Tourism Economics | Data License Agreement and all relevant Service Orders | 02/14/23 | 0 |
| 1180 | Near North America, Inc. | Tourism Economics | Data License Agreement and all relevant Service Orders | 11/14/22 | 0 |
| 1181 | Near North America, Inc. | Tourism Economics | Data License Agreement and all relevant Service Orders | 06/24/21 | 0 |
| 1182 | Near North America, Inc. | Tourism Economics | Data License Agreement and all relevant Service Orders | 09/27/19 | 0 |
| 1183 | Near North America, Inc. | Tourism Economics | Data License Agreement and all relevant Service Orders | 02/22/21 | 0 |
| 1186 | Near North America, Inc. | Tourism Economics | Data License Agreement and all relevant Service Orders | 12/13/22 | 0 |
| 1196 | Near North America, Inc. | Tourism Economics | Data License Agreement and all relevant Service Orders | 02/14/23 | 0 |
| 1197 | Near North America, Inc. | Tourism Economics | Data License Agreement and all relevant Service Orders | 02/14/23 | 0 |
| 1198 | Near North America, Inc. | Tourism Economics | Data License Agreement and all relevant Service Orders | 08/01/23 | 0 |
| 1199 | Near North America, Inc. | Tourism Economics | Data License Agreement and all relevant Service Orders | 08/31/22 | 0 |
| 1200 | Near North America, Inc. | Tourism Economics | Data License Agreement and all relevant Service Orders | 07/28/22 | 0 |
| 1202 | Near North America, Inc. | Tourism Economics | Data License Agreement and all relevant Service Orders | 03/28/23 | 0 |
| 1203 | Near North America, Inc. | Tourism Economics | Data License Agreement and all relevant Service Orders | 04/03/23 | 0 |
| 1204 | Near North America, Inc. | Tourism Economics | Data License Agreement and all relevant Service Orders | 07/13/20 | 0 |
| 1205 | Near North America, Inc. | Tourism Economics | Data License Agreement and all relevant Service Orders | 02/28/22 | 0 |
| 1206 | Near North America, Inc. | Tourism Economics | Data License Agreement and all relevant Service Orders | 06/30/22 | 0 |
| 1211 | Near North America, Inc. | Tourism Economics | Data License Agreement and all relevant Service Orders | 03/23/21 | 0 |
| 1220 | Near Intelligence Pte. Ltd. | Tourist Tracka Pty Ltd | Agreement | 01/12/22 | 0 |
| 1221 | Near North America, Inc. | Tourix | Service Order | 09/29/22 | 0 |
| 1222 | Near North America, Inc. | Town of Pinetop-Lakeside | Agreement | | 0 |
| 1223 | Near North America, Inc. | Town of Superior | Agreement | | 0 |
| 1225 | Near North America, Inc. | Trade Area Systems, Inc. | Bundled Reseller Agreement and all relevant Purchase Orders | 04/12/22 | 0 |
| 1233 | Near North America, Inc. | Trade Area Systems, Inc. | Agreement | 05/18/21 | 0 |
| 1318 | Near North America, Inc. | Trade Area Systems, Inc. | Amendment 1 to Reseller Agreement | 01/01/17 | 0 |
| 1321 | Near Intelligence Pte. Ltd. | Transport for NSW | Agreement | | 0 |
| 1322 | Near North America, Inc. | Transunion Risk and Alternative Data Solutions, Inc. | Service Order | 05/01/19 | 0 |
| 1323 | Near North America, Inc. | Travel Nevada | Service Order | 04/16/19 | 0 |
| 1324 | Near North America, Inc. | Travel Portland | Service Order | 01/29/19 | 0 |
| 1325 | Near North America, Inc. | Trihelix, LLC | Service Order | 10/08/22 | 0 |
| 1326 | Near North America, Inc. | Triple Digital | Service Order | 03/05/21 | 0 |
| 1327 | Near North America, Inc. | Twine Data | Service Order | 04/27/16 | 0 |
| 1328 | Near North America, Inc. | University of Auckland | Data License Agreement and all relevant Service Orders | 11/23/20 | 0 |
| 1329 | Near North America, Inc. | University of California Santa Cruz | Service Order | 05/28/20 | 0 |
| 1330 | Near Intelligence Pte. Ltd. | University of Canterbury | Agreement | 12/22/22 | 0 |
| 1331 | Near North America, Inc. | University of Kansas | Service Order | 09/29/20 | 0 |
| 1332 | Near North America, Inc. | University of Maryland | Data License Agreement and all relevant Service Orders | 05/12/20 | 0 |
| 1333 | Near North America, Inc. | University of Maryland | Data License Agreement and all relevant Service Orders | 08/01/22 | 0 |
| 1334 | Near North America, Inc. | University of Maryland | Amendment 1 to Agreement and Service Order | 07/28/20 | 0 |
| 1335 | Near North America, Inc. | University of Montana | Agreement | 01/01/23 | 0 |
| 1336 | Near North America, Inc. | Urban Studies | Agreement | 04/01/22 | 0 |
| 1337 | Near North America, Inc. | Urban Systems | Data License Agreement and all relevant Service Orders | 06/21/22 | 0 |
| 1338 | Near North America, Inc. | Urban Systems | Data License Agreement and all relevant Service Orders | 05/14/20 | 0 |
| 1340 | Near North America, Inc. | UrbanMetrics | Data License Agreement and all relevant Service Orders | 05/19/21 | 0 |
| 1341 | Near North America, Inc. | UrbanMetrics | Data License Agreement and all relevant Service Orders | 11/23/20 | 0 |
| 1342 | Near North America, Inc. | UrbanMetrics | Data License Agreement and all relevant Service Orders | 08/27/20 | 0 |
| 1343 | Near North America, Inc. | UrbanMetrics | Data License Agreement and all relevant Service Orders | 11/14/22 | 0 |
| 1344 | Near North America, Inc. | UrbanMetrics | Data License Agreement and all relevant Service Orders | 07/30/19 | 0 |
| 1345 | Near North America, Inc. | Urbis | Data License Agreement and all relevant Service Orders | 08/19/19 | 0 |
| 1346 | Near North America, Inc. | Urbis | Data License Agreement and all relevant Service Orders | 02/11/20 | 0 |
| 1351 | Near North America, Inc. | Urbis | Data License Agreement and all relevant Service Orders | 05/29/18 | 0 |
| 1352 | Near North America, Inc. | Urbis | Data License Agreement and all relevant Service Orders | 08/09/20 | 0 |
| 1353 | Near North America, Inc. | Urbis | Data License Agreement and all relevant Service Orders | 08/09/21 | 0 |
| 1357 | Near North America, Inc. | Urbis | Data License Agreement and all relevant Service Orders | 05/05/18 | 0 |
| 1358 | Near North America, Inc. | Urbis | Data License Agreement and all relevant Service Orders | 11/11/19 | 0 |
| 1363 | Near North America, Inc. | Urbis | Data License Agreement and all relevant Service Orders | 08/04/22 | 0 |
| 1365 | Near North America, Inc. | Urbis | Data License Agreement and all relevant Service Orders | 12/11/19 | 0 |
| 1366 | Near North America, Inc. | Urbis | Data License Agreement and all relevant Service Orders | 05/29/18 | 0 |
| 1367 | Near North America, Inc. | Urbis | Data License Agreement and all relevant Service Orders | 03/11/19 | 0 |
| 1368 | Near North America, Inc. | Urbis | Data License Agreement and all relevant Service Orders | 06/07/18 | 0 |

| | | | | | |
|---|---|---|---|---|---|
| 1369 | Near Intelligence Pte. Ltd. | Urbis Pty. Ltd. | Service Order | 08/09/23 | 0 |
| 1370 | Near North America, Inc. | US Ignite, Inc. | Service Level Agreement | 12/12/22 | 0 |
| 1371 | Near North America, Inc. | Valvoline | Data License Agreement and all relevant Service Orders | 07/22/19 | 0 |
| 1372 | Near North America, Inc. | Valvoline | Data License Agreement and all relevant Service Orders | 12/12/19 | 0 |
| 1373 | Near North America, Inc. | Valvoline | Data License Agreement and all relevant Service Orders | 09/27/22 | 0 |
| 1374 | Near North America, Inc. | Valvoline | Data License Agreement and all relevant Service Orders | 03/21/19 | 0 |
| 1375 | Near North America, Inc. | Valvoline | Data License Agreement and all relevant Service Orders | 11/24/21 | 0 |
| 1378 | Near North America, Inc. | Valvoline | Data License Agreement and all relevant Service Orders | 12/28/20 | 0 |
| 1379 | Near North America, Inc. | Valvoline | Agreement | 09/01/22 | 0 |
| 1380 | Near North America, Inc. | Veitch Lister Consulting Pty Ltd. | Service Order for Data Feeds | 06/17/22 | 0 |
| 1381 | Near North America, Inc. | Verizon | Exhibit A to Verizon Data Provider Agreement | 12/12/16 | 0 |
| 1382 | Near North America, Inc. | Verizon | Attachment A Service Statement of Work | 01/01/16 | 0 |
| 1383 | Near North America, Inc. | Verizon | Verizon Data Provider Agreement | 11/30/16 | 0 |
| 1384 | Near North America, Inc. | Verizon | Attachment A Service Statement of Work | 01/01/16 | 0 |
| 1385 | Near North America, Inc. | Verizon | Attachment C Service Statement of Work | 01/01/18 | 0 |
| 1386 | Near North America, Inc. | Vietch Lister Consulting Pty. Ltd. (VLC) | Agreement | 01/01/19 | 0 |
| 1387 | Near North America, Inc. | Vika Enterprises | Service Order for Data Sets | 10/18/19 | 0 |
| 1388 | Near Intelligence Pte. Ltd. | VIOOH Ltd | Agreement | 09/22/23 | 0 |
| 1389 | Near North America, Inc. | Visit Albuquerque | Data License Agreement and all relevant Service Orders | 06/02/21 | 0 |
| 1391 | Near North America, Inc. | Visit Anchorage | Service Order for Data Sets | 05/01/19 | 0 |
| 1392 | Near North America, Inc. | Visit Baltimore | Data License Agreement and all relevant Service Orders | 05/19/21 | 0 |
| 1393 | Near North America, Inc. | Visit California | Master Service Agreement | 01/24/20 | 0 |
| 1394 | Near North America, Inc. | Visit California | Exhibit 1 Work Statement #2 and Budget | 10/14/20 | 0 |
| 1395 | Near North America, Inc. | Visit California | Data License Agreement and all relevant Service Orders | 06/03/21 | 0 |
| 1398 | Near North America, Inc. | Visit California | Data License Agreement and all relevant Service Orders | 12/10/20 | 0 |
| 1399 | Near North America, Inc. | Visit Canton | Near Solutions Quote and Acceptance of Contract - Renewal | 02/18/23 | 0 |
| 1400 | Near North America, Inc. | Visit Canton | Data License Agreement | 09/09/21 | 0 |
| 1401 | Near North America, Inc. | Visit Canton | Agreement | 01/01/23 | 0 |
| 1402 | Near North America, Inc. | Visit Eureka | Data License Agreement | 03/10/20 | 0 |
| 1403 | Near North America, Inc. | Visit Eureka | Purchase Terms and Service Order | 03/12/20 | 0 |
| 1404 | Near North America, Inc. | Visit Fort Wayne | Service Order for Data Sets | 10/17/19 | 0 |
| 1405 | Near North America, Inc. | Visit Greater Palm Springs | Near Solution Overview and Quote for Dataset and Dashboard 2023 Renewal | 02/21/23 | 0 |
| 1406 | Near North America, Inc. | Visit Greater Palm Springs | Near Solution Overview and Quote for Historical Datasets | 04/21/23 | 0 |
| 1407 | Near North America, Inc. | Visit Greater Palm Springs | Data License Agreement | 10/20/21 | 0 |
| 1408 | Near North America, Inc. | Visit Hendricks County | Service Order | 02/27/20 | 0 |
| 1409 | Near North America, Inc. | Visit Manistee County | Service Order | 05/20/21 | 0 |
| 1410 | Near North America, Inc. | Visit Ogden | Service Order | 05/22/19 | 0 |
| 1411 | Near North America, Inc. | Visit Philadelphia | Service Order | 08/09/19 | 0 |
| 1413 | Near North America, Inc. | Visit Redding | Data License Agreement | 09/21/20 | 0 |
| 1414 | Near North America, Inc. | Visit Salt Lake | Data License Agreement | 04/25/19 | 0 |
| 1415 | Near North America, Inc. | Visit Savannah | Service Order | 10/29/19 | 0 |
| 1416 | Near North America, Inc. | Visit Temecula Valley | Service Order | 01/17/20 | 0 |
| 1417 | Near North America, Inc. | Visual Approach | Service Order | 03/17/22 | 0 |
| 1418 | Near North America, Inc. | Vitamin Cottage Natural Foods Market, Inc. | Service Order | 06/14/22 | 0 |
| 1419 | Near North America, Inc. | Vitamin Cottage Natural Foods Market, Inc. | Service Order | 11/18/19 | 0 |
| 1420 | Near North America, Inc. | W E Upjohn Institute for Employment Research | Data License Agreement | 12/21/22 | 0 |
| 1421 | Near North America, Inc. | W E Upjohn Institute for Employment Research | Data License Agreement | 12/01/22 | 0 |
| 1422 | Near North America, Inc. | Wakefern Food Corp. | Data License Agreement | 01/08/20 | 0 |
| 1423 | Near North America, Inc. | Wakefern Food Corp. | Data License Agreement | 02/12/21 | 0 |
| 1424 | Near North America, Inc. | Wal Mart de México, S. de R.L. de C.V. | Limited License Agreement | 01/01/19 | 0 |
| 1425 | Near North America, Inc. | Walmart | Agreement | 10/01/22 | 0 |
| 1426 | Near North America, Inc. | Walmart | Limited License Agreement | 01/05/17 | 0 |
| 1427 | Near North America, Inc. | Walmart | Limited License Agreement | 08/22/18 | 0 |
| 1428 | Near North America, Inc. | Walmart (Corporacion de Supermercados Unidos, S.A | Data License Agreement | 08/22/22 | 0 |
| 1429 | Near North America, Inc. | Walmart (Corporacion de Supermercados Unidos, S.A | Data License Agreement | 09/02/22 | 0 |
| 1430 | Near North America, Inc. | Walmart (Mexico y Centroamerica) | New Vendors Form | 10/10/19 | 0 |
| 1431 | Near North America, Inc. | Walmart (Mexico y Centroamerica) | Agreement | 05/28/19 | 0 |
| 1432 | Near North America, Inc. | Walmart (Mexico y Centroamerica) | Service Order for Historical Data | 06/30/23 | 0 |
| 1435 | Near North America, Inc. | Walmart (Mexico y Centroamerica) | Legal Representative Confirmation | 11/09/15 | 0 |
| 1436 | Near North America, Inc. | Walmart (Nueva Wal Mart de México, S. de R.L. de ( | Amendment Agreement to the Data License Agreement | 07/04/23 | 0 |
| 1437 | Near North America, Inc. | Walmart (Servicios Administrativos Wal-Mart S. de I | Data License Agreement and all relevant Service Orders | 05/29/20 | 0 |
| 1438 | Near North America, Inc. | Walmart (Servicios Administrativos Wal-Mart S. de I | Limited License Agreement | 03/12/19 | 0 |
| 1439 | Near North America, Inc. | Walmart (Servicios Administrativos Wal-Mart S. de I | Limited License Agreement | 03/12/19 | 0 |

| | | | | | |
|---|---|---|---|---|---|
| 1440 | Near North America, Inc. | Walmart (Supermercados Unidos, S.R.L.) | Limited License Agreement | 10/01/21 | 0 |
| 1441 | Near North America, Inc. | Walmart (Supermercados Unidos, S.R.L.) | Limited License Agreement | 10/01/20 | 0 |
| 1442 | Near North America, Inc. | Walmart (Supermercados Unidos, S.R.L.) | Limited License Agreement | 09/09/19 | 0 |
| 1443 | Near North America, Inc. | Wal-Mart Canada Corp. | Data License Agreement | 05/01/20 | 0 |
| 1444 | Near North America, Inc. | Washington County Visitors Association | Data License Agreement | 08/07/20 | 0 |
| 1445 | Near North America, Inc. | Washington County Visitors Association | Agreement | 06/17/21 | 0 |
| 1446 | Near North America, Inc. | Washington DC Economic Partnership | Service Order for Data Sets | 04/24/19 | 0 |
| 1447 | Near North America, Inc. | Watson & Associates Economists | Data License Agreement | 03/27/20 | 0 |
| 1448 | Near North America, Inc. | Watson & Associates Economists | Data License Agreement | 02/04/21 | 0 |
| 1449 | Near North America, Inc. | Wawa | Agreement | 06/01/22 | 0 |
| 1450 | Near North America, Inc. | Wawa | Data License Agreement and all relevant Service Orders | 04/17/19 | 0 |
| 1452 | Near North America, Inc. | Wawa | Data License Agreement and all relevant Service Orders | 06/04/18 | 0 |
| 1453 | Near North America, Inc. | Wawa | Amendment 1 to Agreement | 04/17/19 | 0 |
| 1454 | Near North America, Inc. | Wawa | Amendment 1 to Agreement | 02/20/20 | 0 |
| 1455 | Near North America, Inc. | Wawa | Data License Agreement and all relevant Service Orders | 08/01/18 | 0 |
| 1459 | Near North America, Inc. | Webster Pacific, LLC | Data License Agreement | 01/14/20 | 0 |
| 1460 | Near North America, Inc. | Webster Pacific, LLC | Data License Agreement | 10/22/19 | 0 |
| 1461 | Near North America, Inc. | Webster Pacific, LLC | Data License Agreement | 01/29/20 | 0 |
| 1462 | Near North America, Inc. | Webster Pacific, LLC | Data License Agreement | 11/11/19 | 0 |
| 1463 | Near North America, Inc. | Webster Pacific, LLC | Agreement | 05/24/21 | 0 |
| 1464 | Near North America, Inc. | Webster Pacific, LLC | Data License Agreement | 10/29/19 | 0 |
| 1465 | Near North America, Inc. | Webster Pacific, LLC | Data License Agreement | 12/17/19 | 0 |
| 1466 | Near North America, Inc. | Webster Pacific, LLC | Data License Agreement | 01/04/19 | 0 |
| 1467 | Near North America, Inc. | Webster Pacific, LLC | Data License Agreement | 04/06/21 | 0 |
| 1468 | Near North America, Inc. | Webster Pacific, LLC | Data License Agreement | 08/21/19 | 0 |
| 1469 | Near North America, Inc. | Webster Pacific, LLC | Data License Agreement | 12/01/20 | 0 |
| 1470 | Near North America, Inc. | Webster Pacific, LLC | Data License Agreement | 02/25/19 | 0 |
| 1471 | Near North America, Inc. | Weedmaps | Agreement | 05/10/23 | 0 |
| 1472 | Near North America, Inc. | Welcor Development | Limited License Agreement | 04/18/18 | 0 |
| 1473 | Near North America, Inc. | Welcor Development | Limited License Agreement | 07/18/16 | 0 |
| 1475 | Near North America, Inc. | Wendy's International, LLC | Wendy's International, LLC Master Services Agreement and all relevant Statements of Work | 06/18/18 | 0 |
| 1478 | Near North America, Inc. | West Village | Service Order for Data Sets | 09/01/20 | 0 |
| 1479 | Near North America, Inc. | WestRidge | Service Order | 06/22/17 | 0 |
| 1480 | Near North America, Inc. | Wetzel's Pretzels LLC | Service Order | 09/15/17 | 0 |
| 1481 | Near North America, Inc. | Whatabrands LLC | Data License Agreement | 04/06/20 | 0 |
| 1482 | Near North America, Inc. | Whatabrands LLC | Data License Agreement | 02/01/21 | 0 |
| 1483 | Near North America, Inc. | Whatabrands LLC | Data License Agreement | 02/01/18 | 0 |
| 1484 | Near North America, Inc. | Whatabrands LLC | Data License Agreement | 02/04/19 | 0 |
| 1485 | Near North America, Inc. | Whereabout | Data License Agreement | 03/15/23 | 0 |
| 1486 | Near North America, Inc. | Whysdom | Agreement and all relevant Service Orders | 03/31/22 | 0 |
| 1487 | Near North America, Inc. | Whysdom | Data License Agreement and all relevant Service Orders | 07/24/21 | 0 |
| 1488 | Near North America, Inc. | Whysdom | Data License Agreement and all relevant Service Orders | 07/24/21 | 0 |
| 1489 | Near North America, Inc. | Whysdom | Data License Agreement and all relevant Service Orders | 09/04/20 | 0 |
| 1493 | Near North America, Inc. | Whysdom | Data License Agreement and all relevant Service Orders | 07/17/20 | 0 |
| 1495 | Near North America, Inc. | Whysdom | Data License Agreement and all relevant Service Orders | 02/23/21 | 0 |
| 1496 | Near North America, Inc. | Whysdom | Data License Agreement and all relevant Service Orders | 12/14/21 | 0 |
| 1497 | Near North America, Inc. | Whysdom | Data License Agreement and all relevant Service Orders | 09/09/21 | 0 |
| 1498 | Near North America, Inc. | Whysdom | Data License Agreement and all relevant Service Orders | 06/20/22 | 0 |
| 1499 | Near North America, Inc. | Winick Realty Group, LLP | Data License Agreement | 12/20/17 | 0 |
| 1500 | Near North America, Inc. | Winick Realty Group, LLP | Data License Agreement | 06/04/18 | 0 |
| 1501 | Near Intelligence Pte. Ltd. | X-Locations, Inc | Agreement | 01/01/22 | 0 |
| 1502 | Near Intelligence Pte. Ltd. | X-Locations, Inc | Amendment Agreement | 01/01/23 | 0 |
| 1503 | Near North America, Inc. | X-Mode Social, Inc. | Data License Agreement | 10/01/18 | 0 |
| 1504 | Near North America, Inc. | Yahoo Ad Tech Singapore Pte Ltd | Purchase Order 315001339 | 09/12/23 | 0 |
| 1505 | Near North America, Inc. | Yahoo Ad Tech Singapore Pte Ltd | Purchase Order 315001340 | 09/12/23 | 0 |
| 1506 | Near North America, Inc. | Yahoo Ad Tech Singapore Pte Ltd | Purchase Order 315001341 | 09/12/23 | 0 |
| 1507 | Near North America, Inc. | Yahoo Ad Tech Singapore Pte Ltd | Purchase Order 315001342 | 09/12/23 | 0 |
| 1508 | Near North America, Inc. | Yahoo Ad Tech Singapore Pte Ltd | Purchase Order 315001345 | 09/12/23 | 0 |
| 1509 | Near North America, Inc. | Yahoo Ad Tech Singapore Pte Ltd | Purchase Order 315001346 | 09/12/23 | 0 |
| 1510 | Near North America, Inc. | Yahoo Ad Tech Singapore Pte Ltd | Purchase Order 315001347 | 09/12/23 | 0 |
| 1511 | Near North America, Inc. | Yahoo Ad Tech Singapore Pte Ltd | Purchase Order 315001348 | 09/12/23 | 0 |
| 1512 | Near North America, Inc. | Yahoo Ad Tech Singapore Pte Ltd | Purchase Order 315001303 | 08/04/23 | 0 |
| 1513 | Near North America, Inc. | Yahoo Ad Tech Singapore Pte Ltd | Purchase Order 315001304 | 08/04/23 | 0 |

| | | | | | |
|---|---|---|---|---|---|
| 1514 | Near North America, Inc. | Yahoo Ad Tech Singapore Pte Ltd | Purchase Order 315001291 | 07/14/23 | 0 |
| 1515 | Near North America, Inc. | Yahoo Ad Tech Singapore Pte Ltd | Purchase Order 315001292 | 07/14/23 | 0 |
| 1516 | Near North America, Inc. | Yahoo Ad Tech Singapore Pte Ltd | Purchase Order 315001293 | 07/14/23 | 0 |
| 1517 | Near North America, Inc. | Yahoo Ad Tech Singapore Pte Ltd | Purchase Order 315001294 | 07/14/23 | 0 |
| 1518 | Near North America, Inc. | Yahoo Ad Tech Singapore Pte Ltd | Purchase Order 315001295 | 07/14/23 | 0 |
| 1519 | Near North America, Inc. | Yahoo Ad Tech Singapore Pte Ltd | Purchase Order 315001257 | 06/08/23 | 0 |
| 1520 | Near North America, Inc. | Yahoo Ad Tech Singapore Pte Ltd | Purchase Order 315001258 | 06/08/23 | 0 |
| 1521 | Near North America, Inc. | Yahoo Ad Tech Singapore Pte Ltd | Purchase Order 315001259 | 06/08/23 | 0 |
| 1522 | Near North America, Inc. | Yahoo Ad Tech Singapore Pte Ltd | Purchase Order 315001260 | 06/08/23 | 0 |
| 1523 | Near North America, Inc. | Yahoo Ad Tech Singapore Pte Ltd | Purchase Order 315001029 | 11/04/22 | 0 |
| 1524 | Near North America, Inc. | Yahoo Ad Tech Singapore Pte Ltd | Purchase Order 315001110 | 12/09/22 | 0 |
| 1525 | Near North America, Inc. | Yahoo Ad Tech Singapore Pte Ltd | Purchase Order 315000990, revised | 10/07/22 | 0 |
| 1526 | Near North America, Inc. | Yahoo Ad Tech Singapore Pte Ltd | Purchase Order 315001020 | 10/03/22 | 0 |
| 1527 | Near North America, Inc. | Yahoo Ad Tech Singapore Pte Ltd | Purchase Order 315001049 | 10/24/22 | 0 |
| 1528 | Near North America, Inc. | Yahoo Ad Tech Singapore Pte Ltd | Purchase Order 315001017 | 10/03/22 | 0 |
| 1529 | Near North America, Inc. | Yahoo Ad Tech Singapore Pte Ltd | Purchase Order 315001019 | 10/03/22 | 0 |
| 1530 | Near North America, Inc. | Yahoo Ad Tech Singapore Pte Ltd | Purchase Order 315000991 | 08/18/22 | 0 |
| 1531 | Near North America, Inc. | Yahoo Ad Tech Singapore Pte Ltd | Purchase Order 315001067 | 11/11/22 | 0 |
| 1532 | Near North America, Inc. | Yahoo Ad Tech Singapore Pte Ltd | Purchase Order 315001036 | 11/06/22 | 0 |
| 1533 | Near North America, Inc. | Yahoo Ad Tech Singapore Pte Ltd | Purchase Order 315001033 | 10/05/22 | 0 |
| 1534 | Near North America, Inc. | Yahoo Ad Tech Singapore Pte Ltd | Purchase Order 315001024 | 10/03/22 | 0 |
| 1535 | Near North America, Inc. | Yahoo Ad Tech Singapore Pte Ltd | Purchase Order 315001112 | 12/09/22 | 0 |
| 1536 | Near North America, Inc. | Yahoo Ad Tech Singapore Pte Ltd | Purchase Order 315000992 | 08/19/22 | 0 |
| 1537 | Near North America, Inc. | Yahoo Ad Tech Singapore Pte Ltd | Purchase Order 315001048 | 10/24/22 | 0 |
| 1538 | Near North America, Inc. | Yahoo Ad Tech Singapore Pte Ltd | Purchase Order 315001018 | 10/03/22 | 0 |
| 1539 | Near North America, Inc. | Yahoo Ad Tech Singapore Pte Ltd | Purchase Order 315001032 | 10/05/22 | 0 |
| 1540 | Near North America, Inc. | Yahoo Ad Tech Singapore Pte Ltd | Purchase Order 315001044 | 11/19/22 | 0 |
| 1541 | Near North America, Inc. | Yahoo Ad Tech Singapore Pte Ltd | Purchase Order 315001068 | 11/11/22 | 0 |
| 1542 | Near North America, Inc. | Yahoo Ad Tech Singapore Pte Ltd | Purchase Order 315001113 | 12/09/22 | 0 |
| 1543 | Near North America, Inc. | Yahoo Ad Tech Singapore Pte Ltd | Purchase Order 315001069 | 11/11/22 | 0 |
| 1544 | Near North America, Inc. | Yahoo Ad Tech Singapore Pte Ltd | Purchase Order 315001047 | 11/24/22 | 0 |
| 1545 | Near North America, Inc. | Yahoo Ad Tech Singapore Pte Ltd | Purchase Order 315000993 | 08/19/22 | 0 |
| 1546 | Near North America, Inc. | Yahoo Ad Tech Singapore Pte Ltd | Purchase Order 315000990 | 08/18/22 | 0 |
| 1547 | Near North America, Inc. | Yahoo Ad Tech Singapore Pte Ltd | Purchase Order 315001022 | 10/03/22 | 0 |
| 1548 | Near North America, Inc. | Yahoo Ad Tech Singapore Pte Ltd | Purchase Order 315001021 | 10/03/22 | 0 |
| 1549 | Near North America, Inc. | Yahoo Ad Tech Singapore Pte Ltd | Purchase Order 315001025 | 10/03/22 | 0 |
| 1550 | Near North America, Inc. | Yahoo Ad Tech Singapore Pte Ltd | Purchase Order 315001111 | 12/09/22 | 0 |
| 1551 | Near North America, Inc. | Yahoo Ad Tech Singapore Pte Ltd | Purchase Order 315001023 | 10/03/22 | 0 |
| 1552 | Near North America, Inc. | Yahoo Ad Tech Singapore Pte Ltd | Purchase Order 315000994 | 08/22/22 | 0 |
| 1553 | Near North America, Inc. | Yahoo Ad Tech Singapore Pte Ltd | Purchase Order 315001132 | 01/12/23 | 0 |
| 1554 | Near North America, Inc. | Yahoo Ad Tech Singapore Pte Ltd | Purchase Order 315001046 | 10/24/22 | 0 |
| 1555 | Near North America, Inc. | Yahoo Ad Tech Singapore Pte Ltd | Purchase Order 315001026 | 10/03/22 | 0 |
| 1556 | Near North America, Inc. | Yahoo Ad Tech Singapore Pte Ltd | Purchase Order 315001379 | 10/18/23 | 0 |
| 1557 | Near North America, Inc. | Yahoo Ad Tech Singapore Pte Ltd | Purchase Order 315001380 | 10/18/23 | 0 |
| 1558 | Near North America, Inc. | Yahoo Ad Tech Singapore Pte Ltd | Purchase Order 315001257 | 07/08/23 | 0 |
| 1559 | Near North America, Inc. | Yahoo Ad Tech Singapore Pte Ltd | Purchase Order 315001258 | 07/08/23 | 0 |
| 1560 | Near North America, Inc. | Yahoo Ad Tech Singapore Pte Ltd | Purchase Order 315001259 | 07/08/23 | 0 |
| 1561 | Near North America, Inc. | Yahoo Ad Tech Singapore Pte Ltd | Purchase Order 315001260 | 07/08/23 | 0 |
| 1562 | Near North America, Inc. | Yahoo Ad Tech Singapore Pte Ltd | Purchase Order 315001223 | 05/15/23 | 0 |
| 1563 | Near North America, Inc. | Yahoo Ad Tech Singapore Pte Ltd | Purchase Order 315001224 | 05/15/23 | 0 |
| 1564 | Near North America, Inc. | Yahoo Ad Tech Singapore Pte Ltd | Purchase Order 315001225 | 05/15/23 | 0 |
| 1565 | Near North America, Inc. | Yahoo Ad Tech Singapore Pte Ltd | Purchase Order 315001226 | 05/15/23 | 0 |
| 1566 | Near North America, Inc. | Yahoo Ad Tech Singapore Pte Ltd | Purchase Order 315001227 | 05/15/23 | 0 |
| 1567 | Near North America, Inc. | Yahoo Ad Tech Singapore Pte Ltd | Purchase Order 315001228 | 05/15/23 | 0 |
| 1568 | Near North America, Inc. | Yahoo Ad Tech Singapore Pte Ltd | Purchase Order 315001229 | 05/15/23 | 0 |
| 1569 | Near North America, Inc. | Yahoo Ad Tech Singapore Pte Ltd | Purchase Order 315001230 | 05/15/23 | 0 |
| 1570 | Near North America, Inc. | Yahoo Ad Tech Singapore Pte Ltd | Purchase Order 315001235 | 05/15/23 | 0 |
| 1571 | Near North America, Inc. | Yahoo Ad Tech Singapore Pte Ltd | Purchase Order 315001236 | 05/15/23 | 0 |
| 1572 | Near North America, Inc. | Yahoo Ad Tech Singapore Pte Ltd | Purchase Order 315001237 | 05/17/23 | 0 |
| 1573 | Near North America, Inc. | Yahoo Ad Tech Singapore Pte Ltd | Purchase Order 315001238 | 05/17/23 | 0 |
| 1574 | Near North America, Inc. | Yahoo Ad Tech Singapore Pte Ltd | Purchase Order 315001178 | 03/08/23 | 0 |
| 1575 | Near North America, Inc. | Yahoo Ad Tech Singapore Pte Ltd | Purchase Order 315001179 | 03/08/23 | 0 |
| 1576 | Near North America, Inc. | Yahoo Ad Tech Singapore Pte Ltd | Purchase Order 315001180 | 03/08/23 | 0 |

| 1577 | Near North America, Inc. | Yahoo Ad Tech Singapore Pte Ltd | Purchase Order 315001204 | 04/12/23 | 0 |
|---|---|---|---|---|---|
| 1578 | Near North America, Inc. | Yahoo Ad Tech Singapore Pte Ltd | Purchase Order 315001132 | 01/12/23 | 0 |
| 1579 | Near North America, Inc. | Yahoo Ad Tech Singapore Pte Ltd | Purchase Order 315001133 | 01/12/23 | 0 |
| 1580 | Near North America, Inc. | Yahoo Ad Tech Singapore Pte Ltd | Purchase Order 315001157 | 02/10/23 | 0 |
| 1581 | Near North America, Inc. | Yahoo Ad Tech Singapore Pte Ltd | Purchase Order 315001158 | 02/10/23 | 0 |
| 1582 | Near North America, Inc. | Yahoo Ad Tech Singapore Pte Ltd | Purchase Order 315001159 | 02/10/23 | 0 |
| 1583 | Near North America, Inc. | Yahoo Ad Tech Singapore Pte Ltd | Purchase Order 315001160 | 02/10/23 | 0 |
| 1584 | Near North America, Inc. | Yahoo Ad Tech Singapore Pte Ltd | Purchase Order 315001161 | 02/10/23 | 0 |
| 1586 | Near North America, Inc. | Yahoo AdTech Australia Pty | Agreement and all relevant Purchase Orders | | 0 |
| 1589 | Near North America, Inc. | Yale University | Data Transfer and Use Agreement | 06/16/20 | 0 |
| 1590 | Near North America, Inc. | Zartico, Inc. | Agreement and all relevant Service Orders | 07/01/22 | 0 |
| 1596 | Near North America, Inc. | Zelnik Consulting | Service Order | 06/19/17 | 0 |
| 1597 | Near North America, Inc. | Zelnik Consulting | Service Order | 09/11/17 | 0 |
| 1600 | Near Intelligence Pte. Ltd. | Accuflex Consulting Pvt. | Consultant Agreement | 10/01/19 | 0 |
| 1601 | Near North America, Inc. | Adlakha Kukreja & Co. | Adlakha Kukreja & Co. Service Agreement | 12/01/22 | 0 |
| 1604 | Near North America, Inc. | Advanced Contrubutors Pvt. Ltd. | Agreement | 06/20/22 | 0 |
| 1605 | Near Intelligence Pte. Ltd. | AEI Legal LLC | Agreement | 09/30/23 | 0 |
| 1606 | Near Intelligence Pte. Ltd. | AEI Legal LLC | Agreement | 10/26/23 | 0 |
| 1608 | Near North America Inc | Alight Public Relations, LLC | Agreement | 01/03/23 | 0 |
| 1611 | Near Intelligence Pte. Ltd. | Amazon Web Services | AWS Main Customer Agreement | 10/04/19 | 0 |
| 1612 | Near Intelligence Pte. Ltd. | Amazon Web Services | AWS Private Pricing Addendum | 12/18/19 | 0 |
| 1613 | Near Intelligence Pte. Ltd. | Amazon Web Services | AWS Support Private Pricing Addendum #2 | 01/01/20 | 0 |
| 1614 | Near Intelligence Pte. Ltd. | Amazon Web Services | AWS Customer Notice to Extend Payment Period | 02/01/23 | 0 |
| 1615 | Near Intelligence Pte. Ltd. | Amazon Web Services | AWS Amendment No. 1 to AWS Support Private Pricing Addendum | 12/31/22 | 0 |
| 1616 | Near Intelligence Pte. Ltd. | Amazon Web Services | AWS Private Pricing Addendum | 12/16/21 | 0 |
| 1617 | Near Intelligence Pte. Ltd. | Amazon Web Services | AWS GDPR Data Processing Addendum, undated | N/A | 0 |
| 1618 | Near Intelligence Pte. Ltd. | Amazon Web Services | AWS Mutual Non-Disclosure Agreement | 10/04/19 | 0 |
| 1619 | Near Intelligence Pte Ltd | Amazon Web Services | Agreement | 12/31/21 | 0 |
| 1620 | Near Intelligence Pte. Ltd. | Amazon Web Services | Amazon AWS Inc. Payment Term Customer Notice | 02/01/23 | 0 |
| 1621 | Near Intelligence Pte. Ltd. | Amazon Web Services | Agreement | 12/16/21 | 0 |
| 1622 | Near Intelligence Pte. Ltd. | Amazon Web Services | Private Pricing Addendum | 06/27/23 | 0 |
| 1625 | Near Intelligence Pte. Ltd. | Anthony Fitzgerald (ASLF) | Agreement | 12/01/19 | 0 |
| 1627 | Near North America, Inc. | Aramark Refreshment Services, LLC | Agreement | 08/30/21 | 0 |
| 1628 | Near Intelligence, Inc. | ARInsights, LLC | Agreement | 05/03/23 | 0 |
| 1631 | Near Intelligence Pte Ltd | ASLF Media Pty Ltd | Agreement | 12/01/19 | 0 |
| 1635 | Near North America, Inc. | Baker Tilly US, LLP | Engagement Letter for 2022 Tax Compliance and Tax Provision Services | 01/04/23 | 0 |
| 1636 | Near North America, Inc. and Near Intelligence LLC | Baker Tilly US, LLP | Agreement | | 0 |
| 1637 | Near Intelligence, Inc. | Baker Tilly US, LLP | Tax Engagement Letter | 11/30/23 | 0 |
| 1641 | Near North America Inc | Bisnow, LLC | Agreement | 05/15/23 | 0 |
| 1644 | Near Intelligence Pte Ltd | Bonzai Digital Pte Ltd | Agreement | 12/31/21 | 0 |
| 1646 | Near North America, Inc. | Business Wire Inc | Agreement | 03/24/23 | 0 |
| 1647 | Near North America, Inc. | CACI LTD. | Master Services Agreement for Licensed Data | 12/21/21 | 0 |
| 1648 | Near Intelligence LLC | Calabrese Consulting, LLC | Agreement | 10/19/22 | 0 |
| 1651 | Near North America, Inc. | ChurnZero | Agreement | 10/25/22 | 0 |
| 1655 | Near Intelligence LLC | Craft Capital Management LLC | Agreement | 03/20/23 | 0 |
| 1656 | Near North America, Inc. | CREitech | Agreement | 08/04/23 | 0 |
| 1657 | Near North America, Inc. | Daijogo & Pedersen, LLP | Agreement | 05/25/22 | 0 |
| 1661 | Near Intelligence LLC | Deel Inc. | Agreement | 10/01/22 | 0 |
| 1662 | Near Intelligence, Inc. | Deloitte Financial Advisory Services LLP | Engagement Letter | 04/07/23 | 0 |
| 1663 | Near Intelligence Pte Ltd | Digital Commons Limited | Agreement | 12/30/22 | 0 |
| 1664 | Near Intelligence Pte. Ltd. | Digital Commons Limited | Agreement | 03/16/22 | 0 |
| 1666 | Near Intelligence LLC | Digital Media Innovation - Notified Intrado | Agreement | 11/08/22 | 0 |
| 1670 | Near North America, Inc. | DOMO, Inc. | Agreement and all relevant Service Orders | 07/21/23 | 0 |
| 1676 | Near Intelligence LLC | Driti Advisors LLPs | Agreement and all relevant Statements of Work | 01/02/23 | 0 |
| 1677 | Near Intelligence LLC | Driti Advisors LLPs | Agreement and all relevant Statements of Work | 01/25/23 | 0 |
| 1678 | Near Intelligence LLC | E*TRADE Financial Corporate Services Inc | Agreement | 03/15/23 | 0 |
| 1679 | Near Intelligence LLC | E*TRADE Financial Corporate Services Inc | Agreement | 03/31/23 | 0 |
| 1680 | Near North America, Inc. | eContext.ai LLC dba Complementics | Data License Agreement | 02/29/28 | 0 |
| 1681 | Near North America, Inc. | eContext.ai LLC dba Complementics | Amendement to Data License Agreement | 04/01/19 | 0 |
| 1684 | Near Intelligence LLC | Edgar Agents LLC | Agreement | 03/13/23 | 0 |
| 1685 | Near Intelligence, Inc. | Edgar Agents LLC | Agreement | 06/30/23 | 0 |
| 1686 | Near Intelligence, Inc. | Edgar Agents LLC | Agreement | 03/09/23 | 0 |
| 1687 | Near Intelligence LLC | ePrivacy GmbH | Agreement | 04/21/22 | 0 |

| 1688 | Near Intelligence LLC | ePrivacy GmbH | Agreement | 05/13/22 | 0 |
| 1689 | Near Intelligence LLC | ePrivacy GmbH | Agreement | 05/13/22 | 0 |
| 1696 | Near North America, Inc. | ESRI (Environmental Systems Research Institute) | Agreement | 09/06/19 | 0 |
| 1697 | Near North America, Inc. | ESRI (Environmental Systems Research Institute) | Agreement | 09/06/19 | 0 |
| 1702 | Near North America, Inc. | Fiction Tribe, Inc | Agreement | N/A | 0 |
| 1705 | Near Intelligence Pte. Ltd. | Geoscape Australia | Licence Agreement | 12/17/21 | 0 |
| 1705 | Near Intelligence Pte. Ltd. | Geoscape Australia | Licence Agreement | 12/17/21 | 0 |
| 1712 | Near Intelligence Pte. Ltd. | Google Ireland Limited | Agreement | 12/18/13 | 0 |
| 1713 | Near North America, Inc. | Gokul Krishnan Rathakrishnan | Consultant Agreement | 08/01/22 | 0 |
| 1714 | Near Intelligence LLC | Grant Thornton Bharat LLP | Agreement | 11/18/22 | 0 |
| 1715 | Near Intelligence, Inc. | Grant Thornton Bharat LLP | Engagement Letter | 06/16/23 | 0 |
| 1716 | Near Intelligence, Inc. | Grant Thornton Bharat LLP | Addendum | 06/28/23 | 0 |
| 1717 | Near Intelligence, Inc. | Haynes and Boone, LLP | Letter Agreement | 09/06/23 | 0 |
| 1718 | Near Intelligence INC | Haynes and Boone, LLP | Agreement | | 0 |
| 1719 | Near Intelligence Pte. Ltd. | HERE Europe B.V. | 1. Here Europe B.V Addendum | 09/29/21 | 0 |
| 1720 | Near Intelligence Pte. Ltd. | HERE Europe B.V. | General License Agreement | 01/10/19 | 0 |
| 1721 | Near Intelligence Pte. Ltd. | Here Europe_Novations | Here Europe_Novation | 01/01/22 | 0 |
| 1722 | Near Intelligence LLC | Highspot Inc. | Agreement | 01/01/23 | 0 |
| 1726 | Near North America, Inc. | Hubspot Inc. | Agreement | 07/28/23 | 0 |
| 1728 | Near Intelligence Pte. Ltd. | ICR LLC | Agreement | 01/06/22 | 0 |
| 1729 | Near Intelligence Pte. Ltd. | ICR LLC | Agreement | 02/01/23 | 0 |
| 1730 | Near North America, Inc. | Idealab | Agreement | | 0 |
| 1733 | Near Intelligence Pte. Ltd. | Incubata Australia Pty Ltd | Agreement | 02/01/18 | 0 |
| 1734 | Near Intelligence Pte Ltd | Incubata Australia Pty Ltd | Agreement | 01/01/22 | 0 |
| 1735 | Near Intelligence, Inc. | Infinite Global Consulting Inc. | Public Relations Services Agreement | 07/05/23 | 0 |
| 1736 | Near Intelligence Pte. Ltd. | InfoSum Limited | Order Form | 06/22/23 | 0 |
| 1737 | Near Intelligence | InfoSum Limited | Agreement | 06/30/23 | 0 |
| 1739 | Near Intelligence Pte. Ltd. | INMOBI PTE LTD | Agreement | 04/25/19 | 0 |
| 1740 | Near Intelligence Pte. Ltd. | INMOBI PTE LTD | Transfer of Agreements to Near Intelligence Pte Ltd | 01/01/22 | 0 |
| 1741 | Near Intelligence Pte. Ltd. | INMOBI PTE LTD | Amendment | 06/23/22 | 0 |
| 1742 | Near Intelligence Pte. Ltd. | InMobi Pte Ltd | Data Licensing Master Agreement | 06/25/20 | 0 |
| 1743 | Near North America Inc | Integral Ad Science, Inc. | Agreement | 02/06/23 | 0 |
| 1747 | Near Intelligence LLC | Intrado Digital Media, LLC | Agreement | 01/31/23 | 0 |
| 1748 | Near Intelligence LLC | Intrado Digital Media, LLC | Agreement | 11/08/22 | 0 |
| 1749 | Near Intelligence LLC | Intrado Digital Media, LLC | Interdo Notified Agreement | 11/09/22 | 0 |
| 1750 | Near Intelligence LLC | Intrado Digital Media, LLC | Notified MSA | 11/08/22 | 0 |
| 1751 | Near Intelligence LLC | Intrado Digital Media, LLC | Notified Contract | 11/08/22 | 0 |
| 1752 | Near Intelligence, Inc. | InvestorBrandNetwork (IBN) | Service Agreement and all relevant Statements of Work | 09/01/23 | 0 |
| 1753 | Near Intelligence INC | InvestorBrandNetwork (IBN) | Agreement | 09/01/23 | 0 |
| 1755 | Near North America, Inc. | Irys, Inc | Amendment No. 1 to Data Supply Agreement | 05/05/21 | 0 |
| 1756 | Near North America, Inc. | Irys, Inc | Amendment No. 2 to Data Supply Agreement | 02/02/21 | 0 |
| 1757 | Near North America, Inc. | Irys, Inc | Amendment No. 3 to Data Supply Agreement | 07/19/23 | 0 |
| 1758 | Near North America, Inc. | Irys, Inc | U.S. Data Privacy Addendum for Data Suppliers | 04/26/23 | 0 |
| 1759 | Near North America Inc | Jarrell Chalmers | Agreement | 01/03/23 | 0 |
| 1760 | Near North America Inc | Jason Wu | Agreement | 12/12/22 | 0 |
| 1762 | Near Intelligence LLC | Kelley Drye & Warren LLP | Engagement Letter | 07/27/22 | 0 |
| 1763 | Near Intelligence LLC | Kelley Drye & Warren LLP | Engagement letter | 09/22/22 | 0 |
| 1766 | Near Intelligence Pte. Ltd. | Kollaborations Ltd-Joy Lacana | Agreement | 06/30/23 | 0 |
| 1767 | Near Intelligence LLC | Kundeln I Acquisition Corp. | Engagement Addendum | 12/19/22 | 0 |
| 1768 | Near Intelligence LLC | Kundeln I Acquisition Corp. | Engagement Letter | 12/21/21 | 0 |
| 1770 | Near Intelligence Pte. Ltd. | Lead Generation Pty. Ltd. | Data License Renewal Agreement & Novation | 10/01/22 | 0 |
| 1771 | Near Intelligence Pte Ltd | Lex Connect Consulting Private Limited | Agreement | 05/31/16 | 0 |
| 1772 | Near Intelligence Pte. Ltd. | Lex Connect Consulting Private Limited | Amendment | 08/01/22 | 0 |
| 1773 | Near North America Inc | Linkedin | Agreement | 11/01/22 | 0 |
| 1775 | Near Intelligence Pte. Ltd. | M2K Advisors Pte Ltd | Agreement | 11/27/21 | 0 |
| 1776 | Near Intelligence Pte. Ltd. | M2K Advisors Pte Ltd | Agreement | 03/15/23 | 0 |
| 1777 | Near Intelligence Pte. Ltd. | M2K Advisors Pte Ltd | Agreement | 05/15/23 | 0 |
| 1779 | Near Intelligence, Inc. | Magnite, Inc. | Buyer Order Agreement | 11/20/19 | 0 |
| 1780 | Near Intelligence Pte Ltd | Magnite, Inc. | Agreement | N/A | 0 |
| 1782 | Near Intelligence INC | Marsh & McLennan Agency LLC | Agreement | 07/28/23 | 0 |
| 1783 | Near Intelligence Pte. Ltd. | Masahiro Matsui | Consulting Agreement | 06/12/23 | 0 |
| 1784 | Near Intelligence Pte. Ltd. | MaxMind, Inc. | Contract | 08/01/22 | 0 |
| 1786 | Near Intelligence Pte. Ltd. | MediaQuest Plus Business FZ LLC | Data License Agreement | 01/01/23 | 0 |

| | | | | | |
|---|---|---|---|---|---|
| 1787 | Near Intelligence Pte. Ltd. | MediaQuest Plus Business FZ LLC | Business Agreement | 01/01/23 | 0 |
| 1788 | Near Intelligence Pte. Ltd. | MediaQuest Plus Business FZ LLC | Agreement | 01/01/23 | 0 |
| 1789 | Near Intelligence Pte Ltd. | Metayage Inc | Agreement | 07/27/21 | 0 |
| 1790 | Near North America, Inc. | Michael Bauer International GmbH | Mutual Data Exchange and License Agreement | 04/05/19 | 0 |
| 1791 | Near Intelligence LLC | Miras Visa Pvt Ltd | Agreement | 03/16/23 | 0 |
| 1792 | Near Intelligence Pte. Ltd. | MMP Worldwide FZ LLC | 146 MMP SSP Agreement | 06/01/23 | 0 |
| 1796 | Near Intelligence LLC | My Equity Comp, LLC | Agreement | 02/28/23 | 0 |
| 1797 | Near Intelligence LLC | My Equity Comp, LLC | Outsourcing Agreement | 02/28/23 | 0 |
| 1798 | Near Intelligence LLC | My Equity Comp, LLC | Renaming Notice | 03/24/23 | 0 |
| 1799 | Near Intelligence Pte. Ltd. | Natarajan & Swaminathan | Engagement Letter | 12/07/22 | 0 |
| 1800 | Near North America, Inc. | National Retail Federation, Inc. | Agreement | | 0 |
| 1801 | Near North America, Inc. | New England Sales & Marketing | Telemarketing Sales Support | 11/05/20 | 0 |
| 1808 | Near Intelligence LLC | North Land Capital Markets (Northland Securities, In | Agreement | 03/12/23 | 0 |
| 1810 | Near North America, Inc. | OpenX Technologies, Inc. (V) | Agreement | 09/29/22 | 0 |
| 1815 | Near North America, Inc. | PandaDoc, Inc. | Agreement | 06/21/23 | 0 |
| 1816 | Near North America, Inc. | PARKER IBRAHIM & BERG LLP | Agreement | 11/09/23 | 0 |
| 1818 | Near North America Inc | Pearl Meyer & Partners | Agreement | | 0 |
| 1820 | Near North America, Inc. | PICKWELL SP ZOO | Amendment No. 1 to Mutual Data License Agreement | 05/01/22 | 0 |
| 1821 | Near Intelligence Pte. Ltd. | Propmodo Inc. | Agreement | 11/02/23 | 0 |
| 1822 | Near Intelligence Pte. Ltd. | PublicNSA LLC dba BIGDBM | Amendment No. 2 to Master Services Agreement | 09/05/22 | 0 |
| 1823 | Near North America, Inc. | PublicNSA LLC dba BIGDBM | U.S. Data Privacy Addendum for Data Suppliers | 04/26/23 | 0 |
| 1824 | Near Intelligence Pte. Ltd. | PublicNSA LLC dba BIGDBM | Statement of Work #3 | 05/31/22 | 0 |
| 1826 | Near Intelligence Pte. Ltd. | PubMatic, Inc. | Agreement | 01/01/22 | 0 |
| 1829 | Near Intelligence Pte. Ltd. | SC Tristone Production Impex SRL | Agreement | 01/01/23 | 0 |
| 1834 | Near Intelligence Pte. Ltd. | Shivaami Cloud Services Pvt Ltd | Novation Agreement | 01/01/22 | 0 |
| 1835 | Near North America, Inc. | Sight & Sound Film, LLC | Agreement | 03/08/23 | 0 |
| 1836 | Near Intelligence, Inc. | Singhvi Dev & Unni LLP | Agreement | 07/01/23 | 0 |
| 1838 | Near North America, Inc. | SM10000 PROPERTY, LLC | Agreement | 02/11/22 | 0 |
| 1839 | Near Intelligence Pte. Ltd. | Smaato Inc. | Agreement | 01/01/22 | 0 |
| 1840 | Near North America, Inc. | Spatial Labs, Inc. | Agreement | 05/21/22 | 0 |
| 1842 | Near North America Inc | Subskribe | Agreement | 07/17/23 | 0 |
| 1843 | Near Intelligence Pte. Ltd. | Takeshi Yamamoto | Consultant Agreement | 01/01/22 | 0 |
| 1844 | Near North America Inc | Talent Hunt USA (HireBrain Corporation) | Agreement | | 0 |
| 1845 | Near North America, Inc. | Tamoco Limited | Second Amendment to Data License Agreement | 01/31/23 | 0 |
| 1846 | Near North America, Inc. | Tamoco Limited | Data License Agreement | 11/01/21 | 0 |
| 1847 | Near Intelligence LLC | The Benchmark Company, LLC | Agreement | 03/06/23 | 0 |
| 1848 | Near Intelligence Pte. Ltd. | The Nielsen Company | Agreement | 06/01/20 | 0 |
| 1849 | Near North America Inc. and Near Intelligence Pte. Ltd. | The Nielsen Company | Assignment & Amendement to DMA License Agreement | 06/23/23 | 0 |
| 1850 | Near North America, Inc. | TrueData Solutions, Inc. | Data License & Services Agreement | 10/01/22 | 0 |
| 1851 | Near Intelligence Pte. Ltd. | TrueData Solutions, Inc. | Renewal Addendum for Device Identity Service | 02/01/22 | 0 |
| 1852 | Near Intelligence Pte Ltd | TrueData Solutions, Inc. | Agreement | 10/01/22 | 0 |
| 1853 | Near Intelligence Pte. Ltd. | TrueData Solutions, Inc. | Data License & Services Agreement | 10/01/21 | 0 |
| 1854 | Near North America Inc | TrueGrit Communications, LLC | Agreement | 05/03/23 | 0 |
| 1855 | Near Intelligence LLC | TrustArc Inc - NI01 | Agreement | 03/06/23 | 0 |
| 1856 | Near Intelligence LLC | UHY LLP | Engagement Letter | 03/25/22 | 0 |
| 1857 | Near Intelligence Pte. Ltd. | Unify Technologies Private Limited | Agreement | 08/18/22 | 0 |
| 1858 | Near Intelligence Pte. Ltd. | Unify Technologies Private Limited | Unify Novation Copy | 01/01/23 | 0 |
| 1859 | Near Intelligence Pte. Ltd. | Unify Technologies Private Limited | MSA Amendment | 08/17/22 | 0 |
| 1860 | Near North America, Inc. | Unisource Solutions, Inc. | Agreement | 10/22/21 | 0 |
| 1863 | Near Intelligence Pte. Ltd. | Unruly Group LLC (now Nexxen Group LLC) | Agreement | 11/22/22 | 0 |
| 1866 | Near Intelligence Pte Ltd | Verve Group Europe GmbH | Agreement | 09/27/21 | 0 |
| 1867 | Near Intelligence Pte Ltd. | Verve Group Europe GmbH | Data Protection Addendum | 09/27/21 | 0 |
| 1868 | Near Intelligence Pte. Ltd. | Verve Group Europe GmbH | Real-Time Biddilng End User Agreement | 09/27/21 | 0 |
| 1869 | Near Intelligence Pte. Ltd. | Wahl & Case (EQIQ K.K.) | Agreement | 02/01/23 | 0 |
| 1872 | Near North America Inc | Workaletta Inc | Agreement | 03/01/23 | 0 |
| 1874 | Near North America, Inc. | Xerox | First Amendment to Data Monetization Agreement | 02/07/18 | 0 |
| 1875 | Near North America, Inc. | X-Mode Social, Inc. | Data Monetization Agreement | 08/20/19 | 0 |
| 1876 | Near Intelligence Pte. Ltd. | X-Mode Social, Inc. | Data Monetization Agreement | 11/20/17 | 0 |
| 1877 | Near Intelligence Pte. Ltd. | X-Mode Social, Inc. | Data Monetization Agreement | 07/01/19 | 0 |
| 1878 | Near North America, Inc. | X-Mode Social, Inc. | First Amendment to Data Monetization Agreement | 06/02/20 | 0 |
| 1879 | Near North America, Inc. | X-Mode Social, Inc. | Third Amendment to Data Monetization Agreement | 01/01/23 | 0 |
| 1880 | Near North America, Inc. | X-Mode Social, Inc. | Data Monetization Agreement | 11/20/17 | 0 |
| 1881 | Near North America, Inc. | X-Mode Social, Inc. | First Amendment to Data Monetization Agreement | 06/02/20 | 0 |

| | | | | |
|---|---|---|---|---|
| 1882 | Near North America, Inc. | X-Mode Social, Inc. | Data Monetization Agreement | 08/20/19 | 0 |
| 1886 | Near North America, Inc. | Zoom Video Communications, Inc. | Agreement | 09/29/23 | 0 |
| 1887 | Near North America, Inc. | ZoomInfo Technologies LLC | Agreement | 10/01/23 | 0 |
| 1888 | Near Intelligence, Inc. | AFCO Acceptance Corporation | Premium Finance Agreement | 04/19/23 | 0 |
| 1891 | Near Intelligence, Inc. | AIG Specialty Insurance Company | Insurance Policy | 03/24/23 | 0 |
| 1892 | Near Intelligence, Inc. | AIG Specialty Insurance Company | Insurance Policy | 03/25/23 | 0 |
| 1893 | Near Intelligence, Inc. | Allied World Speciality Insurance Company | Insurance Policy | 03/23/23 | 0 |
| 1894 | Near Intelligence, Inc. | Berkshire Hathaway Specialty Insurance | Insurance Policy | 03/23/23 | 0 |
| 1895 | Near Intelligence, Inc. | Ace American Insurance Company (Chubb) | Insurance Policy | 07/22/23 | 0 |
| 1898 | Near Intelligence Pte. Ltd. | Chubb Insurance Singapore Ltd | Insurance Policy | 07/16/23 | 0 |
| 1899 | Near Intelligence Pte. Ltd. | Chubb Insurance Singapore Ltd | Insurance Policy | 07/17/23 | 0 |
| 1900 | Near Intelligence Pte. Ltd. | Marsh (Singapore) Pte Ltd | Insurance Policy | 08/24/23 | 0 |
| 1901 | Near Intelligence, Inc. | National Union Fire Insurance Company of Pirrsburg | Insurance Policy | 03/23/23 | 0 |
| 1902 | Near Intelligence, Inc. | Sentinel Insurance Company Ltd (Hartford) | Insurance Policy | 07/28/23 | 0 |
| 1903 | Near Intelligence, Inc. | Sentinel Insurance Company Ltd (Hartford) | Insurance Policy | 07/28/23 | 0 |
| 1904 | Near Intelligence, Inc. | Vantage Risk Assurance Company | Insurance Policy | 03/23/23 | 0 |
| 1906 | Near Intelligence Pte. Ltd. | The Executive Centre Singapore Pte Ltd | Exclusive Workspace License Agreement | 02/15/22 | 0 |
| 1909 | Near Intelligence | SARL LDA Aquafontaine | Agreement | 07/14/05 | 0 |
| 1916 | Near Intelligence, Inc. | Chihiro Fukami | Agreement | 11/27/23 | 0 |
| 1917 | Near Intelligence, Inc. | Gladys Kong | Agreement | 03/23/23 | 0 |
| 1918 | Near Intelligence LLC | Gladys Kong | Agreement | 05/18/22 | 0 |
| 1919 | Near Intelligence, Inc. | Gladys Kong | Employment Agreement | 04/11/23 | 0 |
| 1920 | Near Intelligence, Inc. | Gladys Kong | Employment Agreement Modification | 11/10/23 | 0 |
| 1921 | Near Intelligence, Inc. | Gladys Kong | Agreement | 11/10/23 | 0 |
| 1922 | Near Intelligence, Inc. | Harikrishnan Palappetty | Agreement | 11/30/23 | 0 |
| 1926 | Near Intelligence LLC | John Faieta | Employment Agreement | 11/10/23 | 0 |
| 1927 | Near Intelligence LLC | John Faieta | Agreement | 05/18/22 | 0 |
| 1928 | Near Intelligence, Inc. | John Faieta | Agreement | 11/10/23 | 0 |
| 1929 | Near Intelligence LLC | Justin Joseph | Agreement | 05/18/22 | 0 |
| 1930 | Near Intelligence, Inc. | Karthik Uttarkar | Agreement | 11/20/23 | 0 |
| 1931 | Near Intelligence, Inc. | Kathryn T. Petralia | Agreement | 03/23/23 | 0 |
| 1932 | Near Intelligence LLC | Madhu Therani | Agreement | 05/18/22 | 0 |
| 1933 | Near Intelligence, Inc. | Mark N. Greene | Agreement | 03/23/23 | 0 |
| 1934 | Near Intelligence, Inc. | Michelle Zhou | Agreement | 11/17/23 | 0 |
| 1935 | Near Intelligence, Inc. | Mini Krishnamoorthy | Agreement | 03/23/23 | 0 |
| 1936 | Near Intelligence, Inc. | Nitin Agarwal | Agreement | 11/30/23 | 0 |
| 1937 | Near Intelligence, Inc. | Paul Gross | Employment Agreement | 11/10/23 | 0 |
| 1938 | Near Intelligence, Inc. | Paul Gross | Employment Agreement | 11/10/23 | 0 |
| 1942 | Near Intelligence, Inc. | Ronald Steger | Indemnification Agreement | 03/23/23 | 0 |
| 1943 | Near Intelligence, Inc. | Scott Slipy | Employment Agreement | 12/01/23 | 0 |
| 1945 | Near Intelligence, Inc. | Shobhit Shukla | Agreement | 03/23/23 | 0 |
| 1946 | Near Intelligence LLC | Shobhit Shukla | Agreement | 05/18/22 | 0 |
| 1947 | Near Intelligence, Inc. | Shobhit Shukla | Employment Agreement | 04/11/23 | 0 |
| 1948 | Near Intelligence, Inc. | Sooraj Balakrishnan | Agreement | 11/30/23 | 0 |
| 1949 | Near Intelligence, Inc. | Sreenivas Reddy | Agreement | 11/20/23 | 0 |
| 2045 | Near North America, Inc. | KJ Consulting | Legal Consulting Serices | 01/01/24 | 0 |
| 2046 | Near Intelligence Pte. Ltd. | WireWheel, Inc. 2 | Agreement | 05/24/22 | 0 |
| 2047 | Near Intelligence | TriNet HR III, Inc 2 | Agreement | 02/10/23 | 0 |
| 2048 | Near Intelligence | TriNet HR III, Inc 2 | Agreement | 08/16/21 | 0 |
| 2049 | Near Intelligence | TriNet HR III, Inc 2 | Agreement | 08/16/21 | 0 |
| 2050 | Near Intelligence | TriNet HR III, Inc 2 | Agreement | 08/16/21 | 0 |
| 2051 | Near Intelligence | TriNet HR III, Inc 2 | Agreement | 08/16/21 | 0 |

Note:
1) Counterparty filed an objection that is resolved for purposes of the Sale Order; however, counterparty remain in discussion with the Debtors to resolve such objection in accordance with the Bidding Procedures Order.
2) Assumption of this contract remains subject to objection period pursuant to *Notice of Filing of (I) Closing Assigned Contracts and (II) Notice of Third Supplemental Notice of Cure Costs and Assumption and Assignment of Executory Contracts or Unexpired Leases in Connection With Sale of All or Substantially All Assets* [Docket No. 265].

**<u>EXHIBIT 2</u>**

**Blackline**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| NEAR INTELLIGENCE, INC., *et al.*,[1] | Case No. 23-11962 (TMH) |
| Debtors. | (Jointly Administered) |
|  | **Re: Docket Nos. 20, 198** |

## ORDER (I) APPROVING THE STALKING HORSE PURCHASE AGREEMENT AND AUTHORIZING THE SALE OF THE DEBTORS' ASSETS OUTSIDE THE ORDINARY COURSE OF BUSINESS, (II) AUTHORIZING THE SALE OF ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES, (III) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN CONNECTION THEREWITH, AND (IV) GRANTING RELATED RELIEF

Upon the motion, dated December 8, 2023 [Docket No. 20] (the "Motion"),[2] of the debtors and debtors in possession in the above-captioned cases (each, a "Debtor" and collectively, the "Debtors"), pursuant to Bankruptcy Code sections 105(a), 363 and 365 of title 11 of the United States Code (the "Bankruptcy Code") and Rules 2002, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rules 2002-1, 6004-1 and 9006-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), seeking entry of an order (the "Order"): (a) authorizing the sale of the Debtors' Assets free and clear of all liens, claims, interests, and encumbrances, in accordance with the terms and conditions contained in that

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of their federal tax identification numbers, to the extent applicable, are Near Intelligence, Inc. (7857), Near Intelligence LLC (7857), Near North America, Inc. (9078), and Near Intelligence Pte. Ltd.  The Debtors' headquarters is located at 100 W Walnut St., Suite A-4, Pasadena, CA 91124.

[2]   Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Motion or the Stalking Horse Purchase Agreement (as defined herein), as applicable.

certain *Asset Purchase Agreement* (as may be amended or otherwise modified from time to time and including all related documents, exhibits, schedules, and agreements thereto, collectively, the "Stalking Horse Purchase Agreement"), substantially in the form attached hereto as **Exhibit 1**, by and among BTC Near Holdco LLC (together with each of its permitted successors, assigns and designees, collectively, the "Purchaser"), as Buyer, the Debtors (each a "Seller" and collectively, the "Sellers"), Near Intelligence SAS, and Near Intelligence Pty. Ltd., solely for the purposes stated expressly therein, and Blue Torch Finance LLC, as administrative agent and collateral agent, (b) approving the Sale of the Transferred Assets and other transactions contemplated by the Stalking Horse Purchase Agreement to the Purchaser free and clear of all Claims (as defined below), Liens (as defined in the Stalking Horse Purchase Agreement), Liabilities (as defined in the Stalking Horse Purchase Agreement), rights, other interests of any kind or nature whatsoever ("Interests"), and other encumbrances of any kind or nature whatsoever ("Encumbrances" and, collectively, "Claims, Interests and Encumbrances") (other than Permitted Liens and Assumed Liabilities, as defined in the Stalking Horse Purchase Agreement) in accordance with the terms of the Stalking Horse Purchase Agreement, (c) approving the assumption and assignment of certain executory contracts and unexpired leases, and (d) granting certain related relief; and the Court having entered the *Order (I) Approving Bidding Procedures for the Sale of Substantially All of the Debtors' Assets, (II) Scheduling an Auction and Approving the Form and Manner of Notice Thereof, (III) Approving Assumption and Assignment Procedures, (IV) Scheduling a Sale Hearing and Approving the Form and Manner of Notice Thereof and (V) Granting Related Relief* (the "Bidding Procedures Order") on January 23, 2024 [Docket No. 198] authorizing the Debtors to enter into the Stalking Horse Purchase Agreement pursuant to which the Purchaser agreed to serve as the "stalking horse

71631355.1 70219061.13

bidder" with respect to the "Purchased Assets" (as defined thereunder and hereinafter referred to as, the "Transferred Assets"), free and clear of any Claims, Interests and Encumbrances, with such Sale to be in accordance with the terms and conditions of the Bidding Procedures Order and the Stalking Horse Purchase Agreement; and the Bidding Procedures Order having authorized the Debtors to conduct, and approved the terms and conditions of, an auction, if applicable, as required and as set forth in the Bidding Procedures (as defined below) (the "Auction") to consider higher or otherwise better offers for the Transferred Assets, establishing a date for the Auction, if any, and approving, among other things (i) certain bidding procedures (the "Bidding Procedures") to be used in connection with the Auction, if applicable; (ii) the form and manner of notice of the Auction and Bidding Procedures; (iii) the form of Sale Notice (as defined below); (iv) the form of Assumption Notice (as defined below); and (v) the procedures relating to the assumption and assignment of the Assumed Contracts (as defined in the Stalking Horse Purchase Agreement); and the Sale Hearing having been held on February 16, 2024; and the Court having reviewed and considered the relief sought in the Motion, the Stalking Horse Purchase Agreement, all objections to the Motion, and the arguments of counsel made, and the evidence proffered or adduced at the Sale Hearing; and all parties in interest having been heard or having had the opportunity to be heard regarding the Sale Transaction and the relief requested in this Order; and due and sufficient notice of the Sale Hearing and the relief sought therein having been given under the particular circumstances of these chapter 11 cases and in accordance with the Bidding Procedures Order; and it appearing that no other or further notice need be provided; and it appearing that the relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors and all other parties in interest; and it appearing that the Court has jurisdiction over this matter; and it further appearing that the legal and factual

71631355.170219061.13

bases set forth in the Motion and the supplemental declaration of Abraham Han [Docket No. 272] and at the Sale Hearing establish just cause for the relief granted herein; and after due deliberation thereon,

**THE COURT HEREBY MAKES THE FOLLOWING FINDINGS:**[3]

### Jurisdiction and Venue

A.    This Court has jurisdiction to hear and determine the Motion pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue of these cases and proceedings is proper in this District and this Court under 28 U.S.C. §§ 1408 and 1409.

### Statutory Predicates

B.    The statutory predicates for the relief requested in the Motion are Bankruptcy Code sections 105, 363 and 365. Such relief is also warranted pursuant to Bankruptcy Rules 2002, 6004, 6006, 9007, 9008 and 9014 and Local Rules 2002-1 and 6004-1.

### Final Order

C.    This Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a). Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, this Court expressly finds that there is no just reason for delay in the implementation of this Order, waives any stay, and expressly directs entry of judgment as set forth herein.

---

[3]    The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

**Notice of the Stalking Horse Purchase Agreement, Assumption and Assignment of
Assumed Contracts, Sale Transaction, Sale Hearing and Bidding Procedures Order**

D.      On December 8, 2023 (the "Petition Date"), the Debtors commenced these
chapter 11 cases (the "Chapter 11 Cases") by filing a voluntary petition for relief under chapter
11 of the Bankruptcy Code. Since the Petition Date, the Debtors have continued to operate and
manage their businesses as debtors-in-possession pursuant to Bankruptcy Code sections 1107(a)
and 1108.[4]

E.      The Debtors gave due and proper notice of the Sale on January 23, 2024 [Docket
No. 201] (the "Sale Notice"). The Sale Notice constituted good, sufficient, and appropriate
notice of the Sale under the particular circumstances and no further notice need be given with
respect to the proposed Sale. As provided by the Sale Notice, a reasonable opportunity to object
or be heard regarding the requested relief has been afforded to all interested persons and entities.
Other parties interested in bidding on the Transferred Assets were provided, pursuant to the
Bidding Procedures Order, sufficient information to make an informed judgment on whether to
bid.

F.      The Debtors also gave due and proper notice of the potential assumption and
assignment of each executory contract or unexpired lease available to be assumed by the Debtors
and assigned to the Purchaser to each non-Debtor party under each such executory contract or
unexpired lease as reflected on the notice of assumption, sale and assignment of the Assumed
Contracts filed on January 26, 2024 [Docket No. 215, 219, 230 & 265] (the "Assumption
Notice"). Such notice was good, sufficient, and appropriate under the particular circumstances,

---

[4]   A detailed description of the Debtors and their business, including the facts and circumstances giving rise to the
Debtors' chapter 11 cases, is set forth in the *Declaration of John Faieta in Support of Chapter 11 Petitions and
First Day Pleadings* (the "First Day Declaration"), filed on the Petition Date [Docket No. 14] and incorporated
by reference herein.

and the counterparties to the Assumed Contracts are hereby deemed to consent to the relief granted herein unless otherwise provided in this Order.

G.     In addition, the Debtors have caused the Sale Notice to be published in USA Today on January ~~29~~26, 2024 [Docket No. ~~[●]~~233].  Such notice was sufficient and reasonably calculated under the circumstances to reach persons or entities whose identities are not reasonably ascertainable by the Debtors.

H.     As evidenced by the affidavits of service [Docket Nos. ~~[●]~~44, 102, 218, 226, 247, 252, 271 & 284] and publication [Docket No. ~~[●]~~233] previously filed with this Court, and based on the representations of counsel at the Sale Hearing, due, proper, timely, adequate and sufficient notice of the Motion, the Bidding Procedures Order, the Auction, the Sale Hearing, the assumption and assignment of the Assumed Contracts, the Stalking Horse Purchase Agreement, this Order and the Sale Transaction has been provided in accordance with Bankruptcy Code sections 102(1) and 363, Bankruptcy Rules 2002, 9007, 9008 and 9014, and Local Rules 2002-1 and 6004-1. The Debtors have complied with all obligations to provide notice of the Motion, the Bidding Procedures Order, the Auction, the Sale Hearing, the assumption and assignment of the Assumed Contracts, the Stalking Horse Purchase Agreement, this Order and the Sale Transaction as required by the Bidding Procedures Order. The aforementioned notices are good, sufficient and appropriate under the circumstances, and no other or further notice of the Motion, the Bidding Procedures Order, the Bid Deadline, the Auction, the Sale Hearing, the assumption and assignment of the Assumed Contracts, the Contract Objection Deadline, the Sale Objection Deadline, the Post-Auction Objection Deadline (each as defined in the Bidding Procedures Order), the Stalking Horse Purchase Agreement, this Order or the Sale Transaction is or shall be required.

I.       A reasonable opportunity to object or be heard regarding the relief requested in the Motion and provided in this Order was afforded to all parties in interest.

### Compliance with the Bidding Procedures Order

J.       As demonstrated by the evidence proffered or adduced at the Sale Hearing and the representations of counsel at the Sale Hearing, the Debtors have complied in all material respects with the Bidding Procedures Order. The Debtors and their professionals have adequately and appropriately marketed the Transferred Assets in compliance with the Bidding Procedures and the Bidding Procedures Order, and in accordance with the Debtors' fiduciary duties. Based upon the record of these proceedings, creditors, other parties in interest and prospective purchasers were afforded a reasonable and fair opportunity to bid for the Transferred Assets.

K.       The Bidding Procedures were substantively and procedurally fair to all parties and all potential bidders and afforded notice and a full, fair and reasonable opportunity for any person to make a higher or otherwise better offer to purchase the Transferred Assets. The Debtors conducted the sale process without collusion and in accordance with the Bidding Procedures. No other entity or group of entities has presented a higher or otherwise better offer to the Debtors to purchase the Transferred Assets for greater economic value to the Debtors' estates than the Purchaser.

L.       The Purchaser is the Successful Bidder (as defined in the Bidding Procedures), and the Stalking Horse Bid is the Successful Bid (as defined in the Bidding Procedures), for the Transferred Assets in accordance with the Bidding Procedures Order. The Purchaser has complied in all respects with the Bidding Procedures Order and all other applicable orders of this Court in negotiating and entering into the Stalking Horse Purchase Agreement, and the Sale

Transaction and the Stalking Horse Purchase Agreement likewise comply with the Bidding Procedures Order and all other applicable orders of this Court.

<u>**Sale in Best Interests of the Debtors' Estates**</u>

M.     The Stalking Horse Purchase Agreement, including the form and total consideration to be realized by the Debtors under the Stalking Horse Purchase Agreement, (i) constitutes the highest and best offer received by the Debtors for the Transferred Assets; (ii) is fair and reasonable; (iii) is in the best interests of the Debtors, their estates, their creditors and all other parties in interest; and (iv) constitutes reasonably equivalent value, fair consideration and fair value under the Bankruptcy Code and applicable law, including, without limitation, the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act, the Uniform Voidable Transactions Act, and any other applicable law.

N.     The Debtors' determination that the consideration provided by the Purchaser under the Stalking Horse Purchase Agreement constitutes the highest and best offer for the Transferred Assets constitutes a valid and sound exercise of the Debtors' business judgment.

O.     Good and sufficient reasons for approval of the Stalking Horse Purchase Agreement and the transactions to be consummated in connection therewith have been articulated, and the relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors and other parties in interest. The Debtors have demonstrated both (i) good, sufficient, and sound business purposes and justifications and (ii) compelling circumstances for the Sale other than in the ordinary course of business, pursuant to section 363(b) of the Bankruptcy Code, outside of a plan, in that, among other things, the immediate consummation of the Sale Transaction to the Purchaser is necessary and appropriate to maximize the value of the Debtors' estates.

~~71631355.1~~70219061.13

P.      The Sale Transaction must be approved and consummated promptly in order to preserve the viability of the Debtors' businesses as a going concern and to maximize the value of the Debtors' estates. Time is of the essence in consummating the Sale Transaction. Given all of the circumstances of these Chapter 11 Cases and the adequacy and fair value of the Purchase Price, the proposed Sale Transaction constitutes a reasonable and sound exercise of the Debtors' business judgment and should be approved.

Q.      The consummation of the Sale Transaction and the assumption and assignment of the Assigned Contracts are legal, valid, and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, sections 105(a), 363(b), 363(f), 363(m), and 365 of the Bankruptcy Code, and all of the applicable requirements of such sections have been complied with in respect of the transaction.

<u>**Corporate Authority**</u>

R.      Subject to entry of this Order, the Debtors (i) have full corporate power and authority to execute and deliver the Stalking Horse Purchase Agreement and all other documents contemplated thereby, (ii) have all of the necessary corporate power and authority to consummate the transactions contemplated by the Stalking Horse Purchase Agreement, including, without limitation, the Sale Transaction and the assumption and assignment of the Assumed Contracts, (iii) have taken all corporate action necessary to authorize and approve the Stalking Horse Purchase Agreement and the consummation by the Debtors of the transactions contemplated thereby, including, without limitation, the Sale Transaction and the assumption and assignment of the Assumed Contracts, and (iv) subject to entry of this Order, need no consents or approvals, including any consents or approvals from any non-Debtor entities, other than those expressly set forth in the Stalking Horse Purchase Agreement, the DIP Orders (as defined below)

or this Order, to consummate the transactions contemplated thereby, including, without limitation, the Sale Transaction and the assumption and assignment of the Assumed Contracts.

S.    The Stalking Horse Purchase Agreement was not entered into, and none of the Debtors or the Purchaser has entered into the Stalking Horse Purchase Agreement or proposes to consummate the Sale Transaction for the purpose of hindering, delaying or defrauding the Debtors' creditors, for the purpose of statutory and common law fraudulent conveyance and fraudulent transfer claims whether under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof or the District of Columbia or any other applicable jurisdiction with laws substantially similar to the foregoing.

## Credit Bid

T.    As set forth more fully in the DIP Orders, the Debtors have acknowledged that the Prepetition First Lien Obligations (as defined in the DIP Orders): (a) constitute legal, valid, binding, enforceable, unavoidable obligations of the Debtors; (b) are secured by valid, binding, enforceable, unavoidable and properly perfected Prepetition Secured Liens on the Prepetition First Lien Collateral (each as defined in the DIP Orders); (c) constitute allowed secured claims under section 502(a) of the Bankruptcy Code; and (d) are authorized to be credit bid pursuant to section 363(k) of the Bankruptcy Code. The Prepetition First Lien Lenders and/or the DIP Lenders (each as defined in the DIP Orders) shall contribute (x) all outstanding obligations under the DIP Facility, and (y) not less than $34 million of the outstanding obligations under the Prepetition First Lien Facility to the Purchaser in connection with the Sale Transaction contemplated under the Stalking Horse Purchase Agreement; provided,  that, as of the expiration of the Challenge Period, there shall be no pending Challenge (each as defined in the Final DIP Order) or other contest to the validity, amount, perfection or priority of the DIP Documents, the

71631355.170219061.13

Prepetition First Lien Loan Documents or other Claims of Purchaser, Prepetition First Lien Lenders, or DIP Lenders (as applicable) thereunder that would prevent Purchaser's ability to credit bid the Credit Bid Amount, unless any such challenge or contest shall have been resolved to the reasonable satisfaction of Purchaser in its sole discretion.

U.     As set forth more fully in the DIP Orders, the DIP Obligations (as defined in the DIP Orders): (a) constitute legal, valid, binding, enforceable, unavoidable obligations of the Debtors; (b) are secured by valid, binding, enforceable, unavoidable and properly perfected DIP Liens on the DIP Collateral (each as defined in the DIP Orders); and (c) are authorized to be credit bid pursuant to section 363(k) of the Bankruptcy Code. The DIP Obligations shall be contributed by the DIP Lenders (as defined in the DIP Orders) to the Purchaser in connection with the Sale Transaction contemplated under the Stalking Horse Purchase Agreement.

V.     Pursuant to applicable law, including section 363(k) of the Bankruptcy Code, and in accordance with the DIP Orders, the Purchaser is authorized to credit bid the full amount of all outstanding obligations under the DIP Facility and up to the full amount, but not less than $34,000,000, of all outstanding obligations under the Prepetition First Lien Facility in connection with Sale Transaction contemplated under the Stalking Horse Purchase Agreement. Any such credit bid is valid and proper consideration pursuant to sections 363(b) and 363(k) of the Bankruptcy Code and the DIP Orders.

## Good Faith

W.     The sales process engaged in by the Debtors and the Purchaser, including, without limitation, the negotiation of the Stalking Horse Purchase Agreement, was non-collusive, in good faith, from arm's-length bargaining positions, and substantively and procedurally fair to all parties in interest. None of the Debtors or the Purchaser has engaged in any conduct that would

71631355.1 70219061.13

cause or permit the Stalking Horse Purchase Agreement or the Sale Transaction to be avoided, or costs or damages to be imposed, under Bankruptcy Code section 363(n).  the Purchaser is not an "insider" of the Debtors as defined in Bankruptcy Code section 101(31).

X.      The Debtors and the Purchaser have complied, in good faith, in all respects with the Bidding Procedures Order and the Bidding Procedures. The Debtors and the Purchaser, and their respective management, board of directors, board of managers (or comparable governing authority), employees, agents, advisors and representatives, each actively participated in the bidding process and in the Auction, and each acted in good faith and without collusion or fraud of any kind. Purchaser subjected its bid to competitive bidding in accordance with the Bidding Procedures and was designated the Successful Bidder for the Transferred Assets in accordance with the Bidding Procedures and the Bidding Procedures Order.

Y.      The Purchaser is a good faith purchaser within the meaning of Bankruptcy Code section 363(m), and is therefore entitled to the full protection of that provision in respect of the Sale Transaction, each term of the Stalking Horse Purchase Agreement (and any ancillary documents executed in connection therewith) and each term of this Order, and otherwise has proceeded in good faith in all respects in connection with this proceeding. None of the Debtors or the Purchaser has engaged in any conduct that would prevent the application of Bankruptcy Code section 363(m). The Debtors were free to deal with any other party interested in buying or selling some or all of the Transferred Assets on behalf of the Debtors' estates. The protections afforded by Bankruptcy Code section 363(m) are integral to the Sale Transaction and the Purchaser would not consummate the Sale Transaction without such protections.

Z.      The form and total consideration to be realized by the Debtors under the Stalking Horse Purchase Agreement constitutes fair value, fair, full and adequate consideration, reasonably equivalent value and reasonable market value for the Transferred Assets.

### Free and Clear

AA.      The transfer of the Transferred Assets to the Purchaser will be legal, valid, and effective transfers of the Transferred Assets, and will vest the Purchaser with all right, title, and interest of the Debtors to the Transferred Assets free and clear of all claims, liens (including, without limitation, any statutory lien on real and personal property and any and all "liens" as that term is defined and used in the Bankruptcy Code, including section 101(37) thereof), liabilities, interests, rights and encumbrances, including, without limitation, the following: all mortgages, restrictions (including, without limitation, any restriction on the use, voting rights, transfer rights, claims for receipt of income or other exercise of any attributes of ownership), hypothecations, charges, indentures, loan agreements, instruments, leases, licenses, sublicenses, options, deeds of trust, security interests, equity interests, conditional sale rights or other title retention agreements, pledges, judgments, demands, rights of first refusal, consent rights, contract rights, rights of setoff (except for setoffs validly exercised before the petition date), rights of recovery, reimbursement rights, contribution claims, indemnity rights, exoneration rights, product liability claims, alter-ego claims, environmental rights and claims (including, without limitation, toxic tort claims), labor rights and claims, employment rights and claims, pension rights and claims, tax claims, regulatory violations by any governmental entity, decrees of any court or foreign or domestic governmental entity, charges of any kind or nature, debts arising in any way in connection with any agreements, acts, or failures to act, reclamation claims, obligation claims, demands, guaranties, option rights or claims, rights, contractual or other commitment rights and

claims, and all other matters of any kind and nature, whether known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, whether arising prior to or subsequent to the commencement of the Chapter 11 Cases, and whether imposed by agreement, understanding, law, equity or otherwise, including claims otherwise arising under any theory, law or doctrine of successor or transferee liability or theories of liability related to acting in concert or active participation with the Debtors or related theories (all of the foregoing, including, without limitation, Liens and Liabilities, but excluding Permitted Liens and Assumed Liabilities, collectively being referred to in this Order as "Claims" and, as used in this Order, the term "Claims" includes, without limitation, any and all "claims" as that term is defined and used in the Bankruptcy Code, including section 101(5) thereof); provided, however, that such transfer shall not be free and clear of any Permitted Liens and Assumed Liabilities.

BB. The Debtors may transfer the Transferred Assets free and clear of all Claims, Interests and Encumbrances, other than any Permitted Liens and Assumed Liabilities, including, without limitation, rights or claims based on any successor or transferee liability or theories of liability related to actions in concert or active participation with the Debtors, because, in each case, one or more of the standards set forth in Bankruptcy Code section 363(f)(1)-(5) has been satisfied.

CC. Those (a) holders of Claims or Interests and (b) non-Debtor parties to the Assumed Contracts, who did not object or who withdrew their objections to the Motion, are deemed to have consented pursuant to Bankruptcy Code section 363(f)(2). Those (i) holders of

Claims or Interests and (ii) non-Debtor parties to the Assumed Contracts who did object, fall within one or more of the other subsections of Bankruptcy Code section 363(f).

DD.    Each of (i) the DIP Secured Parties (as defined in the DIP Orders) and (ii) the Prepetition First Lien Lenders has consented to the sale of the Transferred Assets to the Purchaser pursuant to the Stalking Horse Purchase Agreement free and clear of any Claims, Interests, or Encumbrances (other than the Permitted Liens and Assumed Liabilities) of the DIP Secured Parties and the Prepetition First Lien Lenders against the Transferred Assets (the "Secured Lenders' Liens"), and any reference herein to Claims, Interests, or Encumbrances shall include the Secured Lenders' Liens.

EE.    The Debtors have, to the extent necessary, satisfied the requirements of section 363(b)(1) of the Bankruptcy Code.

FF.    The Purchaser would not have entered into the Stalking Horse Purchase Agreement and would not consummate the transactions contemplated thereby, including, without limitation, the Sale Transaction and the assumption and assignment of the Assumed Contracts, (i) if the transfer of the Transferred Assets were not free and clear of all Claims, Interests, and Encumbrances (other than any Permitted Liens and Assumed Liabilities), or (ii) if the Purchaser would, or in the future could, be liable for any such Claims, Interests, and Encumbrances (other than any Permitted Liens and Assumed Liabilities). The Purchaser will not consummate the transactions contemplated by the Stalking Horse Purchase Agreement, including, without limitation, the Sale Transaction and the assumption and assignment of the Assumed Contracts, unless this Court expressly orders that none of the Purchaser, its affiliates, its present or contemplated members or shareholders, or the Transferred Assets will have any liability whatsoever (other than any Permitted Liens and Assumed Liabilities) with respect to, or be

required to satisfy in any manner, whether at law or equity, or by payment, setoff, or otherwise, directly or indirectly, any Claims, Interests, and Encumbrances.

GG.    Not transferring the Transferred Assets free and clear of all Claims, Interests, and Encumbrances (other than any Permitted Liens and Assumed Liabilities) would adversely impact the Debtors' efforts to maximize the value of their estates, and the transfer of the Transferred Assets other than pursuant to a transfer that is free and clear of all Claims, Interests, and Encumbrances (other than any Permitted Liens and Assumed Liabilities) would be of substantially less benefit to the Debtors' estates.

HH.    Neither the Purchaser nor any of its affiliates are a mere continuation of the Debtors or their estates, there is no continuity or common identity between the Purchaser, any of its affiliates and any of the Debtors, and there is no continuity of enterprise between the Purchaser, any of its affiliates and any of the Debtors. Neither the Purchaser nor any of its affiliates are holding themselves out to the public as a continuation of any of the Debtors. Neither the Purchaser nor any of its affiliates are a successor to any of the Debtors or their estates and none of the transactions contemplated by the Stalking Horse Purchase Agreement, including, without limitation, the Sale Transaction and the assumption and assignment of the Assumed Contracts amounts to a consolidation, merger, or *de facto* merger of the Purchaser or any of its affiliates with or into any of the Debtors.

II.    Without limiting the generality of the foregoing, and other than as may be set forth in the Stalking Horse Purchase Agreement, none of the Purchaser, its affiliates, its and their respective present or contemplated members or shareholders, or the Transferred Assets will have any liability whatsoever with respect to, or be required to satisfy in any manner, whether at law or equity, or by payment, setoff, or otherwise, directly or indirectly, any Claims relating to any

U.S. federal, state or local income tax liabilities, that the Debtors may incur in connection with consummation of the transactions contemplated by the Stalking Horse Purchase Agreement, including, without limitation, the Sale Transaction and the assumption and assignment of the Assumed Contracts, or that the Debtors have otherwise incurred prior to the consummation of the transactions contemplated by the Stalking Horse Purchase Agreement.

**<u>Validity of Transfer</u>**

JJ.    The consummation of the transactions contemplated by the Stalking Horse Purchase Agreement, including, without limitation, the Sale Transaction and the assumption and assignment of the Assumed Contracts, is legal, valid and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, Bankruptcy Code sections 105(a), 363(b), 363(f), 363(m), 365(b), and 365(f), and all of the applicable requirements of such sections have been complied with in respect of the transactions contemplated under the Stalking Horse Purchase Agreement.

KK.    The Transferred Assets constitute property of the Debtors' estates and good title to the Transferred Assets of the Debtors is vested in the Debtors' estates within the meaning of Bankruptcy Code section 541(a). The Debtors are the sole and lawful owners of the Transferred Assets, and no other person has any ownership right, title, or interest therein.

LL.    The Stalking Horse Purchase Agreement has been duly and validly executed and delivered by the Debtors and, subject to the terms of the Stalking Horse Purchase Agreement, shall constitute a valid and binding obligation of the Debtors, enforceable against the Debtors in accordance with its terms. The Stalking Horse Purchase Agreement, the Sale Transaction, and the consummation thereof shall be specifically enforceable against and binding upon (without posting any bond) the Debtors and any chapter 7 or chapter 11 trustee appointed in these Chapter

~~71631355.1~~70219061.13

11 Cases, and shall not be subject to rejection or avoidance by the foregoing parties or any other person.

## Assumed Contracts

MM.    The assumption and assignment of the Assumed Contracts pursuant to the Assumption Notice, the terms of this Order and the Stalking Horse Purchase Agreement is integral to the transactions contemplated by the Stalking Horse Purchase Agreement and is in the best interests of the Debtors, their estates and creditors, and all other parties in interest, and represents a reasonable exercise of the Debtors' sound and prudent business judgment.

NN.    Pursuant to the terms of the Stalking Horse Purchase Agreement and this Order, on or before the Closing Date (as defined in the Stalking Horse Purchase Agreement), the Debtors or the Purchaser, as applicable, shall have, except as otherwise provided in the Stalking Horse Purchase Agreement or this Order or as otherwise expressly agreed to between the Debtors or the Purchaser (as applicable) and such counterparty: (i) cured, or provided adequate assurance of cure of, any monetary default existing as of and including the Closing Date under any of the Assumed Contracts, within the meaning of Bankruptcy Code section 365(b)(1)(A), (ii) provided compensation, or adequate assurance of compensation, to any party for actual pecuniary loss to such party resulting from a monetary default existing as of and including the Closing Date under any of the Assumed Contracts, within the meaning of Bankruptcy Code section 365(b)(1)(B), and (iii) provided adequate assurance of future performance under the Assumed Contracts within the meaning of Bankruptcy Code sections 365(b)(1)(C), 365(b)(3) (to the extent applicable) and 365(f)(2)(B).

71631355.1 70219061.13

### **Application of Proceeds**

OO.    Pursuant to the interim and final orders authorizing and approving the Debtors' debtor in possession financing and use of Cash Collateral [Docket Nos. 66 and 197] (together, the "DIP Orders"), the Transferred Assets constitute Cash Collateral, Prepetition First Lien Collateral and DIP Collateral and are subject to the Adequate Protection Obligations (including, without limitation, Adequate Protection Liens and the Adequate Protection Claim) set forth in the Final DIP Order (each as defined in the DIP Orders), Prepetition Secured Liens and DIP Liens. Subject to the "Payment in Full" (as defined in the DIP Orders) of the Prepetition First Lien Obligations (as defined in the DIP Orders), pursuant to the DIP Orders and the DIP Documents (as defined in the DIP Orders), the Debtors are required to apply all consideration received from the Sale of the Transferred Assets in accordance with the terms of the DIP Orders and the Stalking Horse Purchase Agreement.

### **Not a *Sub Rosa* Plan**

PP.    The Sale does not constitute a *sub rosa* chapter 11 plan or an element of such plan for the Debtors, for which approval has been sought without the protections that a disclosure statement would afford. The Sale Transaction does not (i) impermissibly restructure the rights of the Debtors' creditors or equity interest holders, (ii) impair or circumvent voting rights with respect to any future plan proposed by the Debtors, (iii) impermissibly dictate a plan of reorganization or liquidation for the Debtors, or (iv) classify claims or equity interests, compromise controversies, or extend debt maturities.

### **Legal and Factual Bases**

QQ.    The legal and factual bases set forth in the Motion and at the Sale Hearing establish just cause for the relief granted herein.

**IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED THAT:**

### General Provisions

1.      The Motion is granted as provided herein, and entry into and performance under, and in respect of, the Stalking Horse Purchase Agreement attached hereto as **Exhibit 1** and the consummation of the transactions contemplated thereby, including, without limitation, the Sale Transaction and the assumption and assignment of the Assumed Contracts is authorized and approved.

2.      Any objections and responses to the Motion or the relief requested therein that have not been withdrawn, waived, settled, or resolved, and all reservation of rights included in such objections and responses, are overruled on the merits and denied with prejudice. All persons and entities given notice of the Motion that failed to timely object thereto are deemed to consent to the relief granted herein, including for purposes of sections 363(f)(2), 365(c)(1), and 365(e)(2) of the Bankruptcy Code.

### Approval of the Stalking Horse Purchase Agreement

3.      The Stalking Horse Purchase Agreement, all ancillary documents, the transactions contemplated thereby, including, without limitation, the Sale Transaction, and the assumption and assignment of the Assumed Contracts (but subject to the Purchaser's rights with respect thereto pursuant to the Stalking Horse Purchase Agreement) and all the terms and conditions thereof, are approved. The failure specifically to include any particular provision of the Stalking Horse Purchase Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Stalking Horse Purchase Agreement be authorized and approved in its entirety.

71631355.170219061.13

4.      The Debtors and their respective officers, employees and agents are authorized and directed to take any and all actions necessary, appropriate or reasonably requested by the Purchaser to perform, consummate, implement and close the Sale Transaction, including, without limitation, (a) the sale to the Purchaser of all Transferred Assets, in accordance with the terms and conditions set forth in the Stalking Horse Purchase Agreement and this Order; and (b) execution, acknowledgment and delivery of such deeds, assignments, conveyances and other assurance, documents and instruments of transfer and any action for purposes of assigning, transferring, granting, conveying and confirming to the Purchaser, or reducing to possession, the Transferred Assets, all without further order of this Court. The Debtors are further authorized to pay, without further order of this Court and in accordance with the Approved Budget (as defined in the DIP Orders), whether before, at or after the Closing Date, any reasonable and documented out-of-pocket expenses or costs that are required to be paid by the Debtors under the Stalking Horse Purchase Agreement, this Order or the Bidding Procedures Order, in order to consummate the Sale Transaction or perform their obligations under the Stalking Horse Purchase Agreement.

5.      All persons and entities, including, without limitation, the Debtors, the Debtors' estates, all debt security holders, equity security holders, governmental tax and regulatory authorities, lenders, customers, vendors, employees, former employees, litigation claimants, trustees, trade creditors, and any other creditors (or agent of any of the foregoing) who may or do hold Claims (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or noncontingent, senior or subordinated) against the Debtors or the Transferred Assets owned by the Debtors, arising under or out of, in connection with, or in any way relating to, the Debtors, the Transferred Assets owned by the Debtors, the operation or ownership of the Transferred Assets by the Debtors prior to the Closing Date, or the Sale Transaction, are hereby prohibited,

forever barred, estopped, and permanently enjoined from asserting or pursuing such Claims against Purchaser, its affiliates, successors, assigns, its property or the Transferred Assets, including, without limitation, taking any of the following actions with respect to any Claims: (a) commencing or continuing in any manner any action, whether at law or in equity, in any judicial, administrative, arbitral, or any other proceeding, against Purchaser, its affiliates, successors, assigns, assets (including the Transferred Assets), and/or properties; (b) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order against Purchaser, its affiliates, successors, assigns, assets (including the Transferred Assets), and/or properties; (c) creating, perfecting, or enforcing any Claim against Purchaser, its affiliates, any of their respective successors, assigns, assets (including the Transferred Assets), and/or properties; (d) asserting a Claim as a setoff (except for setoffs validly exercised before the petition date) or right of subrogation of any kind against any obligation due against Purchaser, its affiliates or any of their respective successors or assigns; or (e) commencing or continuing any action in any manner or place that does not comply, or is inconsistent, with the provisions of this Order, the Stalking Horse Purchase Agreement, or the agreements or actions contemplated or taken in respect thereof, including the Debtors' ability to transfer the Transferred Assets to the Purchaser in accordance with the terms of this Order and the Stalking Horse Purchase Agreement. No such Person shall assert or pursue against Purchaser or its affiliates, successors or assigns any such Claim.

6.     The Sale of the Transferred Assets to the Purchaser under the Stalking Horse Purchase Agreement constitutes a transfer for reasonably equivalent value and fair consideration under the Bankruptcy Code and laws of all applicable jurisdictions, including, without limitation, the laws of each jurisdiction in which the Transferred Assets are located, and the sale of the

71631355.1 70219061.13

Transferred Assets to the Purchaser may not be avoided under any statutory or common law fraudulent conveyance and fraudulent transfer theories whether under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof or the District of Columbia or any other applicable jurisdiction with laws substantially similar to the foregoing.

<b><u>Transfer of the Transferred Assets Free and Clear</u></b>

7.        Pursuant to Bankruptcy Code sections 105(a) and 363(f), the Transferred Assets shall be sold free and clear of all Claims, Interests, and Encumbrances (other than any Permitted Liens and Assumed Liabilities), including, for the avoidance of doubt, the Secured Lenders' Liens, with all such Claims to attach to the proceeds of the Sale Transaction to be received by the Debtors with the same validity, force, priority and effect which they now have as against the Transferred Assets, subject to any claims and defenses the Debtors may possess with respect thereto; provided, however, that setoff rights not validly exercised before the petition date will be extinguished to the extent there is no longer mutuality after the consummation of the Sale Transaction.

8.        At Closing, all of the Debtors' right, title and interest in and to, and possession of, the Transferred Assets shall be immediately vested in the Purchaser pursuant to Bankruptcy Code sections 105(a), 363(b), and 363(f) free and clear of any and all Claims, Interests, and Encumbrances (other than any Permitted Liens and Assumed Liabilities). Such transfer shall constitute a legal, valid, binding and effective transfer of, and shall vest the Purchaser with good and marketable title to, the Transferred Assets. All persons or entities, presently or on or after the Closing Date, in possession of some or all of the Transferred Assets are directed to surrender possession of the Transferred Assets to the Purchaser or its designees on the Closing Date or at such time thereafter as the Purchaser may request.

9.      This Order is and shall be binding upon and govern the acts of all entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, registrars of patents, trademarks or other intellectual property, administrative agencies, governmental departments, secretaries of state, federal and local officials and all other persons and entities who may be required by operation of law, the duties of their office or contract, to accept, file, register or otherwise record or release any documents or instruments; and each of the foregoing persons and entities is hereby authorized to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the Sale Transaction contemplated by the Stalking Horse Purchase Agreement.

10.     Except as otherwise expressly provided in the Stalking Horse Purchase Agreement or this Order, all persons and entities (and their respective successors and assigns), including, but not limited to, all debt security holders, equity security holders, affiliates, foreign, federal, state and local governmental, tax and regulatory authorities, lenders, customers, vendors, employees, trade creditors, litigation claimants and other creditors holding Claims against the Debtors or the Transferred Assets arising under or out of, in connection with, or in any way relating to, the Debtors, their estates, the Debtors' predecessors or affiliates, the Transferred Assets, the ownership, sale or operation of the Transferred Assets prior to the Closing Date or the transfer of the Transferred Assets to the Purchaser, are hereby forever barred, estopped and permanently enjoined from asserting or prosecuting any cause of action or any process or other act or seeking to collect, offset, or recover on account of any Claims against the Purchaser, its successors or assigns, their property or the Transferred Assets, other than Permitted Liens and Assumed Liabilities. Following the Closing Date, no holder of any Claim, Interest or

71631355.170219061.13

Encumbrance (other than Permitted Liens and Assumed Liabilities) shall interfere with the Purchaser's title to or use and enjoyment of the Transferred Assets based on or related to any such Claim, Interest or Encumbrance (other than Permitted Liens and Assumed Liabilities), or based on any action or omission of the Debtors, including any action or omission the Debtors may take in the Chapter 11 Cases.

11.    The Debtors are authorized and directed to execute such documents as may be necessary to release any Claims, Interests, or Encumbrances (other than Permitted Liens and Assumed Liabilities) of any kind against the Transferred Assets as such Claims, Interests, or Encumbrances (other than Permitted Liens and Assumed Liabilities) may have been recorded or may otherwise exist. If any person or entity that has filed financing statements, lis pendens or other documents or agreements evidencing Claims, Interests, or Encumbrances (other than Permitted Liens and Assumed Liabilities) against or in the Transferred Assets shall not have delivered to the Debtors prior to the Closing Date of the Sale Transaction, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of all Claims, Interests, or Encumbrances (other than Permitted Liens and Assumed Liabilities) that the person or entity has with respect to the Transferred Assets, (a) the Debtors are hereby authorized and directed to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to the Transferred Assets; (b) the Purchaser is hereby authorized to file, register or otherwise record a certified copy of this Order, which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all such Claims, Interests, or Encumbrances (other than Permitted Liens and Assumed Liabilities) against the Purchaser and the applicable Transferred Assets; (c) the Debtors' creditors and the holders of any Claims, Interests, or Encumbrances (other than

71631355.170219061.13

Permitted Liens and Assumed Liabilities) are authorized and directed to execute such documents and take all other actions as may be necessary to terminate, discharge or release their Claims, Interests, or Encumbrances (other than Permitted Liens and Assumed Liabilities) in the Transferred Assets and (d) the Purchaser may seek in this Court or any other court to compel appropriate parties to execute termination statements, instruments of satisfaction and releases of all such Claims, Interests, or Encumbrances (other than Permitted Liens and Assumed Liabilities) with respect to the Transferred Assets. This Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state, or local government agency, department or office, and such agencies, departments and offices are authorized to accept this Order for filing or recording. Notwithstanding the foregoing, the provisions of this Order authorizing the sale and assignment of the Transferred Assets free and clear of Claims, Interests, and Encumbrances (other than any Permitted Liens and Assumed Liabilities) shall be self-executing, and none of the Debtors or the Purchaser shall be required to execute or file releases, termination statements, assignments, consents or other instruments in order to effectuate, consummate and implement the provisions of this Order.

12.     To the maximum extent permitted under applicable law, the Purchaser shall be authorized, as of the Closing Date, to operate under any license, permit, registration and governmental authorization or approval of the Debtors with respect to the Transferred Assets, and all such licenses, permits, registrations and governmental authorizations and approvals are deemed to have been, and hereby are, directed to be transferred to the Purchaser with respect to the Transferred Assets as of the Closing Date. To the extent the Purchaser cannot operate under any such license, permit, registration and governmental authorization or approval in accordance with the previous sentence, such licenses, permits, registrations and governmental authorizations

71631355.170219061.13

and approvals shall be in effect while the Purchaser, with assistance from the Debtors (and at the Purchaser's sole cost and expense), works promptly and diligently to apply for and secure all necessary government approvals for new issuance of such licenses, permits, registrations and governmental authorizations and approvals to the Purchaser. Nothing in this Order or the Stalking Horse Purchase Agreement precludes or enjoins the enforcement of any valid police or regulatory liability to a governmental unit for acts taken by the Purchaser after the Closing Date, to which the Purchaser may be subject to as the owner or operator of any property that is a Transferred Asset after the Closing Date; provided, however, that all rights and defenses of the Purchaser under nonbankruptcy law are preserved. Nothing in this Order or the Stalking Horse Purchase Agreement authorizes the transfer or assignment of any governmental (a) license, (b) permit, (c) registration, (d) authorization or (e) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements and approvals under police or regulatory law. Nothing in this Order divests any tribunal of any jurisdiction it may have under police or regulatory law.

13.    No governmental unit (as defined in Bankruptcy Code section 101(27)) or any representative thereof may deny, revoke, suspend or refuse to renew any permit, license or similar grant relating to the operation of the Transferred Assets on account of the filing or pendency of the Chapter 11 Cases or the consummation of the Sale Transaction to the extent that any such action by a governmental unit or any representative thereof would violate Bankruptcy Code section 525.

## No Successor or Transferee Liability

14.    Upon the Closing Date, except as provided in the Stalking Horse Purchase Agreement, the entry of this Order and the Stalking Horse Purchase Agreement shall mean that

71631355.1 70219061.13

the Purchaser (and any of its affiliates, successors, or assigns), as a result of any action taken in connection with the Stalking Horse Purchase Agreement, the consummation of the transactions contemplated by the Stalking Horse Purchase Agreement, including, without limitation, the Sale Transaction and the assumption and assignment of the Assumed Contracts, or the transfer or operation of the Transferred Assets, shall not be, nor be deemed to: (a) be a legal successor or successor employer to the Debtors, or otherwise be deemed a successor to the Debtors, and shall instead be, and be deemed to be, a new employer with respect to all federal or state unemployment laws, including any unemployment compensation or tax laws, or any other similar federal or state laws; (b) have, *de facto*, or otherwise, merged or consolidated with or into the Debtors; or (c) be an alter ego or a mere continuation or substantial continuation of the Debtors or the enterprise(s) of the Debtors, or otherwise be deemed to be acting in concert or active participation with the Debtors, including, in the case of each of (a)-(c), without limitation, (x) within the meaning of any foreign, federal, state or local revenue law, pension law, the Employee Retirement Income Security Act, the Consolidated Omnibus Budget Reconciliation Act, the WARN Act (29 U.S.C. §§ 2101 et seq.) ("WARN"), Comprehensive Environmental Response Compensation and Liability Act ("CERCLA"), the Fair Labor Standard Act, Title VII of the Civil Rights Act of 1964 (as amended), the Age Discrimination and Employment Act of 1967 (as amended), the Federal Rehabilitation Act of 1973 (as amended), the National Labor Relations Act, 29 U.S.C. § 151, et seq. or (y) in respect of (i) any environmental liabilities, debts, claims or obligations arising from conditions first existing on or prior to the Closing Date (including, without limitation, the presence of hazardous, toxic, polluting, or contaminating substances or wastes), which may be asserted on any basis, including, without limitation, under CERCLA, (ii) any liabilities, penalties, costs, debts or obligations of or required to be paid by the

71631355.170219061.13

Debtors for any taxes of any kind for any period, labor, employment, or other law, rule or regulation (including, without limitation, filing requirements under any such laws, rules or regulations), (iii) any products liability law or doctrine with respect to the Debtors' liability under such law, rule or regulation or doctrine or (iv) any consumer protection law or doctrine with respect to the Debtors' liability under such law, rule or regulation or doctrine, including, without limitation, any liabilities, penalties, costs, debts or obligations imposed by the Federal Trade Commission and/or Bureau of Consumer Protection, of or required to be paid by the Debtors.

15.     Without limiting the generality of the foregoing, and except as otherwise provided in the Stalking Horse Purchase Agreement and this Order, neither the Purchaser (nor any of its affiliates, successors or assigns) shall have any responsibility for (a) any liability or other obligation of the Debtors related to the Transferred Assets or (b) any Claims against the Debtors or any of their predecessors or affiliates. By virtue of the Purchaser's purchase of the Transferred Assets, neither the Purchaser nor any of its affiliates shall have any liability whatsoever with respect to the Debtors' (or their predecessors' or affiliates') respective businesses or operations or any of the Debtors' (or their predecessors' or affiliates') obligations based, in whole or part, directly or indirectly, on any theory of successor or vicarious liability of any kind or character, or any theory based on acting in concert or active participation with the Debtors, or based upon any theory of antitrust, environmental (including, but not limited to CERCLA), successor or transferee liability, *de facto* merger or substantial continuity, labor and employment (including, but not limited to, WARN), consumer protection law, or products liability law, whether known or unknown as of the Closing Date, now existing or hereafter arising, asserted or unasserted, fixed or contingent, liquidated or unliquidated, including any liabilities or non-monetary

obligations on account of any settlement or injunction or any liabilities on account of any taxes arising, accruing or payable under, out of, in connection with, or in any way relating to the operation of the Transferred Assets prior to the Closing Date or such later time as Purchaser is assigned and assumes any Assumed Contract (collectively, with the potential claims set forth in paragraph 14 above, "Successor or Transferee Liability"). The Purchaser would not have acquired the Transferred Assets but for the foregoing protections against Successor or Transferee Liability.

16.     None of the Purchaser or its affiliates, successors, assigns, equity holders, employees or professionals shall have or incur any liability to, or be subject to any action by any of the Debtors or any of their estates, predecessors, successors or assigns, arising out of the negotiation, investigation, preparation, execution, delivery of the Stalking Horse Purchase Agreement and the entry into and consummation of the Sale of the Transferred Assets, except as expressly provided in the Stalking Horse Purchase Agreement and this Order.

17.     Nothing in this Order or the Stalking Horse Purchase Agreement shall require the Purchaser or any of its affiliates to (a) continue or maintain in effect, or assume any liability in respect of any employee, collective bargaining agreement, pension, fringe benefit or any trust arrangement or other agreements to which the Debtors are a party or have any responsibility therefor including, without limitation, pension benefits payable after retirement or other termination of employment; or (b) assume any responsibility as a fiduciary, plan sponsor or otherwise, for making any contribution to, or in respect of the funding, investment or administration of any employee benefit plan, arrangement or agreement (including but not limited to pension plans) or the termination of any such plan, arrangement or agreement.

18.    No bulk sales law or similar law of any state or other jurisdiction shall apply in any way to the transactions with the Debtors that are approved by this Order, including, without limitation, the Stalking Horse Purchase Agreement and the Sale Transaction.

## Good Faith Sale

19.    The Stalking Horse Purchase Agreement has been negotiated and executed, and the transactions contemplated thereby, including, without limitation, the Sale Transaction and the assumption and assignment of the Assumed Contracts, are and have been undertaken, by Debtors, the Purchaser and their respective representatives without collusion and in "good faith," as that term is used in Bankruptcy Code section 363(m). Accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale Transaction shall not affect the validity of the Sale Transaction (including the assumption and assignment of the Assigned Contracts) with the Purchaser, or any term of the Stalking Horse Purchase Agreement, and shall not permit the unwinding of the Sale Transaction unless such authorization is duly stayed pending such appeal. The Purchaser is a good faith purchaser of the Transferred Assets within the meaning of Bankruptcy Code section 363(m) and, as such, is entitled to the all of the benefits and full protections of Bankruptcy Code section 363(m).

20.    None of the Debtors or the Purchaser has engaged in any conduct that would cause or permit the Stalking Horse Purchase Agreement or the transactions contemplated thereby, including, without limitation, the Sale Transaction and the assumption and assignment of the Assumed Contracts, to be avoided or costs or damages to be imposed, under Bankruptcy Code section 363(n). The consideration provided by the Purchaser for the Transferred Assets under the Stalking Horse Purchase Agreement is fair and reasonable, and the Sale Transaction may not be avoided under Bankruptcy Code section 363(n).

71631355.1 70219061.13

## Assumption and Assignment of the Assumed Contracts

21.     Except as otherwise expressly provided in the Stalking Horse Purchase Agreement or this Order, upon the Closing Date, pursuant to Bankruptcy Code sections 105(a), 363, and 365, the Debtors are authorized to (a) assume each of the Assumed Contracts and assign the Assumed Contracts, set forth in **Exhibit 2** (the "Assumed Contracts Exhibit") attached hereto, which may be subsequently modified at any time prior to the date that is two (2) business days prior to the Closing Date and upon Purchaser's delivery of written notice to the Debtors, to add or remove certain executory contracts or unexpired leases, pursuant to the terms of the Stalking Horse Purchase Agreement, to the Purchaser free and clear of all Claims, Interests, and Encumbrances (other than any Permitted Liens and Assumed Liabilities) and (b) execute and deliver to the Purchaser such documents or other instruments as may be reasonably requested by Purchaser to assign and transfer the Assumed Contracts to the Purchaser.

22.     The Cure Amounts (as defined in the Stalking Horse Purchase Agreement) listed on the Assumed Contracts Exhibit are the sole amounts necessary to be paid upon assumption of the Assumed Contracts under Bankruptcy Code sections 365(b)(1)(A) and (B) and 365(f)(2)(A). All Cure Amounts shall be paid by the Purchaser. Upon the payment of the Cure Amounts, if any, by the Purchaser, the Assumed Contracts shall remain in full force and effect, and no default shall exist under the Assumed Contracts nor shall there exist any event or condition which, with the passage of time or giving of notice, or both, would constitute such a default. The Cure Amounts shall not be subject to further dispute or audit, including, without limitation, any based on performance prior to the Closing Date, irrespective of whether such Assumed Contract contains an audit clause. After the payment of the Cure Amounts by the Purchaser, none of the Debtors or the Purchaser shall have any further liabilities to the counterparties to the Assumed

Contracts other than the Purchaser's obligations under the Assumed Contracts that accrue and become due and payable on or after the Closing Date.

23.     In the event of a dispute as of, or after, the Closing Date regarding assumption and assignment or Cure Amount of any executory contract or unexpired lease proposed to be an Assumed Contract, the assumption and assignment of such executory contract or unexpired lease, and payment of any applicable Cure Amounts, shall be made following the entry of an order of the Court resolving any such dispute (or upon the consensual resolution of such dispute as may be agreed by the Purchaser and such counterparty and, solely with respect to disputes regarding Cure Amounts, the Debtors). Upon an election of the Purchaser to designate an executory contract or unexpired lease as an Excluded Contract (as defined in, and in accordance with, the Stalking Horse Purchase Agreement), the Purchaser shall have no liability whatsoever to the counterparty to such executory contract or unexpired lease or the Debtors.

24.     To the extent any non-Debtor counterparty to an Assumed Contract has failed to timely object to a proposed Cure Amount, such Cure Amount has been and shall be deemed to be finally determined as the Cure Amount listed on the Assumption Notice and Assumed Contracts Exhibit and any such non-Debtor counterparty shall be prohibited from challenging, objecting to, or denying the validity and finality of the Cure Amount at any time. The non-Debtor counterparty to an Assumed Contract is forever bound by the applicable Cure Amount and, upon payment of the Cure Amounts as provided herein and in the Stalking Horse Purchase Agreement, is hereby enjoined from taking any action against Purchaser with respect to any claim for cure under the Assumed Contract.

25.     Any provisions in any Assumed Contract that prohibit or condition the assignment of such Assumed Contract or allow the party to such Assumed Contract to terminate,

recapture, impose any penalty, condition on renewal or extension or modify any term or condition upon assignment of such Assumed Contract, constitute unenforceable anti-assignment provisions that are void and of no force and effect.

26.     Any party that may have had the right to consent to the assignment of an Assumed Contract is deemed to have consented to such assignment, including for purposes of Bankruptcy Code sections 365(c)(1)(B) and 365(e)(2)(A)(ii) and otherwise, if such party failed to timely object to the assumption and assignment of such Assumed Contract.

27.     Each Assumed Contract constitutes an executory contract or unexpired lease under the Bankruptcy Code and all requirements and conditions under Bankruptcy Code sections 363 and 365 for the assumption by the Debtors and assignment to the Purchaser of the Assumed Contracts have been, or will be, satisfied. Upon the Purchaser's assumption of the Assumed Contracts in accordance with the terms hereof, in accordance with Bankruptcy Code sections 363 and 365, (a) the Purchaser shall be fully and irrevocably vested with all rights, title and interest of the Debtors under the Assumed Contracts, (b) the Purchaser shall be deemed to be substituted for the Debtors as a party to the applicable Assumed Contracts, and (c) the Debtors shall be relieved, pursuant to Bankruptcy Code section 365(k), from any further liability under the Assumed Contracts.

28.     The Purchaser has demonstrated adequate assurance of future performance under the relevant Assumed Contracts within the meaning of Bankruptcy Code sections 365(b)(1)(C) and 365(f)(2)(B).

29.     There shall be no rent accelerations, assignment fees, increases or any other fees charged to the Debtors or the Purchaser as a result of the assumption, assignment and sale of the Assumed Contracts. Subject to the terms of the Stalking Horse Purchase Agreement, the validity

71631355.170219061.13

of the transactions contemplated by the Stalking Horse Purchase Agreement, including, without limitation, the Sale Transaction and the assumption and assignment of the Assumed Contracts, shall not be affected by any dispute between any of the Debtors or their affiliates, and another party to an Assumed Contract regarding the payment of any amount. Upon assignment to the Purchaser, the Assumed Contracts shall be valid and binding, in full force and effect and enforceable by the Purchaser in accordance with their respective terms.

30.    Pursuant to Bankruptcy Code sections 105(a), 363, and 365, all counterparties to the Assumed Contracts are forever barred and permanently enjoined from raising or asserting against the Debtors or the Purchaser any assignment fee, default, breach or claim of pecuniary loss, or condition to assignment, arising under or related to the Assumed Contracts existing as of and including the Closing Date under the Stalking Horse Purchase Agreement or arising by reason of the consummation of transactions contemplated by the Stalking Horse Purchase Agreement, including, without limitation, the Sale Transaction and the assumption and assignment of the Assumed Contracts.

31.    All counterparties to the Assumed Contracts shall cooperate and expeditiously execute and deliver, upon the reasonable requests of the Purchaser, and shall not charge the Debtors or the Purchaser for, any instruments, applications, consents or other documents which may be required or requested by any public or quasi-public authority or other party or entity to effectuate the applicable transfers in connection with the Sale of the Transferred Assets.

**32.    Notwithstanding anything to the contrary in this Order or the Stalking Horse Purchase Agreement, no contract between the Debtors, on the one hand, and Oracle Corporation Singapore Pte. Ltd., Oracle Corporation UK Limited and Oracle America, Inc. (jointly, "Oracle"), on the other hand, will be assumed and/or assigned without**

71631355.1 70219061.13

**Oracle's prior written consent or further Order of Court, specifically relating to Oracle, upon notice and opportunity to be heard by the parties.  In addition, no provision of this Order or any Transition Services Agreement shall authorize: (x) the transfer of any Oracle license agreement to any third party; or (y) use of any Oracle license agreement that is inconsistent with the relevant license grant including, but not limited to, exceeding the number of authorized users, shared use, or license splitting, absent Oracle's express prior written consent or further Order of Court.**

## Failure to Specify Provisions

**33.** 32. The failure specifically to include any particular provisions of the Stalking Horse Purchase Agreement in this Order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Court that the Stalking Horse Purchase Agreement be authorized and approved in its entirety; provided, however, that this Order shall govern if there is any inconsistency between the Stalking Horse Purchase Agreement (including all ancillary documents executed in connection therewith) and this Order. Likewise, all of the provisions of this Order are nonseverable and mutually dependent. To the extent that this Order is inconsistent with any prior order or pleading with respect to the Motion in these Chapter 11 Cases, the terms of this Order shall control.

## Non-Material Modifications

**34.** 33. The Stalking Horse Purchase Agreement and any related agreements, documents, or other instruments may be modified, amended, or supplemented by the parties thereto, in a writing signed by such parties, and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment or supplement does not have a material adverse effect on the Debtors' estates.

71631355.170219061.13

## Sensitive Location Data Program

35.    Within the time periods specified below, the Purchaser must establish and implement, and thereafter maintain, a "Sensitive Location Data Program" designed to develop a comprehensive list of Sensitive Locations[5] and to prevent the use, sale, licensing, transfer, or disclosure of Sensitive Location Data[6].    To satisfy this requirement, the Purchaser must at a minimum:

Within 180 days of the Closing Date (as defined in the Stalking Horse Purchase Agreement):

A.    Document in writing the components of the Sensitive Location Data Program as well as the plan for implementing and maintaining the Sensitive Location Data Program;

B.    Identify a senior officer, such as a Chief Privacy Officer or Chief Compliance Officer, to be responsible for the Sensitive Location Data Program.  The senior officer will be approved by and report directly to the Purchaser's board of managers or a committee thereof (the "Board");

C.    Provide the written program and any evaluations thereof or updates thereto to the Board at least every twelve months;

Within 270 days of the Closing Date:

D.    Develop procedures, including through the use of services obtained from third parties, to identify Sensitive Locations to be used by the Purchaser in preventing the sale, license, transfer, use, or other sharing or disclosure of Sensitive Location Data.  If a building or place is identified as including both a Sensitive

---

[5]    "Sensitive Locations" means locations within the United States associated on the basis of NAICS and/or SIC codes, if any, with:  (1) medical facilities (e.g., family planning centers, general medical and surgical hospitals, offices of physicians, offices of mental health physicians and practitioners, residential mental health and substance abuse facilities, outpatient mental health and substance abuse centers, outpatient care centers, psychiatric and substance abuse hospitals, and specialty hospitals); religious organizations; (3) correctional facilities; (4) labor union offices; (5) locations of entities held out to the public as predominantly providing education or childcare services to minors; (6) associations held out to the public as predominantly providing services based on racial or ethnic origin; or (7) locations held out to the public as providing temporary shelter or social services to homeless, survivors of domestic violence, refugees, or immigrants.

[6]    "Sensitive Location Data" means any consumer Location Data associated with a Sensitive Location.

Location and a non-Sensitive Location, the Purchaser may associate Location Data with the non-Sensitive Location only;

E.    Test procedures and implement the Sensitive Location Data Program;

From and after implementation of the Sensitive Location Data Program:

F.    Assess, update and document, at least once every six months, the accuracy and completeness of the Purchaser's list of Sensitive Locations using the methods, sources, products, or services developed by the Purchaser or provided to it by third parties.  The Purchaser's assessments must include a verification that the Purchaser's list includes Sensitive Locations known to the Purchaser.  The Purchaser must maintain documentation of such assessments for 5 years;

G.    Implement policies, procedures, and technical measures reasonably designed to prevent the Purchaser from using, selling, licensing, transferring, or otherwise sharing or disclosing Sensitive Location Data, and monitor and test the effectiveness of these policies, procedures, and technical measures at least once every six months.  Such testing must be reasonably designed to verify that the Purchaser is not using, selling, licensing, transferring, or otherwise sharing or disclosing Sensitive Location Data;

H.    Delete or render non-sensitive, Sensitive Location Data associated with locations included in the list developed pursuant to Subparts D and E, within 60 days of adding the location to the list of Sensitive Locations.  The Purchaser must not use, provide access to, or disclose Sensitive Location Data during the process of deleting or rendering non- sensitive, for any other purpose;

I.    Evaluate and adjust the Sensitive Location Data Program in light of any material changes to the Purchaser's operations or business arrangements, or any other circumstance that the Purchaser knows or has reason to know may have a material adverse impact on the Sensitive Location Data Program's effectiveness.    At a minimum, the Purchaser must evaluate the Sensitive Location Data Program every twelve months and implement modifications, as necessary, based on the results of the evaluation; and

J.    Maintain policies, procedures, and technical measures reasonably designed to prevent recipients of the Purchaser's Location Data[7] from (i) associating such

---

[7]  "Location Data" means any data that may reveal a mobile device's or consumer's precise location, including but not limited to Global Positioning System (GPS) coordinates, cell tower information, or precise location information inferred from basic service set identifiers (BSSIDs), WiFi Service Set Identifiers (SSID) information, or Bluetooth receiver information, and any unique persistent identifier combined with any such data, such as a mobile advertising identifier (MAID) or identifier for advertisers (IDFA).  Data that reveals only a mobile device or consumer's coarse location (e.g., zip code or census block location with a radius of at least 1,850 feet) is not Location Data.

71631355.170219061.13

data with (a) locations held out to the public as predominantly providing services to LGBTQ+ individuals such as service organizations, bars and nightlife, (b) locations of public gatherings of individuals during political or social demonstrations, marches and protests, or (ii) using such Location Data to determine the identity or the location of an individual's home, i.e., the location of any individual's private residences (e.g., single family homes, apartments, condominiums, townhomes) (together, "Prohibited Uses").  Such policies, procedures, and technical measures shall include:

(i)     contractual prohibitions against recipients of the Purchaser's Location Data from using the Purchaser's Location Data in whole or in part to associate a specific individual with the locations identified above;

(ii)    marking techniques, such as seeding, or salting, reasonably designed to detect recipients' non-compliance with contractual prohibitions;

(iii)   assessing and documenting recipients' compliance at least once every twelve months; and

(iv)    terminating relationships with recipients for non-compliance.

Supplier Assessment Program

36.     Within 180 days of the Closing Date, the Purchaser must implement a program reasonably designed to ensure that consumers have provided consent for the collection and use of Location Data obtained by the Purchaser, including by implementing and maintaining a "Supplier Assessment Program." In connection with the Supplier Assessment Program, the Purchaser must, at a minimum:

A.      Document in writing the content, implementation, and maintenance of the Supplier Assessment Program;

B.      Conduct an initial assessment either within 30 days of a third party entering into data sharing agreements with the Purchaser (or, for parties with existing data-sharing agreements, within 90 days of the Closing Date) or within 30 days of the initial date of data collection from such a third party, and thereafter annually, reasonably designed to confirm that consumers specifically consent to the collection, use, and sale of their Location Data;

C.      Create and maintain records of the suppliers' responses obtained by the Purchaser under the Supplier Assessment Program for 5 years; and

71631355.170219061.13

**D.**     **Cease from using, selling, licensing, transferring, or otherwise sharing or disclosing Location Data for which consumers have not provided consent.**

**Additional Provisions**

**37.**     **34.** Each and every federal, state and governmental agency or department, and any other person or entity, is hereby authorized to accept any and all documents and instruments in connection with or necessary to consummate the Sale Transaction and all other transactions contemplated by the Stalking Horse Purchase Agreement.

**38.**     **35.** To the extent provided in Bankruptcy Code section 525(a), no governmental unit may revoke or suspend any right, license, copyright, patent, trademark or other permission relating to the use of the Transferred Assets sold, transferred or conveyed to the Purchaser on account of the filing or pendency of these Chapter 11 Cases or the consummation of the Sale of the Transferred Assets.

**39.**     **36.** Absent the express written consent of the Purchaser, the Debtors shall not settle or otherwise resolve any existing or future litigation with any third party or any governmental entity other than any settlement pursuant to which no restrictions are placed on or affecting the Transferred Assets or the operation of the business from and after the Closing Date or otherwise directly or indirectly materially affect the operations of, or impose successor or any other theory of liability upon, the Purchaser.

**40.**     **Notwithstanding anything to the contrary herein, the Purchaser and the Debtors will preserve and maintain all records responsive to any subpoena from the U.S. Securities and Exchange Commission ("SEC") for a period not to exceed seven years, or, if earlier, at such time as the SEC staff has advised such party in writing that the staff has no objection to abandonment or destruction of such records; provided, that, if the Purchaser or the Debtors notify the SEC in writing of their intent to destroy or abandon such records**

~~71631355.1~~70219061.13

**and the SEC fails to respond within 60 days of the delivery of such notice, the SEC shall be deemed to consent to such abandonment or destruction of such records; provided further, that, the Purchaser shall be responsible only for preserving and maintaining any such responsive records that are Purchased Assets (as defined in the Stalking Horse APA) and in the custody and control of the Purchaser; and, provided further, that nothing herein shall limit the rights of the Debtors or the Purchaser to contest, object to, or otherwise respond to any such subpoena.**

**41.** ~~37.~~ Unless expressly preserved pursuant to the Stalking Horse Purchase Agreement or the *Combined Disclosure Statement and Chapter 11 Plan of Liquidation of Near Intelligence, Inc. and its Affiliated Debtors* [Docket No. 22] (the "Plan"), all claims and causes of action under chapter 5 of the Bankruptcy Code and similar claims and causes of action under state or other applicable law held by the Sellers first arising on or prior to the Closing Date, whether actual or potential, against any and all parties (such claims and actions, the "Avoidance Actions") and all of the rights, claims or causes of action of the Sellers of any kind, including those available under the Bankruptcy Code shall be Transferred Assets pursuant to the Stalking Horse Purchase Agreement (together with the Avoidance Actions, the "Transferred Claims"). The Purchaser agrees it shall not initiate, and shall cause its Affiliates or any subsidiary acquired in the Sale Transaction, not to initiate, continue, or otherwise maintain, any civil, administrative, or other proceeding related to Avoidance Actions against any party. For the avoidance of doubt, except to the extent expressly preserved pursuant to the Stalking Horse Purchase Agreement or this Order, the Purchaser, to the fullest extent permissible under applicable law, is deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged any and all Avoidance Actions.

71631355.170219061.13

42.  38. Except as expressly provided in the Stalking Horse Purchase Agreement, nothing in this Order shall be deemed to waive, release, extinguish or estop the Debtors or their estates from asserting, or otherwise impair or diminish, any right (including, without limitation, any right of recoupment), claim, cause of action, defense, offset or counterclaim in respect of any Excluded Asset (as defined in the Stalking Horse Purchase Agreement) or Retained Cause of Action (as defined in the Plan).

43.  39. Notwithstanding anything to the contrary herein, in the Stalking Horse Purchase Agreement or in the Final DIP Order, the amounts held in the Carve Out Reserves (as defined in the Final DIP Order) shall constitute Excluded Cash (as defined in the Stalking Horse Purchase Agreement).  Nothing in this Order shall impair, modify, or otherwise affect the Carve Out.  The DIP Agent and DIP Lenders (each as defined in the DIP Orders) shall be deemed to have satisfied their obligations with respect to the Carve Out (as defined in the Final DIP Order) and the Carve Out Reserves as set forth in the Final DIP Order.

44.  40. Except as expressly set forth in this Order, nothing herein shall otherwise impair, modify, or affect the Final DIP Order.

45.  41. All entities that are presently, or on the Closing Date may be, in possession of some or all of the Transferred Assets are hereby directed to surrender possession of the Transferred Assets to the Purchaser on or prior to the Closing Date or such later date that such party and Purchaser mutually agree.

46.  42. Nothing contained in any plan of liquidation or reorganization, or order of any type or kind entered in these Chapter 11 Cases, any subsequent chapter 7 or chapter 11 case of the Debtors, or any related proceeding subsequent to entry of this Order, will conflict with or derogate from the terms of this Order or the Stalking Horse Purchase Agreement.

71631355.170219061.13

47.    43. This Order and the Stalking Horse Purchase Agreement shall be binding in all respects upon all prepetition and postpetition creditors of the Debtors, all interest holders of the Debtors, all non-Debtor parties to the Assumed Contracts, the Official Committee of Unsecured Creditors appointed on December 22, 2023 (the "Committee"), all successors and assigns of the Debtors and their affiliates and subsidiaries, and any trustees, examiners, "responsible persons" or other fiduciaries appointed in these Chapter 11 Cases or upon a conversion of the Debtors' cases to those under chapter 7 of the Bankruptcy Code, including a chapter 7 trustee, and the Stalking Horse Purchase Agreement and Sale Transaction shall not be subject to rejection or avoidance under any circumstances by any party. If any order under Bankruptcy Code section 1112 is entered, such order shall provide (in accordance with Bankruptcy Code sections 105 and 349) that this Order and the rights granted to the Purchaser hereunder shall remain effective and, notwithstanding such dismissal, shall remain binding on parties in interest. For the avoidance of doubt, the Debtors' inability to satisfy in full all administrative expense claims of the Debtors' estates shall not be a basis for termination, rejection or avoidance (as applicable) of the Stalking Horse Purchase Agreement or the Sale Transaction.

48.    44. This Court shall retain jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Order and the Stalking Horse Purchase Agreement, all amendments thereto and any waivers and consents thereunder and each of the agreements executed in connection therewith to which the Debtors are a party or which has been assigned by the Debtors to the Purchaser, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the Sale Transaction, including any and all disputes with any counterparty to any executory contract or unexpired lease of the Debtors (including, without limitation, disputes with respect to assumption and assignment of any Assumed Contracts or any

cure disputes) and any party that has, or asserts, possession, control or other rights in respect of any of the Transferred Assets; provided, however, that, in the event the Court abstains from exercising or declines to exercise such jurisdiction with respect to the Stalking Horse Purchase Agreement, the Bidding Procedures Order, or this Order, such abstention, refusal, or lack of jurisdiction shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction of any other court having competent jurisdiction with respect to any such matter. This Court retains jurisdiction to compel delivery of the Transferred Assets, to protect the Debtors and their assets, including the Transferred Assets, against any Claims and Successor or Transferee Liability and to enter orders, as appropriate, pursuant to Bankruptcy Code sections 105(a) or 363 (or other applicable provisions) necessary to transfer the Transferred Assets to the Purchaser.

**49.** ~~45.~~ At any time prior to the Closing Date, the Purchaser or the Debtors may terminate the Stalking Horse Purchase Agreement pursuant to the terms thereof without any penalty or liability to the Purchaser or the Debtors (or their estates), except as set forth in the Stalking Horse Purchase Agreement and this Order.

**50.** ~~46.~~ This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a). Notwithstanding any provision in the Bankruptcy Rules to the contrary, including but not limited to Bankruptcy Rules 6004(h) and 6006(d), the Court expressly finds there is no reason for delay in the implementation of this Order and, accordingly: (a) the terms of this Order shall be immediately effective and enforceable upon its entry; (b) the Debtors are not subject to any stay of this Order or in the implementation, enforcement or realization of the relief granted in this Order; and (c) the Debtors and the Purchaser may, in their discretion and without further delay, take any action and perform any act authorized under this Order.

51.   47. The Purchaser shall not be required to seek or obtain relief from the automatic stay under Bankruptcy Code section 362, to give any notice permitted by the Stalking Horse Purchase Agreement or to enforce any of its remedies under the Stalking Horse Purchase Agreement or any other sale-related document. The automatic stay imposed by Bankruptcy Code section 362 is modified solely to the extent necessary to implement the preceding sentence; provided however, that this Court shall retain jurisdiction over any and all disputes with respect thereto.

52.   48. Notwithstanding the provisions of Bankruptcy Rules 6004(h) and 6006(d) or any applicable provisions of the Local Rules, this Order shall not be stayed after the entry hereof, but shall be effective and enforceable immediately upon entry, and the 14-day stay provided in Bankruptcy Rules 6004(h) and 6006(d) is hereby expressly waived and shall not apply. Time is of the essence in closing the Sale Transaction and the Debtors and the Purchaser intend to close the Sale Transaction as soon as practicable.

53.   49. All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

71631355.170219061.13

**Exhibit 1**

71631355.170219061.13

**Exhibit 2**

**(To be filed)**